POMERANTZ LLP
Thomas H. Przybylowski
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
tprzybylowski@pomlaw.com

*Attorney for Plaintiff*

- additional counsel on signature page -

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| DREW COHEN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>QUANTUM COMPUTING INC., WILLIAM J. MCGANN, ROBERT LISCOUSKI, CHRISTOPHER BOEHMLER, and CHRISTOPHER ROBERTS,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Drew Cohen ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters,

based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Quantum Computing Inc. ("QCI" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired QCI securities between March 30, 2020 and January 15, 2025, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      QCI is an American company that purportedly utilizes non-linear quantum optics to deliver quantum products for high-performance computing

applications.  The Company has a history of reinventing its business to align with shifting popular trends in the technology industry.

3.    Since its founding in 2018, QCI has shifted its focus from quantum-computer-ready software services to commercializing quantum photonic technology and related devices, to integrating this technology and devices with artificial intelligence ("AI") applications, to producing thin film lithium niobate ("TFLN") quantum computing chips.

4.    In September 2023, QCI announced that it had selected a five-acre site in Arizona State University's ("ASU") Research Park in Tempe, Arizona (the "ASU Research Park") for its purported "Quantum Photonic Chip Foundry" to produce TFLN chips, which Defendants purportedly expected QCI to mass produce by late 2024 to early 2025.

5.    Throughout the Class Period, Defendants repeatedly touted QCI's business dealings and contracts with various entities, including employee staffing solutions company Quad M Solutions, Inc. ("Quad M") and millionways, Inc. ("millionways"), purportedly a leading AI firm, as well as QCI's purported "long-standing strategic partnership" with the National Aeronautics and Space Administration ("NASA").  Defendants represented that each such deal, contract, or partnership resulted from QCI's ability to substantially aid a given use-case through its differentiated quantum computing technologies, products, and/or services.

6.    Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Defendants overstated the capabilities of QCI's quantum computing technologies, products, and/or services; (ii) Defendants overstated the scope and nature of QCI's relationship with NASA, as well as the scope and nature of QCI's NASA-related contracts and/or subcontracts; (iii) Defendants overstated QCI's progress in developing a TFLN foundry, the scale of the purported TFLN foundry, and orders for the Company's TFLN chips; (iv) QCI's business dealings with Quad M and millionways both qualified as related party transactions; (v) accordingly, QCI's revenues relied, at least in part, on undisclosed related party transactions; (vi) all the foregoing, once revealed, was likely to have a significant negative impact on QCI's business and reputation; and (vii) as a result, Defendants' public statements were materially false and misleading at all relevant times.

7.    On November 27, 2024, Iceberg Research ("Iceberg") published a report alleging that QCI's press releases concerning its TFLN foundry, as well as purchase orders for the Company's TFLN chips, were a sham.  In support of these allegations, Iceberg cited communications with a university professor who had ordered the Company's TFLN chips, photos of the address at which the Company's purported TFLN foundry was located per QCI's website—which showed only what

appeared to be an office building—and communications with ASU Research Park building management.

8.    On December 9, 2024, Iceberg published a second report addressing QCI, noting that, although QCI "ha[d] shared photos online of what it claims to be its foundry[,]" "this setup looks more like a laboratory" and "is a far cry from a foundry ready for 'mass production' on what [QCI] said would be 'five acres within the extensive 320-acre research park hosted by ASU[.]'"  The same report further noted that "[f]rom 2021 to 9M24, [QCI] reported insignificant levels of revenue, despite various claims, such as being a NASA sub-contractor."

9.    On this news, QCI's stock price fell $0.46 per share, or 5.8%, to close at $7.47 per share on December 9, 2024.

10.    Then, on January 16, 2025, Capybara Research ("Capybara") published a report alleging, *inter alia*, that QCI had overstated its ties to NASA and fabricated revenues through multiple related-party transactions, particularly with Quad M and millionways.  The Capybara report also alleged that QCI's products were fake, citing comments by former QCI personnel; and that QCI was pumping its stock price with false and misleading press releases, citing discussions with QCI's former employees, QCI's associates and prime contractors, and NASA personnel.  Moreover, the Capybara report alleged that QCI had never purchased the five-acre parcel at the ASU Research Park for its TFLN foundry, citing ASU Research Park management.

11.    On this news, QCI's stock price fell $1.72 per share, or 14.89%, over the following two trading sessions, to close at $9.83 per share on January 17, 2025.

12.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

13.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

14.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

15.    Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  QCI is headquartered in this District, Defendants conduct business in this District, and a significant portion of Defendants' actions took place within this District.

16.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

17.    Plaintiff, as set forth in the attached Certification, acquired QCI securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

18.    Defendant QCI is a Delaware corporation with principal executive offices located at 5 Marine View Plaza, Suite 214, Hoboken, New Jersey 07030. Throughout the Class Period, QCI's common stock traded in an efficient market on either the Nasdaq Stock Market ("NASDAQ") or the OTC Markets-OTCQB ("OTC") under the ticker symbol "QUBT."

19.    Defendant William J. McGann ("McGann") has served as QCI's Chief Executive Officer ("CEO") since February 1, 2024, before which he served as the Company's Chief Operating Officer and Chief Technology Officer.

20.    Defendant Robert Liscouski ("Liscouski") served as QCI's CEO from before the start of the Class Period to January 31, 2024.

21.    Defendant Christopher Boehmler ("Boehmler") has served as QCI's Chief Financial Officer ("CFO") since July 1, 2023.

22.    Defendant Christopher Roberts ("Roberts") served as QCI's CFO from before the start of the Class Period to June 30, 2023.

23.    Defendants McGann, Liscouski, Boehmler, and Roberts are collectively referred to herein as the "Individual Defendants."

24.    The Individual Defendants possessed the power and authority to control the contents of QCI's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of QCI's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with QCI, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

25.    QCI and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

26.    QCI is an American company that purportedly utilizes non-linear quantum optics to deliver quantum products for high-performance computing applications.  The Company has a history of reinventing its business to align with shifting popular trends in the technology industry.

27.    Since its founding in 2018, QCI has shifted its focus from quantum-computer-ready software services to commercializing quantum photonic technology and related devices, to integrating this technology and devices with AI applications, to producing TFLN quantum computing chips.

28.    Throughout the Class Period, Defendants repeatedly touted QCI's business dealings and contracts with various entities, including Quad M and millionways, as well as QCI's purported "long-standing strategic partnership" with NASA.  Defendants represented that each such deal, contract, or partnership resulted from QCI's ability to substantially aid a given use-case through its differentiated quantum computing technologies, products, and/or services.

29.    Notwithstanding Defendants' representations, doubts began to emerge regarding QCI's business in 2022, when Iceberg issued a scathing report addressing the Company.  Iceberg noted that QCI was established by a "former homicide detective"—namely, Defendant Liscouski—who had "bought a beverage company out of receivership (for $155,000)" before reinventing the Company as a quantum computing software business, presumably based on hype regarding quantum computing's future market prospects at the time.  The report noted that "[d]emand for [QCI's quantum computing software] Qatalyst has been poor" with QCI "report[ing] zero sales for the 2018-2021 period."  Although Defendant Liscouski "announced that [QCI] would subsidize some early customers in August 2021[,]"

"[t]his strategy fell flat as [QCI] booked sales of $96,724 in the first half of [2022], of which ~86% had not been collected at the end of June."  The 2022 Iceberg report alleged that "most of these sales come from . . . Quad-M[,]" which, unbeknownst to investors, Defendant "Liscouski ha[d] been serving as a . . . director [of] since August last year."  Iceberg doubted that QCI would ever collect from Quad M, which "reported just $1m cash against $16.2m of liabilities due in the next 12 months."

30.    The 2022 Iceberg Report also noted that, although QCI's "original intent was to focus on software alone[,]" "poor performance seemingly led management to change its mind and invest in hardware."  Accordingly, the Company purchased QPhoton, Inc. ("QPhoton"), a purported leading innovator in the quantum photonic technology space, in a highly dilutive approximate $85 million stock-for-stock deal.  In sum, the 2022 Iceberg Report alleged that QCI "failed to sell its software and we do not expect it to be any better at selling hardware, its latest venture"; and that, "[b]eyond the constant PR [press release] hype, the truth is that [QCI] is poorly capitalized, and has to compete with companies with far more resources."

31.    Subsequent revelations regarding QCI's business in late 2024 and early 2025 would ultimately validate these early concerns regarding the true scope and nature of the Company's business and operations, as well as the capabilities of its purported quantum computing technologies, products, and services.

## Materially False and Misleading Statements Issued During the Class Period

32.    The Class Period begins on March 30, 2020, the first trading day after QCI filed an annual report on Form 10-K with the SEC during after-market hours, reporting the Company's financial and operating results for the quarter and year ended December 31, 2019 (the "2019 10-K").  With respect to QCI's purported quantum computing technology, products, and services, the 2019 10-K stated, *inter alia*:

> Quantum Asset Allocator: We have released our first commercial product for the FinTech, or Financial Technology, market, the Quantum Asset Allocator (QAA) . . . . QAA is available both as a cloud-based software service and as an on-premises software-plus-hardware system. Both implementations are designed to quickly return optimal or near-optimal interactive solutions and analyses of financial asset allocation problems.
>
> * * *
>
> "Mukai" quantum application development platform: The Company recently released its "Mukai" quantum application development platform. Mukai can be used to solve extremely complex optimization problems, which are at the heart of some of the most difficult computing challenges in industry and government. Its software stack enables developers to create and execute quantum-ready applications on classic computers, while being ready to run on quantum computers when those systems can achieve performance advantages . . . . The Company has already demonstrated superior performance against established computational benchmarks for some applications built on Mukai and running on classical computers.

33.    Appended as exhibits to the 2019 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants

Liscouski and Roberts certified that the 2019 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report[.]"

34.    On March 18, 2021, QCI filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2020 (the "2020 10-K").  The 2020 10-K stated, *inter alia*:

> Qatalyst (formerly Mukai) is our answer to the current state of the quantum computing industry. As the industry's first publicly available Quantum Application Accelerator, Qatalyst enables developers to create and execute quantum-ready applications on conventional computers, while being ready to run on quantum computers where those systems achieve performance advantage. Qatalyst performs the complex problem transformations necessary to be executed on a variety of quantum platforms today, and users can call upon the same Qatalyst APIs (Application Programming Interfaces) to achieve optimization performance advantages on conventional computers using our cloud-based solution.

35.    Appended as exhibits to the 2020 10-K were substantively the same SOX certifications as referenced in ¶ 33, *supra*, signed by Defendants Liscouski and Roberts.

36.    On January 19, 2022, QCI issued a press release announcing its entry into an agreement with Quad M to "provide consulting and quantum-driven solutions[.]"  The press release gave the impression that QCI had been selected to aid Quad M based on its quantum computing technology, without disclosing that Quad M was a related party, stating, in relevant part:

> QCI will deliver health insurance underwriting applications to Quad M for optimization of its underwriting services as a subscription with a monthly fee for every employee that avails themselves of Quad M's health solution. Quad M expects to apply these applications to over 100,000 insured lives by the end of 2022.

> * * *

> This collaboration will utilize QCI's Qatalyst™ software to provide more accurate and diverse underwriting insights, leveraging quantum-ready classical, early NISQ [noisy intermediate-scale quantum], and eventually full-scale quantum computers. QCI will work with Quad M's database of 100K employees to provide deeper insights that drive more robust underwriting solutions for Quad M. Once proven, Quad M and QCI will jointly market the product to other self-insured companies as well as medical insurance providers.

37.    On February 24, 2022, QCI issued a press release announcing its entry into an exclusive marketing agreement with QPhoton, stating, in relevant part:

> By coupling quantum hardware technologies from QPhoton with Qatalyst, QCI will deliver more powerful solutions to accelerate the application and value from quantum computing for specific applications and markets. QPhoton technologies will also offer QCI reseller, technology and QPU [quantum processing unit] partners enhanced solutions to further accelerate the adoption of quantum computing.

A key advantage of the Qatalyst software is that it is hardware-agnostic, supporting a variety of quantum technologies and QPUs, each with their own unique performance and computational attributes. This eliminates the need for deep, complex low-level coding and vendor lock-in required by available software alternatives.

38.    On March 15, 2022, QCI filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2021 (the "2021 10-K"). The 2021 10-K contained the same statements as referenced in ¶ 34, *supra*, regarding QCI's purported quantum computing Qatalyst product.

39.    In a section dedicated to disclosing QCI's related party transactions, the 2021 10-K stated, in relevant part:

The following is a summary of transactions since January 1, 2019 to which we have been or will be a party in which the amount involved exceeded or will exceed $162,761 (one percent of the average of our total assets at year-end for our last two completed fiscal years) and in which any of our directors, executive officers or beneficial holders of more than 5% of any class of our capital stock, or any immediate family member of, or person sharing a household with, any of these individuals, had or will have a direct or indirect material interest, other than compensation arrangements that are described under the section captioned "Executive compensation."

Other than as disclosed below, there have been no transactions involving the Company since the beginning of the last fiscal year, or any currently proposed transactions, in which the Company was or is to be a participant and the amount involved exceeds $120,000 or one percent of the average of the Company's total assets at year-end for the last two completed fiscal years, and in which any related person had or will have a direct or indirect material interest.

Significantly, this section purporting to disclose all of QCI's related party transactions did ***not*** disclose any business dealings with Quad M.

40.     Appended as exhibits to the 2021 10-K were substantively the same SOX certifications as referenced in ¶ 33, *supra*, signed by Defendants Liscouski and Roberts.

41.     On May 24, 2022, QCI issued a press release "announc[ing] that it has entered into a definitive agreement to acquire QPhoton" (the "May 2022 Press Release").  The May 2022 Press Release stated that "[t]he acquisition of QPhoton extends QCI's offerings to accelerate the accessibility of quantum computing, and other powerful technologies, into easily deployable solutions today, and advances QCI into a full-spectrum quantum software and hardware company."

42.     The May 2022 Press Release also quoted Defendant Liscouski as stating, *inter alia*, "[t]he combination of QPhoton's powerful quantum processing technology and systems with QCI's Qatalyst software significantly accelerates accessibility to quantum solutions for real business problems."

43.     On June 16, 2022, QCI issued a press release announcing that it had completed its acquisition of QPhoton.  The press release quoted Defendant Liscouski as stating, *inter alia*, that "[t]his acquisition represents a significant leap forward in real-world usability in the quantum computing space" and would result in QCI becoming "a provider of full-stack quantum software and hardware solutions[.]"

44.    On February 8, 2023, QCI issued a press release announcing "a subcontract award from SSAI [Science Systems Applications, Inc.] to support NASA in testing one of its proprietary quantum photonic systems for remote sensing applications." The press release stated, in relevant part:

> Under the subcontract, QCi will test an existing LiDAR system designed to remotely measure the physical properties of different types of snowpacks . . . based on a recent breakthrough theory . . . . The QCi LiDAR system could be used to indicate changes in weather patterns which have a significant impact on water reserves available both for agricultural facilities and in cities[.]
>
> * * *
>
> QCi has recently developed a variety of quantum information technology and systems, including those of entropy quantum computing, reservoir quantum computing, quantum imaging and sensing. Its quantum photonic LiDAR systems deliver new measurement capabilities with single-photon sensitivity, strong noise rejection, and high-ranging and spatial resolution.

45.    On March 30, 2023, QCI filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2022 (the "2022 10-K"). In discussing QCI's full year 2022 revenues as compared to its full year 2021 revenues, the 2022 10-K stated, in relevant part:

> Revenues for the Twelve Months ended December 31, 2022 were $135,648 as compared with $0 for the comparable prior year period, a change of $135,648, or 100% . . . . All revenue in the current reporting period is derived from professional services provided to multiple commercial and government customers under multi-month contracts . .

. . We expect revenues to increase meaningfully in 2023 as we emphasize our hardware capability.

46.    With respect to the purported capabilities of QCI's quantum computing technologies, products, and services, the 2022 10-K stated, *inter alia*:

[F]ollowing the June 2022 merger with QPhoton . . . and its associated intellectual property and engineering team, the Company is now able to provide full-stack quantum information services.

The core of our quantum information services today is our Entropy Quantum Computing (EQC) technology. We have built room-temperature, photonic quantum information processing systems underpinned by a series of patented and patent pending technologies . . . . Our technology, supported by professional services through our "Quantum Solutions" offering, helps our clients benefit from the technology today.

47.    In a section dedicated to disclosing QCI's related party transactions, the 2022 10-K contained similar statements to those referenced in ¶ 39, *supra*, while failing to disclose QCI's business dealings with Quad M.

48.    Appended as exhibits to the 2022 10-K were substantively the same SOX certifications as referenced in ¶ 33, *supra*, signed by Defendants Liscouski and Roberts.

49.    On April 27, 2023, QCI issued a press release announcing its partnership with millionways. The press release gave the impression that QCI had been selected as a partner for millionways based on its purported differentiated quantum computing technology, without disclosing that millionways was a related party involved with one of QCI's founders, stating, in relevant part:

17

> [QCI] . . . a first-to-market full-stack photonic-based quantum computing and solutions company, today announced the signing of a Memorandum of Understanding with AI firm millionways to demonstrate the power of [AI] when combined with [QCI]'s Reservoir Quantum Computing (RQC).
>
> The goal of the partnership is to explore and determine the business value of the combination of millionways' AI algorithms and QCI's existing RQC systems using audio files to produce an emotional scoring capability. If successful, the companies will develop a joint marketing and business development plan to pursue commercial opportunities.

50.    On May 23, 2023, QCI issued a press release "announc[ing] that it received a follow-on task order to its subcontract award . . . to support NASA in remote sensing and climate change monitoring[,]" stating, in relevant part:

> In addition to testing its proprietary quantum photonic system for remote sensing applications (QLiDAR), QCi will also be processing satellite images by utilizing its photonic-based reservoir computing technology.  This initial testing engagement is expected to be completed during the second quarter of 2023.
>
> * * *
>
> QCi . . . will perform both the original quantum LiDAR work as well as applying photonic computing capability to process the LiDAR data. This will be accomplished under a subcontract from [SSAI] . . . . Under the expanded subcontract, QCi will run the data from the QLiDAR system through the photonic-based reservoir computer to improve the calculation of the level of water released from snowmelt.

51.    On July 13, 2023, QCI issued a press release announcing that it had purportedly been "award[ed]" a "subcontract . . . from Bay Area Environmental Research Institute (BAERI) to build and test for NASA Ames an innovative photonic sensor instrument to provide accurate measurement of atmospheric particulates such

as clouds, aerosols, smoke flume, volcanic ashes, etc., in order to identify physical properties including size, shape and chemical composition" (the "July 2023 Press Release").  The July 2023 Press Release asserted that "[t]his award represents the third distinct task order from NASA and is the second research center within NASA to subcontract with the Company."

52.    The July 2023 Press Release described QCI's work under this third subcontract as follows:

> Under the nine-month subcontract, QCi will deliver a compact system, programmed to process a substantial amount of data that can support standalone operations for days, and designed to be powered by a 12-volt battery that consumes no more than 30 watts of power. In addition, QCi will generate reports that will detail the operation of the system in a realistic environment, provide the range of parameters and offer predictive analyses on future enhancements with a possible long-term objective to position these instruments for field deployment to create a monitoring network.

53.    On September 21, 2023, QCI issued a press release announcing that it had selected a five-acre site in the ASU Research Park for what the Company described as a "Quantum Photonic Chip Foundry" to produce TFLN chips.  The press release stated, *inter alia*, that "[t]he location QCi chose for its new facility is on five acres within the extensive 320-acre research park hosted by ASU" and that "QCi anticipates that its chip manufacturing will commence operations first half of 2024 . . . and mass-produc[e] quantum photonics chips with complex nanophotonic circuits by late 2024 / early 2025."

54.    On February 14, 2024, QCI issued a press release announcing that it

had purportedly "been awarded a fourth project from NASA[,]" stating, *inter alia*:

> QCi, the only company worldwide that can utilize Entropy Quantum
> Computing (EQC) to denoise LiDAR spectral information, has been
> tapped by Analytical Mechanics Associates on behalf of NASA to
> provide a new approach to remove sunlight noise from LiDAR spectral
> mapping in lower earth orbit.
>
> * * *
>
> NASA's continued engagement with QCi fosters a partnership for
> leveraging QCi's innovation in photonics.

55.    On April 1, 2024, QCI filed an annual report on Form 10-K with the

SEC, reporting the Company's financial and operating results for the quarter and

year ended December 31, 2023 (the "2023 10-K").  In discussing QCI's full year

2023 revenues as compared to its full year 2022 revenues, the 2023 10-K stated, in

relevant part:

> Revenues for the year ended December 31, 2023 were $358,047
> compared to $135,648 for the year ended December 31, 2022, an
> increase of $222,399, or 164%. Revenue was derived from sales of
> hardware products and professional services in 2023, and solely from
> professional services in 2022, in each case provided to multiple
> commercial and government customers under multi-month contracts . .
> . . We expect revenues to increase meaningfully in 2024 as we continue
> to emphasize our hardware capability.

56.    With respect to the purported capabilities of QCI's quantum computing

technologies, products, and services, the 2023 10-K stated, *inter alia*:

> QCi's core technology is Entropy Quantum Computing ("EQC"). EQC
> is a patent pending methodology that utilizes the environment to drive

controlled energy loss in a photonic architecture . . . . This methodology allows for very low power consumption and room temperature operation. Also, due to the nature of the measurement and feedback process, EQC drives non-linear quantum interactions for "dense, fully connected" problem solving.

* * *

In addition to our photonic computing platform, we have leveraged QCi's core technology to demonstrate powerful quantum sensing use cases in LIDAR (Light Detection and Ranging), reservoir computing (a form of neural network that can be used in machine learning applications) and quantum cyber authentication (a method for highly secure communication within a network).

57.    In a section dedicated to disclosing QCI's related party transactions, the 2023 10-K contained similar statements to those referenced in ¶ 39, *supra*, while failing to disclose QCI's business dealings with Quad M and millionways.

58.    Appended as exhibits to the 2023 10-K were substantively the same SOX certifications as referenced in ¶ 33, *supra*, signed by Defendants McGann and Boehmler.

59.    On September 11, 2024, QCI filed an amendment to its 2023 10-K on Form 10-K/A with the SEC (the "2023 10-K/A") to, *inter alia*, "restate its consolidated financial statements, including the notes thereto, for the years ended December 31, 2023 and 2022[.]"  The 2023 10-K/A also "replace[d] the Report of Independent Registered Public Accounting Firm prepared by BF Borgers CPA PC ('BF Borgers') included in the [2023 10-K] with the Report of Independent Registered Public Accounting Firm from BPM LLP ('BPM')" after the SEC had

"suspend[ed] BF Borgers from appearing and practicing as an accountant before the SEC and" QCI had "subsequent[ly] ret[ained] . . . BPM to replace BF Borgers[.]" In discussing QCI's revenues for full year 2023 as compared to full year 2022, the 2023 10-K/A stated, in relevant part:

> Revenues for the year ended December 31, 2023, were $358 thousand compared to $136 thousand for the year ended December 31, 2022, an increase of $222 thousand, or 163%. Revenue was derived from sales of hardware products and professional services in 2023, and solely from professional services in 2022. In each year, services were provided to multiple commercial and government customers under multi-month contracts . . . . We expect revenues to increase meaningfully in the coming years as we continue to emphasize our hardware capability.

60.     Appended as exhibits to the 2023 10-K/A were substantively the same SOX certifications as referenced in ¶ 33, *supra*, signed by Defendants McGann and Boehmler.

61.     On October 17, 2024, QCI issued a press release announcing that it had purportedly "been awarded a fifth project from [NASA] to develop quantum remote sensing technology that would significantly lower the cost of spaceborne LIDAR imaging and advance scientific understanding of the mechanisms of climate change."  The press release also stated, *inter alia*:

> This is a continuation of a long-standing strategic partnership between NASA and QCi aimed at creating a radically different approach to LiDAR technology for atmospheric remote sensing measurements. The proposed approach, which is currently being developed by QCi, would significantly lower the cost of LIDAR missions, thereby allowing NASA to undertake more frequent flights to better understand the

causes of climate change. The recently awarded contract is an important milestone in further assessing viability of QCi's technology.

62.   On October 22, 2024, QCI issued a press release announcing that it "has reached the final stage of commissioning its quantum photonic chip foundry in Tempe, Arizona" and that "[t]he QCi Foundry has moved into its final phase of construction and capital equipment installation, with an anticipated grand opening set for Q1 2025."

63.   On November 20, 2024, QCI issued a press release announcing that it "has received its second purchase order for its [TFLN] photonic chip foundry[,]" stating, in relevant part:

> The order will support the research efforts of a U.S.-based university and is part of the QCi Foundry's pilot launch program, with fulfillment expected in Q1 2025.
>
> The order will enable the university to advance chip-scale acoustic and cross-domain microsystems, utilizing the scalable industrial processes provided by the QCi Foundry. As part of this order, QCi will leverage its standard TFLN processing recipes to facilitate a custom fabrication run tailored to the needs of the university. This collaboration lays the groundwork for further expanding the use of TFLN into applications that extend into micro electromechanical systems, further establishing TFLN's potential as a versatile material system and a key enabler for the next-generation photonics market and beyond.

64.   The statements referenced in ¶¶ 32-63 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about QCI's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or

failed to disclose that: (i) Defendants overstated the capabilities of QCI's quantum computing technologies, products, and/or services; (ii) Defendants overstated the scope and nature of QCI's relationship with NASA, as well as the scope and nature of QCI's NASA-related contracts and/or subcontracts; (iii) Defendants overstated QCI's progress in developing a TFLN foundry, the scale of the purported TFLN foundry, and orders for the Company's TFLN chips; (iv) QCI's business dealings with Quad M and millionways both qualified as related party transactions; (v) accordingly, QCI's revenues relied, at least in part, on undisclosed related party transactions; (vi) all the foregoing, once revealed, was likely to have a significant negative impact on QCI's business and reputation; and (vii) as a result, Defendants' public statements were materially false and misleading at all relevant times.

## The Truth Begins to Emerge

65.    On November 27, 2024, during intraday trading hours, Iceberg published a report alleging that QCI's press releases concerning its TFLN foundry and related purchase orders were a sham (the "November 2024 Iceberg Report"). With respect to the purchase order at issue in the press release described in ¶ 63, *supra*, the November 2024 Iceberg Report stated, in relevant part:

**The University of Texas pours cold water on [QCI]'s press release**

[QCI] announced two purchase orders for its [TFLN] chips in November 2024. One with an unnamed "research and technology institute based in Asia" and the second with a "US-based university".

Originally, the company disclosed the name of the US-based university – The University of Texas at Austin. But [QCI] removed all references to the university yesterday.

## Quantum Computing, Inc. Announces Second Purchase Order for TFLN Photonic Chip Foundry from University of Texas at Austin



NEWS PROVIDED BY
**Quantum Computing Inc. →**
Nov 20, 2024, 08:30 ET

SHARE THIS ARTICLE


*Source: PR Newswire*

The university was likely unhappy with the representations in the release and being involuntarily part of this PR stunt. We spoke to a university professor who confirmed two things:

- Only a small order had been placed; and
- The individual in charge of the order was surprised to see the [QCI] announcement, as it was not reviewed prior to release.

66.    With respect to QCI's purported TFLN foundry, the November 2024 Iceberg Report stated, in relevant part:

[QCI] claims to have a foundry located at 2050 E ASU Circle Suite 107 Tempe AZ 85284 – a leased space within [ASU]'s Research Park. The facility is intended to fulfil the company's announced purchase orders for TFLN chips, with production expected to begin in 1Q25, indicating that the facility is nearly ready.

**QCi Lab** 5 Marine View Plaza Suite 214 Hoboken, NJ 07030

**QCi Fab** 2050 E ASU Circle Suite 107 Tempe AZ 85284

**QCi Administration** 1201 Wilson Blvd Floor 27 Arlington, VA 22209

*Source: QUBT website*

\* \* \*

When reached by phone, building management very confidently said there was no foundry at this address. Then an investigator was sent to have a look around the area in search of this mysterious foundry. The investigator came back with the following observations and findings:



*Source: Photo taken by investigator*

- People walking around outside said this was an office building. There are no loading docks (that have an elevated space to facilitate loading) or very large doors. There would be no way to get very

large machines inside, which you would expect for a chip foundry about to start "mass production".

- [QCI] was a tenant. But all the investigator saw was some people in a conference room.

From the outside, the buildings do not look suitable for a foundry, which needs high ceilings and open spaces for heavy equipment, and proper ventilation for handling fumes in an environment highly sensitive to contamination. None of these seem to exist.



*Source: Photo taken by investigator*

Other tenants at the same address include IT staffing firm Experis and cloud-based content services platform VisualVault – all of a non-industrial nature.

An old floor plan of a neighbouring identical single-story facility (2030 E. ASU Circle) shows multiple rooms, hallways, and specific spaces like restrooms, but there is no clear indication of spaces for industrial equipment.



*Source: Showcase.com*

67.    The November 2024 Iceberg Report also noted that, despite QCI's claims that it had located a five-acre site in the ASU Research Park for its TFLN foundry, "the entire . . . 2050 building is barely more than an acre, let alone Suite 107 in the building" and, "[a]t that time, production was supposed to start in the first half of 2024."

68.    The November 2024 Iceberg Report further noted that QCI's "fixed asset breakdown does not align with the level of investment one might expect to establish a foundry."

69.    On December 9, 2024, shortly after markets opened, Iceberg published a second report addressing QCI (the "December 2024 Iceberg Report").  The December 2024 Iceberg Report stated, *inter alia*:

> [QCI] has shared photos online of what it claims to be its foundry. But this setup looks more like a laboratory. This is a far cry from a foundry ready for "mass production" on what [QCI] said would be "five acres within the extensive 320-acre research park hosted by ASU". Throwing

together some equipment does not make an operational TFLN-chip foundry. [QCI] has already experienced delays compared to its initial production schedule. Many other companies would already be manufacturing TFLN devices, if creating such a facility were this straightforward.

* * *

From 2021 to 9M24, the company reported insignificant levels of revenue, despite various claims, such as being a NASA sub-contractor. The company has kept recording losses.

70.    Following publication of the December 2024 Iceberg Report, QCI's stock price fell $0.46 per share, or 5.8%, to close at $7.47 per share on December 9, 2024. Despite this decline in the Company's stock price, QCI securities continued trading at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions concerning, *inter alia*, QCI's relationship with NASA and the purported capabilities of QCI's quantum computing technologies, products, and/or services.

71.    For example, on December 17, 2024, QCI issued a press release announcing that it "has been awarded a prime contract by [NASA] Goddard Space Flight Center[,]" stating, *inter alia*:

This contract marks a pivotal step forward for QCi by applying its entropy quantum optimization machine, Dirac-3, to support NASA's advanced imaging and data processing demands.

The contract will apply Dirac-3 to address the challenging phase unwrapping problem for optimally reconstructing images and extracting information from interferometric data generated by radar.

QCi will support NASA in its mission to unwrap interferograms at full scale, ultimately enhancing their data quality and accuracy.

72.    The statements referenced in ¶ 71 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Defendants overstated the capabilities of QCI's quantum computing technologies, products, and/or services; (ii) Defendants overstated the scope and nature of QCI's relationship with NASA, as well as the scope and nature of QCI's contract with NASA; (iii) all the foregoing, once revealed, was likely to have a significant negative impact on QCI's business and reputation; and (iv) as a result, Defendants' public statements were materially false and misleading at all relevant times.

**The Truth Fully Emerges**

73.    On January 16, 2025, during intraday trading hours, Capybara published a report alleging, *inter alia*, that QCI "is a rampant fraud"; that, "[f]rom inception, the company has defrauded investors by fabricating revenue, misrepresenting their products, and issuing a steady stream of false press releases"; and that "[t]o conceal their fraud, [QCI] even included a clause in employee separation agreements prohibiting them from talking to the SEC."

74.    The  Capybara report also cited comments by former QCI personnel who alleged that Defendants had misrepresented the purported capabilities of the Company's technologies, products, and/or services.   For example, the Capybara report quoted a former QCI employee as stating that the Company "insinuated that there were products that were farther along than they were, to lead the public to believe they had quantum capabilities that they didn't and products that were in customers hands when they weren't."

75.    The Capybara report also quoted a former QCI executive as stating:

[It] would take a small army quite some time to make what they currently have work or be a viable product. There's been no evidence from the company. There's been no progress. They haven't even entered the game. No validation that they can run with any interesting results. Until they do that it's just a glorified University project.

76.    The Capybara report also cited Capybara's discussions with certain of QCI's former employees, the Company's associates and prime contractors, and NASA personnel, who indicated that QCI was pumping its stock price with false and misleading press releases, stating, in relevant part:

Former employees and people associated with [QCI] say it was common knowledge among employees that the CEO was doing anything he could to pump the share price, including issuing false press releases that lied about their products, revenue deals, and partnerships.

• [QCI] claims to have a "longstanding relationship" with NASA, but NASA personnel and government contract records confirm this is false.

31

- [QCI] has a single contract with NASA, valued at $26,000. The contract was for generic "computer programming" and [QCI] was the sole bidder.
- [QCI] falsely claims to have won two contracts directly with NASA and at least 4 subcontracts "awarded by NASA".
- NASA confirmed to us that they have no relationship with [QCI] beyond the single $26,000 "computer programming" contract noted above.
- We spoke with NASA and the prime contractors named in [QCI]'s PRs and we found that all the PRs are deliberately misleading or include outright lies.
- The evidence suggests that [QCI] bids on low-value, NASA-related contracts for the sole purpose of pumping their stock via misleading press releases.
- In several cases, [QCI] bid on small subcontracts from companies that do work with NASA. In each case, the prime contractor confirmed that [QCI] was the sole bidder and the contracts were for small amounts. NASA confirmed that they played no role in the issuing of the subcontracts.
- [QCI] promoted each of these subcontracts as significant and related to quantum computing. In reality, the contracts were very small, unrelated to quantum computing, and were awarded to [QCI] because they were the only bidder.
- In a transparent attempt to hide their fraud, [QCI] recently removed some false and misleading PRs from their website.

77.    With respect to QCI's purported revenues generated through fake deals and related party transactions, namely with Quad M and millionways, the Capybara report stated, in relevant part:

> For years [QCI] has struggled to generate revenue because of their lack of real products. [QCI]'s solution to this problem was to sign fake deals with undisclosed related parties. The sole purpose for these deals was to deceive investors through promotional press releases containing outright lies.

- [QCI] is currently being sued by a former partner for breach of contract and fraud. The plaintiff claims [QCI]'s first three revenue deals were completely fake and that [QCI] never even sent invoices for the deals.
- One of these deals was with Millionways Inc, a purported AI company. Undisclosed to investors, Millionways Inc was a related party. One of [QCI]'s founders was involved with Millionways.
- [QCI] later announced a LOI [letter of intent] to acquire Millionways. As part of the deal, [QCI] paid Millionways $500k via an unsecured note. The deal was never completed and [QCI] has been quietly marking down the value of the note because they will never be paid back.
- In 2022, [QCI] announced a deal with Quad M Solutions Inc, an OTC listed company with ties to multiple stock frauds.
- Undisclosed to investors, Quad M was a related party. [QCI]'s CEO served as a director of Quad M and the co-founders of [QCI] were deeply involved in Quad M and are long-time business associates of Quad M insiders and investors.
- In 2022, [QCI] signed an MOU [memorandum of understanding] with Quad M claiming that they would generate 5-10 dollars per employee per month for [QCI]. Unsurprisingly, the deal never materialized and generated no revenue.

78.    The Capybara report also alleged, like the Iceberg reports, that QCI had

misrepresented its progress in developing a TFLN foundry, as well as the scale of

the purported TFLN foundry.  However, the Capybara report went further, alleging

that QCI had never purchased the five-acre parcel at the ASU Research Park for its

TFLN foundry, citing ASU Research Park management:

- In Sep. 2023 [QCI] claimed to have chosen a site for their new fab, a 5-acre plot in the ASU Research Park. Park management confirmed that [QCI] inquired about the 5-acre parcel but never followed up and never attempted to purchase the property. Now, more than a year after [QCI]'s announcement, the 5-acre parcel remains empty, and it still belongs to the orignal [sic] owner.

- In Oct. 2024, [QCI] claimed to have opened the foundry they announced in September the prior year. However, the company didn't open a fully operational foundry, instead they opened a small R&D [research and development] lab in a leased office space.
- [QCI]'s R&D lab is in an office building not suitable for industrial use cases.
- [QCI]'s R&D space does not have a cleanroom, which is required to produce commercial quality TFLN chips.

79.    Following publication of the Capybara report, QCI's stock price fell $1.72 per share, or 14.89%, over the following two trading sessions, to close at $9.83 per share on January 17, 2025.

80.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**<u>Regulation S-K Items 105 and 303</u>**

81.    Throughout the Class Period, QCI's periodic financial filings were required to disclose the adverse facts and circumstances detailed above under applicable SEC rules and regulations.  Specifically, Item 105 of SEC Regulation S-K, 17 CFR § 229.105 ("Item 105"), required QCI to "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the [Company] or offering speculative or risky" and "[c]oncisely explain how each risk affects the [Company] or the securities being offered."  Defendants' failures to disclose, *inter alia*, that QCI's quantum computing technologies, products, and/or services were less effective than Defendants had led investors to believe; that QCI's

purported partnership with NASA, as well as the scope and nature of QCI's NASA-related contracts and/or subcontracts, were less meaningful than Defendants had led investors to believe; that QCI's purported TFLN foundry was less developed, and purchase orders for the Company's TFLN chips were less meaningful, than Defendants had led investors to believe; and that QCI's revenues relied, at least in part, on undisclosed related party transactions; violated Item 105 because these issues represented material factors that made an investment in the Company speculative or risky.

82.    For similar reasons, Defendants violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"), which required the Company to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Defendants' failures to disclose, *inter alia*, that QCI's quantum computing technologies, products, and/or services were less effective than Defendants had led investors to believe; that QCI's purported partnership with NASA, as well as the scope and nature of QCI's NASA-related contracts and/or subcontracts, were less meaningful than Defendants had led investors to believe; that QCI's purported TFLN foundry was less developed, and purchase orders for the Company's TFLN chips were less meaningful, than Defendants had led investors to believe; and that QCI's revenues relied, at least in

part, on undisclosed related party transactions; violated Item 303 because these issues represented known trends and uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results.

## SCIENTER ALLEGATIONS

83.    During the Class Period, Defendants had both the motive and opportunity to commit fraud.  They also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time.  In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

84.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired QCI securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

85.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, QCI securities were actively traded on either the NASDAQ or the OTC.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by QCI or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

86.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

87.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

88.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of QCI;

- whether the Individual Defendants caused QCI to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of QCI securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

89.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

90.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- QCI securities are traded in an efficient market;

38

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and OTC was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold QCI securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

91.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

92.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

93.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

94.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

95.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of QCI securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire QCI securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

96.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other

statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for QCI securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about QCI's finances and business prospects.

97.    By virtue of their positions at QCI, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

98.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of QCI, the Individual Defendants had knowledge of the details of QCI's internal affairs.

99.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of QCI.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to QCI's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of QCI securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning QCI's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired QCI securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

100.    During the Class Period, QCI securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of QCI securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of

the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of QCI securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of QCI securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

101.  By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

102.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## **COUNT II**

### **(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

103.  Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

104.   During the Class Period, the Individual Defendants participated in the operation and management of QCI, and conducted and participated, directly and indirectly, in the conduct of QCI's business affairs.   Because of their senior positions, they knew the adverse non-public information about QCI's misstatement of income and expenses and false financial statements.

105.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to QCI's financial condition and results of operations, and to correct promptly any public statements issued by QCI which had become materially false or misleading.

106.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which QCI disseminated in the marketplace during the Class Period concerning QCI's results of operations.   Throughout the Class Period, the Individual Defendants exercised their power and authority to cause QCI to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of QCI within the meaning of Section 20(a) of the Exchange Act.   In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of QCI securities.

107.   Each of the Individual Defendants, therefore, acted as a controlling person of QCI.  By reason of their senior management positions and/or being directors of QCI, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, QCI to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of QCI and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

108.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by QCI.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff hereby demands a trial by jury.

Dated: February 25, 2025                  Respectfully submitted,

                                         POMERANTZ LLP

                                         <u>*/s/ Thomas H. Przybylowski*</u>
                                         Thomas H. Przybylowski
                                         Jeremy A. Lieberman
                                         (*pro hac vice* application forthcoming)
                                         J. Alexander Hood II
                                         (*pro hac vice* application forthcoming)
                                         600 Third Avenue, 20th Floor
                                         New York, New York 10016
                                         Telephone: (212) 661-1100
                                         Facsimile: (917) 463-1044
                                         tprzybylowski@pomlaw.com
                                         jalieberman@pomlaw.com
                                         ahood@pomlaw.com

                                         *Attorneys for Plaintiff*

# CERTIFICATION PURSUANT
# TO FEDERAL SECURITIES LAWS

1. I, _Drew Cohen_____, make this declaration

pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section

21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private

Securities Litigation Reform Act of 1995.

2. I have reviewed a Complaint against Quantum Computing Inc. ("QCI") and

authorize the filing of a comparable complaint on my behalf.

3. I did not purchase or acquire QCI securities at the direction of plaintiffs' counsel or

in order to participate in any private action arising under the Securities Act or Exchange Act.

4. I am willing to serve as a representative party on behalf of a Class of investors who

purchased or otherwise acquired QCI securities during the Class Period as specified in the

Complaint, including providing testimony at deposition and trial, if necessary. I understand that

the Court has the authority to select the most adequate lead plaintiff in this action.

5. The attached sheet lists all of my transactions in QCI securities during the Class

Period as specified in the Complaint.

6. During the three-year period preceding the date on which this Certification is

signed, I have not served or sought to serve as a representative party on behalf of a class under the

federal securities laws.

7. I agree not to accept any payment for serving as a representative party on behalf of

the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such

reasonable costs and expenses directly relating to the representation of the class as ordered or

approved by the Court.

8.     I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

**Executed** <u>_1/28/2025_____</u>
            **(Date)**

                                          Signed by:

                                          *Drew Cohen*

                                          6E3BC339CD7F4C6...
         _____
                    **(Signature)**

                    Drew Cohen
         _____
                    **(Type or Print Name)**

**Quantum Computing Inc. (QUBT)**                                                     **Drew Cohen**

### List of Purchases/Acquisitions and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase/Acquisition | 12/23/2024 | 268 | $18.6200 |