UNITED STATES DISTRICT COURT DISTRICT OF
NEW JERSEY

| | |
|---|---|
| JAEYEOL JUNG, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>QUANTUM COMPUTING INC., WILLIAM J. MCGANN, ROBERT LISCOUSKI, CHRISTOPHER BOEHMLER, and CHRISTOPHER ROBERTS,<br><br>Defendants. | Case No. 2:25-cv-01457-MEF-JSA<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiff Jaeyeol Jung, individually and on behalf of all others similarly situated, by the undersigned attorneys, alleges in this complaint for violations of the federal securities laws the following based upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Quantum Computing Inc. ("QCI") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of QCI's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning QCI; and (d) information obtained from interviews with former employees and other individuals knowledgeable about QCI.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the

allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired QCI securities between January 19, 2022 and January 15, 2025, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b- 5 promulgated thereunder, against QCI and certain of its top officials.

2.     QCI is a Delaware corporation that claims to develop and sell quantum computing services for high-performance computing applications. QCI has a history of reinventing its business to align with shifting popular trends in the technology industry.

3.     Since its founding in 2018, QCI has shifted its focus from quantum- computer-ready software services to attempting to commercialize quantum photonic technology and related devices, to integrating this technology and devices with artificial intelligence ("AI") applications, and to producing thin film lithium niobate ("TFLN") quantum computing chips.

4.     Throughout the Class Period, Defendants repeatedly touted QCI's business dealings and contracts with various entities, including employee staffing solutions company Quad M Solutions, Inc. ("Quad M") and millionways, Inc. ("millionways"), purportedly a leading AI firm, as well as QCI's purported "long- standing strategic partnership" with the National Aeronautics and Space Administration ("NASA"). Defendants represented that each such deal, contract, or partnership resulted from QCI's ability to substantially aid a given use-

case through its differentiated quantum computing technologies, products, and/or services.

5.      These three contracts were each shams in differing ways. The agreement with Quad M was a related-party transaction as Quad M shared Defendant Liscouski as a director and the contract generated little if any revenue. Similarly, millionways had no product and rather than providing revenue for QCI, required a loan from QCI to keep operating. This loan was never repaid. Finally, the contract with NASA was a tiny software development contract that did not involve quantum computing.

6.      After floundering for years as a pure software developer, on February 24, 2022, QCI announced the entry of an exclusive marketing agreement with QPhoton, a developer of "quantum photonics systems". On May 24, 2022, QCI announced a definitive agreement to acquire QPhoton. The acquisition closed on June 16, 2022.

7.      Starting with its February 24, 2022 press release and continuing throughout the Class Period, QCI emphasized its ability to use QPhoton's hardware technology to deliver "quantum computing". This representation is false, QPhoton's technology does not use quantum computing.

8.      On October 5, 2022, Iceberg Research ("Iceberg") published a report noting the conflict of interest concerning Quad M and Defendant Liscouski as well as the lack of revenues under the Quad M contract. Iceberg concluded "[QCI] failed to sell its software and we do not expect it to be any better at selling hardware, its latest venture."

9.      On October 5, 2022, QCI's stock price fell $0.24 per share, or 9%, from $2.66 per share to $2.42 per share.

10.     On November 27, 2024, Iceberg published a further report alleging that QCI's press releases concerning its TFLN foundry, as well as purchase orders for QCI's TFLN chips,

were a sham. In support of these allegations, Iceberg cited communications with a university professor who had ordered QCI's TFLN chips, photos of the address at which QCI's purported TFLN foundry was located per QCI's website—which showed only what appeared to be an office building—and communications with ASU Research Park building management.

11.     On December 9, 2024, Iceberg published a second report addressing QCI, noting that, although QCI "ha[d] shared photos online of what it claims to be its foundry[,]" "this setup looks more like a laboratory" and "is a far cry from a foundry ready for 'mass production' on what [QCI] said would be 'five acres within the extensive 320-acre research park hosted by ASU[.]'" The same report further noted that "[f]rom 2021 to 9M24, [QCI] reported insignificant levels of revenue, despite various claims, such as being a NASA sub-contractor."

12.     On this news, QCI's stock price fell $0.46 per share, or 5.8%, to close at $7.47 per share on December 9, 2024.

13.     Then, on January 16, 2025, Capybara Research ("Capybara") published a report alleging, inter alia, that QCI "insinuated that there were products that were farther along than they were, to lead the public to believe they had quantum capabilities that they didn't and products that were in customers hands when they weren't." Capybara also reported that QCI had overstated its ties to NASA and fabricated revenues through multiple related-party transactions, particularly with Quad M Solutions, Inc. ("Quad M"), and millionways Inc. ("millionways"). The Capybara report also alleged that QCI was pumping its stock price with false and misleading press releases, citing discussions with QCI's former employees.

14.     On this news, QCI's stock price fell $1.72 per share, or 14.89%, over the following two trading sessions, to close at $9.83 per share on January 17, 2025.

15.     As a result of Defendants' wrongful acts and omissions, and the precipitous

decline in the market value of QCI's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

16.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

17.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

18.    Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). QCI is headquartered in this District, Defendants conduct business in this District, and a significant portion of Defendants' actions took place within this District.

19.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

20.    Plaintiff, as set forth in the Certification previously filed with the Court (ECF No. 4-4), acquired QCI securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

21.    Defendant QCI is a Delaware corporation with principal executive offices located at 5 Marine View Plaza, Suite 214, Hoboken, New Jersey 07030. Throughout the Class Period, QCI's common stock traded on the Nasdaq Stock Market ("NASDAQ") under the ticker symbol

"QUBT."

22.     Defendant William J. McGann ("McGann") has served as QCI's Chief Executive Officer ("CEO") since February 1, 2024, before which he served as QCI's Chief Operating Officer and Chief Technology Officer.

23.     Defendant Robert Liscouski ("Liscouski") served as QCI's CEO from before the start of the Class Period to January 31, 2024.

24.     Defendant Christopher Boehmler ("Boehmler") has served as QCI's Chief Financial Officer ("CFO") since July 1, 2023.

25.     Defendant Christopher Roberts ("Roberts") served as QCI's CFO from before the start of the Class Period to June 30, 2023.

26.     Defendants McGann, Liscouski, Boehmler, and Roberts are collectively referred to herein as the "Individual Defendants."

27.     The Individual Defendants possessed the power and authority to control the contents of QCI's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of QCI's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with QCI, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

28.     QCI and the Individual Defendants are collectively referred to herein as

"Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

29.    QCI has a history of reinventing its business to align with shifting popular trends in the technology industry. QCI was founded in 2001 as a Nevada corporation that purported to sell ink-jet printer cartridges under the name "Ticketcart, Inc." In July 2006, it acquired Innovative Beverage Group and renamed itself Innovative Beverage Group Holdings. It sold beverages until it ceased operations in 2013 and eventually placed in receivership.

30.    In January 2018, Defendant Liscouski purchased a controlling block of common stock in QCI from the receiver, redomiciled the corporation to Delaware, and renamed it Quantum Computing Inc. QCI listed on NASDAQ on July 15, 2021.

31.    Since 2018, QCI has struggled financially and shifted its focus from quantum-computer-ready software services to commercializing quantum photonic technology and related devices, to integrating this technology and devices with AI applications, to producing TFLN quantum computing chips.

### QCI Struggles as a Software Developer.

32.    From 2018 to 2021, QCI operated solely as a software developer. In 2020 it had developed Mukai, a "quantum application development platform." Mukai was designed to help to solve extremely complex optimization problems, which are at the heart of some of the most difficult computing challenges in industry and government. Its software was designed to enable developers to create and execute quantum-ready applications on classic computers, while being ready to run on quantum computers when those systems can achieve performance advantages.

33.    A "classical computer" is a computer that uses standard digital computation and

employs data represented in a binary manner (using either 0 or 1). In contrast, a "quantum computer" is a type of computer that seeks to exploit quantum mechanical phenomena to process information. Instead of binary data, it uses quantum bits (qubits), which can represent and store data in ways that classical bits cannot, allowing quantum computers to solve complex problems much faster than traditional computers. Quantum computers harness the unique properties of quantum mechanics, such as superposition and entanglement, to perform computations that are beyond the capabilities of even the most powerful classical computers.

34.    Quantum computing is a nascent and rapidly developing technology ecosystem that has shown promise in delivering potentially disruptive computing capabilities. The rapid adoption of technologies such as artificial intelligence, 3D imaging, and the Internet of Things (IoT), have served to exponentially increase the generation of data, driving up the demand for high-performance computing. Computationally intensive applications are ubiquitous across various industries, including, but not limited to: IT, aerospace, healthcare, automotive, and e-commerce. Examples of compute-intensive applications include optimization, data management, analytics, and complex modeling. As quantum computing hardware continues to advance, it is anticipated there will be a corresponding growth in demand for software capable of leveraging the computing capabilities of quantum computing hardware. Estimates of the size of this industry vary, but according to Grand View Research, the high-performance computing market was valued at $39.1 billion in 2019 and is expected to reach a value of $53.6 billion by 2027. According to a report from Allied Market Research, the global enterprise quantum computing market size was valued at $1.3 billion in 2020, and was projected to reach $18.3 billion by 2030, growing annually at 29.7% from 2021 to 2030.

35.    During 2021, QCI continued to develop and market its software application, now

called Qatalyst. QCI described Qatalyst as a "Quantum Application Accelerator." Qatalyst was designed to enable developers to create and execute quantum-ready applications on conventional computers, while being ready to run on quantum computers where those systems achieve performance advantage.

36.    Despite QCI's efforts, Qatalyst failed to develop much market traction, and QCI generated no revenue in either 2020 or 2021. By the end of 2021, QCI's board and management determined to pivot away from being a pure software company and acquire a hardware development capability. Starting in October 2021, QCI began discussions to acquire QPhoton, Inc., ("QPhoton") a company founded by Yuping Huang, a professor at the Stevens Institute of Technology.

### QCI Announces New Contracts and Acquisitions and Class Period Commences

### Quad M

37.    On January 19, 2022, Quantum Computing Inc. ("QCI") issued a press release entitled "Quantum Computing Inc. Provides Quantum Consulting and Software to Quad M Solutions ("Quad M") (the "Quad M Press Release"). In that release, QCI made several materially false and misleading statements regarding its purported business relationship with Quad M Solutions, Inc. ("Quad M").

38.    The Quad M Press Release trumpeted QCI's "first customer for QCI Qonsulting" which QCI claimed would provide "quantum-driven solutions" to employee staffing company Quad M. Specifically, the press release indicated that QCI would provide underwriting applications to optimize health insurance, using a subscription model whereby every employee using Quad M's "health solution" would pay a monthly fee. The Quad M Press Release contained the specific expectation that QCI's purported health insurance underwriting applications would

be applied "to over 100,000 insured lives by the end of 2022." Regarding the transaction, Defendant Liscouski said:

> "This is a landmark opportunity for QCI, which we expect to result in our first customer revenue, a residual monthly revenue stream and a scalable revenue model for QCI's growth once implemented . . . [w]ith Qonsulting and ready-to-run quantum software, QCI is positioned to accelerate and enhance our clients' exploration of their optimal path to quantum value."

39.     The Quad M Press Release provided that once the underwriting product was validated, it would be jointly marketed to self-insured companies and medical insurers.

40.     Quad M was actually a related party transactions with numerous undisclosed relationships as shown in the following chart.



41.     Thus, far from being a "landmark opportunity" for QCI, this was a contract designed solely to generate a positive press release with little prospect for any significant revenue as Quad M was also a struggling company with limited cash. For the first six months of 2022, QCI recorded just $96,724 in revenue, 86% of which was unpaid.

**QPhoton**

42.    On February 24, 2022, QCI issued a press release announcing its entry into an

exclusive marketing agreement with QPhoton, stating, in relevant part:

> By coupling quantum hardware technologies from QPhoton with
> Qatalyst, QCI will deliver more powerful solutions to accelerate
> the application and value from quantum computing for specific
> applications and markets. QPhoton technologies will also offer
> QCI reseller, technology and QPU [quantum processing unit]
> partners enhanced solutions to further accelerate the adoption of
> quantum computing.
>
> A key advantage of the Qatalyst software is that it is hardware-
> agnostic, supporting a variety of quantum technologies and QPUs,
> each with their own unique performance and computational
> attributes. This eliminates the need for deep, complex low-level
> coding and vendor lock-in required by available software
> alternatives.

43.    On May 24, 2022, QCI issued a press release "announc[ing] that it has entered

into a definitive agreement to acquire QPhoton" (the "May 2022 Press Release"). The May 2022

Press Release stated that "[t]he acquisition of QPhoton extends QCI's offerings to accelerate the

accessibility of quantum computing, and other powerful technologies, into easily deployable

solutions today, and advances QCI into a full-spectrum quantum software and hardware

company."

44.    The May 2022 Press Release also quoted Defendant Liscouski as stating, *inter*

*alia*, "[t]he combination of QPhoton's powerful quantum processing technology and systems

with QCI's Qatalyst software significantly accelerates accessibility to quantum solutions for real

business problems."

45.    On June 16, 2022, QCI issued a press release announcing that it had completed

its acquisition of QPhoton. The press release quoted Defendant Liscouski as stating, inter alia,

that "[t]his acquisition represents a significant leap forward in real-world usability in the

quantum computing space" and would result in QCI becoming "a provider of full-stack quantum software and hardware solutions[.]"

### First Iceberg Report

46.    Notwithstanding Defendants' representations, doubts began to emerge regarding QCI's business on October 5, 2022, when Iceberg issued a scathing report addressing QCI. Iceberg noted that QCI was established by a "former homicide detective"—namely, Defendant Liscouski—who had "bought a beverage company out of receivership (for $155,000)" before reinventing QCI as a quantum computing software business, presumably based on hype regarding quantum computing's future market prospects at the time. The report noted that "[d]emand for [QCI's quantum computing software] Qatalyst has been poor" with QCI "report[ing] zero sales for the 2018-2021 period." Although Defendant Liscouski "announced that [QCI] would subsidize some early customers in August 2021[,]" "[t]his strategy fell flat as [QCI] booked sales of $96,724 in the first half of [2022], of which ~86% had not been collected at the end of June." The 2022 Iceberg report alleged that "most of these sales come from Quad-M[,]" which, unbeknownst to investors, Defendant "Liscouski ha[d] been serving as a director [of] since August last year." Iceberg doubted that QCI would ever collect from Quad M, which "reported just $1m cash against $16.2m of liabilities due in the next 12 months."

47.    The 2022 Iceberg Report also noted that, although QCI's "original intent was to focus on software alone[,]" "poor performance seemingly led management to change its mind and invest in hardware." Accordingly, QCI purchased QPhoton, Inc. ("QPhoton"), a purported leading innovator in the quantum photonic technology space, in a highly dilutive approximate $85 million stock-for- stock deal. In sum, the 2022 Iceberg Report alleged that QCI "failed to sell its software and we do not expect it to be any better at selling hardware, its latest venture";

and that, "[b]eyond the constant PR [press release] hype, the truth is that [QCI] is poorly capitalized, and has to compete with companies with far more resources."

48.    On October 5, 2022, QCI's stock price fell $0.24 per share, or 9%, from $2.66 per share to $2.42 per share.

### QCI Continues to Scheme during 2023

49.    In an effort to maintain its stock price, QCI continued to issue misleading press releases during 2023 exaggerating technical accomplishments and contract awards.

50.    On February 8, 2023, QCI issued a press release announcing "a subcontract award from SSAI [Science Systems Applications, Inc.] to support NASA in testing one of its proprietary quantum photonic systems for remote sensing applications[]" ("the SSAI Press Release"). The SSAI Press Release stated in relevant part:

> Under the subcontract, QCi will test an existing LiDAR system designed to remotely measure the physical properties of different types of snowpacks.
>
> * * *
>
> QCi has recently developed a variety of quantum information technology and systems, including those of entropy quantum computing, reservoir quantum computing, quantum imaging and sensing. Its quantum photonic LiDAR systems deliver new measurement capabilities with single-photon sensitivity, strong noise rejection, and high-ranging and spatial resolution. QCi systems are built for easy and versatile uses with favorable size, weight, cost, and power specs.

51.    The System for Award Management ("SAM"), the U.S. government's official contracting and award management system records awarded contracts and subcontracts. With respect to QCI, SAM provided the following information:





52.  SAM lists no other contracts, or subcontracts, with QCI.

53.  On March 30, 2023, QCI filed an annual report on Form 10-K with the SEC, reporting QCI's financial and operating results for the quarter and year ended December 31, 2022 (the "2022 10-K"). In discussing QCI's full year 2022 revenues as compared to its full year 2021 revenues, the 2022 10-K stated, in relevant part:

> Revenues for the Twelve Months ended December 31, 2022 were $135,648 as compared with $0 for the comparable prior year period, a change of $135,648, or 100% All revenue in the current reporting period is derived from professional services provided to multiple commercial and government customers under multi-month contracts.
>
> We expect revenues to increase meaningfully in 2023 as we emphasize our hardware capability.

54.    With respect to the purported capabilities of QCI's quantum computing technologies, products, and services, the 2022 10-K stated, inter alia:

> [F]ollowing the June 2022 merger with QPhoton . . . and its associated intellectual property and engineering team, QCI is now able to provide full-stack quantum information services.
>
> The core of our quantum information services today is our Entropy Quantum Computing (EQC) technology. We have built room-temperature, photonic quantum information processing systems underpinned by a series of patented and patent pending technologies
>
> Our technology, supported by professional services through our "Quantum Solutions" offering, helps our clients benefit from the technology today.

55.    In a section dedicated to disclosing QCI's related party transactions, the 2022 10-K failed to disclose QCI's business dealings with Quad M.

56.    Appended as exhibits to the 2022 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002, wherein Defendants Liscouski and Roberts certified that the 2022 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the

[Company] as of, and for, the periods presented in this report[.]"

57.    With respect to QCI's purported relationship with NASA, or its Prime contractors, the 2022 10-K stated, inter alia:

> The Company received a subcontract award from SSAI to support NASA to test quantum photonic sensing solutions for monitoring climate change. Under the subcontract, QCI will test an existing LiDAR system designed to remotely measure the physical properties of different types of snowpacks, including the density, particle size and depth.  Upon successful completion of this testing, QCI may proceed with airborne testing with the ultimate goal to position the QCI LiDAR units on satellites to create a network for monitoring snow levels globally.
>                                 * * *
>
> On January 17, 2023, the Company received a subcontract award from SSAI in the amount of $95,000 to support NASA to test quantum photonic sensing solutions for monitoring climate change. Under the subcontract, QCI will test an existing LiDAR system designed to remotely measure the physical properties of different types of snowpacks, including the density, particle size and depth.  The period of performance of the subcontract runs through May 31, 2021. Upon successful completion of this testing, if approved by NASA, QCI may proceed with airborne testing with the ultimate goal to position the QCI LiDAR units on satellites to create a network for monitoring snow levels globally.

58.    On April 27, 2023, QCI issued a press release announcing its partnership with millionways. The press release gave the impression that QCI had been selected as a partner for millionways based on its purported differentiated quantum computing technology, stating, in relevant part:

> [QCI] a first-to-market full-stack photonic-based quantum computing and solutions company, today announced the signing of a Memorandum of Understanding with AI firm millionways to demonstrate the power of [AI] when combined with [QCI]'s Reservoir Quantum Computing (RQC).
>
> The goal of the partnership is to explore and determine the business value of the combination of millionways' AI algorithms and QCI's existing RQC systems using audio files to produce an emotional scoring capability. If successful, the companies will

develop a joint marketing and business development plan to pursue commercial opportunities.

59.    On May 12, 2023 QCI filed a quarterly report on Form 10-Q with the SEC, reporting QCI's financial and operating results for the quarter ended March 31, 2023 (the "1Q23 10-Q"). With respect to QCI's purported relationship with NASA, or its Prime contractors, the 1Q23 10-Q made the following statements inter alia:

As of March 31, 2023 the Company has begun to commercialize some of the licensed technology pursuant to a subcontract to support NASA, and therefore expects to owe the Stevens Institute royalties of 3.5% on that revenue.

\* \* \*

On May 4, 2023, the Company received an expansion to its subcontract award from SSAI to support NASA by using the Company's reservoir quantum computer to remove solar background noise from LiDAR image data sets using deep learning methods, specifically recurrent neural network algorithms. Under the initial subcontract task, QCI will test and evaluate an existing LiDAR system designed to remotely measure the physical properties of different types of snowpacks, including the density, particle size and depth. With the additional task, NASA expanded the contract to include quantum machine learning processing of the data collected. Upon successful completion of this testing, NASA may authorize QCI to proceed with airborne testing with the ultimate goal to use the quantum LiDAR units on satellites.

\* \* \*

Our Quantum LiDAR ("QLiDAR") can see through dense fog and provide image fidelity at great distances and through difficult environments such as snow, ice, and water. Once again, by leveraging the power of quantum mechanics and single photon detection, LiDAR systems can be greatly enhanced in their ability to measure at improved resolution and distances as well as extend these photonic signals to applications in vibrometry for material stress analysis, particle size analysis, and potential remote sensing from aircraft, drones and even satellites. In January 2023, QCI's federal contracting subsidiary, QI Solutions, received an award from NASA, through a subcontract from Science Systems Applications, Inc., to test its QLiDAR technology for remote measurement of the physical properties of different types of snowpacks including density, particle size and depth. We are also pursuing commercial development of QLiDAR applications and partnerships are actively being explored.

60.     On May 12, 2023, QCI filed a Form 10-Q for the quarter ending March 31, 2023 with the SEC ("Q1 FY 23 10-Q"). The Q1 FY 23 10-Q included the following representation regarding QCI's relationship with millionways:

> On April 27, 2023, the Company expanded its commercially available product line to include its Reservoir Quantum Computing (RQC). Via an MOU with AI company millionways, Inc., the partnership will demonstrate the value of processing millionways' AI algorithms through QCI's existing RQC systems using audio files to produce an emotional scoring capability. If the data processing project is successful, the companies will develop a joint marketing and business development plan to pursue commercial opportunities.

61.     This filing presented QCI as in the business of buying and selling quantum products, when in fact, QCI's "partnership" with millionways was merely intended to draw investor attention through a press release to pump the value of QCI's stock with the placement of buzzy words like "AI" "algorithms" in close proximity to "commercial opportunities. In reality, QCI did not possess a commercially available quantum computing product line – or a commercially viable but a series of projects propped up by potential of a technology with great promise. QCI's "projects" are the kinds that languish in university labs, dependent on grants, but for QCI's purposes they are not important for what they accomplish, but the kind of attention they attract to the company, and the projects ultimately produce nothing, because QCI does not intend for them to produce anything but print.

62.     On May 22, 2023, QCI issued a press release announcing that its Board of Directors had unanimously approved the signing of a non-binding letter of intent to acquire up to 100% of millionways, Inc. - a firm purporting to have created "the world's first emotionally-intelligent AI platform" – pending due diligence and fairness checks (the "millionways Press Release").

63.     The millionways Press Release represented that "[o]ver the past year, QCI has

built and tested multiple hybrid AI hardware systems … [which] have demonstrated substantial advantages over existing digital electronic hardware."

64.    The millionways Press Release contained the representation that "QCi's hybrid hardware solutions meet the evolving needs of AI and delivers remarkable computing speed, low electric power needs with minimal heat dispersion and supports large-scale parallel processing and thereby the agility to compete with large data centers on big data challenges.

65.    On May 23, 2023, QCI issued a press release "announc[ing] that it received a follow-on task order to its subcontract award to support NASA in remote sensing and climate change monitoring[,]" stating, in relevant part:

> In addition to testing its proprietary quantum photonic system for remote sensing applications (QLiDAR), QCi will also be processing satellite images by utilizing its photonic-based reservoir computing technology. This initial testing engagement is expected to be completed during the second quarter of 2023.
> 
> * * *
> 
> QCi will perform both the original quantum LiDAR work as well as applying photonic computing capability to process the LiDAR data. This will be accomplished under a subcontract from [SSAI]    Under the expanded subcontract, QCi will run the data from the QLiDAR system through the photonic-based reservoir computer to improve the calculation of the level of water released from snowmelt.

66.    On June 26, 2023, QCI filed an amendment to the 2022 10-K on Form 10-K/A ("the Amended 2022 10-K") with the SEC. With respect to QCI's purported relationship with NASA, or its Prime contractors, the 10-Q made the following statements, inter alia:

> On January 17, 2023, the Company received a subcontract award from SSAI in the amount of $95,000 to support NASA to test quantum photonic sensing solutions for monitoring climate change. Under the subcontract, QCI will test an existing LiDAR system designed to remotely measure the physical properties of different types of snowpacks, including the density, particle size and depth. The period of performance of the subcontract runs through May 31, 2021. Upon successful completion of this testing, if approved by NASA, QCI may proceed with airborne testing with the ultimate goal to position the QCI LiDAR units on satellites to create a network for monitoring snow levels globally.

67.    On July 13, 2023, QCI issued a press release announcing that it had purportedly

been "award[ed]" a "subcontract from Bay Area Environmental Research Institute (BAERI) to build and test for NASA Ames an innovative photonic sensor instrument to provide accurate measurement of atmospheric particulates such as clouds, aerosols, smoke flume, volcanic ashes, etc., in order to identify physical properties including size, shape and chemical composition" (the "July 2023 Press Release"). The July 2023 Press Release asserted that "[t]his award represents the third distinct task order from NASA and is the second research center within NASA to subcontract with QCI."

68.    The July 2023 Press Release described QCI's work under this purportedly third subcontract as follows:

> Under the nine-month subcontract, QCi will deliver a compact system, programmed to process a substantial amount of data that can support standalone operations for days, and designed to be powered by a 12- volt battery that consumes no more than 30 watts of power. In addition, QCi will generate reports that will detail the operation of the system in a realistic environment, provide the range of parameters and offer predictive analyses on future enhancements with a possible long-term objective to position these instruments for field deployment to create a monitoring network.

69.    The statements contained in the July 2023 Press Release regarding the project's assignment to QCI as "the third distinct task order" and implying that QCI's work on this subcontract evidences a working relationship between NASA Ames, in addition to a relationship with another "research center within NASA" exaggerated the relationship between NASA and QCI which was actually very limited. Public records indicate that there is no relationship between QCI and any research centers within NASA. QCI does not appear on the Ames Contractors Council Information directory, where companies contracting with NASA Ames are listed. Rather, it appears QCI has been sub-contracted to provide the most basic services to a Prime contractor, so they can release a press release touting their relationship with NASA and

its Prime contractors and leverage this work into a press release announcing work on important, technically sophisticated projects, when in reality, QCI is doing the lowest-level work.

70.    Further, the representation in the July 2023 Press Release that NASA Ames "is the second research center within NASA to subcontract with QCI[]" is materially false and misleading because QCI was not awarded another subcontract with another NASA research center.

71.    On August 14, 2023 QCI filed a quarterly report on Form 10-Q with the SEC, reporting QCI's financial and operating results for the quarter ended June 30, 2023 (the "2Q23 10-Q"). With respect to QCI's purported relationship with NASA, or its Prime contractors, the 1Q23 10-Q made the following statements *inter alia*:

> On July 13, 2023, the Company received a subcontract award from Bay Area Environmental Research Institute (BAERI) for $122,200 to build and test for NASA Ames an innovative photonic sensor instrument to provide accurate measurement of atmospheric particulates such as clouds, aerosols, smoke flume, volcanic ashes, etc., in order to identify physical properties including size, shape and chemical composition. This award represents the third distinct task order from NASA and is the second research center within NASA to subcontract with the Company. Under the nine-month subcontract, the Company will deliver a compact system, programmed to process a substantial amount of data that can support standalone operations for days, and designed to be powered by a 12-volt battery that consumes no more than 30 watts of power. The possible long-term objective of this engagement is to position these instruments for field deployment to create a monitoring network.

72.    On August 18, 2023, QCI filed a prospectus supplement on a Form 424B5 (the August 18 Prospectus Supplement") with the SEC. With respect to QCI's purported relationship with NASA, or its Prime contractors, the August 18 Prospectus Supplement made the following statements inter alia:

> The QCi's reservoir computer can address complex problems in fields such as

natural language processing, weather prediction, financial analysis, drug discovery, optimization, autonomous driving, enhancement of LiDAR capabilities, and a material boost to performance (speed, accuracy and data processing volume), affordability, and power-savings to the AI industry. Our current contract with NASA and collaboration with AI firm millionways, both of whom are the first to use the QCi RC, speak to QCi's Reservoir Computer's ability to solve complex machine learning problems across different application areas. We are accepting order for the RC now and will begin shipping during second half of 2023.

* * *

Our Quantum LiDAR ("QLiDAR") can see through dense fog and provide image fidelity at great distances and through difficult environments such as snow, ice, and water. Once again, by leveraging the power of quantum mechanics and single photon detection, LiDAR systems can be greatly enhanced in their ability to measure at improved resolution and distances as well as extend these photonic signals to applications in vibrometry for material stress analysis, particle size analysis, and potential remote sensing from aircraft, drones and even satellites. In January 2023, QCI's federal contracting subsidiary, QI Solutions, received an award from NASA, through a subcontract from Science Systems Applications, Inc., to test its QLiDAR technology for remote measurement of the physical properties of different types of snowpacks including density, particle size and depth. We are also pursuing commercial development of QLiDAR applications and partnerships are actively being explored. Importantly, we are actively engaged in multiple testing opportunities through a subcontract with NASA.

73.     The multiple QCI press releases touting work purportedly awarded it by NASA prime contractors, and the press releases attempt to create the idea that NASA and QCI are partners who frequently collaborate. In reality, however, QCI's work was rarely directly with NASA but, instead, as a sub-contractor to the prime contractor. Through its press releases and other public statements, QCI sought to attach its brand to NASA by bidding on small, uncompetitive subcontracts so that it could describe its work as partaking in the and contributing to the larger contract from NASA.

74.     Evidently, QCI's false and misleading claims regarding the commercial viability of its products were successful in taking in analysts. An Ascendiant Capital Markets update note, published August 25, 2023, by Edward Woo, made the following observation:

> Quantum's recent financial performance is reflective of its developmental and early commercialization stage though it has commenced commercialization of its technology in Q1 2023. The company has recently launched several new products and is currently focusing on sales and marketing of them. We believe investors should be focused on its product commercialization, which we believe (and company's guidance) in 2023/2024 that revenue should grow quickly.

75.    On September 21, 2023, QCI issued a press release announcing that it had selected a five-acre site in the ASU Research Park for what QCI described as a "Quantum Photonic Chip Foundry" to produce TFLN chips.  The press release stated, *inter alia*, that "[t]he location QCi chose for its new facility is on five acres within the extensive 320-acre research park hosted by ASU" and that "QCi anticipates that its chip manufacturing will commence operations first half of 2024 and mass-produc[e] quantum photonics chips with complex nanophotonic circuits by late 2024 / early 2025."

76.    On September 21, 2023, QCI issued a press release announcing that it had selected a five-acre site in the ASU Research Park for what QCI described as a "Quantum Photonic Chip Foundry" to produce TFLN chips. The press release stated, inter alia, that "[t]he location QCi chose for its new facility is on five acres within the extensive 320-acre research park hosted by ASU" and that "QCi anticipates that its chip manufacturing will commence operations first half of 2024 and mass-produc[e] quantum photonics chips with complex nanophotonic circuits by late 2024 / early 2025."

77.    On November 13, 2023, QCI filed a quarterly report on Form 10-Q with the SEC, reporting QCI's financial and operating results for the quarter ended September 30, 2023 (the "3Q23 10-Q"). With respect to QCI's purported relationship with NASA, or its Prime contractors, the 1Q23 10-Q made the following statement inter alia:

> We believe that our unique capabilities that can be adopted

for immediate applications are appropriate for multiple programs within various government departments and agencies and anticipate that we could soon see our solutions utilized in a wide variety of boutique applications for our clients. To illustrate, in July 2023, the Company received a NASA Ames subcontract award from Bay Area Environmental Research Institute (BAERI) to build and test an innovative photonic sensor instrument that provides accurate measurement of atmospheric particulates such as clouds, aerosols, smoke flume, volcanic ashes, etc. to identify physical properties including size, shape and chemical composition. This award represents the third distinct task order from NASA in 2023 and is the second research center within NASA to subcontract with the Company. Under the nine-month subcontract, QCi will deliver a compact system, programmed to process a substantial amount of data that can support standalone operations for days, and designed to be powered by a 12-volt battery that consumes no more than 30 watts of power. The possible long-term objective of this engagement is to position these instruments for field deployment to create a monitoring network.

78.    Also in its Q3 FY 23 10-Q, QCI continued to promote its relationship with millionways. The Q2 FY23 10-Q contained the following representation:

On October 31, 2023, the Company signed contracts for its first sales of its Reservoir Computer and its Quantum Random Number Generator products to its partners' Assured Cyber Protection Ltd and AI firm millionways to enhance their AI capabilities. These sales kick off the Company's commercial delivery of its computing technologies. The QCi Reservoir Computer is a first-to-market portable device with technology inspired by the power of quantum mechanics. The device can perform complex computational tasks with unprecedented speed and efficiency to facilitate data analysis, machine learning and artificial intelligence. Its minimal size, weight, power, and cost factors make it particularly suitable for use as an edge computing tool. QCi's Reservoir Computer uses the Company's proprietary capabilities to create a small footprint hardware device that requires 80% to 95% less power consumption than conventional silicon-based computers. Additionally, the QCi Quantum Random Number Generator (QRNG) enables true randomness for applications in cryptography, secure communications, and

24

data encryption. By integrating QCi's Reservoir Computer and QRNG into their security algorithms, Assured Cyber Protection Ltd aims to enhance its ability to detect and respond to cyberattacks in real-time, staying ahead of cybercriminals in this ever-shifting landscape. The addition of QCi's Reservoir Computer to millionways' assessment process is expected to significantly boost machine learning efficiency, particularly in assessing audio files, dramatically reduce the power consumption and materially speed up the "training" of machine learning models.

79.    On February 14, 2024, QCI issued a press release announcing that it had purportedly "been awarded a fourth project from NASA[,]" stating, inter alia:

QCi, the only company worldwide that can utilize Entropy Quantum Computing (EQC) to denoise LiDAR spectral information, has been tapped by Analytical Mechanics Associates on behalf of NASA to provide a new approach to remove sunlight noise from LiDAR spectral mapping in lower earth orbit.

* * *

NASA's continued engagement with QCi fosters a partnership for leveraging QCi's innovation in photonics.

80.    On April 1, 2024, QCI filed an annual report on Form 10-K with the SEC, reporting QCI's financial and operating results for the quarter and year ended December 31, 2023 (the "2023 10-K"). In discussing QCI's full year 2023 revenues as compared to its full year 2022 revenues, the 2023 10-K stated, in relevant part:

Revenues for the year ended December 31, 2023 were $358,047 compared to $135,648 for the year ended December 31, 2022, an increase of $222,399, or 164%. Revenue was derived from sales of hardware products and professional services in 2023, and solely from professional services in 2022, in each case provided to multiple commercial and government customers under multi-month contracts.We expect revenues to increase meaningfully in 2024 as we continue to emphasize our hardware capability.

81.    With respect to the purported capabilities of QCI's quantum computing technologies, products, and services, the 2023 10-K stated, inter alia:

QCi's core technology is Entropy Quantum Computing ("EQC"). EQC is a patent pending methodology that utilizes the environment to drive controlled energy loss in a photonic architecture.  This methodology allows for very low power consumption and room temperature operation. Also, due to the nature of the measurement and feedback process, EQC drives non-linear quantum interactions for "dense, fully connected" problem solving.

* * *

In addition to our photonic computing platform, we have leveraged QCi's core technology to demonstrate powerful quantum sensing use cases in LIDAR (Light Detection and Ranging), reservoir computing (a form of neural network that can be used in machine learning applications) and quantum cyber authentication (a method for highly secure communication within a network).

82.    With respect to QCI's purported relationship with NASA, or its Prime contractors, the 2023 10-K stated, inter alia:

On February 14, 2024 the Company announced that it has been awarded a fourth subcontract with NASA to study sun noise reduction in LIDAR images using the EQC. The prime contractor for this award is Analytical Mechanics Associates. This technology would be an effective and affordable method for NASA to measure the unique physical properties of clouds and aerosols to prepare for space missions at any time of day and offers a superior alternative to the traditional noise reduction methodologies that require a larger laser and restrictive bandwidth filtering at greater size, weight, power and cost.

83.    In a section dedicated to disclosing QCI's related party transactions, the 2023 10-K continued to omit its business dealings with Quad M.

84.    Appended as exhibits to the 2023 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002, wherein Defendants McGann and Boehmler certified that the 2023 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" and that

"the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report[.]"

85.    On August 1, 2024, QCI issued a "From-the-Desk-of-the-Chief-Executive-Officer" Letter to Shareholders (the "2024 CEO Letter"). With respect to QCI's purported relationship with NASA, or its Prime contractors, the 2024 CEO Letter stated, inter alia:

> We are proud to have received four research grants to date from the National Aeronautics and Space Administration (NASA), including one underway that is using QCi's Entropy Quantum Computing as a potentially superior and affordable alternative for filtering out the background noise ("denoising") from LiDAR imagery. If the denoising demonstration project is successful, the technology could eventually be incorporated into LIDAR satellite missions in the future. Using quantum optimization to predict and eliminate spectral noise in general can have enormous far-reaching improvements in optical spectroscopy and imaging in general and has potential for significant improvements in these fields.

86.    On September 11, 2024, QCI filed an amendment to its 2023 10-K on Form 10-K/A with the SEC (the "2023 10-K/A") to, inter alia, "restate its consolidated financial statements, including the notes thereto, for the years ended December 31, 2023 and 2022[.]" The 2023 10-K/A also "replace[d] the Report of Independent Registered Public Accounting Firm prepared by BF Borgers CPA PC ('BF Borgers') included in the [2023 10-K] with the Report of Independent Registered Public Accounting Firm from BPM LLP ('BPM')" after the SEC had "suspend[ed] BF Borgers from appearing and practicing as an accountant before the SEC and" QCI had "subsequent[ly] ret[ained] . . . BPM to replace BF Borgers[.]" In discussing QCI's revenues for full year 2023 as compared to full year 2022, the 2023 10-K/A stated, in relevant part:

> Revenues for the year ended December 31, 2023, were $358 thousand compared to $136 thousand for the year ended December 31, 2022, an increase of $222 thousand, or 163%. Revenue was derived from sales of hardware products and professional services in 2023, and solely from professional services in 2022. In each year, services were provided to multiple commercial and government customers under multi-month contracts. We expect revenues to increase meaningfully in the coming years as we continue to emphasize our hardware capability.

87.    Appended as exhibits to the 2023 10-K/A were signed certifications pursuant to the Sarbanes-Oxley Act of 2002, wherein Defendants McGann and Boehmler certified that the 2023 10-K/A "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report[.]"

88.    On October 17, 2024, QCI issued a press release announcing that it had purportedly "been awarded a fifth project from [NASA] to develop quantum remote sensing technology that would significantly lower the cost of spaceborne LIDAR imaging and advance scientific understanding of the mechanisms of climate change." The press release also stated, inter alia:

> This is a continuation of a long-standing strategic partnership between NASA and QCi aimed at creating a radically different approach to LiDAR technology for atmospheric remote sensing measurements. The proposed approach, which is currently being developed by QCi, would significantly lower the cost of LIDAR missions, thereby allowing NASA to undertake more frequent flights to better understand the causes of climate change. The recently awarded contract is an important milestone in

further assessing viability of QCi's technology.

89. On October 22, 2024, QCI issued a press release announcing that it "has reached the final stage of commissioning its quantum photonic chip foundry in Tempe, Arizona" and that "[t]he QCi Foundry has moved into its final phase of construction and capital equipment installation, with an anticipated grand opening set for Q1 2025."

90. On November 15, 2024, in an Investor Presentation, QCI included the following slide:



91. On November 20, 2024, QCI issued a press release announcing that it "has received its second purchase order for its [TFLN] photonic chip foundry[,]" stating, in relevant part:

> The order will support the research efforts of a U.S.-based university and is part of the QCi Foundry's pilot launch program, with fulfillment expected in Q1 2025.
>
> The order will enable the university to advance chip-scale

acoustic and cross-domain microsystems, utilizing the scalable industrial processes provided by the QCi Foundry. As part of this order, QCi will leverage its standard TFLN processing recipes to facilitate a custom fabrication run tailored to the needs of the university. This collaboration lays the groundwork for further expanding the use of TFLN into applications that extend into micro electromechanical systems, further establishing TFLN's potential as a versatile material system and a key enabler for the next-generation photonics market and beyond.

### **The Truth Begins to Emerge**

92.    On November 27, 2024, during intraday trading hours, Iceberg published a report alleging that QCI's press releases concerning its TFLN foundry and related purchase orders were a sham (the "November 2024 Iceberg Report"). With respect to the purchase order at issue in the press release described in ¶ 63, supra, the November 2024 Iceberg Report stated, in relevant part:

> The University of Texas pours cold water on [QCI]'s press release
>
> [QCI] announced two purchase orders for its [TFLN] chips in November 2024. One with an unnamed "research and technology institute based in Asia" and the second with a "US-based university". Originally, QCI disclosed the name of the US-based university – The University of Texas at Austin. But [QCI] removed all references to the university yesterday.



Quantum Computing, Inc.
Announces Second Purchase
Order for TFLN Photonic Chip
Foundry from University of
Texas at Austin



NEWS PROVIDED BY
**Quantum Computing Inc.** →
Nov 20, 2024, 08:30 ET

SHARE THIS ARTICLE


*Source: PR Newswire*

> The university was likely unhappy with the representations in the release and being involuntarily part of this PR stunt. We spoke to a university professor who confirmed two things: only a small order had been placed; and the individual in charge of the order was surprised to see the [QCI] announcement, as it was not reviewed prior to release.

93.    With respect to QCI's purported TFLN foundry, the November 2024 Iceberg

Report stated, in relevant part:

> [QCI] claims to have a foundry located at 2050 E ASU Circle Suite 107 Tempe AZ 85284 – a leased space within [ASU]'s Research Park. The facility is intended to fulfil QCI's announced purchase orders for TFLN chips, with production expected to begin in 1Q25, indicating that the facility is nearly ready.

31

**QCi Lab** 5 Marine View Plaza Suite 214 Hoboken, NJ 07030

**QCi Fab** 2050 E ASU Circle Suite 107 Tempe AZ 85284

**QCi Administration** 1201 Wilson Blvd Floor 27 Arlington, VA 22209

*Source: QUBT website*



*Source: Photo taken by investigator*

* * *

When reached by phone, building management very confidently said there was no foundry at this address. Then an investigator was sent to have a look around the area in search of this mysterious foundry. The investigator came back with the following observations and findings:

People walking around outside said this was an office building. There are no loading docks (that have an elevated space to facilitate loading) or very large doors. There would be no way to get very large machines inside, which you would expect for a chip foundry about to start "mass production". QCI] was a tenant. But all the investigator saw was some people in a conference room. From the outside, the buildings do not look suitable for a foundry, which

needs high ceilings and open spaces for heavy equipment, and proper ventilation for handling fumes in an environment highly sensitive to contamination. None of these seem to exist.



*Source: Photo taken by investigator*

Other tenants at the same address include IT staffing firm Experis and cloud-based content services platform VisualVault – all of a non- industrial nature.

An old floor plan of a neighbouring identical single-story facility (2030 E. ASU Circle) shows multiple rooms, hallways, and specific spaces like restrooms, but there is no clear indication of spaces for industrial equipment.



*Source: Showcase.com*

94.    The November 2024 Iceberg Report also noted that, despite QCI's claims that it

had located a five-acre site in the ASU Research Park for its TFLN foundry, "the entire . . . 2050 building is barely more than an acre, let alone Suite 107 in the building" and, "[a]t that time, production was supposed to start in the first half of 2024."

95.    The November 2024 Iceberg Report further noted that QCI's "fixed asset breakdown does not align with the level of investment one might expect to establish a foundry."

96.    On December 9, 2024, shortly after markets opened, Iceberg published a second report addressing QCI (the "December 2024 Iceberg Report"). The December 2024 Iceberg Report stated, *inter alia*:

> [QCI] has shared photos online of what it claims to be its foundry. But this setup looks more like a laboratory. This is a far cry from a foundry ready for "mass production" on what [QCI] said would be "five acres within the extensive 320-acre research park hosted by ASU". Throwing together some equipment does not make an operational TFLN-chip foundry. [QCI] has already experienced delays compared to its initial production schedule. Many other companies would already be manufacturing TFLN devices, if creating such a facility were this straightforward.
>
> * * *
>
> From 2021 to 9M24, QCI reported insignificant levels of revenue, despite various claims, such as being a NASA sub-contractor. QCI has kept recording losses.

97.    Following publication of the December 2024 Iceberg Report, QCI's stock price fell $0.46 per share, or 5.8%, to close at $7.47 per share on December 9, 2024. Despite this decline in QCI's stock price, QCI securities continued trading at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions concerning, *inter alia*, QCI's relationship with NASA and the purported capabilities of QCI's quantum computing technologies, products, and/or services.

98.    As of December 31, 2024, QCI had written down the entirety of the outstanding

$558,000 receivable from the bridge loan to millionways as uncollectible based on credit risk.

**The Truth Fully Emerges**

99.     On January 16, 2025, during intraday trading hours, Capybara published a report alleging, *inter alia*, that QCI "is a rampant fraud"; that, "[f]rom inception, QCI has defrauded investors by fabricating revenue, misrepresenting their products, and issuing a steady stream of false press releases"; and that "[t]o conceal their fraud, [QCI] even included a clause in employee separation agreements prohibiting them from talking to the SEC."

100.     The Capybara report also cited comments by former QCI personnel who alleged that Defendants had misrepresented the purported capabilities of QCI's technologies, products, and/or services. For example, the Capybara report quoted a former QCI employee as stating that QCI "insinuated that there were products that were farther along than they were, to lead the public to believe they had quantum capabilities that they didn't and products that were in customers hands when they weren't."

101.     The Capybara report also quoted a former QCI executive as stating:

> [It] would take a small army quite some time to make what they currently have work or be a viable product. There's been no evidence from QCI. There's been no progress. They haven't even entered the game. No validation that they can run with any interesting results. Until they do that it's just a glorified University project.

102.     The Capybara report also cited Capybara's discussions with certain of QCI's former employees, QCI's associates and prime contractors, and NASA personnel, who indicated that QCI was pumping its stock price with false and misleading press releases, stating, in relevant part:

> Former employees and people associated with [QCI] say it

was common knowledge among employees that the CEO was doing anything he could to pump the share price, including issuing false press releases that lied about their products, revenue deals, and partnerships.

[QCI] claims to have a "longstanding relationship" with NASA, but NASA personnel and government contract records confirm this is false.

[QCI] has a single active contract with NASA, valued at $26,000. The contract was for generic "computer programming" and [QCI] was the sole bidder.

[QCI] falsely claims to have won two contracts directly with NASA and at least 4 subcontracts "awarded by NASA".

NASA confirmed to us that they have no relationship with [QCI] beyond the single $26,000 "computer programming" contract noted above.

We spoke with NASA and the prime contractors named in [QCI]'s PRs and we found that all the PRs are deliberately misleading or include outright lies.

The evidence suggests that [QCI] bids on low-value, NASA-related contracts for the sole purpose of pumping their stock via misleading press releases.

In several cases, [QCI] bid on small subcontracts from companies that do work with NASA. In each case, the prime contractor confirmed that [QCI] was the sole bidder and the contracts were for small amounts. NASA confirmed that they played no role in the issuing of the subcontracts.

[QCI] promoted each of these subcontracts as significant and related to quantum computing. In reality, the contracts were very small, unrelated to quantum computing, and were awarded to [QCI] because they were the only bidder.

In a transparent attempt to hide their fraud, [QCI] recently removed some false and misleading PRs from their website.

103.    With respect to QCI's purported revenues generated through fake deals and related party transactions, namely with Quad M and millionways, the Capybara report stated, in relevant part:

For years [QCI] has struggled to generate revenue because of their lack of real products. [QCI]'s solution to this problem was to sign fake deals with undisclosed related parties. The sole purpose for these deals was to deceive investors through promotional press releases containing outright lies.

[QCI] is currently being sued by a former partner for breach of contract and fraud. The plaintiff claims [QCI]'s first three revenue deals were completely fake and that [QCI] never even sent invoices for the deals.

One of these deals was with millionways Inc, ("millionways") a purported AI company. Undisclosed to investors, millionways was a related party. One of [QCI]'s founders was involved with millionways.

[QCI] later announced a LOI [letter of intent] to acquire millionways. As part of the deal, [QCI] paid millionways $500k via an unsecured note. The deal was never completed and QCI been quietly marking down the value of the note because they will never be paid back.

In 2022, [QCI] announced a deal with Quad M Solutions Inc, ("Quad M") an OTC listed company with ties to multiple stock frauds.

Undisclosed to investors, Quad M was a related party. [QCI]'s CEO served as a director of Quad M and the co-founders of [QCI] were deeply involved in Quad M and are long-time business associates of Quad M insiders and investors.

In 2022, [QCI] signed an MOU [memorandum of understanding] with Quad M claiming that they would generate 5-10 dollars per employee per month for [QCI]. Unsurprisingly, the deal never materialized and generated no revenue.

104.    The Capybara report also alleged, like the Iceberg reports, that QCI had misrepresented its progress in developing a TFLN foundry, as well as the scale of the purported TFLN foundry.  However, the Capybara report went further, alleging that QCI had never purchased the five-acre parcel at the ASU Research Park for its TFLN foundry, citing ASU Research Park management:

In Sep. 2023 [QCI] claimed to have chosen a site for their new fab, a 5-acre plot in the ASU Research Park. Park management confirmed that [QCI] inquired about the 5-acre parcel but never followed up and never attempted to purchase the property. Now, more than a year after [QCI]'s announcement, the 5-acre parcel remains empty, and it still belongs to the orignal [*sic*] owner.

In Oct. 2024, [QCI] claimed to have opened the foundry they announced in September the prior year. However, QCI didn't open a fully operational foundry, instead they opened a small R&D [research and development] lab in a leased office space.

[QCI]'s R&D lab is in an office building not suitable for industrial use cases.

[QCI]'s R&D space does not have a cleanroom, which is required to produce commercial quality TFLN chips.

105.    Following publication of the Capybara report, QCI's stock price fell $1.72 per share, or 14.89%, over the following two trading sessions, to close at $9.83 per share on January 17, 2025.

**Former QCI Employees Confirm Iceberg and Capybara Reports.**

106.    FE1 worked as an engineer at QCI from September 2021 to November 2023. He worked as part of a team that reported to Walter Poxon who, in turn, reported to Defendant McGann. FE1 participated in employee townhall meetings when McGann addressed the entire engineering team.

107.    FE1's team worked on developing "a layer in the cloud" by which "other teams" (including from prospective customers) could "interact with a subset of machines, of supposedly quantum computing machines." This was an application programming interface by which a user could, say, use a laptop to access a quantum computer that was "running in the lab." Initially, FE1 worked on a software layer that enabled users to access the quantum computing technology of other companies such as Amazon. As FE1 explained, "we were trying to do a single interface" for users to be able to interact with the technology of other companies. For instance, there were

three devices that belonged to other companies and which had been coded as Dirac 1, Dirac 2, and Dirac 3.

108.    After the QPhoton acquisition, QCI's connection would connect with QCI's devices. FE1 was "pretty sure" that the software layer was actually interacting with the lab's devices "because of how unreliable" the devices were, which resulted in the devices having to be taken "off-line."  Given the unreliability of the devices, FE1's group had "asked for multiple devices" so that there would always be one available on-line.

109.    As part of their development work, FE1's team requested information from QCI's hardware engineering group but, according to FE1, experienced "a lot of secrecy and refusal to answer questions" from the hardware engineering group.

110.    FE2 worked at QCI as an engineer and developer from before the Class Period to November 2023. During his employment, FE2 had frequent close contact with Defendants Liscouski, McGann, and Roberts, including participation in regular all-hands meetings where all aspects of QCI's business were discussed.

111.    When FE2 joined QCI, it was a "pure software play". It developed software that would enable users to interface with both quantum and classical computing capabilities offered by other companies. FE2 helped write the software for this interface which was initially called Mukai and then renamed for marketing purposes to Qatalyst.

112.    During 2021, Qatalyst was getting very little market traction. According to FE2, it was "the wrong product at the wrong time". In late 2021, FE2 learned of the potential transaction between QCI and QPhoton. In January 2022, FE2 visited QPhoton's laboratory in New Jersey to perform some due diligence on its technology and device. When he arrived, however, the device had been taken apart so that he could not test it. When FE2 asked Yuping

Huang how QPhoton's device worked, Huang refused to provide any details to FE2. QCI ultimately acquired QPhoton without any technical due diligence as to how its technology and device worked.

113.    The secrecy regarding QPhoton's device continued after the acquisition with Huang continuing to withhold information. Through probing the device while developing software for it, FE2 determined that the QPhoton technology and its device did not involve any quantum computing but worked as a classical computer with some photonic elements. In response to queries submitted by FE2's team, QPhoton's device delivered results that would only come from operating as a classical computer, not a quantum computer. For the same reasons, this was evident to every user of the device, including QCI customers, that the QPhoton device was not a quantum computer. FE2 described QPhoton's device as a type of coherent Ising machine.

114.    By fall of 2022, FE2 had personally advised Defendants McGann and Liscouski that QPhoton's technology did not use quantum computing. The software development team all knew that QPhoton's device was a classical computer, not a quantum computer. FE2 felt uncomfortable seeing QCI's technology publicly described as quantum computing as he believed it was inaccurate and thought other terms were more appropriate.

115.    FE2 learned of QCI's contract with Quad M when it was signed. FE2 understood the contract was to develop some software or an application for Quad M. FE2's team would have had responsibility for undertaking any development work for Quad M. FE2 never heard any discussion of actual development work being undertaken for Quad M. FE2 was also aware of a contract signed with between QCI and millionways. FE2 was aware that QCI lent money to millionways but never saw anything delivered from millionways to QCI.

## **CLASS ACTION ALLEGATIONS**

116.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired QCI securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of QCI, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

117.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, QCI securities were actively traded on either the NASDAQ or the OTC.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by QCI or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

118.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

119.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

120.    Common questions of law and fact exist as to all members of the Class and

predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of QCI;

- whether the Individual Defendants caused QCI to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of QCI securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

121.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

122.   Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

123.   Defendants made public misrepresentations or failed to disclose material facts

during the Class Period; the omissions and misrepresentations were material; QCI securities are traded in an efficient market; QCI's shares were liquid and traded with moderate to heavy volume during the Class Period; QCI traded on the NASDAQ and OTC was covered by multiple analysts; the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of QCI's securities; and Plaintiff and members of the Class purchased, acquired and/or sold QCI securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

124.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## COUNT I
### I.    (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

125.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

126.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

127.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other

Class members, as alleged herein; (ii) artificially inflate and maintain the market price of QCI securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire QCI securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

128.   Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for QCI securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about QCI's finances and business prospects.

### Materially False and Misleading Statements Issued During the Class Period

**Quad M**

129.   On January 19, 2022, Quantum Computing Inc. ("QCI") issued a press release entitled "Quantum Computing Inc. Provides Quantum Consulting and Software to Quad M Solutions ("Quad M") (the "Quad M Press Release"). In that release, QCI made several materially false and misleading statements regarding its purported business relationship with Quad M Solutions, Inc. ("Quad M").

130.   The Quad M Press Release trumpeted QCI's "first customer for QCI Qonsulting" which QCI claimed would provide "quantum-driven solutions" to employee staffing company Quad M. Specifically, the press release indicated that QCI would provide underwriting

applications to optimize health insurance, using a subscription model whereby every employee using Quad M's "health solution" would pay a monthly fee. The Quad M Press Release contained the specific expectation that QCI's purported health insurance underwriting applications would be applied "to over 100,000 insured lives by the end of 2022." Regarding the transaction, Defendant Liscouski said:

> "This is a landmark opportunity for QCI, which we expect to result in our first customer revenue, a residual monthly revenue stream and a scalable revenue model for QCI's growth once implemented . . . [w]ith Qonsulting and ready-to-run quantum software, QCI is positioned to accelerate and enhance our clients' exploration of their optimal path to quantum value."

131.    The Quad M Press Release provided that once the underwriting product was validated, it would be jointly marketed to self-insured companies and medical insurers.

132.    The press release did not disclose that Defendant Liscouski was a member of Quad M's board at the time of the transaction.

133.    QCI's statement that it "will deliver health insurance underwriting applications to Quad M for optimization of its underwriting services as a subscription with a monthly fee for every employee that avails themselves of Quad M's health solution[]" was materially false and misleading because, at the time it was made, QCI had no functional or commercially viable quantum software capable of delivering underwriting applications to Quad M. Nor did Quad M have the operational infrastructure or resources to implement such a system. By representing that delivery of subscription-based underwriting applications was imminent, Defendants misled investors into believing that QCI already possessed working technology and the ability to generate revenue through its relationship with Quad-M.

134.    QCI's statement that "Quad M expects to apply these applications to over 100,000

insured lives by the end of 2022[]" was materially false and misleading because Quad M did not, in fact, have 100,000 insured lives under management, nor did it have the capacity to apply QCI's unproven applications on such a scale. Defendants' statement implied that Quad M's customer base and operational capabilities could support the mass adoption of QCI's software, when in reality Quad M was a financially distressed entity with minimal operational reach. As such, the statement materially overstated the potential adoption of QCI's product and misled investors regarding the scale of its business opportunity.

135.    QCI's statement that "[t]his is a landmark opportunity for QCI, which we expect to result in our first customer revenue, a residual monthly revenue stream and a scalable revenue model for QCI's growth once implemented[]" was materially false and misleading because QCI's agreement with Quad M did not, and could not, result in material revenue. Quad M's limited financial and operational condition precluded it from generating the promised "residual monthly revenue stream." By presenting the Quad M arrangement as the source of QCI's first customer revenue and as the foundation for a scalable revenue model, Defendants materially misrepresented the company's financial prospects and misled investors regarding its ability to generate commercial revenue.

136.    Despite the inclusion of a boilerplate warning in the statement regarding forward-looking statements, the above statements were not protected by the PSLRA safe harbor for forward-looking statements because: (a) they contained misrepresentations of present or historical fact (e.g., that QCI already possessed and could deliver functional underwriting applications, and that Quad M had 100,000 insured lives); (b) QCI's boilerplate disclaimer regarding forward-looking statements was generic and failed to disclose the specific, known risks that undermined the Quad M arrangement; and (c) Defendants knew or recklessly

disregarded that these statements were false when made, given Quad M's financial condition and QCI's lack of commercially viable quantum software.

137.    The Quad M Press Release was materially false and misleading in that it did not disclose to investors Defendant Liscouski's relationship with Quad M as a director.

138.    QCI did not mention its "QCI Qonsulting" business in any of its filings with the SEC – indeed, the only place QCI Qonsulting is mentioned is in the Quad M Press Release.

139.    Following publication of the Iceberg and Capybara Reports, the Quad M Press Release was removed from QCI's website.

140.    On January 19, 2022, QCI issued a press release announcing its entry into an agreement with Quad M to "provide consulting and quantum-driven solutions[.]"  The press release gave the impression that QCI had been selected to aid Quad M based on its quantum computing technology, without disclosing that Quad M was a related party, stating, in relevant part:

> QCI will deliver health insurance underwriting applications to Quad M for optimization of its underwriting services as a subscription with a monthly fee for every employee that avails themselves of Quad M's health solution. Quad M expects to apply these applications to over 100,000 insured lives by the end of 2022.
>
> * * *
>
> This collaboration will utilize QCI's Qatalyst™ software to provide more accurate and diverse underwriting insights, leveraging quantum- ready classical, early NISQ [noisy intermediate-scale quantum], and eventually full-scale quantum computers. QCI will work with Quad M's database of 100K employees to provide deeper insights that drive more robust underwriting solutions for Quad M. Once proven, Quad M and QCI will jointly market the product to other self-insured companies as well as medical insurance providers.

141.    On February 24, 2022, QCI issued a press release announcing its entry into an exclusive marketing agreement with QPhoton, stating, in relevant part:

> By coupling quantum hardware technologies from QPhoton with Qatalyst, QCI will deliver more powerful solutions to accelerate the application and value from quantum computing for specific applications and markets. QPhoton technologies will also offer QCI reseller, technology and QPU [quantum processing unit] partners enhanced solutions to further accelerate the adoption of quantum computing.

> A key advantage of the Qatalyst software is that it is hardware- agnostic, supporting a variety of quantum technologies and QPUs, each with their own unique performance and computational attributes. This eliminates the need for deep, complex low-level coding and vendor lock-in required by available software alternatives.

142.    On March 15, 2022, QCI filed an annual report on Form 10-K with the SEC, reporting QCI's financial and operating results for the quarter and year ended December 31, 2021 (the "2021 10-K"). The 2021 10-K contained the same statements as referenced in ¶ 34, *supra*, regarding QCI's purported quantum computing Qatalyst product.

143.    In a section dedicated to disclosing QCI's related party transactions, the 2021 10-K stated, in relevant part:

> The following is a summary of transactions since January 1, 2019 to which we have been or will be a party in which the amount involved exceeded or will exceed $162,761 (one percent of the average of our total assets at year-end for our last two completed fiscal years) and in which any of our directors, executive officers or beneficial holders of more than 5% of any class of our capital stock, or any immediate family member of, or person sharing a household with, any of these individuals, had or will have a direct or indirect material interest, other than compensation arrangements that are described under the section captioned "Executive compensation."

> Other than as disclosed below, there have been no transactions involving QCI since the beginning of the last fiscal year, or any currently proposed transactions, in which QCI was or is to be a participant and the amount involved exceeds $120,000 or one percent of the average of QCI's total assets at year-end for the last two completed fiscal years, and in which any related person had or will have a direct or indirect material interest.

Significantly, this section purporting to disclose QCI's related party transactions did ***not*** disclose any business dealings with Quad M.

144.    The representations regarding the Quad M transactions were false and misleading in that they failed to disclose that Quad M was a related party and that QCI was not undertaking any development work for Quad M and had no reasonable expectation of material revenue from Quad M.

## Quantum Computing

145.    During the Class Period, Defendants made numerous misrepresentations regarding QCI's ability to offer "quantum computing" products.

146.    On February 24, 2022, QCI published a press release announcing a collaboration with QPhoton ("the QPhoton Press Release"). With regard to QCI's quantum computing technology, the QPhoton Press Release made the following misrepresentations:

> QCI, a leader in bridging the power of classical and quantum computing, today announced their business partnership and exclusive marketing agreement with QPhoton, Inc., a leading innovator in the quantum photonic technology space. The companies will work together to merge QCI's quantum software solution, Qatalyst™, with QPhoton's advanced photonic quantum technologies for its application to QCI-specific solutions.

> QPhoton's technology is a condensate of ground-breaking quantum research over two decades, with the support from DARPA, NSF, NASA, DoD, and other prestigious federal funding agencies. Dr. Yuping Huang, CEO of QPhoton, the Gallaher associate professor of physics and director of the Center for Quantum Science and Engineering at Stevens Institute of

Technology, has led many pivotal, large-scale quantum projects both at Northwestern University (2009-2014) and now Stevens (2014-present), for a total fund volume of ~$30 million.

"QCI is committed to developing quantum computing solutions that bring real value to business and government customers - today. We believe our partnership with QPhoton has the potential to accelerate and expand our effort to democratize quantum computing with groundbreaking and immediately usable quantum solutions that are affordable and can deliver ROI to end users," said Robert Liscouski, CEO of QCI. "As a quantum innovator, QPhoton leverages two decades of leading quantum studies to bring significant quantum value to the market including advanced photonic chips, quantum nanophotonics, quantum-boosted sensing (Light Detection and Ranging), quantum-secured cyber applications, and quantum networks."

Liscouski added, "We are honored to partner with such a visionary scientist and innovator as Dr. Huang."

"I am honored and truly excited to partner with QCI in this effort," stated Dr. Yuping Huang, CEO of QPhoton. "It is my dream and life's work to bring quantum advantages to everyday technology users and to make it widely available to disciplines across industries. If quantum is indeed going to change the world, it shall be made accessible to everyone."

"QPhoton's agreements with QCI are a major step forward in achieving this vision. I look forward to a long and prosperous working relationship with QCI," added Dr. Huang.

QCI is focused on creating powerful quantum optimization software and algorithms that can be processed on any quantum computer in a fraction of the time and effort currently needed. By coupling quantum hardware technologies from QPhoton with Qatalyst, QCI will deliver more powerful solutions to accelerate the application and value from quantum computing for specific applications and markets. QPhoton technologies will also offer QCI reseller, technology and QPU partners enhanced solutions to further accelerate the adoption of quantum computing.

A key advantage of the Qatalyst software is that it is hardware-agnostic, supporting a variety of quantum technologies and QPUs, each with their own unique performance and computational attributes. This eliminates the need for deep, complex low-level

coding and vendor lock-in required by available software alternatives. By adding QPhoton's capabilities, QCI believes that the proposed partnership has the potential to allow QCI to add photonic technologies into its supported quantum hardware technology, further expanding its customers' options when selecting their preferred quantum IP and/or approaches to quantum computing.

"I am very grateful for the continued trust and generous support by the government," said Dr. Huang. "My commitment in those projects has always been twofold: advancing knowledge and creating broader impacts. Partnering with QCI, QPhoton will contribute significantly to the rise of the quantum industry in the U.S. and help deliver on the promises we made to the government."

Pursuant to the Exclusive Marketing Agreement, the companies will seek to jointly sell and market the quantum and photonic products and services developed by the parties. The agreement also includes a Note Purchase Agreement that provides for a $2.5 million note. To date, QCI has provided $1.25 million to QPhoton, and agreed to provide an additional $1.25 million subject to certain conditions. The proceeds are intended to allow QPhoton to continue its ongoing photonic innovation and establish joint R&D with QCI.

"A significant part of our value proposition is to expand and extend the capabilities of current QPU technology by conditioning the customer application to scale with the QPU capability to deliver real business value," explained Dr. William McGann, COO and CTO of QCI. "We believe that the newly emerging quantum technologies using photonic methods will create significant advances as we deliver real business quantum solutions to problems that are plaguing several areas of industry such as logistics and supply chain."

QPhoton has secured a wide spectrum of quantum IP covering quantum sensing, communications, encryption, and nanophotonic chips. "Its engineers have successfully developed advanced nanophotonic and microelectronic circuits, and a series of prototype systems for quantum big data processing and measurement, demonstrating significant advantages over the state-of-the-art."

"As demonstrated in our BMW Challenge submission concerning sensor placement, the volume of sensors and possible

combinations demand significant optimization processing power," added Liscouski. "Working with QPhoton, we will create an integrated quantum solution that offers the opportunity to better solve these types of problems with a suite of highly integrated and optimized quantum technologies, including quantum sensors, quantum processors and quantum software."

The agreement includes exclusive marketing rights to QPhoton's quantum and photonic computing technologies and resources. The companies expect to demonstrate initial joint quantum solutions in the Q4 2022 time frame.

147.    On May 24, 2022, QCI issued a press release "announc[ing] that it has entered into a definitive agreement to acquire QPhoton" (the "May 2022 Press Release"). The May 2022 Press Release stated that "[t]he acquisition of QPhoton extends QCI's offerings to accelerate the accessibility of quantum computing, and other powerful technologies, into easily deployable solutions today, and advances QCI into a full-spectrum quantum software and hardware company."

148.    The May 2022 Press Release also quoted Defendant Liscouski as stating, *inter alia*, "[t]he combination of QPhoton's powerful quantum processing technology and systems with QCI's Qatalyst software significantly accelerates accessibility to quantum solutions for real business problems."

149.    On June 16, 2022, QCI issued a press release announcing that it had completed its acquisition of QPhoton. The press release quoted Defendant Liscouski as stating, *inter alia*, that "[t]his acquisition represents a significant leap forward in real-world usability in the quantum computing space" and would result in QCI becoming "a provider of full-stack quantum software and hardware solutions[.]"

150.    On November 14, 2022, QCI filed a Form 10-Q for the quarter ending September 14, 2022 with the SEC ("Q3 FY 22 10-Q"). Regarding QCI's quantum computing technology,

the Q3 FY 22 10-Q contained the following representations:

> Our short-term core business model will be based on generating revenue from selling access to our advanced quantum data processing systems via the cloud, with the long-term model focused on selling desktop or rack-sized quantum devices and systems to commercial and individual users. We currently offer access to our quantum computing machines via our own in-house cloud service and plan to eventually offer access through other commercial service providers.
>
> ***
>
> QCI is focused on providing integrated quantum information acquisition, transmission, and processing solutions, including both the user interface software and the quantum hardware. With our proprietary full-stack technologies that are designed using our solution-oriented system architectures, we believe we will have a competitive advantage in the market. With an integrated engineering team working across multiple quantum technology domains, we believe we are uniquely positioned to leverage our expertise in software, hardware, and nanophotonic circuits to develop quantum services and products, from quantum chip design and manufacturing through cloud delivery and eventually sales of hardware systems. We believe this full-stack development approach offers both the fastest and lowest risk path to building commercially valuable quantum machines.
>
> ***
>
> QCI's acquisition of QPhoton, combined with QCI's significant IP work that culminated in the development of the Company's Qatalyst software, enables the Company to currently offer room temperature quantum computation systems through cloud services now, as well as affordable, turn-key products in the future. This combination of quantum hardware and software will address the steep learning curve and highly particular skillsets generally associated with quantum information processing, which have historically represented significant barriers to adoption for companies and government entities looking to leverage novel quantum computing capabilities to solve problems.
>
> ***
>
> QCI's evolution into full-stack quantum computing company was enabled by the prior creation of its Qatalyst software. The Qatalyst development platform is QCI's answer to the broader industry's current approach to quantum software development, which relies on highly trained scientists working with SDK's at the circuit level, which is analogous to programming in assembly language. Unlike SDK's, which require deep level quantum expertise to

create quantum workflows, Qatalyst is not a tool kit, but a complete platform. Qatalyst enables developers to create and execute quantum-ready applications on conventional computers, while also being ready to run on multiple quantum computers. Qatalyst performs the complex problem transformations necessary to be executed on a variety of quantum processor platforms today. Users can call upon the same Qatalyst APIs (Application Programming Interfaces) on conventional computers to achieve optimization performance advantages using our cloud-based solution.

\*\*\*

As a full stack quantum solutions provider, while selling subscriptions in some manner to Dirac EQCs will be the cornerstone of our business model, providing professional services or quantum solutions support will likely be needed in many cases, especially in the beginning of a customers' quantum journey. We partner today with large management consulting companies as a way to scale our business and we expect that consulting partners will continue to grow in numbers and as a percentage of our customers. In addition, we plan to always provide a Quantum Solutions offering for customers that prefer to work directly with a full stack provider and customers who are using cutting edge technologies that may not have become supported yet by our consulting partners.

\*\*\*

The Cybersecurity field has been aware for some time of the potential threats and benefits of quantum computing resulting from the expectation that quantum computers will eventually have the capability to can "break" any of the currently utilized non-quantum-based encryption methods. However, effective cybersecurity goes well beyond encryption for protection. Effective cybersecurity requires a holistic approach to protecting the enterprise. The Company believes that our quantum computing capabilities may have applications in encryption. However, initially we are applying our quantum technologies to create secure transport layers (quantum networks) and endpoints (quantum authentication) which will contribute greatly to the cybersecurity domain, beyond encryption. QCI has several patents in the area of quantum-based technologies for protection of data at rest and in quantum private communication. QCI plans to begin commercial development of quantum networking products in 2023 and partnerships are actively being

explored.

151.   On March 30, 2023, QCI filed an annual report on Form 10-K with the SEC, reporting QCI's financial and operating results for the quarter and year ended December 31, 2022 (the "2022 10-K"). In discussing QCI's quantum computing products, the 2022 10-K stated, in relevant part:

> Since our formation in 2018, the Company has focused on providing software tools and applications for several commercially available quantum computers and we remain committed to that goal. However, following the June 2022 merger with QPhoton, Inc. ("QPhoton") and its associated intellectual property and engineering team, the Company is now able to provide full-stack quantum information services.
>
> ***
>
> Our short-term core business model is based on generating revenue from selling access to our advanced quantum data processing systems via the cloud, with the long-term model focused on selling desktop or rack-sized quantum devices and systems to commercial and individual users. We currently offer access to our quantum computing machines via our own in-house cloud service and plan to eventually offer access through other commercial service providers.
>
> ***
>
> QCI's merger with QPhoton, combined with QCI's significant IP work that culminated in the development of the Company's Qatalyst software, enables the Company to offer room temperature quantum computation systems through cloud services today, as well as affordable, turn-key products in the future.
>
> ***
>
> QCI's evolution into full-stack quantum computing company was enabled by the prior creation of its Qatalyst software.
>
> ***
>
> We are developing quantum computing systems as well as hardware agnostic software capable of delivering high-performance computing capabilities to various industries while mitigating dependency risks that may emerge from a dominant quantum computing hardware vendor. As an early participant in this rapidly growing ecosystem, we believe we are well-positioned to capture and drive a meaningful amount of this category growth. We believe there is further potential upside from quantum computing and technology more broadly opening

up new markets not captured in traditional high-performance computing market size estimates.

\*\*\*

If large-scale development of our quantum computers commences, our computers may contain defects in design and manufacture that may cause them to not perform as expected or that may require repair and design changes. Our quantum computers are inherently complex and incorporate technology and components that have not been used for other applications and that may contain defects and errors, particularly when first introduced. We have a limited frame of reference from which to evaluate the long-term performance of our computers. There can be no assurance that we will be able to detect and fix any defects in our quantum computers in a timely manner that does not disrupt our services to our customers.

\*\*\*

*We have not produced quantum computers with high qubit counts at volume and we face significant barriers in our attempts to produce quantum computers, including the need to invent and develop new technology. If we cannot successfully overcome those barriers, our business will be negatively impacted and could fail.*
Our projections are dependent on the cost per qubit decreasing over the next several years as our quantum computers advance. These cost projections are based on economies of scale due to demand for our computer systems, technological innovation and negotiations with third-party parts suppliers. If these cost savings do not materialize, the cost per qubit may be higher than projected, making our quantum computing solution less competitive than those produced by our competitors, which could have a material effect on our business, financial condition or results of operations.

\*\*\*

*Even if we are successful in developing quantum computing systems and executing our strategy, competitors in the industry may achieve technological breakthroughs which render our quantum computing systems obsolete or inferior to other products.*

\*\*\*

The nascent market for quantum computers is still rapidly evolving, characterized by rapidly changing technologies, competitive pricing and competitive factors, evolving government regulation and industry standards, and changing customer demands and behaviors. If demand for quantum computers in general does not develop as expected, or develops more slowly than expected, our business, prospects, financial condition and operating results could be harmed.

In addition, our growth and future demand for our products is

highly dependent upon the adoption by developers and customers of quantum computers, as well as on our ability to demonstrate the value of quantum computing to our customers. Delays in future generations of our quantum computers or technical failures at other quantum computing companies could limit acceptance of our solution.

\*\*\*

*Our quantum computing systems may not be compatible with some or all industry-standard software and hardware in the future, which could harm our business.*

Since the merger with QPhoton, we will be focusing more of our efforts on creating quantum computing hardware, in addition to refining the software development platform to access our hardware, and application programing interfaces ("APIs") to access our systems.

152.    On May 12, 2023 QCI filed a quarterly report on Form 10-Q with the SEC, reporting QCI's financial and operating results for the quarter ended March 31, 2023 (the "1Q23 10-Q"). With respect to QCI's quantum computing technology, the 1Q23 10-Q made the following representations:

As a result of the merger with QPhoton, Inc. in June 2022, the Company is now able to offer photonic quantum computing systems and related services.

\*\*\*

Our short-term core business model is based on generating revenue from selling access to our advanced quantum data processing systems via the cloud, with the long-term model focused on selling desktop or rack-sized quantum devices and systems to commercial and individual users. We currently offer access to our quantum computing machines via our own in-house cloud service and plan to eventually offer access through other commercial service providers.

\*\*\*

QCI is focused on providing integrated quantum information gathering, transmission, and processing solutions, including both the user interface software and the quantum hardware. With our proprietary full-stack technologies that are designed using our

solution-oriented system architectures, we believe we will have a competitive advantage in the market. With an integrated engineering team working across multiple quantum technology domains, we believe we are uniquely positioned to leverage our expertise in software, hardware, and nanophotonic circuits to develop quantum services and products, from quantum chip design and manufacturing through cloud delivery and eventually sales of hardware systems. We believe this full-stack development approach offers both the fastest and lowest risk path to building commercially valuable quantum machines.

\*\*\*

QCI's merger with QPhoton, combined with QCI's significant IP work that culminated in the development of the Company's Qatalyst software, enables the Company to offer room temperature quantum computation systems through cloud services today, as well as affordable, turn-key products in the future. This combination of quantum hardware and software will address the steep learning curve and highly particular skillsets generally associated with quantum information processing, which have historically represented significant barriers to adoption for companies and government entities looking to leverage novel quantum computing capabilities to solve problems.

\*\*\*

QCI's evolution into full-stack quantum computing company was enabled by the prior creation of its Qatalyst software.

\*\*\*

The combination of the Entropy Quantum Computer and Qatalyst has enabled QCI to launch its cloud-based quantum computing solutions on a subscription basis. Subscriptions are offered on an annual, quarterly, and proof of concept (short term) basis with discounts provided for multiyear commitments. Subscription prices are based on the expected usage from each customer. A dedicated system subscription (currently offered as the "Dirac Dedicated Subscription"), is also available that provides unlimited usage within the SLA included in our agreement. QCI anticipates that our subscription service will be competitive with the quantum computing subscription services offered by our competitors, such as IBM, IonQ and Quantinuum. However, we believe our subscription service will offer significant computational advantage that will differentiate it from our competitors.

\*\*\*

As a full stack quantum solutions provider, while selling subscriptions in some manner to Dirac EQCs will be the cornerstone of our business model, providing professional services or quantum solutions support will likely be needed in many cases, especially in the beginning of a customers' quantum journey. We partner today with large management consulting companies as a way to scale our business and we expect that consulting partners will continue to grow in numbers and as a percentage of our customers. In addition, we plan to always provide a Quantum Solutions offering for customers that prefer to work directly with a full stack provider and customers who are using cutting edge technologies that may not have become supported yet by our consulting partners.

\*\*\*

The Cybersecurity field has been aware for some time of the potential threats and benefits of quantum computing resulting from the expectation that quantum computers will eventually have the capability to can "break" any of the currently utilized non-quantum-based encryption methods. However, effective cybersecurity goes well beyond encryption for protection. Effective cybersecurity requires a holistic approach to protecting the enterprise. The Company believes that our quantum computing capabilities may have applications in encryption. However, initially we are applying our quantum technologies to create secure transport layers (quantum networks) and endpoints (quantum authentication) which will contribute greatly to the cybersecurity domain, beyond encryption. QCI has several patents in the area of quantum-based technologies for protection of data at rest and in quantum private communication. QCI plans to begin commercial development of quantum networking products in 2023 and partnerships are actively being explored.

153.    On June 26, 2023, QCI filed an amendment to the 2022 10-K on Form 10-K/A ("the Amended 2022 10-K") with the SEC. With respect to QCI's quantum computing technology, the Amended 2022 10-K made the following representations:

As a result of the merger with QPhoton, Inc. in June 2022, the

Company is now able to offer photonic quantum computing systems and related services.

\*\*\*

The merger with QPhoton adds to the Company's portfolio of quantum computing products and enables the Company to offer a wider range of quantum information services.

154. On August 14, 2023 QCI filed a quarterly report on Form 10-Q with the SEC, reporting QCI's financial and operating results for the quarter ended June 30, 2023 (the "2Q23 10-Q"). With respect to QCI's quantum computing technology, the 2Q23 10-Q made the following statements:

As a result of the merger with QPhoton in June 2022, the Company is now able to offer its software capability that is embedded within its new hardware offering of photonic quantum computing systems and related services.

\*\*\*

The merger with QPhoton adds to the Company's portfolio of quantum computing products and enables the Company to offer a wider range of quantum information services.

\*\*\*

By combining QPhoton's quantum hardware intellectual property with QCi's quantum software platform and its expertise in various quantum hardware platforms, the Company has transformed into is now able to provide full-stack innovative quantum solutions company providing quantum technologies ranging from quantum computing to quantum sensing, quantum imaging and quantum cyber security.

\*\*\*

While we are continuing to develop and evolve our technology, our short-term goals and core business model are based on generating revenue from selling access to our advanced quantum computing systems (via the cloud) as we develop commercial capabilities. As previously stated, we are developing commercial quantum imaging, sensing, and cybersecurity products that we are offering to both commercial and government clients. The Company's near-term model is focused on selling desktop or rack-sized as well as portable quantum devices that will power hybrid computing systems that will create the combination

of classical computing and quantum computing to deliver critical business solutions unavailable in the market today. Our long term product goal is to build laptop quantum computers, at price points that will make them affordable to computer users at every business level, not just the largest companies who can afford better technology. We currently offer access to our quantum computing machines via our own in-house cloud service and have begun the process to be able to take orders for select hardware and device products. Our plan is to also eventually offer access through other commercial service providers.

***

QCi's merger with QPhoton, combined with QCi's significant intellectual property work that culminated in the development of Qatalyst software, enables the QCi to offer room temperature quantum computation systems through cloud services today and, we expect, will enable us to offer affordable, turn-key products in the future as well. This combination of quantum hardware and software will address the steep learning curve and highly particular skillsets generally associated with quantum information processing, which have historically presented significant barriers to adoption for companies and government entities looking to leverage novel quantum computing capabilities to solve problems.

***

*Quantum Computing*

*QCi's unique position in the marketplace is due to its core photonic computing capability which has transformed us into a full-stack innovative quantum solutions company. This core technology results in QCi's ability to offer quantum technologies ranging from quantum computing to quantum sensing, quantum imaging and quantum cyber security. Addressing multiple quantum technology market areas that few of its competitors can claim.*

***

The combination of the Entropy Quantum Computer and Qatalyst, our internally-developed software that acts as an interface pathway for external access, has enabled us to launch our cloud-based quantum computing solutions on a subscription basis. Subscriptions are offered on an annual, quarterly, and proof of concept (short term) basis with discounts provided for multiyear

61

commitments. Subscription prices are based on the expected usage from each customer. A dedicated system subscription (currently offered as the "Dirac Dedicated Subscription"), is also available that provides unlimited usage within the SLA included in our agreement. QCi anticipates that our subscription service will be competitive with the quantum computing subscription services offered by our competitors, such as IBM, IonQ and Quantinuum. However, we believe our subscription service will offer significant computational advantage that will differentiate it from our competitors.

155. On November 13, 2023, QCI filed a quarterly report on Form 10-Q with the SEC, reporting QCI's financial and operating results for the quarter ended September 30, 2023 (the "3Q23 10-Q"). With respect to QCI's quantum computing technology, the 3Q23 10-Q made the following representations:

As a result of the merger with QPhoton in June 2022, the Company is now able to offer its software capability that is embedded within its new hardware offering of photonic quantum computing systems and related services.

\*\*\*

The merger with QPhoton adds to the Company's portfolio of quantum computing products and enables the Company to offer a wider range of quantum information services.

\*\*\*

We believe that the key to our competitive advantage over other quantum computing hardware is the ability of our products to operate at room temperature with no expensive specialized cryogenic cooling, controlled noise and vibration free environments.

\*\*\*

While we are continuing to develop and improve our technology, our short-term goals and core business model are based on generating revenue from selling access to our advanced quantum computing systems (via the cloud) and on premise, both available with support from our Quantum Solutions team. As previously stated, we are developing commercial quantum imaging, sensing, and cybersecurity products that we are offering to both commercial and government clients. The Company's near-term

model is focused on selling desktop or rack-sized as well as portable quantum devices that will power hybrid computing systems that will create the combination of conventional computing and quantum computing to deliver alternative problem-solving solutions. Our long-term product goal is to build laptop quantum computers at price points that will make them affordable to computer users at every business level, not just the largest companies that can afford to spend significant sums to obtain better technology. We currently offer access to our quantum computing machines via our own in-house cloud service and have begun the process to be able to take orders for select hardware and device products.

\*\*\*

QCi's merger with QPhoton, combined with QCi's significant intellectual property work that culminated in the development of our Qatalyst software, enables the Company to offer room temperature quantum computation systems through cloud services today and, we expect, will enable us to offer affordable, turn-key products in the future as well. This combination of quantum hardware and software will address the steep learning curve and highly particular skillsets generally associated with quantum information processing, which have historically presented significant barriers to adoption for companies and government entities looking to leverage novel quantum computing capabilities to solve problems.

156.    On April 1, 2024, QCI filed an annual report on Form 10-K with the SEC, reporting QCI's financial and operating results for the quarter and year ended December 31, 2023 (the "2023 10-K"). In discussing QCI's quantum computing technologies, the 2023 10-K stated, in relevant part:

Our longer-term product development plan is to migrate product designs based on discrete components to a set of optical integrated circuits built on wafers using a crystalline material called lithium niobate ("Thin Film Lithium Niobate" or "TFLN"). The Company believes that TFLN is an excellent material for design and implementation of optical integrated circuits suitable for our quantum computing and sensing products because it is crystal based and hence can have optical waveguides directly etched into the material. QCi possesses strong domain experience and intellectual property in TFLN design and chip fabrication and has

completed initial production of several specialty devices such as electro-optical modulators ("EOM's"). The Company has begun buildout of a state-of-the-art TFLN chip manufacturing facility in a leased space within Arizona State University's Research Park in Tempe, Arizona. The Company's understanding is that this could be the nation's first dedicated optical integrated circuit manufacturing facility using TFLN wafers to achieve quantum effects. Our plan for the facility is to produce a range of custom lithium niobate chips for use in our own product lines as well as chips for sale in the commercial market. The Company has plans to support this initiative by applying for funding for distinct uses under both the Title 17 Clean Energy Financing Program managed by the US Department of Energy's Loan Programs Office and also the Creating Helpful Incentives to Produce Semiconductors Act of 2022 (the "CHIPS Act"), which allocates $52 billion for the revitalization and onshoring of semiconductor manufacturing in the U.S. The CHIPS Act funding specifically includes $39 billion in manufacturing incentives and $13 billion to support new research and development.

\*\*\*

QCi's strategy is to provide a range of accessible and affordable quantum machines to commercial and government markets. Our proprietary technology is central to our strategy because we believe that it enables us to leverage the advantages of size, weight, power and cost (over competing cryogenic products to drive market adoption and volume of sales.

In addition to cloud-based access to our quantum computers, we offer on premises installation of our EQC product, rack-mountable and compatible with standard server room infrastructure requiring no need for special cooling, shielding, or power considerations. The Company believes the EQC's small rack-mountable size and low-energy consumption provides a substantial competitive edge as compared to superconducting, cryogenic quantum systems offered by competitors that are also designed to solve optimization problems.

\*\*\*

Our growth is dependent upon our ability to successfully market and sell our quantum computers and quantum computing products and services. We do not have experience with the large-scale production and sale of quantum computing technology. Our growth and long-term success will depend upon the development

of our sales and production capabilities.

\*\*\*

Without timely innovation and development, our quantum computing products and services could be rendered obsolete or less competitive by changing customer preferences or because of the introduction of a competitor's newer technologies.

\*\*\*

In addition, our growth and future demand for our products is highly dependent upon the adoption by developers and customers of quantum computers, as well as on our ability to demonstrate the value of quantum computing to our customers. Delays in future generations of our quantum computers or technical failures at other quantum computing companies could limit acceptance of our products and services. Negative publicity concerning our products and services or the quantum computing industry as a whole could limit acceptance of our products and services.

157.    On September 11, 2024, QCI filed an amendment to its 2023 10-K on Form 10-K/A with the SEC (the "2023 10-K/A") to, inter alia, "restate its consolidated financial statements, including the notes thereto, for the years ended December 31, 2023 and 2022[.]" The 2023 10-K/A also "replace[d] the Report of Independent Registered Public Accounting Firm prepared by BF Borgers CPA PC ('BF Borgers') included in the [2023 10-K] with the Report of Independent Registered Public Accounting Firm from BPM LLP ('BPM')" after the SEC had "suspend[ed] BF Borgers from appearing and practicing as an accountant before the SEC and" QCI had "subsequent[ly] ret[ained] . . . BPM to replace BF Borgers[.]" In discussing QCI's quantum computing technology, the 2Q23 10-Q made the following representations:

While we have made significant progress toward this overarching objective, the generation of revenue from customers has been slow to develop, in part due to the fact that quantum computing is a cutting-edge technology for most potential customers, who are therefore proceeding cautiously with small, exploratory contracts to better understand its applicability to their requirements.

\*\*\*

65

> The merger with QPhoton adds to the Company's portfolio of quantum computing products and enables the Company to offer a wider range of quantum information services.

158.    On October 2, 2024, QCI filed a Form 10-Q for the quarter ending March 31, 2024 with the SEC ("Q1 FY 24 10-Q"). The Q1 FY 24 10-Q included the following representations regarding QCI's quantum computing technology:

> The Company initially focused on providing software tools and applications for several commercially available quantum computers. However, following the June 2022 merger with QPhoton and its associated intellectual property and engineering team, the Company now offers integrated high-performance quantum systems, ancillary products and services.
>
> ***
>
> Our longer-term product development plan is to migrate product designs based on discrete components to a set of optical integrated circuits built on wafers using a crystalline material called lithium niobate ("Thin Film Lithium Niobate" or "TFLN"). The Company believes that TFLN is an excellent material for design and implementation of optical integrated circuits ("TFLN Chips") suitable for our quantum computing and sensing products because it is crystal based and hence can have optical waveguides directly etched into the material.

159.    On October 2, 2024, QCI filed a Form 10-Q for the quarter ending June 30, 2024 with the SEC ("Q2 FY 24 10-Q"). The Q2 FY 24 10-Q included the following representations regarding QCI's quantum computing technology:

> The Company initially focused on providing software tools and applications for several commercially available quantum computers. However, following the June 2022 merger with QPhoton and its associated intellectual property and engineering team, the Company now offers integrated high-performance quantum systems, ancillary products and services.
>
> ***
>
> Our longer-term product development plan is to migrate product designs based on discrete components to a set of optical integrated circuits built on wafers using a crystalline material called lithium niobate ("Thin Film Lithium Niobate" or "TFLN"). The Company believes that TFLN is an excellent material for design and implementation of optical integrated circuits ("TFLN Chips")

> suitable for our quantum computing and sensing products because it is crystal based and hence can have optical waveguides directly etched into the material.

160.    On November 6, 2024, QCI filed a Form 10-Q for the quarter ending September 30, 2024 with the SEC ("Q3 FY 24 10-Q"). The Q3 FY 24 10-Q included the following representations regarding QCI's quantum computing technology:

> The Company initially focused on providing software tools and applications for several commercially available quantum computers. However, following the June 2022 merger with QPhoton and its associated intellectual property and engineering team, the Company now offers integrated high-performance quantum systems, ancillary products and services.

161.    The statements set forth in paragraphs 146 to 160 were all misleading because they represented that QCI offered "quantum computing" or "quantum computers" when the QPhoton technology and hardware did not use quantum computing and could not be accurately or fairly described as using "quantum computing" or being a "quantum computer".

**"millionways"**

162.    On May 22, 2023, QCI issued a press release announcing that its Board of Directors had unanimously approved the signing of a non-binding letter of intent to acquire up to 100% of millionways, Inc. - a firm purporting to have created "the world's first emotionally-intelligent AI platform" – pending due diligence and fairness checks (the "millionways Press Release"). The millionways Press Release contained several materially false and misleading statements about QCI's business, technology, and the purported acquisition.

163.    The millionways Press Release represented that "[o]ver the past year, QCI has built and tested multiple hybrid AI hardware systems … [which] have demonstrated substantial advantages over existing digital electronic hardware." This statement was materially false and misleading because QCI did not actually measure the advantages of a hybrid AI hardware system

against "digital electronic hardware"; it was only interested in a seat on the AI hype train and interested in the degree to which associating the idea of quantum computing with AI could pump its price. This statement misrepresented the present functionality and competitiveness of QCI's technology.

164.    The millionways Press Release contained the representation that "QCi's hybrid hardware solutions meet the evolving needs of AI and delivers remarkable computing speed, low electric power needs with minimal heat dispersion and supports large-scale parallel processing and thereby the agility to compete with large data centers on big data challenges. This is materially false and misleading because QCI's hardware was not capable of competing with large data centers or delivering the described performance. In asserting that QCI's systems could presently achieve such capabilities, defendants materially misrepresented QCI's technological development.

165.    On May 12, 2023, QCI filed a Form 10-Q for the quarter ending March 31, 2023 with the SEC ("Q1 FY 23 10-Q"). The Q1 FY 23 10-Q included the following representation regarding QCI's relationship with millionways:

> On April 27, 2023, the Company expanded its commercially available product line to include its Reservoir Quantum Computing (RQC). Via an MOU with AI company millionways, Inc., the partnership will demonstrate the value of processing millionways' AI algorithms through QCI's existing RQC systems using audio files to produce an emotional scoring capability. If the data processing project is successful, the companies will develop a joint marketing and business development plan to pursue commercial opportunities.

166.    This representation is materially false and misleading because it includes language which would impress upon an investor that QCI is in the business of buying and selling quantum products, when in fact, QCI's "partnership" with millionways was merely intended to draw investor attention through a press release to pump the value of QCI's stock with the

placement of buzzy words like "AI" "algorithms" in close proximity to "commercial opportunities. In reality, QCI did not possess a commercially available product line – or a commercially viable but a series of projects propped up by potential of a technology with great promise. QCI's "projects" are the kinds that languish in university labs, dependent on grants, but for QCI's purposes they are not important for what they accomplish, but the kind of attention they attract to the company, and the projects ultimately produce nothing, because QCI does not intend for them to produce anything but print.

167.    On August 14, 2023, QCI filed a Form 10-Q for the quarter ending June 30, 2023 with the SEC ("Q2 FY 23 10-Q"). The Q2 FY23 10-Q contained the following representation:

> On May 16, 2023, the Company entered into a Summary of Proposed Terms (the "Letter of Intent") with millionways, Inc. ("millionways") to provide bridge loans to millionways and enter into due diligence to acquire up to 100% of the AI firm. On June 6, 2023, the Company entered into a Note Purchase Agreement (the "MW Agreement") with millionways, pursuant to which the Company agreed to purchase from millionways up to three unsecured promissory notes (each, a "MW Note"), in an aggregate principal amount of up to $2,000,000, subject to the terms and conditions of the MW Agreement. Also on June 6, 2023, pursuant to the terms of the MW Agreement, the Company purchased the MW Notes from millionways and loaned an aggregate principal amount of $500,000 to millionways.
>
> The MW Agreement contains customary representations and warranties by millionways and the Company, as well as a "most favored nations" provision for the benefit of the Company. The MW Notes issued under the MW Agreement, including the MW Notes issued on June 6, 2023, provide that the indebtedness evidenced by the applicable MW Note bears simple interest at the rate of 10% per annum (or 15% per annum during the occurrence of an event of default, as defined in the MW Notes), and becomes due and payable in full on the earlier of (i) May 16, 2024, (ii) a change of control (as defined in the MW Notes) of millionways, (iii) dollar-for-dollar prepayment for additional capital received through any vehicle from a third party or (iv) an event of default.

168.    The above statement is materially false and misleading because it contains language that would lead a reasonable investor to believe that QCI had actually acquired millionways, instead of merely providing a loan to millionways with a right of first refusal if it were purchased.

169.    The Q2 FY 23 10-Q also contained the following representation:

> Launched June 2023, our first reservoir computing product is an edge device that is photonic-inspired, FPGA-based, and optimized for recurrent neural network applications. The Reservoir Computer ("RC") hardware system has advantages over the more traditional software approaches to reservoir computing include significantly faster processing speeds, 80% - 95% less energy consumption, portable (size of power bank), affordable, and offering materially less training time. The RC delivers superior performance in time dependent tasks, such as chaotic time series prediction, radar signal classification, and speech recognition. The QCi Reservoir Computer's advantage of being deployed at the edge of a computer network, allows data analysis to occur at the sensors or collection point, reducing latency, dependency on network connections, and allows for more real-time processing of data. To date, the market for reservoir computing has been limited due to computing cost and technical implementation complexities, which is expected to be practically eliminated with our reservoir computer. The QCi's reservoir computer can address complex problems in fields such as natural language processing, weather prediction, financial analysis, drug discovery, optimization, autonomous driving, enhancement of LiDAR capabilities, and a material boost to performance (speed, accuracy and data processing volume), affordability, and power-savings to the AI industry. Our current contract with NASA and collaboration with AI firm millionways, both of whom are the first to use the QCi RC, speak to QCi's Reservoir Computer's ability to solve complex machine learning problems across different application areas. We are accepting order for the RC now and will begin shipping during second half of 2023.

170.    The above statement is materially false and misleading because a reasonable reader would read it as describing QCI as at or very near to commercial capacity. In reality, QCI was nowhere near commercial capacity, and knew that the Reservoir Computer could not be commercially produced. Instead, this statement reads like one of QCI's press releases, filled with

buzzy language designed for SEO and intended to draw investors' attention. The Reservoir Computer language reads like a sales brochure but was not actually a commercial product.

### Regulation S-K Items 105 and 303

171.    Throughout the Class Period, QCI's periodic financial filings were required to disclose the adverse facts and circumstances detailed above under applicable SEC rules and regulations.  Specifically, Item 105 of SEC Regulation S- K, 17 CFR § 229.105 ("Item 105"), required QCI to "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the [Company] or offering speculative or risky" and "[c]oncisely explain how each risk affects the [Company] or the securities being offered."  Defendants' failures to disclose, *inter alia*, that QCI's quantum computing technologies, products, and/or services were less effective than Defendants had led investors to believe; that QCI's purported partnership with NASA, as well as the scope and nature of QCI's NASA- related contracts and/or subcontracts, were less meaningful than Defendants had led investors to believe; that QCI's purported TFLN foundry was less developed, and purchase orders for QCI's TFLN chips were less meaningful, than Defendants had led investors to believe; and that QCI's revenues relied, at least in part, on undisclosed related party transactions; violated Item 105 because these issues represented material factors that made an investment in QCI speculative or risky.

172.    For similar reasons, Defendants violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"), which required QCI to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Defendants' failures to disclose, *inter alia*, that QCI's quantum computing technologies, products, and/or services were less effective than Defendants had led investors to believe; that QCI's purported partnership with NASA, as well as the scope and nature of QCI's NASA-related contracts and/or

subcontracts, were less meaningful than Defendants had led investors to believe; that QCI's purported TFLN foundry was less developed, and purchase orders for QCI's TFLN chips were less meaningful, than Defendants had led investors to believe; and that QCI's revenues relied, at least in part, on undisclosed related party transactions; violated Item 303 because these issues represented known trends and uncertainties that were likely to have a material unfavorable impact on QCI's business and financial results.

## SCIENTER

173.    Defendants Liscouski, McGann, Roberts, and Boehmler, because of their positions with QCI, possessed the power and authority to control the contents of QCI's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market. Each Individual Defendant was provided with copies of QCI's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

174.    As set forth above, Defendant had actual knowledge of the related party nature of the contract with Quad M as he knew that he was a director of both companies. Furthermore, through the regular all-hands meetings and other communications described by FE1 and FE2, Defendants were aware of the circumstances of the Quad M and millionways contracts and the

fact that no work was being performed by QCI on those contracts and no meaningful payments were received from either Quad M or millionways.

175.    As set forth above, Defendants Liscouski, McGann, and Roberts had actual knowledge of the falsity of QCI's statements of its "quantum computing" technology as set forth above as FE2 personally advised each of those Defendants that the QPhoton device and technology did not use quantum computing.

176.    Alternatively, Defendants made public statements regarding the capabilities of QPhoton's technology and hardware by describing it as "quantum computing" knowing that QCI had been prevented from conducting technological due diligence and, therefore, was without knowledge or any basis for describing QPhoton's technology as "quantum computing". The Defendants thus acted with deliberate recklessness as to those statements.

177.    QCI is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

178.    The scienter of the Individual Defendants, and other employees and agents of QCI are similarly imputed to QCI under respondeat superior and agency principles.

## RELIANCE

179.    At all relevant times, the markets for QCI securities were efficient for the following reasons, among others: (a) as a regulated issuer, QCI filed periodic public reports with the SEC; (b) QCI regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as

communications with the financial press, securities analysts, and other similar reporting services; (c) QCI was followed by several securities analysts employed by major brokerage firm(s), who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and (d) QCI securities was actively traded in an efficient market, namely NASDAQ, under the ticker symbol "QUBT".

180.    At all material times, Plaintiff and the Class relied on the misleading statements and omissions by Defendants.

181.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: (a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period; (b) the omissions and misrepresentations were material; (c) QCI securities traded in an efficient market; (d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of QCI securities; and (e) Plaintiff and other members of the Class purchased QCI securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

182.    As a result of the foregoing, the market for QCI securities promptly digested current information regarding QCI from publicly available sources and reflected such information in QCI securities. Under these circumstances, all purchasers of QCI securities during the Class Period suffered similar injury through their purchase of QCI securities at artificially inflated prices and the presumption of reliance applies.

## **LOSS CAUSATION**

183.    During the Class Period, as detailed herein, Defendants engaged in a scheme to

deceive the market and a course of conduct that artificially inflated and/or maintained the price of QCI's securities, and operated as a fraud or deceit on Class Period purchasers of QCI's securities by failing to disclose and misrepresenting the facts detailed herein.

184.    When Defendants' prior misrepresentations, omissions, and fraudulent conduct were disclosed on October 5, 2022, December 9, 2024, and January 16, 2025, the price of QCI's stock declined significantly as the prior artificial inflation came out of its stock price.

185.    As a result of their purchases of QCI's securities during the Class Period, Plaintiff and the other Class members suffered economic loss, i.e. damages, under the federal securities laws.

186.    By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of QCI's business, financial performance, and financial results. When the truth about and risks associated with Defendants' misstatements were disclosed, the price of QCI's securities declined significantly. These declines removed the inflation from the price of QCI securities, causing real economic loss to investors who had purchased QCI securities during the Class Period.

187.    The economic loss, i.e. damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate and/or maintain the price of QCI securities and the subsequent decline in the value of the securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

188.    Furthermore, as alleged herein, during the Class Period, Defendants engaged in practices intended to mislead investors by artificially affecting the prices of QCI securities. Defendants employed devices, schemes, and artifices to defraud, and/or engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of

QCI securities during the Class Period.

189.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of QCI securities during the Class Period.

190.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II
### (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)

191.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

192.    During the Class Period, the Individual Defendants participated in the operation and management of QCI, and conducted and participated, directly and indirectly, in the conduct of QCI's business affairs. Because of their senior positions, they knew the adverse non-public information about QCI's misstatement of income and expenses and false financial statements.

193.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to QCI's financial condition and results of operations, and to correct promptly any public statements issued by QCI which had become materially false or misleading.

194.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which QCI disseminated in the marketplace during the Class Period concerning QCI's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause QCI to engage in the wrongful acts complained of

herein. The Individual Defendants, therefore, were "controlling persons" of QCI within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of QCI securities.

195.    Each of the Individual Defendants, therefore, acted as a controlling person of QCI. By reason of their senior management positions and/or being directors of QCI, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, QCI to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of QCI and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

196.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by QCI.

## <ins>PRAYER FOR RELIEF</ins>

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: August 26, 2025                    Respectfully submitted,

                                          **LEVI & KORSINSKY, LLP**

                                          */s/ Adam Apton*
                                          Adam M. Apton
                                          Nicholas I. Porritt
                                          33 Whitehall St, 27th Floor
                                          New York, NY 10004
                                          Tel: (212) 363-7500
                                          Fax: (212) 363-7171
                                          nporritt@zlk.com

                                          *Counsel for Lead Plaintiff*