**Levi & Korsinsky, LLP**
Adam M. Apton
33 Whitehall Street, 27th Floor
New York, NY 10004
Tel: (212) 363-7500
aapton@zlk.com

*Counsel for Lead Plaintiff Jaeyeol Jung*

–additional counsel on signature page—

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JAEYEOL JUNG, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>QUANTUM COMPUTING INC., WILLIAM J. MCGANN, ROBERT LISCOUSKI, CHRISTOPHER BOEHMLER, and CHRISTOPHER ROBERTS,<br>,<br><br>Defendants. | **Case No. 2:25-cv-01457-MEF-JSA**<br><br>CLASS ACTION<br><br>**ORAL ARGUMENT REQUESTED** |

**LEAD PLAINTIFF JAEYEOL JUNG'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS QUANTUM COMPUTING INC., WILLIAM J. MCGANN, ROBERT LISCOUSKI, CHRISTOPHER BOEHMLER, AND CHRISTOPHER ROBERTS, MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

**Page**

I.    Preliminary Statement ................................................................. 1

II.   Factual Background ..................................................................... 4

      A.    QCI Acquires QPhoton and Begins Marketing "Quantum ................... 4

      Computing" Technology ................................................................. 4

      B.    Former Employees Reveal That QPhoton Technology Does Not
            Use Quantum Computing ......................................................... 5

      C.    Defendants Continue to Make False And Misleading
            Representations About Its Hardware. ......................................... 6

      D.    QCI Exaggerates Its NASA Relationships ................................... 8

      E.    QCI's Partnership and Loan to millionways ............................... 8

      F.    QCI Announces Plans for TFLN Foundry ................................... 9

      G.    Capybara and Iceberg Reports Reveal the Fraud ........................ 9

III.  ARGUMENT ............................................................................. 11

      A.    Legal Standard .................................................................. 11

      B.    The Complaint Alleges Materially False and Misleading
            Statements ........................................................................ 12

            1.    Defendants Misled Investors About QCI's Quantum
                  Computing Capabilities. ................................................. 13

            2.    Defendants Mislead Investors About QCI's Relationship
                  with NASA ................................................................. 22

            3.    Defendants Mislead Investors About QCI's Relationship
                  with millionways ........................................................ 24

            4.    Defendants Mislead Investors About QCI's "TFLN
                  Foundry" ................................................................... 26

# TABLE OF CONTENTS

**Page**

5.     The Court should credit Plaintiff's allegations based on the Iceberg and Capybara Reports. ............................27

C.     The Complaint Adequately Alleges Defendants' Scienter .................30

1.     Defendants' knowledge and reckless disregard of QCI's lack of quantum computing hardware.......................................30

2.     The core operations doctrine support scienter. .........................34

3.     Defendants' SOX certifications bolster scienter......................35

D.     The Complaint Alleges Loss Causation .............................................36

E.     Control Person Liability Under Section 20(a) is Adequately Pled .....................................................................................................39

IV.     CONCLUSION.......................................................................................40

# TABLE OF AUTHORITIES

**Page**

## CASES

*Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*,
532 F. Supp. 3d 189 (E.D. Pa. 2021) ................................................................33

*Alta Fundamental Advisors LLC v. Bisaro,*
2025 WL 1793691 (D.N.J. June 30, 2025) ......................................................40

*Arata v. Standard Lithium Ltd.*,
2025 WL 2773004 (E.D.N.Y. Sept. 28, 2025) .................................................17

*Barbee v. Amira Nature Foods*,
2024 WL 626302 (D.N.J. Feb. 14, 2024)..........................................................40

*Bond v. Clover Health Invs., Corp.*,
587 F. Supp. 3d 641(M.D. Tenn. 2022).............................................................39

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*,
394 F.3d 126 (3d Cir. 2004)..............................................................................12

*Carmignac Gestion, S.A. v. Perrigo Co. PLC*,
2019 WL 3451523 (D.N.J. July 31, 2019).........................................................34

*City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*,
70 F.4th 668 (3d Cir. 2023) ..............................................................................12

*City of Warren Police & Fire Ret. Sys. V. Prudential Fin., Inc.*,
70 F.4th 668 (3d Cir. 2023)...............................................................15, 18, 25

*Dang v. Amarin Corp.,*
750 F. Supp. 3d 431(D.N.J. 2004) ...................................................................17

*Druskin v. Answerthink,Inc.*,
299 F. Supp. 2d 1307 (S.D. Fla. 2004) .............................................................39

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)..............................................................................36, 38

# TABLE OF AUTHORITIES

**Page**

*Eng v. Edison Int'l,*
2017 WL 1857243 (S.D. Cal. May 5, 2017)....................................................39

*Frazier v. Vitalworks, Inc.*,
341 F. Supp 2d 142 (D. Conn. 2004) ............................................................17

*Hall v. Johnson & Johnson*,
2019 WL 7207491 (D.N.J. Dec. 27, 2019)..............................................35, 36

*HP Holding LLC v. Red Roof Inns, Inc.*,
2024 WL 2720463 (D.N.J. May 28, 2024) ...................................................... 1

*Hull v. Glob. Digital Sols., Inc.*,
2017 WL 6493148 (D.N.J. Dec. 19, 2017).....................................................37

*In re Adient PLC Sec. Litig.*,
2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020)...................................................17

*In re Anadigics, Inc., Sec. Litig.*,
2011 WL 4594845 (D.N.J. Sep. 30, 2011) .....................................................16

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004)............................................................36

*In re Banco Bradesco S.A. Sec. Litig.*,
277 F. Supp. 3d 600 (S.D.N.Y. 2017)............................................................33

*In re Bio-Technology Gen. Corp. Sec. Litig.*,
380 F.Supp.2d 574 (D.N.J. 2005). .................................................................36

*In re Coinbase Glob., Inc. Sec. Litig.*,
2024 WL 4053009 (D.N.J. Sept. 5, 2024) ......................................................39

*In re Dexcom, Inc. Class Action Sec. Litig.*,
2025 WL 2606620 (S.D. Cal. Sep. 9, 2025)...................................................25

*In re Digital Island Sec. Litig.*,
223 F. Supp 2d 546 (D. Del. 2002)................................................................40

# TABLE OF AUTHORITIES

**Page**

*In re Discovery Lab'ys Sec. Litig.*,
2006 WL 3227767 (E.D. Pa. Nov. 1, 2006) ................................................. 16

*In re Eros Int'l PLC Sec. Litig.*,
2021 WL 1560728 (D.N.J. Apr. 20, 2021) ................................................. 27

*In re FirstMarblehead Corp. Sec. Litig.*,
639 F. Supp. 2d 145 (D. Mass. 2009) ........................................................ 39

*In re Genta,Inc., Sec. Litig.*,
2005 WL 2416970 (D.N.J. Sept. 30, 2005) ................................................. 34

*In re Intelligroup Sec. Litig.*,
527 F. Supp. 2d 262 (D.N.J. 2007) ........................................................... 21

*In re Nice Sys., Ltd. Sec. Litig.*,
135 F. Supp. 2d 551 (D.N.J. 2001) ........................................................... 25

*In re Par Pharm. Sec. Litig.*,
2009 WL 3234273 (D.N.J. Sept. 30, 2009) ................................................. 19

*In re PTC Therapeutics, Inc. Sec. Litig.*,
2017 WL 3705801(D.N.J. Aug. 28, 2017)............................................... 33, 34

*In re Suprema Specialties, Inc. Sec. Litig.*,
438 F.3d 256 (3d Cir. 2006) .................................................................... 12

*In re Toronto-Dominion Bank Sec. Litig.*,
2018 WL 6381882 (D.N.J. Dec. 6, 2018) ............................................... 35, 36

*In re Wachovia Equity Sec Litig.*,
753 F. Supp 2d 326 (S.D.N.Y 2011)......................................................... 20

*In re Winstar Commc'ns,*
2006 WL 473885 (S.D.N.Y. Feb. 27, 2006).............................................. 38

*In re: Enzymotec Sec. Litig.*,
2015 WL 8784065 (D.N.J. Dec. 15, 2015)............................................. 18, 35

# TABLE OF AUTHORITIES

**Page**

*Institutional Invs. Grp. V. Avaya, Inc.*,
 564 F.3d 242 (3d Cir. 2009) ..................................................................passim

*Klein v. Autek Corp.*,
 2004 WL 3635650 (D.N.J. June 30, 2004). ...................................................15

*Kline v. First W. Gov't Sec., Inc.*,
 24 F.3d 480 (3d Cir. 1994) ...........................................................................25

*Leacock v. IonQ, Inc.*,
 2023 WL 6308045 (D. Md. Sep. 28, 2023) ...................................................27

*Levon v. CorMedix Inc.*,
 797 F. Supp. 3d 381 (D.N.J. 2025) .........................................................25, 31

*Martin v. GNC Holdings, Inc.*,
 757 F. App'x 151(3d Cir. 2018)....................................................................34

*Matrixx Initiatives, Inc. v. Siracusano,*
 563 U.S. 27 (2011)........................................................................................12

*Miao v. Fanhua, Inc.*,
 442 F. Supp. 3d 774 (S.D.N.Y. 2020)......................................................27, 28

*Nat'l Junior Baseball League v. PharmaNet,*
 720 F. Supp. 2d 517, 547 (D.N.J. 2010) .......................................................21

*Ng v. Berkeley Lights, Inc.*,
 2024 WL 695699 (N.D. Cal. Feb. 20, 2024) .................................................27

*Novak v. Kasaks*,
 216 F.3d 300 (2d Cir. 2000).........................................................................28

*Oran v. Stafford*,
 226 F.3d 275 (3d Cir. 2000).........................................................................23

*Ortiz v. Canopy Growth Corp.*,
 537 F. Supp. 3d 621 (D.N.J. 2021) ...............................................................20

# TABLE OF AUTHORITIES

**Page**

*Police & Fire Ret. Sys. City of Detroit v. Argo Grp. Int'l Holdings, Ltd.*,
  2024 WL 5089970 (S.D.N.Y. Dec. 12, 2024) ................................................20

*Saskatchewan Healthcare Employee's Pension Plan v. KE Holdings Inc.*,
  718 F. Supp. 3d 344 (S.D.N.Y. 2024)...........................................................28

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*,
  351 F. Supp. 3d 874 (E.D. Pa. 2018) ..................................................33, 34, 35

*See Sun v. Han*,
  2015 WL 9304542 (D.N.J. Dec. 21, 2015).....................................................34

*Semerenko v. Cendant Corp.*,
  223 F.3d 165 (3d Cir. 2000)...........................................................................38

*Shapiro v. UJB Fin. Corp.*,
  964 F.2d 272 (3d Cir. 1992)...........................................................................16

*Stichti, 25ng Pensioenfonds ABP v. Merrill Lynch & Co.*,
  2013 WL 3989066 (S.D.N.Y. July 31, 2013)................................................28

*Stichting Pensioenfonds ABP v. Merrill Lynch & Co.*,
  2013 WL 3989066 (S.D.N.Y. July 31, 2013)................................................28

*T. Rowe Price Growth Stock Fund, Inc. v. Valeant Pharms. Int'l, Inc.*,
  2018 WL 395730 (D.N.J. Jan. 12, 2018) .......................................................32

*U.S. ex rel. Wilkins v. United Health Grp., Inc.*,
  659 F.3d 295 (3d Cir. 2011)...........................................................................12

*Vanderhoef v. China Auto Logistics Inc.*,
  2020 WL 5105243 (D.N.J. Aug. 31, 2020)....................................................38

*Werner v. Werner*,
  267 F.3d 288 (3d Cir. 2001)...........................................................................25

*Winer Family Trust v. Queen*,
  503 F.3d 319 (3d Cir. 2007)...........................................................................35

- vii -

# TABLE OF AUTHORITIES

**Page**

*Wu v. GSX Techedu Inc.*,
  738 F. Supp. 3d 527 (D.N.J. 2024) ....................................................20, 27, 37

**STATUTES**

15 U.S.C. § 78u-4(b)(2) ...............................................................................31

**RULES**

FED. R. CIV. P. 8(a)...................................................................................37

## I.    Preliminary Statement[1]

Plaintiff alleges a straightforward fraud: Seeking to take advantage of investor demand for quantum computing stocks, Quantum Computing Inc. ("QCI") branded itself as a cutting-edge **quantum** company that offered "**a full-spectrum quantum software and hardware company**" with "**full-stack quantum systems**". QCI, however, never had a functioning quantum computer, even as it repeatedly assured investors—in the present tense—that it was delivering **quantum** systems and solutions. Those assurances were not vague puffery or forward-looking hopes; they were concrete statements about what QCI already purportedly had and was already offering to customers.

By fall 2022, at the latest, internal testing had dispelled that notion. As detailed by Former Employee 2 ("FE2"), an engineer responsible for integrating QCI's software with its newly acquired quantum hardware, QCI's much-touted "quantum"

---

[1] With this opposition, Plaintiff has filed a motion for leave to file a Second Amended Complaint. The proposed amended complaint adds further particularized allegations of falsity and scienter, including additional detail drawn from FE2, and omits the Regulation S-K claims previously asserted as well as modifying other misrepresentations alleged as a basis for claims pursuant to Rule 10b-5. In the event that a Second Amended Complaint is filed, Defendants' Motion to Dismiss the Amended Class Action Complaint (Dkt. No. 29-1) ("MTD") may be denied as moot. *HP Holding LLC v. Red Roof Inns, Inc.*, 2024 WL 2720463, at *3 (D.N.J. May 28, 2024)("a district court may deny as moot a defendant's motion to dismiss where the complaint at issue has been supplanted by the filing of a subsequent amended complaint").

hardware behaved as an ordinary classical computing system, with no observable quantum effects and no quantum advantage of any kind. FE2 personally informed both William McGann, QCI's Chief Operating Officer and Chief Technology Officer, and Robert Liscouski, QCI's Chief Executive Officer, that QPhoton's device was not functioning as a quantum computer. Even armed with those warnings, Defendants continued to tell the market that QCI had "**quantum**" systems and "**quantum**" solutions available to customers.

In their Motion to Dismiss the Amended Class Action Complaint (Dkt. No. 29-1) ("MTD"), Defendants do not attempt to refute Plaintiff's well-pleaded allegations that QCI's much-heralded quantum computer was no such thing. Instead, Defendants rely on technical arguments based on the statutory safe harbor and argue that their "quantum" statements are insulated as forward-looking optimism. That argument fails as a matter of law and common sense. The challenged statements are classic present-tense factual claims about what QCI already "has," what its systems already "are," and what its technology already "does" and not contingent projections about what the company might achieve someday. Because the securities laws do not permit a company to relabel existing-fact misstatements as "forward-looking," the safe harbor provides no protection for Defendants' decision to describe a classical device as a working quantum computer, even after their own engineer told them otherwise.

In addition, the Amended Complaint highlights multiple instances where QCI's public communications and SEC filings materially overstated or mischaracterized the nature and status of key relationships and projects, including its subcontracting work associated with NASA, QCI's announced collaboration with millionways, and its claimed progress toward establishing a TFLN foundry. These misrepresentations, taken together, created a misleading picture of QCI's technological maturity, commercial traction, and strategic partnerships during the Class Period.

In making their public statements, the Defendants possessed the requisite *scienter* under the Securities Exchange Act: they knew facts or had access to information contradicting those statements. Specifically, FE2 told McGann and Liscouski that QCI's hardware was not a quantum computer. QCI, McGann, and Liscouski continued to misrepresent that it was. This is a direct allegation of knowledge that misrepresentations were false on the part of the most senior corporate executives. This is more than sufficient to create the strong inference of scienter required under the Private Securities Litigation reform Act pleading standard. Lastly, Plaintiff's loss causation allegations easily satisfy the minimal pleading burden that the law imposes at this stage. All that is required is for Plaintiff to show a causal connection between Defendants' conduct and his (and the Class's) losses, which he has done. Accordingly, Defendants' motions should be denied.

- 3 -

## II.    Factual Background

### A.    QCI Acquires QPhoton and Begins Marketing "Quantum Computing" Technology

By late 2021, QCI's board and management decided to pivot the company from a pure software model and acquire in-house hardware capabilities. ¶36.[2] Starting in October 2021, QCI began discussions to acquire QPhoton, Inc., a company founded by Stevens Institute of Technology professor Yuping Huang. ¶36. On May 24, 2022, QCI announced a definitive agreement to acquire QPhoton, claiming the deal would "accelerate the accessibility of quantum computing" and advance QCI "into a full-spectrum quantum software and hardware company." ¶¶43, 147. Defendant Liscouski stated that combining QPhoton's "powerful quantum processing technology and systems" with Qatalyst "significantly accelerates accessibility to quantum solutions for real business problems." ¶148. On June 16, 2022, QCI closed the QPhoton acquisition announcing that it was "a significant leap forward in real-world usability in the quantum computing space" and that QCI would become "a provider of full-stack quantum software and hardware solutions." ¶¶45, 47, 149.

---

[2] Paragraph citations ("¶") refer to the numbered paragraphs of Plaintiff's Amended Class Action Complaint ("Complaint") (ECF No. 24). Unless otherwise noted, internal citations are omitted and emphasis is added.

### B.    Former Employees Reveal That QPhoton Technology Does Not Use Quantum Computing

Two former QCI engineers, identified as FE1 and FE2, provide detailed allegations contradicting Defendants' representations about QCI's quantum computing technology.

FE1 worked as an engineer at QCI from September 2021 to November 2023 on a team reporting to Walter Poxon, QCI's Senior Director of Engineering, who in turn reported to Defendant McGann. ¶106. FE1 attended townhalls where McGann addressed the engineering organization and worked on a software layer intended to interface with "quantum computing machines." ¶¶106–107. After the QPhoton acquisition, FE1 understood that this layer was interacting with the lab devices because the devices were unreliable and frequently taken offline, prompting FE1's group to request multiple devices so at least one would remain available. ¶108. FE1's team also encountered "a lot of secrecy and refusal to answer questions" from the hardware group when they sought basic technical information. ¶109.

FE2 worked at QCI as an engineer and developer from before the Class Period to November 2023. ¶110. During his employment, FE2 had frequent close contact with Defendants Liscouski, McGann, and Roberts, including participation in regular all-hands meetings where all aspects of QCI's business were discussed. ¶110. FE2 helped write the software for this interface, which was initially called Mukai and then renamed Qatalyst. ¶111.

In January 2022, FE2 visited QPhoton's laboratory in New Jersey to perform due diligence on its technology. ¶112. When he arrived, however, the device had been taken apart so that he could not test it. ¶112. When FE2 asked Yuping Huang how QPhoton's device worked, Huang refused to provide any details to FE2. ¶112. QCI ultimately acquired QPhoton without any technical due diligence as to how its technology and device worked. ¶112.

The secrecy regarding QPhoton's device continued after the acquisition, with Huang continuing to withhold information. ¶113. Through probing the device while developing software for it, FE2 determined that the QPhoton technology and its device did not involve any quantum computing but worked as a classical computer with some photonic elements. ¶113. In response to queries submitted by FE2, QPhoton's device delivered results that would only come from operating as a classical computer, not a quantum computer. ¶113. By fall of 2022, FE2 had personally advised Defendants Liscouski and that QPhoton's technology did not use quantum computing. ¶114.

**C.    Defendants Continue to Make False And Misleading Representations About Its Hardware.**

Even after FE2 told management that QPhoton's device was not a quantum computer, QCI continued to brand itself as a "full-stack quantum company" offering "quantum computing" systems. ¶¶150–161. On November 14, 2022, QCI's Form 10-Q for the quarter ended September 30, 2022, described its "short-term core

business model" as selling cloud access to "advanced quantum data processing systems," claiming it provided integrated "quantum information acquisition, transmission, and processing solutions." ¶150.

QCI repeated and expanded these claims in its March 30, 2023 Form 10-K, asserting that the QPhoton merger gave it the ability to "provide full-stack quantum information services." ¶151. The filing further stated that QCI's technology "enables the Company to offer room-temperature quantum computation systems through cloud services today," allegedly blending QPhoton's intellectual property with Qatalyst. Later filings—including Forms 10-Q dated May 12, August 14, and November 13, 2023, as well as the 2023 Form 10-K (Apr. 1, 2024) and 10-K/A (Sept. 11, 2004)—carried the same refrain. ¶¶152–157. In those filings, QCI also announced a TFLN chip foundry and claimed it would deliver "accessible and affordable quantum machines" to commercial and government clients. ¶156.

QCI maintained these representations through its October 2, 2024 and November 6, 2024 Forms 10-Q, which covered all three quarters of 2024. ¶¶158–160. Plaintiff alleges these statements were materially false and misleading because they continued to label QPhoton-based hardware as "quantum computing" even though testing confirmed the devices operated solely as classical systems. ¶161.

## D.    QCI Exaggerates Its NASA Relationships

Throughout the Class Period, QCI repeatedly highlighted supposed NASA work in press releases, creating the impression of a substantial, strategic relationship even though QCI in fact held only very small subcontracts. ¶¶50–52, 65, 67, 79, 88, 102. For instance, QCI announced a "subcontract award" from SSAI to support NASA testing of a "proprietary quantum photonic" system, a "follow-on task order" for remote sensing and climate monitoring, and a BAERI subcontract to build and test an "innovative photonic sensor instrument" for NASA Ames, which QCI called its "third distinct task order" and second NASA center relationship. ¶¶50, 65, 67. QCI later claimed a "fourth" and "fifth" project, describing these as evidence of a "long-standing strategic partnership" and "continued engagement" with NASA. ¶¶79, 88. The System for Award Management ("SAM"), the U.S. government's official contracting and award management system, listed only a single small contract between QCI and NASA. ¶¶51-52.

## E.    QCI's Partnership and Loan to millionways

QCI also highlighted a purported strategic AI collaboration with millionways Inc., described as a leading AI company, to showcase "the power of artificial intelligence" combined with QCI's Reservoir Quantum Computing. ¶58. QCI claimed it had "built and tested multiple hybrid AI hardware systems" over the prior year that showed "substantial advantages over existing digital electronic hardware"

and later announced that its Board had approved a non-binding letter of intent to acquire up to 100% of millionways. ¶¶58, 62, 163. In fact, the only substantive transaction between QCI and millionways was a loan from QCI to millionways. ¶103. The loan has never been repaid and has since been written off. ¶98.

### F.    QCI Announces Plans for TFLN Foundry

QCI also promoted ambitious plans for a TFLN-based "Quantum Photonic Chip Foundry." On September 21, 2023, it announced that it had selected a five-acre site in the ASU Research Park to produce TFLN chips and told investors that chip manufacturing would start in the first half of 2024, with "mass-production" of quantum photonics chips with complex nanophotonic circuits by late 2024 or early 2025. ¶75. QCI later claimed it had reached "the final stage of commissioning" its Tempe foundry, that construction and capital equipment installation were in their "final phase," and that a grand opening was anticipated in Q1 2025. ¶¶89, 91. The "foundry" had none of the attributes of a proper fabrication facility but was, at most, a space in an office building allowing the manufacture of prototypes. ¶104. QCI's building at the ASU Research Park occupied barely an acre—far smaller than the five-acre site QCI had touted—and that QCI in fact leased only Suite 107. ¶94.

### G.    Capybara and Iceberg Reports Reveal the Fraud

On November 27, 2024, Iceberg Research released a report accusing QCI of fabricating its claims about a proprietary thin-film lithium niobate ("TFLN")

foundry and related chip orders. ¶92. The report quoted a university professor who had placed a small order for QCI's chips and was "surprised" by QCI's sweeping announcement—one that had never been reviewed or approved by anyone involved in the purchase. ¶92. Iceberg also published photographs of the address QCI had identified as its foundry, revealing an ordinary office building rather than an operational industrial facility. ¶93. These findings directly contradicted QCI's public representation that it had secured a five-acre campus dedicated to large-scale chip manufacturing.

On December 9, 2024, Iceberg issued a follow-up report expanding on these revelations. ¶96. The second report observed that photographs QCI had circulated of "its foundry" looked "more like a small laboratory" than a production-level plant "ready for mass production on five acres within ASU's 320-acre research park." ¶96. Iceberg also highlighted that from 2021 through the first three quarters of 2024, QCI had generated only minimal revenue—despite touting commercial success and claiming work as a NASA subcontractor. ¶96.

Then, on January 16, 2025, Capybara Research published a comprehensive report amplifying these concerns. ¶99. Capybara alleged that QCI was "a rampant fraud" that had fabricated revenue, exaggerated its technology, and issued false press releases since inception. ¶99. Citing multiple former employees, the report explained that QCI repeatedly misrepresented the readiness of its products and overstated the

- 10 -

existence of paying customers. ¶100–101. Capybara also debunked QCI's supposed "longstanding" NASA partnership, noting that records showed only a single $26,000 "computer programming" contract awarded without competition. ¶102.

Finally, Capybara alleged that QCI fabricated transactions with "millionways," an affiliate tied to a QCI founder. ¶103. QCI had announced a letter of intent to acquire millionways and advanced $500,000 via an unsecured note, only to abandon the deal and quietly write down the note. ¶103. Capybara further confirmed that QCI never purchased the alleged five-acre ASU foundry site; park officials reported that QCI merely made preliminary inquiries, never followed up, and that the parcel remained unused and under its original ownership more than a year later. ¶104.

## III.   ARGUMENT

### A.   Legal Standard

"'Faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true.'" *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009).[3] The motion to dismiss should

---

[3] To plead a claim under § 10(b), 15 U.S.C. § 78j(b), and SEC Rule 10b-5, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano,*

be denied if a plaintiff alleges facts showing "a 'reasonable expectation that discovery will reveal evidence' of the necessary elements.'" *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc*., 70 F.4th 668, 681 (3d Cir. 2023) (citation omitted). The question is not whether the plaintiff "will ultimately prevail" but whether that party is "entitled to offer evidence to support the claims." *U.S. ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 302 (3d Cir. 2011).

### B.   The Amended Complaint Alleges Materially False and Misleading Statements

To plead falsity, a plaintiff must allege facts supporting a reasonable belief that a statement or omission was misleading. *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004). Plaintiff does so here through four categories of concrete, present-tense misrepresentations, each backed by particularized facts showing contemporaneous falsity. First, QCI repeatedly claimed to offer quantum computing hardware, even after FE2's contemporaneous tests confirmed the QPhoton device was purely classical, findings FE2 personally reported to McGann and Liscouski in the fall of 2022. Second, QCI falsely touted a "long-standing strategic partnership" with NASA when it merely provided basic programming services. Third, QCI described short-term bridge loans

---

563 U.S. 27,37-38 (2011), 563 U.S. at 37-38; *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 275 (3d Cir. 2006). Defendants only challenge the elements of falsity, scienter, and loss causation.

to *millionways* as a strategic partnership and planned acquisition, though the loans were soon written off. Fourth, QCI announced a "foundry" for mass production of TFLN chips, when it had a small office suite unsuited for such use. None of these statements were puffery or forward-looking, but they were specific misstatements about QCI's current operations.

### 1. Defendants Misled Investors About QCI's Quantum Computing Capabilities.

#### a. The Amended Complaint identifies what is false and misleading about Defendants' Statements

Defendants contend that the Amended Complaint cannot show falsity by string-citing SEC disclosures while offering just one simple theory of why they are misleading. MTD at 22. Yet when the core representation—that QPhoton's and QCI's hardware was "quantum computing"—was wrong because the technology was something materially different, a single, straightforward explanation is precisely what makes it proper to allege that broad swaths of those disclosures are false and misleading. Defendants repeated the same lie about QCI's hardware throughout the Class Period. The sheer number of virtually identical lies does not provide a defense to a claim for securities fraud.

The Amended Complaint draws on numerous SEC filings, each containing multiple examples of the same pattern of statements:

- **February 24, 2022 press release** (¶146): "By coupling quantum hardware technologies from QPhoton with

Qatalyst, QCI will deliver more powerful solutions to accelerate the application and value from quantum computing."

- **May 24, 2022 press release** (¶147): "The acquisition of QPhoton extends QCI's offerings to accelerate the accessibility of quantum computing... and advances QCI into a full-spectrum quantum software and hardware company"

- **November 14, 2022 Form 10-Q** (¶150): "QCI is focused on providing integrated quantum information acquisition, transmission, and processing solutions"; "full-stack quantum computing company"

- **March 30, 2023 Form 10-K** (¶151): "[F]ollowing the June 2022 merger with QPhoton... the Company is now able to provide full-stack quantum information services."

After identifying these specific statements from specific filings on specific dates, the Amended Complaint states: "The statements set forth in paragraphs 146 to 160 were all misleading because they represented that QCI offered 'quantum computing' or 'quantum computers' when the QPhoton technology and hardware did not use quantum computing and could not be accurately or fairly described as using 'quantum computing' or being a 'quantum computer.'" ¶161. The Amended Complaint identifies the date, document, and content of each statement. It explains the common thread: all claimed QCI offered "quantum computing" technology, including hardware. And it explains why that common claim was false: the technology was classical computing, not quantum computing, as FE2's testing demonstrated.

- 14 -

Contrary to Defendants' argument the "time, place, contents" requirement is satisfied when the Amended Complaint identifies statements and explains its theory of falsity. *City of Warren*, 70 F.4th at 680, 693-94. Similarly, in *Avaya*, Plaintiff identified specific SEC filings and earnings calls when the Defendants made their allegedly false and misleading statements. *Avaya,* 564 F.3d at 247-48 and 267 (finding that shareholders adequately specified why certain defendants' statements were false or misleading when made). Unlike *Klein*, where plaintiffs failed to quote or attach the alleged misstatements, this Amended Complaint is anything but "devoid of facts," detailing specific statements, dates, and reasons those statements were false. *Klein v. Autek Corp.*, 2004 WL 3635650, at 7–8 (D.N.J. June 30, 2004).

### b.    Present-Tense Claims About Current Technology Are Not Forward-Looking

Defendants argue the quantum computing statements are forward-looking statements that are protected by the statutory safe harbor enacted by the PSLRA or inactionable opinion and corporate puffery. MTD at 23-25. Defendants mischaracterize the allegations, rewriting the Amended Complaint to suggest investors were misled into thinking QCI was still "developing" its technology, an argument that ignores what Defendants' statements actually say.

Start with the statements themselves. These are not projections about future capabilities, they are representations of current, present-tense technological reality:

- 15 -

"The Company **is now able to** provide full-stack quantum information services" (¶151) (emphasis added)

"The Company **is now able to offer** photonic quantum computing systems" (¶152) (emphasis added)

"We **currently offer** access to our quantum computing machines" (¶155) (added)

"The Company **now offers** integrated high-performance quantum systems" (¶158)

These are not forward-looking projections. ¶¶151–152, 155. Defendants' safe-harbor cases are unpersuasive because none involves the kind of concrete, present-tense misstatements at issue in QCI's "quantum computing" narrative. MTD at 23-24 (citing *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 280 n.11 (3d Cir. 1992); *In re Discovery Lab's Sec. Litig.*, 2006 WL 3227767, at *11 (E.D. Pa. Nov. 1, 2006); *In re Anadigics, Inc., Sec. Litig.*, 2011 WL 4594845, at *28 (D.N.J. Sep. 30, 2011)).

The Third Circuit has made clear that the safe harbor does not protect statements of present or historical fact even if embedded in forward-looking context. *Avaya*, 564 F.3d at 254-56. When QCI said it "is now able to offer" quantum computing systems, it asserted a current capability; whether those systems might succeed commercially is forward-looking, but whether they used quantum computing is a present fact. FE2's testing showed QPhoton's device did not perform quantum computing, and by fall 2022 FE2 personally informed Defendants McGann

- 16 -

and Liscouski that the technology was not quantum, establishing that Defendants knew their "now able to offer" quantum-computing claims were false. ¶114.

### c. "Quantum Computing" Is Not Opinion or Puffery

Defendants further mischaracterize the Amended Complaint, suggesting it takes issue with vague phrases like "significant leap forward," "accelerate accessibility," or "offer a wide range of quantum information sources." MTD at 23-25. Not so. The challenged statements include specific, present-tense claims that QCI offered "quantum computing" and was a "full-stack quantum software and hardware company." These are not vague adjectives like "major advance" or "key project milestone."[4] As the Amended Complaint explains:

> A "quantum computer" is a type of computer that seeks to exploit quantum mechanical phenomena to process information. Instead of binary data, it uses quantum bits (qubits), which can represent and store data in ways that classical bits cannot, allowing quantum computers to solve complex problems much faster than traditional computers. ¶33.

---

[4] Unlike Defendants' cases, these statements are not loose adjectives or rosy generalities. *In re Adient PLC Sec. Litig.*, 2020 WL 1644018, at *17 (S.D.N.Y. Apr. 2, 2020); *Dang v. Amarin Corp.,* 750 F. Supp. 3d 431, 472 (D.N.J. 2004); *Arata v. Standard Lithium Ltd.*, 2025 WL 2773004, at *9 (E.D.N.Y. Sept. 28, 2025); *Frazier v. Vitalworks, Inc.*, 341 F. Supp 2d 142, 153 (D. Conn. 2004). Those cases dealt with soft characterizations: "strong," "innovative," "well positioned." The statements here concern the specific technical classification of whether QCI's hardware was a quantum computer.

These are technical classifications with specific meanings in the computer science industry. A company cannot call its gasoline car an "electric vehicle" and claim puffery when challenged. And QCI cannot call its classical computer "quantum computing" and claim puffery. Furthermore, "[a] statement is considered puffery only when it is immaterial." *In re: Enzymotec Sec. Litig.*, 2015 WL 8784065, at \*14 (D.N.J. Dec. 15, 2015). Defendants do not specifically contest the materiality of each alleged misrepresentation.

Reasonable investors in a company called "Quantum Computing Inc." understand and rely on whether the company's technology actually uses quantum computing. That is not like evaluating whether a product is "great" or "superior"— subjective judgments on which reasonable minds differ. Whether technology uses quantum computing versus classical computing is an objective, technical fact that engineers can test and determine. FE2 did exactly that and QCI's device failed the test.

### d.    QCI's Former Employee Allegations Are Particularized and Reliable.

Defendants' attacks on the former-employee allegations misstate the pleading standard and ignore what the witnesses say. Defendants argue the allegations are "fatally flawed" because they lack detail about specific meeting dates, attendees, and discussion topics, and do not explain "how that would render any statements false." MTD at 25. However, in *City of Warren* 70 F. 4th at 691-92, the Third Circuit

- 18 -

reaffirmed that confidential former employee's allegations in a securities fraud complaint should not be discounted where the complaint provides the "confidential witness's basis of knowledge; the level of detail provided by the witness; the degree to which other testimony or evidence corroborates the witness's account; and the internal consistency of the information provided." *See also Avaya*, 564 F.3d at 261; *In re Par Pharm. Sec. Litig.*, 2009 WL 3234273, at *7 (D.N.J. Sept. 30, 2009).

FE1 and FE2 easily meet this standard. FE1 was an engineer at QCI from September 2021 to November 2023 and worked on a team that was responsible for developing a cloud computing layer to interact with the "supposed quantum computing machines. ¶¶ 106-107. FE2 was an engineer and developer at QCI from before the Class Period until November 2023 and helped write the software for QCI's quantum/classical interface. ¶¶110–111 His job was to build the software layer connecting users to QCI's purported quantum devices, placing him in a direct position to assess whether those devices used quantum computing. ¶111. While developing that software, FE2 tested the QPhoton device and determined—based on objective test responses—that it behaved as a classical computer with photonic elements, not as a quantum computer. ¶113.

Defendants argue the allegations are "steeply discounted" under *Avaya* because they lack particularity. MTD at 3. But *Avaya* requires discounting allegations only if a complaint fails to plead particularized facts supporting

- 19 -

reliability and credibility. 564 F.3d at 262-63. Defendants also mistakenly argue that the omission of specific dates warrants dismissal, but many courts in this District have upheld confidential witness' allegations without requiring such details. *See, e.g., Ortiz v. Canopy Growth Corp.*, 537 F. Supp. 3d 621, 658-59 (D.N.J. 2021) ("the inquiry is a more holistic, multifactor assessment."); *Wu v. GSX Techedu Inc.*, 738 F. Supp. 3d 527, 545 (D.N.J. 2024) (Farbiarz, J.) (FE allegations, which did not include the dates on which the relevant information was acquired, "are plainly detailed").

Here, the Amended Complaint identifies FE2's specific position (engineer/developer), specific responsibilities (writing software interface), specific timeframe (September 2021/before the Class Period to November 2023), specific testing methodology (connecting through the cloud and probing device with queries), specific results (unreliability and classical computer responses), and specific communication (FE2 personally told McGann and Liscouski in fall 2022). Further, unlike the allegations in *Wachovia* and *Argo Grp.*, FE2's allegations are anchored to concrete dates (January 2022 and the fall of 2022) rather than to some open-ended, indeterminate period. MTD at 27; *In re Wachovia Equity Sec Litig.*, 753 F. Supp 2d 326, 352 (S.D.N.Y 2011); *Police & Fire Ret. Sys. City of Detroit v. Argo Grp. Int'l Holdings, Ltd.*, 2024 WL 5089970, at *7 n. 79 (S.D.N.Y. Dec. 12, 2024).

Defendants invoke *Nat'l Junior Baseball League v. PharmaNet* to argue confidential witnesses must show "how the information connects to the alleged misrepresentations." 720 F. Supp. 2d 517, 547 (D.N.J. 2010). That standard is met here. FE2 explicitly told Defendants that QPhoton's technology was not quantum computing, and FE1 worked on software meant to interact with QCI's "supposedly quantum computing machines" and observed those devices to be unreliable. ¶¶107–108, 114. Defendants, meanwhile, publicly claimed QCI was offering its own quantum computing hardware with superior capabilities. ¶¶146–160.

Defendants' reliance on *Intelligroup* is similarly misplaced. *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262 (D.N.J. 2007). There, a former employee offered vague "personal doubts" that were undermined by factual inaccuracies. 527 F. Supp. 2d at 361, 363 & n.71. Here, FE2 did not merely harbor doubts; he conducted objective testing and directly observed classical, not quantum, behavior. ¶113 FE1 was "pretty sure" the software layer was interacting with QCI's devices because of their distinctive unreliability, a specific experience not contradicted by other facts. ¶108.

Defendants' statements about its quantum computing capabilities were false and misleading and the Amended Complaint alleges why with particularity. Accordingly, the quantum computing allegations should survive dismissal.

- 21 -

## 2. Defendants Mislead Investors About QCI's Relationship with NASA

Defendants argue the NASA statements cannot be false because QCI disclosed it was a subcontractor, but that misses the point. ¶¶50–52, 57. Plaintiff does not claim QCI hid its subcontractor status; the claim is that QCI systematically exaggerated the significance, scope, and nature of minimal subcontract work to create the false impression of a substantial, ongoing, quantum-focused partnership with NASA. ¶¶57, 59, 67, 79, 85, 88. QCI described a "long-standing strategic partnership between NASA and QCi," asserted that NASA had "expanded" work to "quantum machine learning processing," and claimed "NASA's continued engagement" fostered a partnership leveraging QCI's photonics innovation. ¶¶59, 79, 88. In reality, government records and NASA personnel confirmed a single $26,000 "computer programming" contract for which QCI was the sole bidder, plus a few small, uncompetitive subcontracts having nothing to do with quantum computing. ¶¶51–52, 102.

Press releases and SEC filings reinforced this inflated picture. QCI's February 8, 2023 release touted a subcontract from SSAI to "support NASA" in testing QCI's "proprietary quantum photonic systems," describing quantum LiDAR capabilities and suggesting NASA chose QCI for advanced quantum technology when the SAM database shows a small programming contract. ¶¶50–52, 102. The July 13, 2023 release framed a BAERI subcontract as the "third distinct task order from NASA"

and evidence that a "second research center within NASA" was now subcontracting with QCI, language designed to sound like direct, multi-center NASA engagement rather than two small primes hiring QCI for low-dollar work. ¶67 QCI's 2022 Form 10-K and August 1, 2024 CEO Letter went further, recasting these subcontracts as "research grants" and emphasizing potential satellite missions and global LiDAR networks, thereby implying NASA viewed QCI as a strategic technology partner. ¶¶57, 85.

The October 17, 2024 press release crystallized the misrepresentation by calling the relationship "a long-standing strategic partnership between NASA and QCi" aimed at radically new LiDAR approaches. ¶88 A company with a single $26,000 NASA programming contract and a few small sole-bid subcontracts does not have a "long-standing strategic partnership" with NASA. ¶¶51–52, 102 That QCI used the word "subcontractor" somewhere in its disclosures does not cure the deception; it merely cloaked exaggerated, carefully crafted language that dramatically overstated the importance and nature of QCI's limited NASA-related work. ¶¶50, 57, 67, 79, 85, 88.

The Third Circuit has repeatedly held that literally true statements can be misleading through implication or omission of context. *Oran v. Stafford*, 226 F.3d 275, 288 (3d Cir. 2000) ("literally true statement can be misleading if defendant omits material facts"). Here, the literal truth (subcontractor status) was buried in

language creating the false impressions that QCI had a long-standing strategic partnership with NASA that was based on QCI's quantum technology innovations and hid that the QCI was providing the most basic service to the prime contractors.

### 3. Defendants Mislead Investors About QCI's Relationship with millionways

By December 31, 2024, QCI had written off the entire $558,000 millionways receivable as uncollectible; the loan was never repaid, the acquisition never happened, and the "partnership" produced nothing. ¶98 QCI had framed this relationship as a strategic collaboration with a leading AI firm to showcase the power of combining AI with QCI's Reservoir Quantum Computing, but in reality it was a risky bridge loan to a failing company. ¶¶58, 62, 98 In April and May 2023, QCI told investors it had partnered with millionways "to demonstrate the power" of AI plus QCI's technology and that its Board had approved a letter of intent to acquire "up to 100% of the AI firm," while claiming it had "built and tested multiple hybrid AI hardware systems" that showed "substantial advantages over existing digital electronic hardware" and could "compete with large data centers on big data challenges." ¶¶58, 62–64

Defendants again mischaracterize the allegations in the Amended Complaint arguing that the millionways statements generally are non-actionable puffery and that QCI adequately disclosed the loan via its "Note Purchase Agreement Loan" discussion in the August 14, 2023 Form 10-Q. But disclosure cannot be cured by

burying technical loan terms in an SEC filing while press releases imply a strategic acquisition of cutting-edge AI technology. *Werner v. Werner*, 267 F.3d 288, 297 (3d Cir. 2001); *Levon v. CorMedix Inc.*, 797 F. Supp. 3d 381, 406 (D.N.J. 2025) (citing *Kline v. First W. Gov't Sec., Inc.*, 24 F.3d 480, 490-91 (3d Cir. 1994)). The Form 10-Q language—that QCI entered a letter of intent "to provide bridge loans to millionways **and** enter into due diligence to acquire up to 100% of the AI firm"—framed the loans and acquisition as parallel objectives, not as emergency financing to a distressed counterparty that QCI had no obligation to acquire and that ultimately defaulted. ¶167

Nor are QCI's statements too vague to be actionable. Defendants cite cases such as *In re Nice Sys., Ltd. Sec. Litig.*, 135 F. Supp. 2d 551, 580 (D.N.J. 2001) and *In re Dexcom, Inc. Class Action Sec. Litig.*, 2025 WL 2606620, at *10 (S.D. Cal. Sep. 9, 2025) to argue that optimistic language is puffery. Those cases are inapposite. QCI did not merely say its position was "strong" or its products "superior." It asserted that it had "built and tested multiple hybrid AI hardware systems," that those systems had "demonstrated substantial advantages over existing digital electronic hardware," and that they could "compete with large data centers on big data challenges." ¶¶63–64. Such statements contain embedded statements of objective fact about present capabilities, which are actionable when false. *City of Warren*, 70 F.4th at 685–87. The escalating series of write-offs within a year of the

announcement, combined with FE2's allegation that he "never saw anything delivered from millionways to QCI," supports a strong inference that these claims about built-and-tested systems and competitive performance were false when made, not merely optimistic predictions that failed. ¶115.

### 4. Defendants Mislead Investors About QCI's "TFLN Foundry"

Defendants' TFLN arguments fail because they contradict both QCI's own disclosures and the Amended Complaint's well-pleaded allegations. QCI did not merely express optimism; it made concrete, present-tense assertions about having "begun buildout" of a "foundry" and a "state-of-the-art TFLN chip manufacturing facility" in a specific leased space at the ASU Research Park, claimed to have "completed initial production" of TFLN devices, and touted a purchase order for its chips. Those are statements of existing fact and current capacity, not protected forward-looking beliefs or puffery, and generic warnings about being a "development stage" company do not cure affirmative misrepresentations about facilities and production that did not exist as described. The Iceberg Report revealed that the purported "foundry" was a small lab, "a far cry from a foundry ready for mass production" on the five-acre footprint QCI had described.

**5.    The Court should credit Plaintiff's allegations based on the Iceberg and Capybara Reports.**

Defendants argue that allegations drawn from the Iceberg and Capybara reports cannot establish falsity as a matter of law. MTD at 12 (citing *Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 802 (S.D.N.Y. 2020)); *see also, e.g.*, *Ng v. Berkeley Lights, Inc.*, 2024 WL 695699, at *10 (N.D. Cal. Feb. 20, 2024); *Leacock v. IonQ, Inc.*, 2023 WL 6308045, at *13 (D. Md. Sep. 28, 2023). However, these out of district cases make no such bold pronouncement and numerous Courts in district have reached the opposition conclusion. *Wu v. GSX Techedu Inc.*, 738 F. Supp. 3d 527, 550 n.25 (D.N.J. 2024) (Farbiarz, J.) (collecting cases). Indeed, the court in *In re Eros* took the opposite view, accepting allegations stemming from a Hindenburg report as true because "many courts 'have held that a short-seller report ... 'does not implicate the same skepticism as a 'traditional' anonymous source.'" *In re Eros Int'l PLC Sec. Litig.*, 2021 WL 1560728, at *9 (D.N.J. Apr. 20, 2021).

Defendants argue the information from the reports because they do not identify the personnel they spoke, explain the basis for their knowledge, and because Plaintiff's counsel did not replicate Iceberg or Capybara's efforts. MTD at 21, 25. This is incorrect as Plaintiff has independently corroborated many of the details contained in the Iceberg and Capybara reports, especially the claim that QCI misrepresented its computing technology. ¶¶51, 106-115. Complaint paras with corroborating info]. Defendants' caselaw is, accordingly, inapposite. *Stichting Pensioenfonds ABP*

*v. Merrill Lynch & Co.*, 2013 WL 3989066 (S.D.N.Y. July 31, 2013) involved citing confidential witnesses from another lawsuit, which the court distinguished from statements recounted in newspaper articles and government reports. 2013 WL 3989066, at *4. Second, "Judge Engelmayer [in *Miao* ] was not announcing a rule that the content of short seller reports must be disregarded unless it is independently corroborated by counsel, as Defendants argue here." *Saskatchewan Healthcare Employee's Pension Plan v. KE Holdings Inc.*, 718 F. Supp. 3d 344, 383 (S.D.N.Y. 2024) (finding a short seller report sufficiently reliable to support lead plaintiff's claims when it relied on both confidential and non-confidential sources). In *Miao*, the court simply analyzed allegations based solely on statements by confidential witnesses, applying the standard described by the Second Circuit in *Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000). *Miao*, 442 F. Supp. 3d at 797-798.

The Third Circuit has never held that anonymous sources are per se unreliable for purposes of pleading falsity. The court requires assessing "the detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." *Avaya*, 564 F.3d at 261 (emphasis added).

Capybara's NASA allegations easily clear the Third Circuit's standard for anonymous sources. The report identifies a single subcontract worth $26,000,

- 28 -

describes the work as generic computer programming unrelated to quantum computing, alleges QCI was the sole bidder with no NASA role in selection, and notes that multiple prime contractors confirmed these points. ¶¶51–52, 102. These are concrete facts about size, nature, and context, not vague impressions. NASA personnel are well-positioned to know whether NASA has a "long-standing strategic partnership" with QCI, and primes like SSAI, BAERI, and AMA are uniquely positioned to know who bid, what QCI actually did, and how the work was priced and characterized. ¶102.

Iceberg's TFLN allegations also meet the Third Circuit's standard. The complaint relies on detailed, on-the-ground factual assertions about the Tempe site's configuration and permitted uses that cannot be squared with QCI's description of a functioning or near-functioning foundry. Coupled with QCI's own filings tying the TFLN foundry and chips to its core strategy of selling quantum hardware, and with stock-price drops following public revelations that undercut that narrative, these allegations comfortably satisfy Rule 9(b) and the PSLRA's falsity and loss-causation requirements; Defendants' contrary narrative merely raises factual disputes inappropriate for resolution on a motion to dismiss.

C.      **The Amended Complaint Adequately Alleges Defendants'**
        **Scienter**

To plead scienter, the PSLRA requires a plaintiff to allege facts which give rise to a strong inference that the defendant acted with the required state of mind in making misleading statements and/or omissions. 15 U.S.C. § 78u-4(b)(2). These requirements can be met by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *Avaya*, 564 F.3d at 276. The inference of scienter, however, "need not be irrefutable, i.e., of the 'smoking-gun' genre." *Id*. at 324. The analysis must be "case specific" and should "ultimately rest not on the presence or absence of certain types of allegations but on a practical judgment about whether, accepting the whole factual picture painted by the Amended Complaint, it is at least as likely as not that defendants acted with scienter." *Avaya*, 564 F.3d at 269.

1.      **Defendants' knowledge and reckless disregard for**
        **QCI's lack of quantum computing hardware.**

On the main allegation of fraud contained in the Amended Complaint—that QCI described its device as a quantum computer when it was not—Plaintiff alleges facts showing that QCI and the Individual Defendants knew that the representations were false. This meets any requirement to plead scienter under the PSLRA. FE2 directly informed the Individual Defendants that QCI's device was not a quantum computer. QCI and the Individual Defendants continued to publicly describe it as

- 30 -

such anyway. ¶114. The inference of fraud could not be any stronger. This knowledge existed early in the Class Period, by Fall 2022. Even before then, QCI and the Individual Defendants were making public statements claiming quantum computing capability without having undertaken any technical due diligence or having any other basis for these statements.  That is the definition of deliberate recklessness and sufficient to support a claim for securities fraud. "A reckless statement is one involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Levon v. CorMedix Inc.*, 797 F. Supp. 3d 381, 417 (D.N.J. 2025) (*quoting Avaya*, 564 F.3d at 267 n.42).

In *Levon*, the court held that detailed accounts from two former employees supplied a cogent inference that CorMedix's leaders knew, or were reckless in not knowing, that their public assurances about its new drug application to the FDA and contract manufacturer were false. *Id.* at 417-420. There, FE1 personally audited the contract manufacturer, spent weeks on-site, and then issued a written report concluding that it should not be used and "would never be able to pass an FDA inspection," squarely contradicting CorMedix's public narrative. *Id.* at 419-420. FE2, the Senior Director of Quality Assurance during the class period, accessed that

- 31 -

report on the shared drive, traced its circulation to the CEO and general counsel, and identified facility-compliance failures at the manufacturer. *Id.* at 420. As in *Levon*, where FEs bridged the gap between internal red flags and upbeat public assurances, the Amended Complaint's FE1 and FE2 likewise operate as technically senior insiders who, by determining and reporting that QPhoton's flagship device functioned as a classical—not quantum—machine, squarely contradict Defendants' public claims that it possessed commercially viable, "full-stack" quantum hardware.

Defendants attempt to ignore that the Amended Complaint alleges that Liscouski and McGann had direct knowledge of the falsity of their statement and incorrectly assert that Plaintiff is simply relying on the high-level nature of Individual Defendants' positions within QCI to establish scienter. MTD at 33-34. As set forth above, this is incorrect but Courts in this district have previously rejected such arguments, holding that allegations that a defendant's executive position provided "access to information contradicting [that defendant's] public statements," taken together with other allegations of scienter, suffice to create a strong inference of scienter. *T. Rowe Price Growth Stock Fund, Inc. v. Valeant Pharms. Int'l, Inc.*, 2018 WL 395730, at \*6-7 (D.N.J. Jan. 12, 2018).

Further, Liscouski and McGann made numerous public statements about QCI's "quantum computing" technology and hardware. Making such statements supports an inference of scienter as it indicates knowledge about the subject matter

- 32 -

of the statements. *Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 228 (E.D. Pa. 2021) (inferring scienter where executive "held himself out to investors as knowledgeable" by speaking "in detail" about project.); *SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 906 (E.D. Pa. 2018) ("Their public comments regarding the clinical data in press releases and earnings calls confirm they had intimate knowledge of the data. Indeed, that is what they wanted the public, particularly investors, to think."); *In re PTC Therapeutics, Inc. Sec. Litig.*, 2017 WL 3705801, at *16-17 (D.N.J. Aug. 28, 2017).

Defendants Boehmler and Roberts served as CFOs during the Class Period and exercised control over QCI's operations. ¶¶24-25, 195. Given their roles, they would also have necessarily been aware of, at a bare minimum, the nature of QCI's business and operations. It would have taken far less than a "reasonable investigation" for either Defendant Boehmler or Roberts to discover that QCI did not have a quantum computer. *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 666 (S.D.N.Y. 2017).

Here, the Individual Defendants' positions provided them with access to knowledge that contradicted their public statements about QCI's technology, NASA contracts, relationship with millionways, and QCI's TFLN "foundry." This, viewed in concert with the other allegations of scienter, including the fact that the misrepresentations and omissions concerned QCI's core operations, create an

- 33 -

inference of scienter to arise. *See SEB*, 351 F. Supp. 3d at 905-06 (holding that "an inference of scienter may arise" by virtue of a defendant's position and when the misrepresentations and omissions involved core matters of central importance to the company and its executives); *PTC*, 2017 WL 3705801, at \*17 (same); *In re Genta,Inc., Sec. Litig.*, 2005 WL 2416970, at \*6-7 (D.N.J. Sept. 30, 2005) (same) (collecting cases). These facts likewise support a strong inference of the QCI's scienter. *See Sun v. Han*, 2015 WL 9304542, at \*12 (D.N.J. Dec. 21, 2015) (finding corporate scienter where "pleaded facts [] create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter.").

### 2.    The core operations doctrine supports scienter.

"Under the core operations doctrine, material misrepresentations concerning core matters of central importance to a company may support an inference of scienter when accompanied by some additional allegation of specific information conveyed to management and related to the fraud." *Carmignac Gestion, S.A. v. Perrigo Co. PLC*, 2019 WL 3451523, at \*16 (D.N.J. July 31, 2019) (citing *Martin v. GNC Holdings, Inc.*, 757 F. App'x 151, 155 (3d Cir. 2018)).

As the Amended Complaint explains, Defendants' misstatements and omissions concerned the very heart of QCI's business—its purported quantum computing technology and the marquee contracts and partnerships that supposedly showcased that technology, including millionways, and NASA. This more than

- 34 -

suffices to establish scienter under the core operations doctrine. *See, e.g., Hall v. Johnson & Johnson*, 2019 WL 7207491, at *21 (D.N.J. Dec. 27, 2019) (collecting cases and finding scienter where defendant considered the product at the heart of the misstatements a "flagship product"); *Carmignac*, 2019 WL 3451523 at *16 (finding scienter where the relevant section comprised 22% of defendant's business); *SEB*, 351 F. Supp. 3d at 905 (recklessness "can be established by demonstrating that the fact was so obviously material that defendant must have been aware both of its materiality and that its non-disclosure would likely mislead investors."). *Enzymotec*, 2015 WL 8784065, at *17-18 (finding scienter where the misstatements concerned defendants' core business "about which Defendants regularly spoke").

### 3.    Defendants' SOX certifications bolster scienter

The strong inference of scienter is further supported by the Individual Defendants' SOX certification, which claim that all four of them accessed QCI's disclosures and disclosure controls. Courts in the Third Circuit have held that this type of allegation can contribute to a court's finding of scienter, and it does so here. *See In re Toronto-Dominion Bank Sec. Litig.*, 2018 WL 6381882, at *19 (D.N.J. Dec. 6, 2018). Defendants' cases are not on point. MTD at 35-36. *Winer Family Trust v. Queen* "did not address group pleading in the scienter context." *See id.*, at *14; *Winer Family Trust v. Queen*, 503 F.3d 319, 337 (3d Cir. 2007). *In re Bio-Technology Gen. Corp. Sec. Litig.* only addressed group pleading and scienter in

part. 380 F.Supp.2d 574, 586-87 (D.N.J. 2005). *"There, the Court held 'generalized allegations of motive and opportunity do not suffice to create a strong inference of scienter unless accompanied by particularized allegations ....'" Toronto-Dominion*, 2018 WL 6381882, at \*14. As in *Toronto-Dominion*, Plaintiff here pleads particularized facts supporting scienter, including those giving rise under the core operations doctrine. *Id.*

The Individual Defendant contention that they merely signed the SEC filings does not insulate them from liability from the false statements contained within. *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 496-97 (S.D.N.Y. 2004). Their failure to verify whether QCI had in fact acquired a quantum computer when it merged with QPhoton before assenting to statements that it was full-spectrum quantum software and hardware company and was at least reckless. ¶128.

### D.    The Amended Complaint Alleges Loss Causation

"[C]ourts of this district have consistently analyzed loss causation under Rule 8(a) ..." *Hall v. Johnson & Johnson*, 2019 WL 7207491, at \*27 (D.N.J. Dec. 27, 2019) (collecting cases). To satisfy Rule 8(a), a plaintiff need only allege "some indication of the loss and the causal connection." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005) (quoting FED. R. CIV. P. 8(a)). This "is typically a matter of alleging (a) that the relevant company's share price 'significantly' fell, and (b) that

the price fall was caused to a sufficient extent by information becoming known that revealed the truth about something the company had previously said ... often called a 'corrective disclosure.'" *Wu*, 738 F. Supp. 3d at 565 (citations omitted). A corrective disclosure "need not take a particular form." *Hull v. Glob. Digital Sols., Inc.*, 2017 WL 6493148, at *14-15 (D.N.J. Dec. 19, 2017). As the Supreme Court emphasized in *Dura*, pleading loss causation does not "impose a great burden upon a plaintiff." 544 U.S. at 346.

The Amended Complaint readily pleads loss causation. Plaintiff alleges that a series of reports by Iceberg Research and Capybara Research publicly revealed the truth about QCI's supposed quantum capabilities, and the misleading nature of its TFLN foundry, NASA work, and relationship with millionways thereby correcting Defendants' prior misstatements. On December 9, 2024, Iceberg's follow-up report detailed why QCI's purported TFLN "foundry" and NASA-related revenues were inconsistent with a genuine, revenue-generating quantum business; and on January 16, 2025, Capybara's report alleged that QCI had never developed the quantum products it touted, had overstated its NASA ties, and millionways partnership. In response to these disclosures, QCI's stock price fell on each event date, including a 5.8% drop on December 9, 2024, and a further 14.89% decline over the two trading days following the Capybara report, causing substantial losses to investors. The Amended Complaint thus alleges a clear causal connection between the revelation

- 37 -

of new information that corrected QCI's prior misrepresentations and the economic losses suffered by the Class. *See Dura*, 544 U.S. at 347.

Defendants wrongly invoke out-of-circuit authority applying the Fourth and Ninth Circuit's heightened Rule 9(b) gloss to loss causation. MTD at 36–37. This is not the law in the Third Circuit. In this Circuit, it is enough at the pleading stage to allege that the price of a security was inflated by Defendants' misrepresentations and then declined when the market learned the truth. *See Semerenko v. Cendant Corp.*, 223 F.3d 165, 184 (3d Cir. 2000) ("where the claimed loss involves the purchase of a security at a price that is inflated due to an alleged misrepresentation, there is a sufficient causal nexus between the loss and the alleged misrepresentation to satisfy the loss causation requirement"); *Vanderhoef v. China Auto Logistics Inc.*, 2020 WL 5105243, at *4 (D.N.J. Aug. 31, 2020) (loss causation "is not subject to the heightened pleading requirements of Rule 9(b) and the PSLRA").

Investor losses confirm the Icerberg and Capybara Report's significance: following their publication, QCI's stock plummeted demonstrating that the market had not previously absorbed its revelations. *See Winstar*, 2006 WL 473885, at *15 (sharp stock price decline in the immediate wake of a short seller report undermines defendants' argument that the report, based on public information, was not corrective); *Bond v. Clover Health Invs., Corp.*, 587 F. Supp. 3d 641, 668 (M.D.

Tenn. 2022) (the market "agreed" with short report's credibility by "reacting negatively"). Accordingly, Plaintiff has adequately pled loss causation.[5]

**E.     Control Person Liability Under Section 20(a) is Adequately Pled**

Section 20(a) liability requires a primary Section 10(b) violation and control over the violator's action. *In re Coinbase Glob., Inc. Sec. Litig.*, 2024 WL 4053009, at 18 (D.N.J. Sept. 5, 2024).  Because Plaintiff pleads a Section 10(b) claim, and the Individual Defendants—QCI's CEOs and CFOs—a controlled its reporting and disclosures, the Section 20(a) claim stands. Defendants' cases bear little resemblance to this one. None involved CEOs or CFOs who personally signed SOX certifications or appeared in company press releases. In *Digital Island* other than the former CEO, none of the defendants had any responsibilities within the company other than serving as directors. *In re Digit. Island Sec. Litig.*, 223 F. Supp 2d 546, 561 (D. Del.

---

[5] The cases that Defendants cite for the proposition that earlier stock-price declines negate loss causation are readily distinguishable. In *Druskin v. Answerthink,Inc.*, the stock had dropped from $34.75 to $7.01 when the disclosures were made. 299 F. Supp. 2d 1307, 1339 (S.D. Fla. 2004). *In re FirstMarblehead Corp. Sec. Litig.* the company's stock-price drop coincided with a significant downturn in the credit markets. 639 F. Supp. 2d 145, 165 (D. Mass. 2009). And in *Eng v. Edison International*, 2017 WL 1857243 (S.D. Cal. May 5, 2017), the issue was a lack of statistical significance with six separate declines between .9% to 2.71% declines. Defendants have neither made a statistical significance argument, nor have they put forward an explanation for the declines other than then Iceberg and Capybara Reports. The latter would be improper to consider at the motion to dismiss stage.

2002). In *Bisaro*, the defendants at issue were an executive vice president and the investor-relations officer, not core decisionmakers. *Alta Fundamental Advisors LLC v. Bisaro,* 2025 WL 1793691, at *1, *11 (D.N.J. June 30, 2025). *Barbee*, a *pro se* case, alleged time-barred claims against a post-fraud CFO and no false statement. *Barbee v. Amira Nature Foods*, 2024 WL 626302 (D.N.J. Feb. 14, 2024). Here, by contrast, each Individual Defendant personally signed or issued detailed, contemporaneous misstatements corroborated by insiders, documents, and investigations establishing scienter.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' motion to dismiss in its entirety.[6]

Respectfully submitted,

Dated:        January 22, 2026        **LEVI & KORSINSKY, LLP**

 s/ Adam M. Apton
Adam M. Apton
Nicholas I. Porritt (*pro hac vice forthcoming*)
Max E. Weiss (*pro hac vice forthcoming*)

---

[6] If the Court dismisses any of the Section 10(b) or 20(a) claims, Plaintiff asks for leave to amend. Along with this opposition, Plaintiff has moved for leave to file a Second Amended Complaint. The proposed amendment adds more particularized allegations of falsity and scienter, including additional detail from FE2.

33 Whitehall Street, 27th Floor
New York, New York 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
aapton@zlk.com
nporritt@zlk.com
mweiss@zlk.com

*Counsel for Lead Plaintiff Jaeyeol Jung*