UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JAEYEOL JUNG, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> QUANTUM COMPUTING INC., WILLIAM J. MCGANN, ROBERT LISCOUSKI, CHRISTOPHER BOEHMLER, and CHRISTOPHER ROBERTS, <br><br> Defendants. | **Case No. 2:25-cv-01457-MEF-JSA** <br><br> **SECOND AMENDED CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

TABLE OF CONTENTS

I. SUMMARY OF THE ACTION.................................................................................. 1

II. JURISDICTION AND VENUE ............................................................................... 6

III. PARTIES ............................................................................................................ 6

IV. SUBSTANTIVE ALLEGATIONS......................................................................... 8

  A. Background ....................................................................................................... 8

    1. Liscouski salvages QCI from receivership and makes it into a technology company .......................................................................................................... 8

    2. Classical versus quantum computing............................................................ 8

    3. QCI struggles as a software company and transitions to hardware. .......... 10

    4. QCI Announces Quad M "Landmark" Deal to Boost Investor Interest. ......... 11

  B. The QPhoton Merger Recasts QCI as a "Full-Stack" Company, Offering Quantum Software and Hardware. .................................................................. 12

    1. QCI Aggressively Promotes Its "Quantum Computing Technology."............... 17

    2. QCI exploited its inflated stock price to raise additional capital. ............... 17

  C. QCI Announces "Partnership" with NASA. .................................................... 17

  D. Millionways: a "Quantum" Partner in Name Only. ....................................... 20

  E. QCI Continues to Exaggerate its Sub-Contracts with NASA........................ 23

  F. QCI Returns to the Market to Cash In on Its Inflated Stock. ...................... 24

  G. TFLN Hype: QCI Turned a Pilot Lab into a "Quantum Foundry" ................ 24

  H. From Quantum Hype to Corporate Spin: Iceberg and Capybara Reports Expose QCI's Lies ........................................................................................... 29

    1. The November 27, 2024 Iceberg Report ..................................................... 29

    2. The December 9, 2024 Iceberg Report........................................................ 32

    3. QCI Raises Another $46 million Using Its Inflated Stock. .......................... 33

    4. QCI writes off all its millionways loan. ..................................................... 34

    5. QCI Raises $100 million Using Its Inflated Stock. ..................................... 34

    6. The January 16, 2025 Capybara Report: The Truth Fully Emerges .......... 34

  I. Insiders Expose a Quantum Mirage................................................................. 38

    1. Former Engineer Confirms QCI's 'Quantum' Machines Were Unreliable Black Boxes, Not Ready-for-Prime-Time Technology.......................................... 38

    2. A QCI Senior Developer Warned Leadership That QPhoton Was Not A Quantum Device. ........................................................................................ 39

V. SUBSTANTIVE ALLEGATIONS BY ELEMENT ............................................... 44

  A. DEFENDANTS' FALSE AND MISLEADING STATEMENTS.......................... 44

1. False and Misleading Statements Made in 2022. .................................................. 45

2. False and Misleading Statements Made in 2023 ................................................ 60

3. False and Misleading Statements Made in 2024 ................................................ 83

B. DEFENDANTS ACTED WITH SCIENTER ........................................................ 100

1. Knowledge and Deliberate Recklessness ......................................................... 100

2. Core Operations and Corporate Scienter ......................................................... 101

3. Defendants were motivated to artificially inflate QCI's stock price to raise additional capital. ............................................................................................. 102

C. LOSS CAUSATION AND ECONOMIC LOSS ..................................................... 103

1. The November 27, 2024 Iceberg Report ........................................................... 103

2. The December 9, 2024 Iceberg Report .............................................................. 104

3. The January 16, 2026 Capybara Report ............................................................ 105

D. RELIANCE ........................................................................................................... 107

E. NO SAFE HARBOR ............................................................................................ 108

VI. CLASS ACTION ALLEGATIONS ...................................................................... 109

VII. COUNTS ............................................................................................................... 111

COUNT I: Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against All Defendants ................................................... 111

COUNT II: Violations of Section 20(a) of the Exchange Act Against the Individual Defendants ............................................................................................................... 113

VII. PRAYER FOR RELIEF ........................................................................................ 114

VIII. DEMAND FOR TRIAL BY JURY ....................................................................... 115

Lead Plaintiff Jaeyeol Jung ("Plaintiff"), individually and on behalf of all others similarly situated, by the undersigned attorneys, alleges in this complaint for violations of the federal securities laws the following based upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Quantum Computing Inc. ("QCI") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of QCI's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning QCI; and (d) information obtained from interviews with former employees and other individuals knowledgeable about QCI.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## I.    SUMMARY OF THE ACTION

1.    This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired QCI securities between February 24, 2022 and January 15, 2025, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, against QCI and certain of its top officials.

2.    QCI is a Delaware corporation that claims to develop and sell quantum computing software and hardware for high-performance computing applications. Throughout the Class Period, QCI held itself out as a "full-stack" quantum company that could already deliver

quantum advantage through its Qatalyst software, its Entropy Quantum Computing ("EQC") platform, and, later, its thin-film lithium niobate ("TFLN") chips and photonic "foundry." In press releases, SEC filings, and investor presentations, Defendants repeatedly assured investors that QCI's technology harnessed uniquely quantum phenomena to solve real-world, high-value problems and underpinned meaningful commercial contracts and a "long-standing" NASA relationship.

3.      Defendants told investors that by combining its longstanding Qatalyst software with hardware, obtained from its 2022 acquisition of QPhoton, Inc., QCI could deliver powerful quantum solutions on room-temperature photonic systems using EQC and TFLN chips to unlock problems "beyond the capabilities" of classical machines. It touted billions of dollars of projected quantum and high-performance computing market opportunity and positioned its platform as hardware-agnostic software that could seamlessly tap emerging quantum processing units.

4.      None of these representations by Defendants is true. Former QCI engineers confirmed that the QPhoton hardware did not perform quantum computing at all. Instead, QPhoton's device behaved like a classical and not a quantum computer. Furthermore, at the time of the QPhoton acquisition, QCI had failed to undertake any technical due diligence into QPhoton's hardware at all. When testing was belatedly carried out by QCI engineers after the acquisition, it produced results that only a classical system would generate.  By fall 2022 QCI engineers had personally told Defendants McGann and Liscouski that the device was not using quantum computing, even as QCI continued to market the technology as a quantum computer to investors and counterparties.

5.      Defendants repeatedly touted QCI's business dealings and contracts with various entities, including employee staffing solutions company Quad M Solutions, Inc. ("Quad M") and

millionways, Inc. ("millionways"), purportedly a leading AI firm, as well as QCI's purported long-standing strategic partnership with the National Aeronautics and Space Administration ("NASA"). Defendants represented that each such deal, contract, or partnership resulted from QCI's ability to substantially aid a given use-case through its differentiated quantum computing technologies.

6.      To reinforce the appearance that its purported quantum technology had been validated in the field, QCI repeatedly invoked NASA and "prime contractors," press-releasing a cascade of "awards" and "projects" supposedly tied to quantum LiDAR and EQC-based development. Yet government contracting records show that QCI had only a single small, generic computer-programming contract directly with NASA, that the touted subcontracts were low-dollar, non-quantum awards where QCI was often the sole bidder, and that NASA personnel rejected QCI's characterization of a broader strategic quantum partnership. Likewise, QCI announced "landmark" commercial arrangements that, on their face, credited QCI's quantum capabilities, such as the Quad M and millionways deals, but those arrangements were, according to detailed allegations and corroborating witness accounts, undisclosed related-party or non-arm's-length transactions that generated little or no real revenue and were never supported by functioning quantum technology.

7.      These contracts were each shams in differing ways. The agreement with Quad M was a related-party transaction as Quad M shared Defendant Liscouski as a director and the contract generated little if any revenue. Similarly, millionways had no product and rather than providing revenue for QCI, required a loan from QCI to keep operating. This loan was never repaid. Finally, the contracts with NASA were tiny software development or testing contracts that did not involve quantum computing.

8.      Defendants' pivot to hardware also included promoting a TFLN photonic chip "foundry" in Arizona that would supposedly mass-produce next-generation quantum chips on a five-acre site and that had already attracted university purchase orders. The advertised "foundry", however, was a small R&D lab in an ordinary office suite lacking the infrastructure, cleanroom environment, and capital equipment one would expect of a true commercial foundry. The purchase order was disavowed by the purported university counterparty cited in a QCI press release who described it as only a small order and confirmed that QCI's announcement had not been cleared in advance. These revelations, coupled with disclosures that QCI never purchased the promised five-acre parcel and that its fixed-asset disclosures were inconsistent with a large-scale fabrication facility, further undercut Defendants' claims that QCI had built a commercially credible quantum-chip platform capable of scaling its technology.

9.      The market began to learn the truth in a series of partial and then fuller corrective disclosures from November 2024 through January 2025, when Iceberg Research and Capybara Research published reports detailing the gap between QCI's quantum marketing and its actual technology, revenue base, and NASA relationship. Each revelation triggered significant stock-price declines as the artificial inflation attributable to QCI's misstatements and omissions about its supposed quantum computing technology and related contracts was removed, causing substantial damages to Plaintiff and the proposed Class of investors who purchased QCI securities at prices distorted by that false quantum narrative.

10.     On November 27, 2024, Iceberg Research published a report alleging that QCI's press releases concerning its TFLN foundry, as well as purchase orders for QCI's TFLN chips, were a sham. In support of these allegations, Iceberg cited communications with a university professor who had ordered QCI's TFLN chips, photos of the address at which QCI's purported

4

TFLN foundry was located per QCI's website—which showed only what appeared to be an office building—and communications with ASU Research Park building management.

11.     On December 9, 2024, Iceberg published a second report addressing QCI, noting that, although QCI "ha[d] shared photos online of what it claims to be its foundry[,]" "this setup looks more like a laboratory" and "is a far cry from a foundry ready for 'mass production' on what [QCI] said would be 'five acres within the extensive 320-acre research park hosted by ASU[.]'" The same report further noted that "[f]rom 2021 to 2024, [QCI] reported insignificant levels of revenue, despite various claims, such as being a NASA sub-contractor."

12.     On this news, QCI's stock price fell $0.46 per share, or 5.8%, to close at $7.47 per share on December 9, 2024.

13.     Then, on January 16, 2025, Capybara Research ("Capybara") published a report alleging, inter alia, that QCI "insinuated that there were products that were farther along than they were, to lead the public to believe they had quantum capabilities that they didn't and products that were in customers hands when they weren't." Capybara also reported that QCI had overstated its ties to NASA and fabricated revenues through multiple related-party transactions, particularly with Quad M Solutions, Inc. ("Quad M"), and millionways Inc. ("millionways"). The Capybara report also alleged that QCI was pumping its stock price with false and misleading press releases, citing discussions with QCI's former employees.

14.     On this news, QCI's stock price fell $1.72 per share, or 14.89%, over the following two trading sessions, to close at $9.83 per share on January 17, 2025.

15.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of QCI's securities, Plaintiff and other Class members have suffered significant losses and damages.

## II.    JURISDICTION AND VENUE

16.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

17.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

18.    Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). QCI is headquartered in this District, Defendants conduct business in this District, and a significant portion of Defendants' actions took place within this District.

19.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mail, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

20.    Plaintiff, as set forth in the Certification previously filed with the Court (ECF No. 4-4), acquired QCI securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

21.    Defendant QCI is a Delaware corporation with principal executive offices located at 5 Marine View Plaza, Suite 214, Hoboken, New Jersey 07030. Throughout the Class Period, QCI's common stock traded on the Nasdaq Stock Market ("NASDAQ") under the ticker symbol "QUBT."

22.    Defendant William J. McGann ("McGann") served as QCI's Chief Executive Officer ("CEO") between February 1, 2024 and May 12, 2025, before which he served as QCI's

6

Chief Operating Officer and Chief Technology Officer.

23.    Defendant Robert Liscouski ("Liscouski") served as QCI's CEO from before the start of the Class Period to January 31, 2024.

24.    Defendant Christopher Boehmler ("Boehmler") has served as QCI's Chief Financial Officer ("CFO") since July 1, 2023.

25.    Defendant Christopher Roberts ("Roberts") served as QCI's CFO from before the start of the Class Period to June 30, 2023.

26.    Defendants McGann, Liscouski, Boehmler, and Roberts are collectively referred to herein as the "Individual Defendants."

27.    The Individual Defendants possessed the power and authority to control the contents of QCI's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of QCI's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with QCI, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

28.    QCI and the Individual Defendants are collectively referred to herein as "Defendants."

## IV.   SUBSTANTIVE ALLEGATIONS

### A. Background

**1. Liscouski salvages QCI from receivership and makes it into a technology company**

29.    QCI was founded in 2001 as a Nevada corporation that purported to sell ink-jet printer cartridges under the name "Ticketcart, Inc." In July 2006, it acquired Innovative Beverage Group and renamed itself Innovative Beverage Group Holdings. It sold beverages until it ceased operations in 2013 and eventually placed in receivership.

30.    In January 2018, Defendant Liscouski purchased a controlling block of common stock in QCI from the receiver, redomiciled the corporation to Delaware, and renamed it Quantum Computing Inc. QCI listed on NASDAQ on July 15, 2021.

### 2. Classical versus quantum computing.

31.    Classical computers and quantum computers process information in fundamentally different ways.  Quantum computers use the laws of quantum mechanics rather than conventional digital logic. This difference has direct implications for what problems can be solved efficiently, how those problems are represented, and how any technical claim about "quantum" capabilities should be understood in context.

32.    Classical computers process information by storing and manipulating numbers as discrete digital values, either 0 or 1, and the same inputs run through the same program ordinarily yield the same outputs with high precision.

33.    Quantum computing, by contrast, is tied to the behavior of a physical analog system. A quantum computer is more than software; it is a device that encodes a problem into controlled physical states and then measures those states to obtain an output. Although quantum computing systems may include digital components for sending instructions and collecting

8

results, the computing element itself depends on physical effects, and the output is obtained through measurement of that physical system. In certain implementations, for example, physical particles (such as ions) are manipulated, often using lasers, so that their physical states represent the problem being solved, and the result is obtained by measuring those physical states to determine the returned "ones and zeros."

34.    The result of this different approach to computing is that quantum computers are capable of exploring many possible solutions to a problem simultaneously rather than a classical computer which explores possible solutions to a problem sequentially. This ability to explore many possibilities at once makes quantum computers extraordinarily powerful for certain types of problems:

(a) *Finding the best option among countless choices.* To plan delivery routes for thousands of packages, or determining the optimal way to schedule flights at an airport, regular computers have to check options one by one, while quantum computers can evaluate many combinations in parallel.

(b) *Simulating nature.* Molecules and chemical reactions follow quantum rules themselves. A quantum computer can naturally model how a new drug might interact with a disease, or how to create better batteries and materials. Regular computers struggle enormously with this because they're trying to describe quantum behavior using non-quantum tools.

(c) *Breaking and creating codes.* Quantum computers could crack many of today's security systems, but they can also create virtually unbreakable new ones.

35.    The differences between quantum and classical computers can be observed through their different responses to objective testing. Classical computers can represent and preserve extremely fine numerical distinctions. A quantum computer, as a physical system, is easily disrupted by noise and is therefore more limited than classical computers on how precisely it can set, maintain, and read the values used to represent a problem. Those limits are described as limits on the system's accuracy, or "fidelity". In practical terms, a quantum computer cannot be expected to reliably distinguish very tiny numerical differences in the same way a classical

9

computer can.

36.    One way to evaluate whether a product marketed as a quantum computer is behaving physically as a quantum computer is through a "coupling strength" test, in which the evaluator treats the system as a black box and submits a problem expressed as a matrix of numbers, including "couplings" that represent how different variables interact. The evaluator then repeats the same test while making those coupling values progressively smaller, to see when the system stops reliably recognizing the couplings and producing coherent results based on them.

37.    Because a quantum computer depends on a noisy physical process, it would be expected to stop reliably recognizing results once the couplings become sufficiently small. In practical terms, the output would show inconsistency at relatively modest levels (for example, somewhere around $10^2$ to $10^5$), reflecting the limits of an analog device. Classical devices can, on the other hand, continue to return a smooth, steady stream of results that reflect extremely fine numerical precision – down to about $10^{15}$ or $10^{16}$. Outputs that precise indicate the system is a classical computation operating "behind the curtain," rather than a quantum computer operating through an analog physical process.

### 3. QCI struggles as a software company and transitions to hardware.

38.    From 2018 to 2021, QCI operated solely as a software developer. In 2020 it had developed Mukai, a "quantum application development platform." Mukai was designed to help to solve extremely complex optimization problems, which are at the heart of some of the most difficult computing challenges in industry and government. Its software was designed to enable developers to create and execute quantum-ready applications on classic computers, while being ready to run on quantum computers when those systems can achieve performance advantages.

39. During 2021, QCI continued to develop and market its software application, now called Qatalyst. QCI described Qatalyst as a "Quantum Application Accelerator." Despite QCI's efforts, Qatalyst failed to develop much market traction, and QCI generated no revenue in either 2020 or 2021. By the end of 2021, QCI's board and management determined to pivot away from being a pure software company and acquire a hardware development capability. Starting in October 2021, QCI began discussions to acquire QPhoton, Inc., ("QPhoton") a company founded by Huang, who was then a professor at the Stevens Institute of Technology.

**4. QCI Announces Quad M "Landmark" Deal to Boost Investor Interest.**

40. On January 19, 2022, Quantum Computing Inc. ("QCI") issued a press release entitled "Quantum Computing Inc. Provides Quantum Consulting and Software to Quad M Solutions ("Quad M") (the "Quad M Press Release").

41. The Quad M Press Release trumpeted QCI's "first customer for QCI Qonsulting" which QCI claimed would provide "quantum-driven solutions" to employee staffing company Quad M. Specifically, the press release indicated that QCI would provide underwriting applications to optimize health insurance, using a subscription model whereby every employee using Quad M's "health solution" would pay a monthly fee. The Quad M Press Release contained the specific expectation that QCI's purported health insurance underwriting applications would be applied "to over 100,000 insured lives by the end of 2022." Regarding the transaction, Defendant Liscouski said:

> "This is a landmark opportunity for QCI, which we expect to result in our first customer revenue, a residual monthly revenue stream and a scalable revenue model for QCI's growth once implemented . . . [w]ith Qonsulting and ready-to-run quantum software, QCI is positioned to accelerate and enhance our clients' exploration of their optimal path to quantum value."

11

42.    The Quad M Press Release provided that once the underwriting product was validated, it would be jointly marketed to self-insured companies and medical insurers.

43.    However, Quad M was a related party transaction with numerous undisclosed relationships as shown in the following chart.



44.    Thus, far from being a "landmark opportunity" for QCI, this was a contract designed solely to generate a positive press release with little prospect for any significant revenue as Quad M was also a struggling company with limited cash. For the first six months of 2022, QCI recorded just $96,724 in revenue, 86% of which was unpaid.

**B. The QPhoton Merger Recasts QCI as a "Full-Stack" Company, Offering Quantum Software and Hardware.**

**February 24, 2022: QCI Press Release, "QCI and QPhoton Announce Exclusive Marketing Agreement for Photonic Quantum Processing Technologies."**

45.    On February 24, 2022, the beginning of the Class Period, Defendants publicly unveiled an exclusive marketing agreement with QPhoton., casting QPhoton as "a leading

innovator in the quantum photonic technology space" and the linchpin of QCI's move into quantum hardware. QCI told investors that it would "merge QCI's quantum software solution, Qatalyst™, with QPhoton's advanced photonic quantum technologies" to deliver QCI-specific solutions, thus positioning QPhoton's hardware as the quantum engine that would finally make Qatalyst (QCI's software) a real quantum product.

46.    QCI further emphasized that "QPhoton's technology is a condensate of ground-breaking quantum research over two decades" funded by DARPA, NSF, NASA, DoD, and other federal agencies, and touted QPhoton's CEO, Dr. Yuping Huang, as a visionary quantum scientist who had led "many pivotal, large-scale quantum projects" totaling roughly $30 million in funding. In QCI's telling, QPhoton "leverages two decades of leading quantum studies to bring significant quantum value to the market," including "advanced photonic chips, quantum nanophotonics, quantum-boosted sensing (LiDAR), quantum-secured cyber applications, and quantum networks," thereby supplying the quantum sensing, networking, and security capabilities QCI claimed it could commercialize.

47.    QCI described QPhoton's intellectual property as "a wide spectrum of quantum IP covering quantum sensing, communications, encryption, and nanophotonic chips," asserting that QPhoton's engineers had already built "advanced nanophotonic and microelectronic circuits" and "prototype systems for quantum big data processing and measurement" that purportedly demonstrated "significant advantages over the state-of-the-art." QCI told investors that "[b]y coupling quantum hardware technologies from QPhoton with Qatalyst, QCI will deliver more powerful solutions to accelerate the application and value from quantum computing," and that adding "QPhoton's capabilities" would allow QCI to integrate "photonic technologies into its supported quantum hardware," including "quantum sensors, quantum

13

processors and quantum software."

48.    The February 24, 2022 release also framed the QPhoton relationship as a commercial inflection point: QCI said it would jointly sell and market "quantum and photonic products and services" with QPhoton, highlighted QPhoton's "ongoing photonic innovation," and told investors that QPhoton's "newly emerging quantum technologies using photonic methods" would "create significant advances" as QCI delivered "real business quantum solutions" in areas such as logistics and supply chain. The companies announced that QCI held "exclusive marketing rights to QPhoton's quantum and photonic computing technologies and resources," and they forecast that they "expect[ed] to demonstrate initial joint quantum solutions in the Q4 2022 time frame," thereby signaling to the market that QPhoton's quantum hardware would soon be powering demonstrable quantum systems for customers.

49.    This February 24, 2022 announcement thus marked QCI's public pivot from a struggling "quantum-ready" software shop into a self-proclaimed quantum hardware company, with QPhoton's purported quantum photonic technology and IP presented as the foundation of QCI's claimed quantum computing, sensing, communications, and encryption capabilities.

**May 24, 2022: QCI Press Release, "Quantum Computing Inc. Announces Agreement to Acquire QPhoton Delivering First Commercially Available, Ready-to-Run Full-Stack Quantum Solutions."**

50.    On May 24, 2022, QCI issued a press release announcing that it had entered into a definitive agreement to acquire QPhoton, (the "May 2022 Press Release"). The May 2022 Press Release stated that "[t]he acquisition of QPhoton extends QCI's offerings to accelerate the accessibility of quantum computing, and other powerful technologies, into easily deployable solutions today, and advances QCI into a full-spectrum quantum software and hardware company."

14

51.     The May 2022 Press Release further quoted Defendant Liscouski as asserting that "[t]he combination of QPhoton's powerful quantum processing technology and systems with QCI's Qatalyst software significantly accelerates accessibility to quantum solutions for real business problems," and that, with QPhoton's technology, QCI would be "launching ready-to-run anywhere, full-stack quantum systems that can deliver affordable, user-friendly solutions for real business problems to a much larger audience"—functionality that Liscouski claimed had "seemed far off" only a year earlier. It also disclosed that QPhoton would become a wholly-owned subsidiary of QCI, that QPhoton's stockholders would receive common stock, preferred stock convertible into additional common shares upon stockholder approval, and low-priced warrants representing in the aggregate approximately 49% of QCI's outstanding capital stock post-closing

52.     The May 2022 Press Release stated that "[t]he acquisition of QPhoton extends QCI's offerings to accelerate the accessibility of quantum computing, and other powerful technologies, into easily deployable solutions today, and advances QCI into a full-spectrum quantum software and hardware company."

53.     The May 2022 Press Release also quoted Defendant Liscouski as stating, *inter alia*, "[t]he combination of QPhoton's powerful quantum processing technology and systems with QCI's Qatalyst software significantly accelerates accessibility to quantum solutions for real business problems. Just a year ago this quantum functionality seemed far off. QCI, with QPhoton's technology, will be launching ready-to-run anywhere, full-stack quantum systems that can deliver affordable, user-friendly solutions for real business problems to a much larger audience."

**June 16, 2022: QCI Press Release, "Quantum Computing Inc. Closes Acquisition of QPhoton."**

54.     On June 16, 2022, QCI issued a press release announcing that it had closed its previously announced merger to acquire QPhoton, making QPhoton a wholly owned subsidiary and adding its founder, Dr. Yuping Huang, to QCI as Chief Quantum Officer and a director. The release quoted CEO Robert Liscouski as stating that the deal "represents a significant event in the quantum computing industry," "a significant leap forward in real-world usability in the quantum computing space," and would transform QCI into "a full-stack quantum computing company" and "a provider of full-stack quantum software and hardware solutions" for non-experts in real-world business applications.

55.     The press release further highlighted that QCI would combine its Qatalyst ready-to-run, vendor-neutral quantum software with QPhoton's room-temperature quantum photonic systems ("QPS") to deliver "broadly accessible and affordable" full-stack quantum systems that operate alongside classical technology and target use cases such as supply chain and portfolio optimization, fraud detection, underwriting, biomedical imaging, drug trials, data security, and government defense and security.

**July 19, 2022: QCI Press Release, "Liscouski to Ring the Nasdaq Closing Bell."**

56.     On July 19, 2022, QCI issued a press release to announce that it would ring the NASDAQ closing bell the following day. The press release touted the ceremony as an opportunity for QCI to commemorate its many milestones and achievements in the quantum computing sector and to celebrate the QPhoton acquisition and their "agreement to deliver the first commercially available ready-to-run full-stack quantum photonic solution." Liscouski went onto to state, "We have achieved breakthroughs never before seen in the quantum computing

16

industry and will continue to innovate and deliver ready-to-run quantum solutions that enable non-quantum experts to tackle real-world business problems."

### 1.  QCI Aggressively Promotes Its "Quantum Computing Technology."

57.    Throughout the remainder of 2022, QCI continuously presented itself as a leading provider of a "full quantum solution" and a "full-stack quantum computing company". These efforts included regular videos posted on its YouTube page as well appearances on NASADAQ's "Trade Talk" and "New to the Street" on Bloomberg TV and Fox Business.

### 2. QCI exploited its inflated stock price to raise additional capital.

58.    On December 5, 2022, QCI entered into a $25 million At-the-Market Issuance Sales Agreement with Ascendant Capital Markets, LLC as sales agent, permitting QCI to sell primary common shares from time to time directly into the market pursuant to its shelf registration statement and base prospectus, with Ascendant acting on a commercially reasonable efforts basis and receiving a commission on shares sold.

### C.  QCI Announces "Partnership" with NASA.

59.    QCI cynically wrapped itself in NASA's prestige by touting a "long-standing strategic partnership" and multiple "NASA" contracts during 2023 when it had only a handful of tiny subcontracts for low-level, non-quantum programming or sensing work, often awarded because QCI was the sole bidder and for amounts as small as roughly $26,000. QCI's strategy was to chase small, uncompetitive NASA-related subcontracts through primes like SSAI and BAERI, then rebrand those modest tasks as evidence of a deep NASA collaboration in quantum computing.

17

**February 8, 2023: QCI Press Release, "Quantum Computing Inc. Receives Subcontract Award to Support NASA to Test Quantum Sensing Solutions for Monitoring Climate Change."**

60.    On February 8, 2023, QCI announced that NASA, through prime contractor SSAI, has hired it to test its quantum photonic LiDAR technology as a remote sensing tool to monitor snowpack and, by extension, climate-driven water availability. ("the SSAI Press Release"). The SSAI Press Release frames the work as a proof-of-concept step toward deploying compact quantum sensors on aircraft and satellites for global climate monitoring. The SSAI Press Release stated in relevant part:

> QCi, a first-to-market full-stack photonic-based quantum computing and solutions company, **today announces a subcontract award from SSAI to support NASA in testing on of its proprietary quantum photonic systems for remote sensing applications.**
>
> * * *
>
> **"As a full-stack quantum computing company, QCi is position to contribute to NASA's efforts to protect the Earth's environment.** Our team is incredibly proud to have the opportunity to demonstrate the vital real-world applications of QCi's quantum technology to the recognized global leader in space research and exploration," said Robert Liscouski, CEO of Quantum Computing, Inc.
>
> Under the subcontract, QCi will test an existing LiDAR system designed to remotely measure the physical properties of different types of snowpacks.
>
> * * *
>
> **QCi has recently developed a variety of quantum information technology and systems, including those of entropy quantum computing, reservoir quantum computing, quantum imaging and sensing. Its quantum photonic LiDAR systems deliver new measurement capabilities with single-photon sensitivity, strong noise rejection, and high-ranging and spatial resolution.** QCi systems are built for easy and versatile uses with favorable size, weight, cost, and power specs.

61.    The System for Award Management ("SAM"), the U.S. government's official contracting and award management system records awarded contracts and subcontracts. With respect to QCI, SAM provided the following information:



62.    SAM lists no other contracts, or subcontracts, with QCI.

**D. Millionways: a "Quantum" Partner in Name Only.**

**April 27, 2023: QCI Press Release, "Quantum Computing Inc.'s Reservoir Quantum Computer to Demonstrate 'the Power of Artificial Intelligence' via Partnership with millionways AI."**

63. On April 27, 2023, QCI issued a press release announcing its partnership with millionways. The press release gave the impression that QCI had been selected as a partner for millionways based on its purported differentiated quantum computing technology. Under the arrangement, QCI and millionways will test how QCI's reservoir quantum system processes audio files so millionways can generate emotional scoring and personality insights from voice, not just text, and, if the pilots succeed, the parties plan joint marketing and business-development efforts to commercialize the combined solution.

64. QCI's reservoir quantum computer is described as a photonic-based platform designed to accelerate AI by improving processing speed, reducing power consumption, and cutting training-data demands, while millionways contributes an emotionally intelligent AI engine that analyzes language to infer personality and emotional IQ for uses such as hiring, culture-building, customer relations, and consumer-facing services. QCI's press release frames this collaboration as the first joint commercial application of its reservoir computing technology and a proof point that quantum photonics can "transform the world of AI" relative to classical systems like ChatGPT-style models, and it signals an aggressive timeline by stating that successful testing could lead to a commercial application or product by the end of 2023, with energy savings, cost efficiencies, and higher-performance AI as the main differentiators.

**May 14, 2023, Liscouski's "New to the Street" Interview.**

65. On May 14, 2023, Liscouski went on "New to the Street" to showcase its photonic-based "Reservoir Computer" as a versatile edge device for real-time AI tasks, while positioning the company as an ambitious, vertically integrated quantum hardware-and-software

20

player with applications from healthcare to finance and remote sensing.

66. Liscouski highlights the new agreement with AI firm "A Million Ways" (referred to elsewhere as millionways) to pair QCI's Quantum Reservoir Computer with the partner's existing AI stack. The host situates this within QCI's broader push to commercialize quantum-inspired and quantum-enhanced products rather than focus on abstract research.

67. Liscouski portrays the Reservoir Computer as both an AI product in its own right and a stepping-stone toward a fully quantum Reservoir Computer, with ongoing work to increase speed and scalability to address larger AI workloads such as large-language-model training. He links this roadmap to broader QCI initiatives in quantum LiDAR and vibrometry (including remote sensing through fog and non-line-of-sight environments) and quantum-based authentication in cybersecurity.

68. He describes millionways as an AI company working in the healthcare space that applies proven algorithms to extract emotional and psychological content from text-based inputs (e.g., chats, internet text) to support diagnoses or assessments related to mental and emotional conditions.

69. The central claim is that integrating QCI's Reservoir Computer will allow millionways to move from text-only analysis to voice-based analysis, extracting the same "characteristics" from audio in near real time. QCI and millionways are also described in external materials as Reservoir Computer customers, with expectations that the device will dramatically reduce power consumption, materially speed training, and significantly boost machine-learning efficiency for assessing audio files.

**May 22, 2023: QCI's Press Release " Quantum Computing Inc. Signs Letter of Intent to Acquire Privately Held Artificial Intelligence Platform millionways."**

70. On May 22, 2023, Quantum Computing Inc. ("QCi" or the "Company")

announced that its Board of Directors had unanimously authorized a non-binding letter of intent to acquire up to 100% of millionways, Inc., an AI firm that styles itself as the creator of "the world's first emotionally-intelligent AI platform," subject to completion of due diligence and independent valuation and fairness reviews (the "millionways Press Release"). According to the release, the letter of intent builds on QCi's prior collaboration, in which millionways' AI sensing algorithms were paired with QCi's quantum photonics computing capabilities, with QCi reporting "substantive progress" since an initial testing engagement disclosed in April 2023.

71.     The press release further stated that, over the preceding year, QCI had "built and tested multiple hybrid AI hardware systems" that purportedly "demonstrated substantial advantages over existing digital electronic hardware." It also represented that QCI's "hybrid hardware solutions meet the evolving needs of AI and deliver[] remarkable computing speed, low electric power needs with minimal heat dispersion and support[] large-scale parallel processing," thereby allegedly giving QCi "the agility to compete with large data centers on big data challenges."

72.     On June 6, 2023, QCI entered into a Note Purchase Agreement (the "MW Agreement") with millionways, pursuant to which QCI agreed to purchase from millionways up to three unsecured promissory notes (each, an "MW Note") in an aggregate principal amount of up to $2,000,000, subject to the MW Agreement's terms and conditions, and that, on that same date, QCI purchased MW Notes and advanced $500,000 in the aggregate to millionways. The MW Agreement is described as containing customary representations and warranties by both parties and a "most favored nations" provision in QCI's favor, and the MW Notes are described as bearing simple interest at 10% per annum (15% upon an event of default) and maturing upon the earliest of (i) May 16, 2024, (ii) a change of control of millionways, (iii) dollar-for-dollar

prepayment from new third-party capital, or (iv) an event of default.

**E.  QCI Continues to Exaggerate its Sub-Contracts with NASA.**

**July 13, 2023: QCI Press Release, "Quantum Computing Inc. Receives Third NASA Subcontract Award.**

73.    On July 13, 2023, QCI issued a press release announcing that its federal-contracting subsidiary, Qi Solutions, has received a subcontract from Bay Area Environmental Research Institute (BAERI) to "build and test for NASA Ames" a compact photonic sensor to measure atmospheric particulates—clouds, aerosols, smoke plumes, volcanic ash—so NASA can infer size, shape, and chemical composition. The award is described as a nine-month subcontract under which QCI will deliver a low-power, battery-operated instrument, generate operational reports, and provide analysis to support potential future field deployment.

74.    QCI states that this BAERI subcontract "represents the third distinct task order from NASA" in four months and "the second research center within NASA to subcontract with the Company," casting the work as part of a growing, multi-center NASA franchise.  The release highlights that prior "engagements" with NASA Langley involved LiDAR and reservoir-computing work, while the new Ames project will apply QCI's photonic laser technology to resolve particle composition with higher spatiotemporal precision.

75.    McGann contrasts the planned instrument with "big and clumsy" legacy optics, promising state-of-the-art quantum-optics components that measure extinction and backscatter coefficients at multiple wavelengths. QCI links the NASA work to a broad commercial roadmap, suggesting future uses in gas-emission monitoring, petroleum and chemical processing, firefighting, pollution tracking, weather forecasting, and battlefield gas detection.

**F.  QCI Returns to the Market to Cash In on Its Inflated Stock.**

76.    On August 18, 2023, QCI filed a Form 424B5 prospectus supplement that amended and upsized its ATM program with Ascendiant: by then it had already sold approximately $22.6 million of common stock, and the amendment increased the overall facility so that roughly $27.4 million of additional common stock remained available for sale "at the market" through Ascendiant at prevailing Nasdaq prices.

**G.  TFLN Hype: QCI Turned a Pilot Lab into a "Quantum Foundry"**

**September 21, 2023: QCI's Press Release, "Quantum Computing Inc. Selects Tempe, Arizona as the Site for its Quantum Photonic Chip Foundry"**

77.    On September 21, 2023, QCI issued a press release announcing it had selected the ASU Research Park in Tempe Arizona as the location for a new quantum photonic chips manufacturing facility, where it would produce its Thin Film Lithium Niobate (TFLN) chips. The press release stated that QCI planned to begin the buildout of the facility during the fourth quarter of 2023.

78.    The press release stated that, as a lease incentive, the landlord agreed to provide a significant portion of the leasehold improvements needed to develop the fabrication facility. The press release stated that QCI's chip manufacturing would commence operations in the first half of 2024, and anticipated it would mass-produce quantum photonics chips with complex nanophotonic circuits by late 2024 / early 2025.

79.    In the press release, Liscouski stated: "[t]he quantum photonic chip facility is poised to make a significant impact in the United States by becoming the first US-based developer and producer of thin film lithium niobate chips."

24

**April 1, 2024: QCI'S 2023 10-K**

80.    On April 1, 2024, QCI filed an annual report on Form 10-K with the SEC, reporting QCI's financial and operating results for the quarter and year ended December 31, 2023 (the "2023 10-K"). In discussing QCI's quantum computing technologies and TFLN, the 2023 10-K stated, does more than tout a new material; it stakes its future on a migration path and a manufacturing thesis built around these chips. QCI tells investors that today's quantum products rest on discrete optical components—but tomorrow's will run on optical integrated circuits etched directly into crystalline lithium niobate wafers. That migration is not framed as speculative: QCI asserts both "strong domain experience and intellectual property" in TFLN chip design and fabrication and "initial production" of specialty electro-optical modulators, signaling that TFLN is already out of the lab and into limited production.

81.    The filing also elevates TFLN from a mere R&D platform to the centerpiece of a domestic manufacturing strategy. QCI reports that it has begun building out a "state-of-the-art" TFLN chip facility in leased space at Arizona State University's research park and goes so far as to say its understanding is that this could be the nation's first dedicated TFLN optical integrated circuit plant aimed at quantum effects. The company then links that claim to two federal capital pools—DOE's Title 17 clean-energy loan program and the CHIPS Act's $52 billion semiconductor package, including $39 billion in incentives and $13 billion for research—presenting TFLN as both technologically differentiated and policy-aligned.

82.    Finally, QCI casts the facility as a dual-use engine: it will fabricate lithium niobate chips both for QCI's own quantum computing and sensing lines and for sale into the broader commercial market. In one passage, then, the company promises a technological migration, asserts present knowhow and initial output, claims a first-mover manufacturing

25

position, and ties the entire TFLN initiative to large-scale federal semiconductor funding in service of portraying TFLN not as an incremental improvement, but as the platform on which QCI's long-term business model will rest.

**November 6, 2024: QCI's Quarterly Earnings Call**

83.    During the November 6, 2024 earnings call, McGann and Boehmler also discussed the TFLN foundry. McGann explained that QCI's core strategy is to use its thin-film lithium niobate (TFLN) photonic chips both to power its own scalable quantum machines and to generate near-term revenue from foundry services in high-growth telecom and data center markets. In the near term, McGann told investors that QCI planned to capitalize on rising demand for TFLN devices by offering "foundry services" and to generate significant early cash flow, while in parallel channeling those revenues into continued development of its own quantum computing platform as the underlying technology matures. He also claimed that the same TFLN processes that support commercial foundry work will be used to fabricate miniaturized photonic integrated circuits, or PICs, that form the internal architecture of QCI's scalable photonic quantum machines, allowing the company to meet the extreme performance and integration demands of emerging quantum, telecom, and data-center use cases on a single photonic platform. During the Q&A portion, Ascendion's Woo asked when the "foundry in Tempe will be operational?" would be open

84.    During his prepared remarks Boehmler focused on two themes: disciplined cost containment and continued strategic investment in capital projects and R&D, including the Arizona TFLN foundry facility. Looking ahead, Boehmler told investors that QCI's strategy was to turn that TFLN foundry into a primary engine for revenue and, in the intermediate term, positive cash flow. Over time, Boehmler said that QCI expected the facility to provide a

26

stable, non-dilutive cash stream that supports the business while market demand for quantum computing scales to match the company's manufacturing capabilities.

**November 13, 2024: QCI's Press Release, "Quantum Computing, Inc. Secures First Order for TFLN Photonic Chip Foundry"**

85.     On November 13, 2024 QCI issued a press release, announcing that the company landed the inaugural order for its thin-film lithium niobate (TFLN) photonic chip foundry, a milestone it casts as both commercial validation and strategic proof of concept. A "major Asian research and technology institute" has contracted with QCI for high-performance photonic integrated circuits and nanophotonic devices, signaling rising global demand for TFLN-based fabrication and its role in next-generation telecom, datacom, and quantum systems. The press release claims that the engagement drew on QCI's proprietary strengths in TFLN etching, processing, and wafer-scale characterization—capabilities the company characterizes as essential to state-of-the-art optical devices and photonic engines for coherent communication and other high-growth markets.

**QCI Returns to the Markets to raise $40 million.**

86.     In late 2024, QCI turned to larger, fully negotiated deals with Titan Partners Group, LLC, a division of American Capital Partners, LLC, acting as placement agent. On November 18, 2024, under its November 8, 2022 shelf registration statement, QCI completed a registered direct offering of 16,000,000 shares of common stock at $2.50 per share, for gross proceeds of $40.0 million. Titan served as exclusive placement agent on a reasonable best efforts basis and received a 7.25% cash fee (approximately $2.9 million), along with placement agent warrants exercisable for up to 800,000 shares at $2.875 per share, commencing six months after the prospectus date and expiring five years thereafter. Net proceeds of roughly $36.8 million were earmarked first to repay an approximately $9.3 million loan owed to Streeterville Capital,

27

LLC, with the balance for general corporate purposes, working capital, and capital expenditures.

**November 20, 2024: QCI's Press Release, "Quantum Computing, Inc. Announces Second Purchase Order for TFLN Photonic Chip Foundry."**

87.     On November 20, 2024, QCI issued a press release announcing that it had received its second purchase order for its thin film lithium niobate photonic chip foundry, an order that would "support and is part of the QCi Foundry's pilot launch program, with fulfillment expected in Q1 2025." This time the order was from a U.S. university that will use QCi's scalable industrial processes to advance chip-scale acoustic and cross-domain microsystems as part of the foundry's pilot launch program, with delivery expected in the first quarter of 2025. Under the order, QCi will apply its standard TFLN processing "recipes" in a custom fabrication run, laying the groundwork for TFLN's use in micro-electromechanical systems and reinforcing its role as a versatile material platform for next-generation photonics and beyond. CEO William McGann discusses the collaboration as evidence of both the expanding capabilities and the commercial viability of the Tempe, Arizona foundry, which is being built to support high-volume signal processing, sensing, computing, and advanced acoustic applications.

**H. From Quantum Hype to Corporate Spin: Iceberg and Capybara Reports Expose QCI's Lies**

**1. The November 27, 2024 Iceberg Report**

88.     On November 27, 2024, during intraday trading hours, Iceberg published a report alleging that QCI's press releases concerning its TFLN foundry and related purchase orders were a sham (the "November 2024 Iceberg Report"). With respect to the purchase order at issue in the press release described in ¶ 63, supra, the November 2024 Iceberg Report stated, in relevant part:

> The University of Texas pours cold water on [QCI]'s press release
>
> [QCI] announced two purchase orders for its [TFLN] chips in November 2024. One with an unnamed "research and technology institute based in Asia" and the second with a "US-based university". Originally, QCI disclosed the name of the US-based university – The University of Texas at Austin. But [QCI] removed all references to the university yesterday.

Quantum Computing, Inc. Announces Second Purchase Order for TFLN Photonic Chip Foundry from University of Texas at Austin



NEWS PROVIDED BY
Quantum Computing Inc. →
Nov 20, 2024, 08:30 ET

SHARE THIS ARTICLE



Source: PR Newswire

> The university was likely unhappy with the representations in the release and being involuntarily part of this PR stunt. We spoke to a university professor who confirmed two things: only a small order had been placed; and the individual in charge of the order was surprised to see the [QCI] announcement, as it was not reviewed prior to release.

29

89.    With respect to QCI's purported TFLN foundry, the November 2024 Iceberg

Report stated, in relevant part:

> [QCI] claims to have a foundry located at 2050 E ASU Circle Suite 107 Tempe AZ 85284 – a leased space within [ASU]'s Research Park. The facility is intended to fulfil QCI's announced purchase orders for TFLN chips, with production expected to begin in 1Q25, indicating that the facility is nearly ready.

**QCi Lab** 5 Marine View Plaza Suite 214 Hoboken, NJ 07030

**QCi Fab** 2050 E ASU Circle Suite 107 Tempe AZ 85284

**QCi Administration** 1201 Wilson Blvd Floor 27 Arlington, VA 22209

Source: QUBT website



Source: Photo taken by investigator

* * *

> When reached by phone, building management very confidently said there was no foundry at this address. Then an investigator was sent to have a look around the area in

30

search of this mysterious foundry. The investigator came back with the following observations and findings:

People walking around outside said this was an office building. There are no loading docks (that have an elevated space to facilitate loading) or very large doors. There would be no way to get very large machines inside, which you would expect for a chip foundry about to start "mass production". QCI] was a tenant. But all the investigator saw was some people in a conference room. From the outside, the buildings do not look suitable for a foundry, which needs high ceilings and open spaces for heavy equipment, and proper ventilation for handling fumes in an environment highly sensitive to contamination. None of these seem to exist.



Source: Photo taken by investigator

Other tenants at the same address include IT staffing firm Experis and cloud-based content services platform VisualVault – all of a non- industrial nature.

An old floor plan of a neighbouring identical single-story facility (2030 E. ASU Circle) shows multiple rooms, hallways, and specific spaces like restrooms, but there is no clear indication of spaces for industrial equipment.



*Source: Showcase.com*

90.    The November 2024 Iceberg Report also noted that, despite QCI's claims that it had located a five-acre site in the ASU Research Park for its TFLN foundry, "the entire . . . 2050 building is barely more than an acre, let alone Suite 107 in the building" and, "[a]t that time, production was supposed to start in the first half of 2024."

91.    The November 2024 Iceberg Report further noted that QCI's "fixed asset breakdown does not align with the level of investment one might expect to establish a foundry."

### 2. The December 9, 2024 Iceberg Report

92.    On December 9, 2024, shortly after markets opened, Iceberg published a second report addressing QCI (the "December 2024 Iceberg Report"). The December 2024 Iceberg Report stated, *inter alia*:

> [QCI] has shared photos online of what it claims to be its foundry. But this setup looks more like a laboratory. This is a far cry from a foundry ready for "mass production" on what [QCI] said would be "five acres within the extensive 320-acre research park hosted by ASU". Throwing together some equipment does not make an operational TFLN-chip foundry. [QCI] has already experienced delays compared to its initial production schedule. Many other companies would already be manufacturing TFLN devices, if creating such a facility were this straightforward.

32

* * *

> From 2021 to 9M24, QCI reported insignificant levels of revenue, despite various claims, such as being a NASA sub-contractor. QCI has kept recording losses.

93. Following publication of the December 2024 Iceberg Report, QCI's stock price fell $0.46 per share, or 5.8%, to close at $7.47 per share on December 9, 2024. Despite this decline in QCI's stock price, QCI securities continued trading at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions concerning, *inter alia*, QCI's relationship with NASA and the purported capabilities of QCI's quantum computing technologies, products, and/or services.

### 3. QCI Raises Another $46 million Using Its Inflated Stock.

94. On December 10, 2024, the QCI again used the November 8, 2022 base prospectus for a combined registered and private transaction. A new Form 424B5 prospectus supplement covered a registered primary offering of 1,540,000 shares of common stock at $5.00 per share, yielding $7.7 million of gross proceeds. Concurrently, QCI agreed to sell 8,460,000 additional common shares in a private placement to the same investors, also at $5.00 per share, for $42.3 million in gross proceeds, relying on Section 4(a)(2) and Rule 506 of Regulation D, with those "Private Placement Shares" to be registered for resale later. Taken together, the two legs produced $50.0 million in gross proceeds; Titan, as exclusive placement agent, earned a 7.0% cash fee on the aggregate proceeds plus expense reimbursement up to $100,000, and received placement agent warrants exercisable for up to 500,000 shares at $5.75 per share, starting 180 days after the prospectus date and running for five years. QCI disclosed that it expected to realize approximately $46.2 million in combined net proceeds for general corporate and working capital purposes and capital expenditures.

33

**4.  QCI writes off all its millionways loan.**

95.     As of December 31, 2024, QCI had written down the entirety of the outstanding $558,000 receivable from the bridge loan to millionways as uncollectible based on credit risk.

**5.  QCI Raises $100 million Using Its Inflated Stock.**

96.     In early January 2025, QCI pivoted to a large institutional private placement accompanied by a resale registration. A Form 8-K filed January 8, 2025 discloses a $100 million private placement of common stock and warrants to a syndicate of institutional purchasers under a Securities Purchase Agreement, with a registered placement agent arranging the transaction. Under that deal, investors purchased newly issued common shares at a negotiated price and received common stock purchase warrants featuring customary anti-dilution adjustments, "fundamental transaction" protection, and a beneficial ownership cap of 4.99% (or 9.99% at the holder's election), with any change in the cap above 4.99% becoming effective 61 days after notice. QCI granted piggyback and one-time demand registration rights for the warrant shares, subject to standard Commission-driven limits and temporary deferral rights where a registration would be materially detrimental or conflict with corporate transactions. Closely related, a prospectus on Form 424B3 dated January 7, 2025 registers 8,960,000 shares of common stock for resale by the private placement investors and other selling stockholders, covering shares issued in the private placement as well as shares underlying investor and compensation warrants.

**6. The January 16, 2025 Capybara Report: The Truth Fully Emerges**

97.     On January 16, 2025, during intraday trading hours, Capybara published a report alleging, *inter alia*, that QCI "is a rampant fraud"; that, "[f]rom inception, QCI has defrauded investors by fabricating revenue, misrepresenting their products, and issuing a steady stream of false press releases"; and that "[t]o conceal their fraud, [QCI] even included a clause in employee

34

separation agreements prohibiting them from talking to the SEC."

98.     The Capybara report also cited comments by former QCI personnel who alleged that Defendants had misrepresented the purported capabilities of QCI's technologies, products, and/or services. For example, the Capybara report quoted a former QCI employee as stating that QCI "insinuated that there were products that were farther along than they were, to lead the public to believe they had quantum capabilities that they didn't and products that were in customers hands when they weren't."

99.     The Capybara report also quoted a former QCI executive as stating:

> [It] would take a small army quite some time to make what they currently have work or be a viable product. There's been no evidence from QCI. There's been no progress. They haven't even entered the game. No validation that they can run with any interesting results. Until they do that it's just a glorified University project.

100.    The Capybara report also cited Capybara's discussions with certain of QCI's former employees, QCI's associates and prime contractors, and NASA personnel, who indicated that QCI was pumping its stock price with false and misleading press releases, stating, in relevant part:

> Former employees and people associated with [QCI] say it was common knowledge among employees that the CEO was doing anything he could to pump the share price, including issuing false press releases that lied about their products, revenue deals, and partnerships.
>
> [QCI] claims to have a "longstanding relationship" with NASA, but NASA personnel and government contract records confirm this is false.
>
> [QCI] has a single active contract with NASA, valued at $26,000. The contract was for generic "computer programming" and [QCI] was the sole bidder.
>
> [QCI] falsely claims to have won two contracts directly with NASA and at least 4 subcontracts "awarded by NASA".

35

NASA confirmed to us that they have no relationship with [QCI] beyond the single $26,000 "computer programming" contract noted above.

We spoke with NASA and the prime contractors named in [QCI]'s PRs and we found that all the PRs are deliberately misleading or include outright lies.

The evidence suggests that [QCI] bids on low-value, NASA-related contracts for the sole purpose of pumping their stock via misleading press releases.

In several cases, [QCI] bid on small subcontracts from companies that do work with NASA. In each case, the prime contractor confirmed that [QCI] was the sole bidder and the contracts were for small amounts. NASA confirmed that they played no role in the issuing of the subcontracts.

[QCI] promoted each of these subcontracts as significant and related to quantum computing. In reality, the contracts were very small, unrelated to quantum computing, and were awarded to [QCI] because they were the only bidder.

In a transparent attempt to hide their fraud, [QCI] recently removed some false and misleading PRs from their website.

101.    With respect to QCI's purported revenues generated through fake deals and related party transactions, namely with Quad M and millionways, the Capybara report stated, in relevant part:

For years [QCI] has struggled to generate revenue because of their lack of real products. [QCI]'s solution to this problem was to sign fake deals with undisclosed related parties. The sole purpose for these deals was to deceive investors through promotional press releases containing outright lies.

[QCI] is currently being sued by a former partner for breach of contract and fraud. The plaintiff claims [QCI]'s first three revenue deals were completely fake and that [QCI] never even sent invoices for the deals.

One of these deals was with millionways Inc, ("millionways") a purported AI company. Undisclosed to investors, millionways was a related party. One of [QCI]'s founders was involved with millionways.

36

> [QCI] later announced a LOI [letter of intent] to acquire millionways. As part of the deal, [QCI] paid millionways $500k via an unsecured note. The deal was never completed and QCI been quietly marking down the value of the note because they will never be paid back.
>
> In 2022, [QCI] announced a deal with Quad M Solutions Inc, ("Quad M") an OTC listed company with ties to multiple stock frauds.
>
> Undisclosed to investors, Quad M was a related party. [QCI]'s CEO served as a director of Quad M and the co-founders of [QCI] were deeply involved in Quad M and are long-time business associates of Quad M insiders and investors.
>
> In 2022, [QCI] signed an MOU [memorandum of understanding] with Quad M claiming that they would generate 5-10 dollars per employee per month for [QCI]. Unsurprisingly, the deal never materialized and generated no revenue.

102. The Capybara report also alleged, like the Iceberg reports, that QCI had misrepresented its progress in developing a TFLN foundry, as well as the scale of the purported TFLN foundry. However, the Capybara report went further, alleging that QCI had never purchased the five-acre parcel at the ASU Research Park for its TFLN foundry, citing ASU Research Park management:

> In Sep. 2023 [QCI] claimed to have chosen a site for their new fab, a 5-acre plot in the ASU Research Park. Park management confirmed that [QCI] inquired about the 5-acre parcel but never followed up and never attempted to purchase the property. Now, more than a year after [QCI]'s announcement, the 5-acre parcel remains empty, and it still belongs to the orignal [sic] owner.
>
> In Oct. 2024, [QCI] claimed to have opened the foundry they announced in September the prior year. However, QCI didn't open a fully operational foundry, instead they opened a small R&D [research and development] lab in a leased office space.
>
> [QCI]'s R&D lab is in an office building not suitable for industrial use cases.
>
> [QCI]'s R&D space does not have a cleanroom, which is

37

required to produce commercial quality TFLN chips.

103.    Following publication of the Capybara report, QCI's stock price fell $1.72 per share, or 14.89%, over the following two trading sessions, to close at $9.83 per share on January 17, 2025.

## I. Insiders Expose a Quantum Mirage.

104.    Former QCI employees revealed that QCI's much-touted "quantum" platform was, in practice, a fragile set of lab devices accessed through a cloud layer that frequently went offline and operated behind a wall of secrecy from the hardware team, undermining any claim of robust, commercial-grade technology. Further, the former employees confirmed that QCI's core QPhoton device behaved like a classical coherent Ising machine rather than a true quantum computer, that senior executives were told this by 2022, and that they nonetheless continued to market QCI as a quantum computing leader.

### 1.    Former Engineer Confirms QCI's 'Quantum' Machines Were Unreliable Black Boxes, Not Ready-for-Prime-Time Technology.

105.    FE1 worked as an engineer at QCI from September 2021 to November 2023. He worked as part of a team that reported to Walter Poxon who, in turn, reported to Defendant McGann. FE1 participated in employee townhall meetings when McGann addressed the entire engineering team.

106.    FE1's team worked on developing "a layer in the cloud" by which "other teams" (including from prospective customers) could "interact with a subset of machines, of supposedly quantum computing machines." This was an application programming interface by which a user could use a laptop or other device to access a quantum computer that was "running in the lab." Initially, FE1 worked on a software layer that enabled users to access the quantum computing

38

technology of other companies such as Amazon.  As FE1 explained, "we were trying to do a single interface" for users to be able to interact with the technology of other companies.

107.    After the QPhoton acquisition, QCI's connection would connect with QCI's devices rather than third parties. FE1 observed how "unreliable" the devices were, which resulted in the devices having to be taken "off-line."  Given the unreliability of the devices, FE1's group had "asked for multiple devices" so that there would always be one available on-line.

108.    As part of their development work, FE1's team requested information from QCI's hardware engineering group but, according to FE1, experienced "a lot of secrecy and refusal to answer questions" from the hardware engineering group.

### 2. A QCI Senior Developer Warned Leadership That QPhoton Was Not A Quantum Device.

109.    FE2 worked at QCI as an engineer and developer from before the Class Period to November 2023. During his employment, FE2 had frequent close contact with Defendants Liscouski, McGann, and Roberts, including participation in regular all-hands meetings where all aspects of QCI's business were discussed. Critically, during much of the Class Period, FE2 reported directly to Defendant McGann on a weekly basis, tasked with managing the interface between QCI's software and hardware architectures—a role that afforded him comprehensive visibility into both the technical realities and management's awareness of those realities.

110.    When FE2 joined QCI, the company was a "pure software play." It had developed software designed to enable users to interface with both quantum and classical computing capabilities offered by other companies. FE2 helped write the foundational software for this interface, which was initially called Mukai and subsequently renamed Qatalyst for marketing purposes.

111.    During 2021, Qatalyst generated very little market traction. According to FE2, it

39

was "the wrong product at the wrong time." In late 2021, FE2 learned of potential acquisition discussions between QCI and QPhoton, Inc. ("QPhoton"). In January 2022, FE2 visited QPhoton's laboratory in New Jersey to conduct technical due diligence on its purported quantum computing technology and device. Upon arrival, he discovered that the device had been disassembled, preventing any meaningful hands-on assessment. When FE2 inquired of Huang, QPhoton's founder, how the device actually functioned, Huang refused to provide any substantive technical details. QCI ultimately acquired QPhoton without conducting any formal technical due diligence. As FE2 explained, had he been permitted to participate in a thorough technical review, he would have wanted to "kick the tires," but he knew that such fundamental testing never occurred.

112.    The secrecy and withholding of technical information persisted after the June 2022 acquisition. After QCI's acquisition closed, FE2 was reassigned from the general software group to report directly to Defendant McGann, with explicit responsibility for owning and managing the hardware-software interface. In this capacity, FE2's role was to ensure that every software component moved in lockstep with the hardware's actual capabilities and requirements, and to implement regression testing to verify that changes on either the software or hardware side did not break existing functionality.

113.    Through his work integrating QCI's software stack with QPhoton's hardware, and through multiple controlled testing studies conducted by his team, FE2 determined that QPhoton's technology and its device did not involve any genuine quantum computing but instead operated as a classical computer with photonic elements. When FE2's team submitted technical queries to the device, the results demonstrated behavior consistent only with classical digital computation, not with quantum processes. FE2 characterized QPhoton's system as a coherent

Ising machine, a classical device that used iterative calculations with photonic components to indicate when computations should cease but performed no actual quantum computing.

114. The central evidence emerged from a benchmark presentation that FE2 prepared and presented at an all-hands company meeting held in Newark, New Jersey in September 2022. This presentation included a slide that contained a plot that displayed the device's output across an extremely wide range of coupling strengths, extending down to vanishingly small values far beyond the resolution of any analog hardware, without any visible loss of numerical precision. That behavior is the unmistakable hallmark of a conventional digital computer, not an analog quantum device. Genuine quantum processors are inherently noisy analog physical systems; their readout fidelity limits how many reliable "digits" of output they can effectively resolve. In practice, a genuinely analog quantum device would lose precision after just a few effective "slots" of information, and its output would visibly degrade well before reaching the much smaller coupling strengths shown in the data.

115. By contrast, FE2's plot demonstrated a steady stream of numerically precise outputs all the way down to coupling strengths well into the regime where only high-precision double-precision digital (non-quantum) representation could still distinguish individual values. The smooth trajectory of the plot simply traced the numerical precision of underlying classical code, not the degraded precision characteristic of a noisy quantum system. No known analog device, including those at national laboratories, can measure or represent values with such stable, high precision across that range; such hardware "does not exist." The data therefore conclusively indicated that the "quantum" device being evaluated was producing digital, classical results, inconsistent with the behavior of a true quantum computer.

116. FE2 presented these findings at meetings starting in early August 2022 including

41

a meeting held at the Lincoln Harbor Hotel in Weehawken, New Jersey from September 26-30, 2022. FE2 personally advised both Defendants McGann and Liscouski that QPhoton's technology did not employ quantum computing. His entire software development team understood that QPhoton's device was a classical computer, not a quantum computer. FE2 felt deeply uncomfortable seeing QCI's technology publicly described as quantum computing, as he believed such characterization was inaccurate and fundamentally misleading.

117.    FE2's concerns escalated throughout 2022 and into 2023. He and Defendant McGann met on a weekly basis, and during these regular meetings, FE2 consistently raised concerns about his inability to obtain collaboration or substantive technical answers from the hardware engineering team led by Yuping Huang. These frustrations came to a head in June 2023, when the hardware team essentially stonewalled further inquiry.

118.    FE2 also conducted other testing initiatives.  Different versions of the benchmark presentation were circulated at different internal meetings. FE2 and his team ran sample problems both before and after November 2022, consistently finding that the device failed on even simple optimization problems. FE2 raised his concerns with many colleagues across both software and hardware teams, as well as with Defendant McGann, Defendant Liscouski, Mike Kiemer of the professional development team, and laterally to other engineers who had similarly been denied early access to conduct due diligence and who independently reached the same conclusion: the QPhoton device was not quantum. Even after FE2 departed QCI in November 2023, former colleagues confirmed to him that the hardware remained unable to make progress on basic computational tasks. Write-ups documenting these failures were prepared and presented to group leadership and specifically to the engineer who was the head of QCI's quantum computing effort, and reported up through the organization.

119. The lack of genuine technical due diligence before and after the QPhoton acquisition was not accidental. In late 2021, QCI's leadership, including Defendant McGann, Defendant Liscouski, and others, flew to QPhoton's facility for what FE2 later learned was a hastily arranged, "quasi-secret" one-day trip to "check things out." No one with meaningful technical expertise participated. Months after the acquisition closed, no one from QCI had been granted direct access to the device for hands-on evaluation; instead, QCI's engineers were reduced to emailing matrices to QPhoton and waiting for results to be returned. In FE2's view, such avoidance of authentic technical due diligence was inexplicable, the only explanation is that a thorough examination would expose the technology's classical nature.

120. FE2's understanding of QCI's relationship with Quad M further corroborated the pattern of deception. FE2 learned of QCI's contract with Quad M when it was signed and understood that the arrangement called for development of software or applications for Quad M. FE2's own software team would have held responsibility for undertaking any such development work. Yet FE2 never heard any discussion of actual development work being undertaken for Quad M—no technical planning, no implementation, no deliverables. Similarly, FE2 was aware of a purported partnership between QCI and millionways, Inc. FE2 knew that QCI had lent money to millionways but never observed anything of value delivered from millionways to QCI in return. These relationships appeared to exist solely as vehicles for generating press releases, not as genuine business ventures.

121. Critical insight emerged from a conversation FE2 had with QCI's Chief Financial Officer, Defendant Christopher Bohmler, after FE2's employment with the company in the Fall of 2023. During that discussion, Bohmler acknowledged that QCI's technology was not actually quantum, yet insisted that "quantum" had to remain central to the company's message to investors

because investors "needed the word 'quantum.'" Bohmler explained that the company could not "get quantum out" of its messaging without undermining its entire pitch to the investment community. FE2 understood from this candid admission that if the product was not genuinely quantum, it had no competitive value against established classical solvers offered by large technology companies. QCI's only realistic path to continued investment was to market its system as quantum technology—which meant, in FE2's view, that each time QCI went to the market to sell shares on a quantum premise, the offering was fundamentally a fraud.

122.    This understanding was reinforced by a remark FE2 recalled from a board member at a Nasdaq bell-ringing event in June 2022. During a dinner conversation, the board member commented, half-jokingly but with evident seriousness, that the company was considering shutting down because it was struggling to gain traction and needed the QPhoton acquisition to succeed to avoid closure. If the acquisition "did not work out, they were going to shut things down." The message was unmistakable: absent a compelling hardware story, absent the ability to claim quantum computing technology, QCI had no viable future.

## V.    SUBSTANTIVE ALLEGATIONS BY ELEMENT

### A. DEFENDANTS' FALSE AND MISLEADING STATEMENTS

123.    Plaintiff alleges that the statements highlighted in ***bold and italics*** within this Section were materially false, misleading, and omitted to disclose material information. Each statement attributed to the Individual Defendants during the Class Period was also made by Defendant QCI because in each such statement the Individual Defendants were speaking on behalf of Defendant QCI. The reference to a statement being "misleading" includes statements that are misleading due to the omission of truthful information.

### 1. False and Misleading Statements Made in 2022.

**February 24, 2022: QCI Press Release, "QCI and QPhoton Announce Exclusive Marketing Agreement for Photonic Quantum Processing Technologies."**

124. On February 24, 2022, the beginning of the Class Period, Defendants publicly unveiled an exclusive marketing agreement with QPhoton., casting QPhoton as "a leading innovator in the quantum photonic technology space" and the linchpin of QCI's move into quantum hardware. QCI told investors that it would "merge QCI's quantum software solution, Qatalyst™, with QPhoton's advanced photonic quantum technologies" to deliver QCI-specific solutions, thus positioning QPhoton's hardware as the quantum engine that would finally make Qatalyst (QCI's software) a real quantum product.

125. The February 24, 2022 release also framed the QPhoton relationship as a commercial inflection point: QCI said it would jointly sell and market "quantum and photonic products and services" with QPhoton, highlighted QPhoton's "ongoing photonic innovation," and told investors that QPhoton's "newly emerging quantum technologies using photonic methods" would "create significant advances" as QCI delivered "real business quantum solutions" in areas such as logistics and supply chain. The companies announced that QCI held "exclusive marketing rights to QPhoton's quantum and photonic computing technologies and resources," and they forecast that they "expect[ed] to demonstrate initial joint quantum solutions in the Q4 2022 time frame," thereby signaling to the market that QPhoton's quantum hardware would soon be powering demonstrable quantum systems for customers.

126. Specifically, the February 24, 2022, QCI press release stated, in relevant part:

> ***By coupling quantum hardware technologies from QPhoton with Qatalyst, QCI will deliver more powerful solutions to accelerate the application and value from quantum computing for specific applications and markets.*** QPhoton technologies will

also offer QCI reseller, technology and QPU [quantum processing unit] partners enhanced solutions to further accelerate the adoption of quantum computing.

A key advantage of the Qatalyst software is that it is hardware-agnostic, supporting a variety of quantum technologies and QPUs, each with their own unique performance and computational attributes. This eliminates the need for deep, complex low-level coding and vendor lock-in required by available software alternatives. *By adding QPhoton's capabilities, QCI believes that the proposed partnership has the potential to allow QCI to add photonic technologies into its supported quantum hardware technology, further expanding its customers' options when selecting their preferred quantum IP and/or approaches to quantum computing.*

127.    The bold statements in paragraph 126 conveyed that QCI's integration of QPhoton's "quantum hardware technology" with its Qatalyst platform was already sufficiently advanced that Defendants could plausibly assure investors that by partnering with QPhoton, QCI could offer quantum computing services that could expand its customers' options when selecting their preferred approaches to quantum computing. Those statements were materially false and misleading because QCI's so-called quantum offerings relied on classical techniques and lacked demonstrable quantum advantage; at bottom, QCI represented that QCI offered quantum computing or quantum computers when the QPhoton technology and hardware did not use quantum computing and could not be accurately or fairly described as using quantum computing or being a quantum computer.

128.    On May 24, 2022, QCI issued a press release announcing that it had entered into a definitive agreement to acquire QPhoton, stating: *"[t]he acquisition of QPhoton extends QCI's offerings to accelerate the accessibility of quantum computing, and other powerful technologies, into easily deployable solutions today, and advances QCI into a full-spectrum quantum software and hardware company."* The press release also quotes Liscouski, stating: "The combination of QPhoton's powerful quantum processing technology and systems with

46

QCI's Qatalyst software significantly accelerates accessibility to quantum solutions for real business problems. Just a year ago this quantum functionality seemed far off. *QCI, with QPhoton's technology, will be launching ready-to-run anywhere, full-stack quantum systems that can deliver affordable, user-friendly solutions for real business problems to a much larger audience.*"

129.    The bold statements in paragraph 128 conveyed that QPhoton already possessed powerful quantum processing technology and systems and that, by acquiring QPhoton, QCI had effectively transformed itself into a genuine, "full-spectrum quantum software and hardware company" capable of launching "ready-to-run anywhere, full-stack quantum systems" that would deliver practical quantum solutions for real-world business problems in the near term. Those statements were materially false and misleading because QCI's so-called quantum offerings relied on classical or photonic-inspired techniques and lacked demonstrable quantum advantage; at bottom, QCI represented that QCI offered quantum computing or quantum computers when the QPhoton technology and hardware did not use quantum computing and could not be accurately or fairly described as using quantum computing or being a quantum computer. QCI branded its setup as true "quantum processing" and "full-stack quantum" capability, thereby overstating both the nature and the maturity of its technology at the time the statements were made.

130.    On June 16, 2022, QCI issued a press release announcing that it had closed its previously announced merger to acquire QPhoton, making QPhoton a wholly owned subsidiary and adding its founder, Dr. Yuping Huang, to QCI as Chief Quantum Officer and a director. The press release stated, *"[t]he closing of this transaction will enable QCI to deliver the first ready-to-run, broadly accessible and affordable full-stack QPS that can be used by non-quantum*

47

*experts, anywhere, for real-world business applications*. QCI expects to release initial quantum solutions leveraging QPhoton's QPS in Q4 2022." The press release also quotes Liscouski, stating: "*[w]ith this acquisition, QCI will be a provider of full-stack quantum software and hardware solutions, delivering value and results for non-quantum experts – truly democratizing quantum computing.* We are excited that Dr. Huang and his quantum team are joining QCI and that *they will deliver the most advanced quantum technology to accelerate the value of quantum computing to the business world today.*" In the section entitled "About Quantum Computing Inc." the press release states, "*The combination of QCI's flagship ready-to-run software product, Qatalyst, with QPhoton's QPS, sets QCI on a path to delivering a broadly accessible and affordable full-stack quantum solution that can be used by non-quantum experts, anywhere, for real-world industry applications.*"

131.    The bold statements in paragraph 130 conveyed that, with the QPhoton merger closed and Dr. Huang on board, QCI now stood ready to deliver "the first ready-to-run, broadly accessible and affordable full-stack" quantum photonic system—true "full-stack quantum software and hardware solutions" that would "democratiz[e] quantum computing" for non-experts. Those statements were materially false and misleading because QCI's so-called quantum offerings relied on classical or photonic-inspired techniques and lacked demonstrable quantum advantage; at bottom, QCI represented that QCI offered quantum computing or quantum computers when the QPhoton technology and hardware did not use quantum computing and could not be accurately or fairly described as using quantum computing or being a quantum computer.  Defendant marketed QCI as having "the most advanced quantum technology" and a "full-stack quantum solution," thereby misrepresenting both the nature and the readiness of the technology for "real-world business applications" at the time of the merger closing.

132.    On July 19, 2022 QCI issued a press release announcing that Liscouski would ring the Nasdaq closing bell the following day. The press release stated in relevant part, "[t]he closing bell ceremony is an opportunity for QCI to commemorate its many milestones and achievements in the quantum computing sector. ***The event marks the celebration of the company's recent acquisition of quantum photonics innovation company QPhoton and agreement to deliver the first commercially available ready-to-run full-stack quantum photonic solution***..."

133.    The bold statements in paragraph 132 were materially false and misleading because QCI's so-called quantum offerings relied on classical or photonic-inspired techniques and lacked demonstrable quantum advantage; at bottom, QCI represented that QCI offered quantum computing or quantum computers when the QPhoton technology and hardware did not use quantum computing and could not be accurately or fairly described as using quantum computing or being a quantum computer. QCI nonetheless touted the QPhoton deal as if it had already secured a uniquely advanced, "ready-to-run full-stack" quantum solution that was commercially ready, thereby overstating both the company's achievements and the true state of its technology.

### July 28, 2022: "The Future of Quantum, Today".[1]

134.    On July 28, 2022, QCI published a video entitled "The Future of Quantum, Today" to its YouTube page: @QCiQuantumComputingInc.  The video is a short promotional piece in which executives repeatedly claim that QCI already has real, usable quantum technology that can solve meaningful problems "today," democratize access to quantum computing for non-experts, and soon deliver major breakthroughs in fields like medicine and cancer treatment.

---

[1] Quantum Computing Inc., The Future of Quantum, Today, YouTube (July 28, 2022), https://www.youtube.com/watch?v=C0Pdb1CC-8s.

135.    In the video, Liscouski stated, "[w]hat I want to demonstrate to anybody who comes in contact with QCi is that **we have real technology that can solve a problem today. A meaningful problem *using quantum technologies*.** That is our foundation. Our mission is never going to change from that. This company can actually take us into the future and build something that's really going to be meaningful…"

136.    The "Future of Quantum, Today" video and the bold statements in paragraph 135 conveyed that QCI already possessed functioning, commercially ready quantum systems capable of solving "meaningful" real-world problems right now and in the hands of ordinary users, implying that it offered a product built on genuine quantum computing hardware. Those statements were materially false and misleading because QCI's so-called quantum offerings relied on classical or photonic-inspired techniques and lacked demonstrable quantum advantage; at bottom, QCI represented that QCI offered quantum computing or quantum computers when the QPhoton technology and hardware did not use quantum computing and could not be accurately or fairly described as using quantum computing or being a quantum computer. It was misleading for Liscouski to claim QCI possessed "real technology that can solve problems today" using "Quantum technologies" and to frame the company as already having delivered the very quantum breakthroughs they were still unable to achieve, given their technology and hardware could not be accurately described as using quantum computing or comprised of quantum computers.

### July 31, 2022: QCI Presents EQC Results to BMW Sensor Problem[2]

137.    On or about July 31, 2022, QCI posted a video presentation to its YouTube channel, QCI published a video presentation to its YouTube page, QCiQuantumComputingInc,

---

[2]    Quantum Computing Inc., QCI Presents EQC Results to BMW Sensor Problem, YouTube (July 31, 2022), https://www.youtube.com/watch?v=GANYTiyW9Qk.

demonstrating QCI's results applying its technology to the BMW-sponsored vehicle sensor placement challenge. In the video, McGann presented QCI's results using its Entropy Quantum Computing ("EQC"). He claimed that the EQC solved a 3,854 variable, 500 constraint problem in six minutes, with superior, feasible results. The first substantive slide stated that "QCI is now presenting the first *full quantum* solution with a new prototype, Entropy Quantum Computer (EQC) system." (Emphasis on the slide).

138.    QCI's presentation describes a BMW-sponsored vehicle sensor placement challenge and promotes QCI's "Entropy Quantum Computing" (EQC) device as delivering what the speaker repeatedly characterizes as a "full quantum" solution to that optimization problem, in contrast to both classical and hybrid quantum–classical methods.

139.    The BMW Vehicle Sensor Placement Challenge is framed as an optimization problem: find an optimal configuration of sensors on an autonomous vehicle that (1) maximizes coverage around the vehicle and (2) minimizes cost, subject to a strict cap on the number of sensors and numerous geometric and performance constraints. QCI states that the specific instance they tackled has 3,854 variables and approximately 500–501 constraints, and that the feasible solution they highlight uses 15 sensors to achieve roughly 96% coverage of the vehicle's surroundings, while satisfying BMW's sensor-count constraint.

140.    The presentation explains that BMW's test is intended to show, at a minimum:

(1) Whether a solver can ingest the full large-scale Hamiltonian/Ising formulation of the sensor-placement problem, without extensive decomposition or pre-processing. QCI says its EQC "consumed the problem by directly feeding the Hamiltonian into the EQC, no pre-processing or post-processing software involved."

(2) Whether the solver produces a feasible solution that

51

simultaneously satisfies all constraints and provides commercially reasonable coverage and cost; QCI contrasts its EQC run (96% coverage, ≤15 sensors) with (a) an earlier variational algorithm on a D-Wave annealer that allegedly required about seven hours, used hundreds of sensors, and failed the cost/sensor-count objective, and (b) an internal classical solver ("c-sample") that ran quickly but yielded only about 63% coverage and therefore was characterized as practically unacceptable.

(3) Whether the platform can solve the entire problem at industrial scale in a practically relevant runtime. QCI asserts that EQC produced its preferred solution in "just over six minutes" and that they have been sweeping problem sizes from about 1,000 to 5,600 effective variables to study runtime versus problem size.

141.   Throughout the presentation, Dr. McGann uses the language of "full quantum" and "quantum computing" in several distinct ways:

(1) At the outset, he emphasizes "the first full quantum solution" to this BMW problem using QCI's "brand new prototype" called the Entropy Quantum Computer, and describes their approach as "to our knowledge, the world's first full quantum solution to this problem using a completely new prototype from our company called entropy quantum computing."

(2) He repeatedly contrasts EQC with what he calls "current systems for QPUs," which he characterizes as having limited qubit counts, limited connectivity, and requiring "very extreme environmental conditions" (closed, cryogenic systems), whereas EQC is said to operate "completely at room temperature" as an "open quantum system."

(3) In describing the physics, he states that "entropy quantum

52

computing is deeply rooted in quantum physics" and "aligns very tightly with the measurement postulate," emphasizing that EQC treats the environment as part of the computation—"we use it as a free source of energy"—and that the system "allows [the quantum state] to relax or collapse to a desired solution across the many quantum modes in the optical system."

(4) He labels EQC "a photonic system" with "many photonic modes" and implies that these modes function as quantum degrees of freedom, claiming that this enables them to handle "very large variable space problems" such as this 3,854-variable instance.

(5) In comparing 2021 and 2022 results, he underscores that QCI's prior entry used "an innovative software approach called QAmplify" running as a variational algorithm on D-Wave hardware—described as a "hybrid" or "variational" quantum approach—while the 2022 effort is touted as a "full quantum" hardware solution "with just our hardware," which he contrasts with "just software in someone else's hardware."

(6) He asserts that EQC "represents really the world's first full solution to a problem of this scale and size that is actually meaningful to the world today," explicitly positioning this as a quantum milestone and "quantum landmark" in BMW's challenge.

142.    In addition, QCI's materials about the BMW echo and amplify the same framing: press releases and articles describe EQC as a "new quantum hardware technology," speak of solving the BMW problem "with quantum computing," and emphasize that EQC "operates on an Ising formulation of a Hamiltonian" to find a ground state, language that reinforces the claim that this is not merely a classical heuristic but a quantum computing process.

53

143.     During the presentation, McGann made numerous statements about QCI's quantum computing hardware including:

> "If there's one thing I'd like to try to really drive home today in our presentation is that *to our knowledge we are presenting the first full quantum solution to this problem using a brand new prototype from our company called entropy quantum computing…*"

> "The big change for us this year in 2022 is that quantum computing incorporated partnered and did a merger and acquisition with a very innovative new company hardware company called q photon… *so QCi is now a full stack quantum solution provider both offering innovative hardware and software solutions and today we're going to talk about one of those solutions called the entropy quantum computer and this is a completely new … hardware approach to solving computational problems at room temperature.*"

> "Again the one thing I wanted you to take away at the very beginning is that Quantum Computing Inc new entropy quantum computer prototype is to our view the world's first *full quantum solution to a problem like this on of its size and scale*…"

144.     @QCiQuantumComputingInc also posted a comment stating "*It is a whole system approach* where photons from the entropy are coupled to the temporal modes (qubits) and allowed to settle into the lowest loss states - representing the ground State."

145.     The "QCI Presents EQC Results to BMW Sensor Problem" video and the bold statements in the paragraphs 143 and 144 conveyed that QCI built and successfully deployed a quantum computer justifying the claim that it was a "full stack quantum solution provider" with innovative quantum hardware, not just software. Those statements were materially false and misleading because QCI's so-called quantum offerings relied on classical or photonic-inspired techniques and lacked demonstrable quantum advantage; at bottom, QCI represented that QCI offered quantum computing or quantum computers when the QPhoton technology and hardware did not use quantum computing and could not be accurately or fairly described as using quantum

54

computing or being a quantum computer. Nevertheless, QCI and McGann described classical computing and touted QCI's prototype as the "world's first full quantum solution," thereby overstating both its quantum nature and technological maturity.

**October 10, 2022: Liscouski appears on NASDAQ's Trade Talks.[3]**

146.    On October 10, 2022, Liscouski appeared on NASDAQ's "Trade Talks." In this interview, Liscouski presents QCI as a full-stack quantum company offering both software and hardware that let non-experts tackle large-scale optimization problems, supposedly involving thousands of "qubits." He claims quantum methods can already help fight inflation by optimizing supply chains, improve autonomous-driving technologies through lidar and AI integration, and support national-security applications in sensing and cryptography. Throughout, he downplays debates over "quantum supremacy," urging viewers instead to focus on practical, present-day business value that he asserts QCI is already delivering.

147.    Specifically, Liscouski told the interviewer:

> *QCi Quantum Computing Inc is a full stack Quantum Computing company which means that we provide a software platform that allows the end users business users non-quantum programmers to access quantum computers and we also offer our own Hardware solution Quantum Computing Hardware Solution on top of that so we provide an end-to-end capability that allows Quantum users to be able to do big problems um you know optimization problems in excess of several thousand qubits.*
>
> *  *  *
>
> *Some of the things we're doing not unique to QCi necessarily but we do it is we can solve some of these big problems today and problems that can't be solved by some of the less capable quantum computers and even arguably about with some of the… classical computers we can actually solve problems today in that*

---

[3] Robert Liscouski, CEO, Quantum Computing Inc., How the Supply Chain Crisis & Dwindling Workforce Is Meeting Its Match With Quantum Computing, Nasdaq TradeTalks (Oct. 10, 2022), https://www.youtube.com/watch?v=zNT4mp2kGyo.

*space.*

148.    The bold statements in paragraph 147 conveyed that QCI's progress in developing quantum technology was sufficiently far along that Liscouski could make an honest assurance – including by asserting that QCI is a "full stack Quantum Computing company" offering its "own Hardware solution Quantum Computing Hardware Solution" – that QCI was already delivering genuine quantum hardware and end-to-end quantum computing capabilities on real-world, large-scale problems. Those statements were materially false and misleading because QCI's so-called quantum offerings relied on classical or photonic-inspired techniques and lacked demonstrable quantum advantage; at bottom, QCI represented that QCI offered quantum computing or quantum computers when the QPhoton technology and hardware did not use quantum computing and could not be accurately or fairly described as using quantum computing or being a quantum computer. Nevertheless, Liscouski presented QCI as a "full stack Quantum Computing company," asserting that QCI is already solving problems at scales "in excess of several thousand qubits" in ways that surpass some "less capable quantum computers" and even some classical computers.

**November 14, 2022: QCI's Q3 FY 22 10-Q.**

149.    On November 14, 2022, QCI filed with the SEC its Quarterly Report on Form 10-Q for the quarter ending September 14, 2022 with the SEC ("Q3 FY 22 10-Q"). QCI's Q3 FY 2022 portrayed it as a full-stack quantum data-processing and quantum-computing business built around photonic hardware and Qatalyst software

150.    The filing stated that QCI's near-term revenue would come from selling cloud access to its "advanced quantum data processing systems," with a longer-term goal of selling desktop and rack-mounted quantum devices to commercial and individual users. QCI

56

represented that it already offered access to its "quantum computing machines" through an in-house cloud service, with plans to add other commercial cloud providers over time.

151.   QCI described itself as providing integrated quantum information acquisition, transmission, and processing solutions that encompass both user-interface software and quantum hardware. It emphasized proprietary "full-stack" technologies, a solution-oriented system architecture, and an engineering team working across multiple quantum domains – software, hardware, and nanophotonic circuits – to span chip design, manufacturing, cloud delivery, and eventual hardware sales, which QCI claimed offered the "fastest and lowest-risk" route to commercially valuable quantum machines.

152.   The filing further positioned Qatalyst as the software foundation for QCI's evolution into a full stack quantum computing company. Unlike circuit-level software development kits that require deep quantum expertise, Qatalyst was described as a complete platform that lets developers build "quantum ready" applications on classical systems, automatically transforms problems for various quantum processors, and uses the same APIs to access performance gains through QCI's cloud solution.

153.   Specifically, the Q3 FY 22 10-Q included the following statements:

> "***QCI or the Company is a full-stack quantum solutions company***. Our mission is to be the democratizing force that brings quantum solutions to business, academia, and government clients."

> "***With our proprietary full-stack technologies that are designed using our solution-oriented system architectures, we believe we will have a competitive advantage in the market.***"

> "***As a full stack quantum solutions provider***, while selling subscriptions in some manner to Dirac EQCs will be the cornerstone of our business model, providing professional services or quantum solutions support will likely be needed in many cases, especially in the beginning of a customers quantum

57

journey.

> "Nature of Business: ***The Company is a developer of full stack quantum computing systems, including hardware platforms*** and ready-to-run software for complex optimization computations.

154. The bold statements in paragraph 153 conveyed that QCI offered functional full-stack quantum computing services and that the company is positioned to guide customers through a "quantum journey." Those statements were materially false and misleading because QCI's so-called quantum offerings relied on classical or photonic-inspired techniques and lacked demonstrable quantum advantage; at bottom, QCI represented that QCI offered quantum computing or quantum computers when the QPhoton technology and hardware did not use quantum computing and could not be accurately or fairly described as using quantum computing or being a quantum computer. QCI nonetheless labeled itself a "full-stack quantum solutions company" and "developer of full stack quantum computing systems," thereby overstating both the quantum nature and the commercial maturity of its technology and suggesting capabilities and customer-ready quantum offerings that did not in fact exist.

### November 29, 2022: Liscouski's "New to The Street" Interview.[4]

155. On November 29, 2022, Liscouski appeared for an interview on "New to The Street," a show that is one of the most widely distributed financial media platforms in the world, airing weekly on Bloomberg TV and FOX Business. In the interview, Liscouski presented QCI as operating a mature, differentiated "full stack" quantum computing and sensing ecosystem. Liscouski recounts a journey from "software connector" to "full quantum solutions company" after acquiring QPhoton, insisting that QCI now offers a room-temperature desktop quantum computer, thousands of "qubits" for complex problems, and a holistic stack spanning computing,

---

[4] New to The Street, Quantum Computing, Inc.'s interviews with Robert Liscouski, President, CEO, and Chairman, YouTube (Nov. 29, 2022), https://www.youtube.com/watch?v=qtfdhf4iyfk.

sensing, imaging, and cybersecurity.

156.    Liscouski told the interviewer that "[QCI] is a full stack quantum software and hardware company on a mission to accelerate the value of quantum computing for real-world business solutions" and "we've become a full stack quantum computer … not just a computing company but a quantum applications and solutions company."  When discussing QPhoton, he said, "[t]his acquisition represents a significant leap forward … and would result in QCI becoming a provider of full-stack quantum software and hardware solutions." He represented that QCI was more advanced than more traditional computers, saying, "we use photonics for our quantum capabilities, not the more traditional gate model computer." Liscouski emphasized that, culturally, he does not like to talk about future possibilities but instead "talk[s] about what we can do today to solve problems," and that "we're solving those problems" now.

157.    Specifically, during the interview, Liscouski made the following statements:

"Quantum Computing is a leader in accessible **full stack** Quantum Solutions with the potential to change a lot of different Industries…"

"…we've recently changed and we've evolved into what we'll call a Quantum **ecosystem where we offer everything from software to hardware** and some additional Quantum enabled Technologies."

"…with the acquisition of Q Photon we've become a **hardware** company and we've actually become a **full Quantum Solutions company** so that was a pivotal moment for us with this acquisition."

"…with our technology we have that full stack Quantum cyber security solution."

"…combined with our technology have really enabled us to get into the marketplace **with a full quantum computer**…"

"you know it candidly **we are far ahead of our competitors** we have the ability to do really really complex problems with

59

thousands of qubits… and… our competitors are aspirationally hoping to be able to do the same thing in several years…"

158.    The bold statements in paragraph 157 conveyed that QCI offered functioning full-stack quantum computing services. Those statements were materially false and misleading because QCI's so-called quantum offerings relied on classical or photonic-inspired techniques and lacked demonstrable quantum advantage; at bottom, QCI represented that QCI offered quantum computing or quantum computers when the QPhoton technology and hardware did not use quantum computing and could not be accurately or fairly described as using quantum computing or being a quantum computer. Liscouski nonetheless claimed that QCI was a "full-stack quantum solutions company" and "developer of full stack quantum computing systems," thereby overstating both the quantum nature and the commercial maturity of its technology and suggesting capabilities and customer-ready quantum offerings that did not in fact exist.

### 2.    False and Misleading Statements Made in 2023

159.    On February 8, 2023, QCI issued the SSAI Press Release, which stated in relevant part:

> ***QCi, a first-to-market full-stack photonic-based quantum computing and solutions company, today announces a subcontract award from SSAI to support NASA in testing one of its proprietary quantum photonic systems for remote sensing applications.***
>
> \* \* \*
>
> ***"As a full-stack quantum computing company, QCi is positioned to contribute to NASA's efforts to protect the Earth's environment. Our team is incredibly proud to have the opportunity to demonstrate the vital real-world applications of QCi's quantum technology to the recognized global leader in space research and exploration,"*** said Robert Liscouski, CEO of Quantum Computing, Inc.
>
> Under the subcontract, QCi will test an existing LiDAR system

60

designed to remotely measure the physical properties of different types of snowpacks.

*  *  *

***QCi has recently developed a variety of quantum information technology and systems, including those of entropy quantum computing, reservoir quantum computing, quantum imaging and sensing. Its quantum photonic LiDAR systems deliver new measurement capabilities with single-photon sensitivity, strong noise rejection, and high-ranging and spatial resolution.*** QCi systems are built for easy and versatile uses with favorable size, weight, cost, and power specs.

160.    The bold statements in paragraph 159 describing QCI as a "full-stack photonic-based quantum computing and solution company," were materially false and misleading because QCI's so-called quantum offerings relied on classical or photonic-inspired techniques and lacked demonstrable quantum advantage; at bottom, QCI represented that QCI offered "full-stack quantum computing" when the QPhoton technology and hardware did not use quantum computing and could not be accurately or fairly described as using quantum computing or being a quantum computer. The statements concerning NASA are false and misleading because QCI took a small, non-quantum, low-dollar software/subcontracting relationship and described it as supporting NASA in testing one of its proprietary quantum photonic systems, thereby overstating both the scope and technological significance of the NASA work.

**February 16, 2023: The A.G.P. Emerging Growth Technology Conference.**

161.    On or about February 16, 2023, QCI appeared at the virtual A.G.P. Emerging Growth Technology Conference and delivered an investor presentation that it later filed with the SEC on Form 8-K. The A.G.P. Emerging Growth Technology Conference is a virtual investor event organized by A.G.P./Alliance Global Partners, where smaller, fast-growing tech companies pitch their story and take one-on-one meetings with institutional investors and analysts. For QCI, the conference was a venue to promote itself and using the "Snapshot" page

of the PowerPoint to present its "***full-stack photonic-based quantum computing and solutions***" narrative and to showcase new offerings such as its quantum random number generator or other "first-to-market" products. Another slide, titled "Our Unique Capability," juxtaposed the Entropy Quantum Computer against "Other QPUs," while a slide labeled "Products & Services – Available in the market TODAY" (emphasis in original) asserted that QCI's "***breadth of capabilities in both quantum computing and quantum solutions is unsurpassed on the market today.***"

162. The bold statements in paragraph 161 conveyed that QCI already offered commercially available, full-stack photonic "quantum" systems, including a functioning Entropy Quantum Computer and other first-to-market quantum products, and that its quantum computing and solutions capabilities exceeded those of other QPU providers "in the market TODAY." Those statements were materially false and misleading because QCI's so-called quantum offerings relied on classical or photonic-inspired techniques and lacked demonstrable quantum advantage; at bottom, QCI represented that QCI offered quantum computing or quantum computers when the QPhoton technology and hardware did not use quantum computing and could not be accurately or fairly described as using quantum computing or being a quantum computer. By presenting its technology as superior quantum products, QCI overstated both the quantum character and the maturity of its technology and suggested customer-ready quantum offerings that did not exist.

**March 30, 2023: QCI's 2022 10-K.**

163. On March 30, 2023, QCI filed an annual report on Form 10-K with the SEC, reporting QCI's financial and operating results for the quarter and year ended December 31, 2022 (the "2022 10-K"). The QPhoton merger is characterized as the moment QCI became a

hardware-driven "quantum machines" company, anchored in an allegedly photonic quantum computer called the Entropy Quantum Computer, or EQC. Primarily their strategy was to offer "cloud-based access to our quantum computers…"

164.    The 2022 10-K explains that after merging with QPhoton in June 2022, QCI no longer offered just platform-agnostic "quantum-ready" software but now "integrated high-performance quantum systems" built on QPhoton's photonics hardware. QPhoton is described as a "developer of quantum photonic systems and related technologies and applications" whose merger "substantially broadened" QCI's technology portfolio and enabled a "suite of quantum machines" rather than mere tools for third-party quantum computers.

165.    The 10-K identifies QCI's "core technology" as "Entropy Quantum Computing (EQC)," presented as a **quantum** application of QPhoton's "Core Photonics Technology" that conditions, manipulates, and measures single photons to solve complex optimization problems. EQC is described as a photonic "quantum information processing" system that exploits "open quantum systems," uses "quantum measurements of single photons" and "non-linear quantum interactions," and is repeatedly labeled a "quantum machine" and "quantum computer" intended to outperform classical and other quantum architectures. Leveraging the QPhoton merger, QCI tells investors it can now deliver a family of quantum products derived from the same photonic platform: the EQC computer, quantum LIDAR sensing and imaging systems, quantum-secured network solutions, and photonic chips, all characterized as "quantum" offerings. The 10-K states that this photonic technology allows QCI to offer "quantum machines and solutions to the market today" at room temperature and low power, suggesting commercially available, fully functional quantum computing hardware traceable to QPhoton's IP and engineering team.

166.    Specifically, the 2022 10-K included the following statements:

"Quantum Computing Inc. is a full-stack quantum solutions company."

"However, following the June 2022 merger with QPhoton, Inc. QPhoton and its associated intellectual property and engineering team, the Company is now able to provide full-stack quantum information services."

"QCI is focused on providing integrated quantum information gathering, transmission, and processing solutions, including both the user interface software and the quantum hardware. ***With our proprietary full-stack technologies that are designed using our solution-oriented system architectures, we believe we will have a competitive advantage in the market. With an integrated engineering team working across multiple quantum technology domains, we believe we are uniquely positioned to leverage our expertise in software, hardware, and nanophotonic circuits to develop quantum services and products, from quantum chip design and manufacturing through cloud delivery and eventually sales of hardware systems. We believe this full-stack development approach offers both the fastest and lowest risk path to building commercially valuable quantum machines***."

"Our Strategy QCIs strategy has evolved to become a **full stack quantum solutions company**, with products and services available in the market today."

"As a ***full stack quantum solutions provider***, while selling subscriptions in some manner to Dirac EQCs will be the cornerstone of our business model, providing professional services or quantum solutions support will likely be needed in many cases, especially in the beginning of a customers quantum journey."

"Nature of Business ***The Company is a developer of full stack quantum computing systems, including hardware platforms*** and ready-to-run software for complex optimization computations."

167.    The bold statements in paragraph 166 conveyed that QCI offered functional full-stack quantum computing services and that the company develops integrated quantum computing hardware and that is positioned to guide customers through a "quantum journey." Those statements were materially false and misleading because QCI's so-called quantum offerings relied on classical or photonic-inspired techniques and lacked demonstrable quantum

64

advantage; at bottom, QCI represented that QCI offered quantum computing or quantum computers when the QPhoton technology and hardware did not use quantum computing and could not be accurately or fairly described as using quantum computing or being a quantum computer. QCI nonetheless labeled itself a "full-stack quantum solutions company" and "developer of full stack quantum computing systems," thereby overstating both the quantum nature and the commercial maturity of its technology and suggesting capabilities and customer-ready quantum offerings that did not in fact exist.

168. On April 4, 2023, Ascendiant Capital Markets LLC's Edward Woo ("Ascendiant" and "Woo") published a report characterizing QCI as on the cusp of rapid revenue growth, keeping a "Buy" rating and raising his 12-month target to $9.25 based on the "major acquisition of QPhoton and strong growth over the next year." He leans heavily on QCI's marketing, describing QPhoton as a "leading innovator in the quantum photonic technology space," highlighting its "quantum photonic system (QPS)" as low-cost, room-temperature quantum hardware and presenting QCI as a "software company focused on classical and quantum software" that is "well-positioned" to capture a large quantum-computing market. The report includes QCI's investor presentations. One characterized the company as a "full-stack quantum solutions company" and that its "core technology positions QCI as a full stack quantum solutions provider." The presentation also promoted QCI's "unique and differentiated hardware…that delivers value today." The second presentation described Qphoton as offering "Qunatum Anywhere, For Anyone" and as "Affordable, Highly Accessible Quantum Computing."

169. Woo again emphasizes that QCI has "commenced commercialization of its technology in Q1 2023," and raises his price target for QCI stock to $9.50 per share. The thesis

remains that investors should "be focused on its product commercialization," because QPhoton's QPS, operating at room temperature and "at a substantially reduced cost relative to competing quantum computers," and the Qatalyst "quantum and classical" optimization software together give QCI high-risk, high-reward exposure to a billion-dollar quantum-computing opportunity. This report attached the same QCI investor presentations.

**April 27, 2023: QCI Press Release, "Quantum Computing Inc.'s Reservoir Quantum Computer to Demonstrate 'the Power of Artificial Intelligence' via Partnership with millionways AI."**

170.    On April 27, 2023, QCI issued a press release announcing its partnership with millionways. The press release stated:

> *"[QCI] a first-to-market full-stack photonic-based quantum computing and solutions company, today announced the signing of a Memorandum of Understanding with AI firm millionways to demonstrate the power of artificial intelligence when combined with Quantum Computing Inc.'s Reservoir Quantum Computing (RQC).*
>
> *"This is the first joint commercial application of our reservoir computing technology. Over the past few months, we have done lots of internal tests on our systems, which has built our confidence in the opportunity of transforming the world of AI with quantum," stated Robert Liscouski, QCi's CEO.*
>
> \* \* \*
>
> Reservoir computing is a type of machine learning technique that uses a fixed, random "reservoir" of interconnected nodes to perform computations on input data. The reservoir is a complex dynamical system that has a high-dimensional state space and exhibits nonlinear and chaotic behavior. The input data is fed into the reservoir, which transforms it in a non-linear way, and the output is obtained by reading out a linear combination of the reservoir's states. The key advantage of reservoir computing is that the reservoir can be pre-trained using simple random connections and then used as a fixed feature extractor for a wide range of tasks. Reservoir computing has been successfully applied to a variety of applications, including time-series prediction, speech recognition, image and video processing, and control

66

systems.  However, ***there are limitations to classical reservoir computing, particularly in training the computer, which can take a long time and require a lot of energy***.

***Quantum reservoir computing is a variation of classical reservoir computing that uses quantum-mechanics, such as superposition and entanglement principles, to create quantum-boosted neural networks. Quantum reservoir computing has a number of significant advantages over classical reservoir computing with, namely, increased connectivity and capacity, decreased training bias, and strengthened security.*** The photonic systems at QCi also deliver additional benefits of high energy-efficiency, versatility, and scalability.

\* \* \*

171.    The bold statements paragraph 170 conveyed that QCI as a leading, full-stack photonic quantum company that has signed a memorandum of understanding with AI firm millionways to showcase how its Reservoir Quantum Computing can enhance AI, framing this as the first commercial joint use of its reservoir technology after extensive internal testing.  These statements misled investors by falsely attributing to QCI's so-called "quantum reservoir computing" a suite of realized advantages despite the internal recognition that the underlying hardware behaved classically rather than quantum-mechanically  Those statements were materially false and misleading because QCI's so-called quantum offerings relied on classical or photonic-inspired techniques and lacked demonstrable quantum advantage; at bottom, QCI represented that QCI offered quantum computing or quantum computers when the QPhoton technology and hardware did not use quantum computing and could not be accurately or fairly described as using quantum computing or being a quantum computer. Those statements were also materially false and misleading because they mischaracterized the true nature of and commercial significance of the millionways agreement, which was essentially a loan to struggling company rather than am meaningful quantum-AI commercial agreement.

**May 12, 2023: 1Q FY 23 10-Q**

67

172. On May 12, 2023, QCI filed its Form 10-Q for the quarter ended March 31, 2023 (the "1Q23 10-Q"), which highlighted QCI's supposed transformation into a full-stack quantum-computing company following its June 2022 merger with QPhoton.

173. The 1Q23 10-Q claimed that, "[a]s a result of the merger with QPhoton, Inc.," QCI was "now able to offer photonic quantum computing systems and related services," positioning QPhoton's device as a true quantum computer rather than the classical, photonic-based system former QCI engineers concluded it was. By describing QPhoton's technology as "photonic quantum computing" hardware, QCI mislabeled a non-quantum coherent Ising-style machine as a quantum computer, despite internal recognition that the device did not exploit quantum-mechanical effects such as superposition or entanglement.

174. QCI further asserted that its "short-term core business model" centered on selling cloud access to "advanced quantum data processing systems" and that it "currently offer[ed] access to our quantum computing machines via our own in-house cloud service." These statements implied that paying customers were accessing bona fide quantum computers owned and operated by QCI, even though QCI's own developers understood that (i) QCI's early cloud layer front-ended third-party hardware and (ii) after the QPhoton merger, the in-house devices driving that layer did not in fact perform quantum computing.

175. The 1Q23 10-Q described QCI as "focused on providing integrated quantum information gathering, transmission, and processing solutions" and claimed that its "proprietary full-stack technologies" gave it a "competitive advantage" as a "full-stack quantum computing company."

176. Specifically, the 1Q23 10-Q included the following statements:

68

"Our short-term core business model is based on generating revenue from selling access to our advanced quantum data processing systems via the cloud, with the long-term model focused on selling desktop or rack-sized quantum devices and systems to commercial and individual users. *We currently offer access to our quantum computing machines via our own in-house cloud service and plan to eventually offer access through other commercial service providers*."

***

QCI is focused on providing integrated quantum information gathering, transmission, and processing solutions, including both the user interface software and the quantum hardware. With our proprietary full-stack technologies that are designed using our solution-oriented system architectures, we believe we will have a competitive advantage in the market.

***

"*QCIs strategy has evolved to become a full stack quantum solutions company, with products and services available in the market today*."

"QCI's merger with QPhoton, combined with QCI's significant IP work that culminated in the development of the Company's Qatalyst software, enables the Company to offer room temperature quantum computation systems through cloud services today, as well as affordable, turn-key products in the future. *This combination of quantum hardware and software will address the steep learning curve and highly particular skillsets generally associated with quantum information processing, which have historically represented significant barriers to adoption for companies and government entities looking to leverage novel quantum computing capabilities to solve problems.*"

"*As a full stack quantum solutions provider*, while selling subscriptions in some manner to Dirac EQCs will be the cornerstone of our business model, providing professional services or quantum solutions support will likely be needed in many cases, especially in the beginning of a customers quantum journey."

"*QCIs evolution into full-stack quantum computing company was enabled by the prior creation of its Qatalyst software.*"

"QCI is focused on providing integrated quantum information gathering, transmission, and processing solutions, including both

69

the user interface software and the quantum hardware. ***With our proprietary full-stack technologies that are designed using our solution-oriented system architectures, we believe we will have a competitive advantage in the market. With an integrated engineering team working across multiple quantum technology domains, we believe we are uniquely positioned to leverage our expertise in software, hardware, and nanophotonic circuits to develop quantum services and products, from quantum chip design and manufacturing through cloud delivery and eventually sales of hardware systems. We believe this full-stack development approach offers both the fastest and lowest risk path to building commercially valuable quantum machines.***"

177.    The bold statements in paragraph 176 conveyed that QCI offered functional full-stack quantum computing services and that the company develops integrated quantum computing hardware and that is positioned to guide customers through a "quantum journey." Those statements were materially false and misleading because QCI's so-called quantum offerings relied on classical or photonic-inspired techniques and lacked demonstrable quantum advantage; at bottom, QCI represented that QCI offered quantum computing or quantum computers when the QPhoton technology and hardware did not use quantum computing and could not be accurately or fairly described as using quantum computing or being a quantum computer. QCI nonetheless labeled itself a "full-stack quantum solutions company" and "full-stack quantum computing company" thereby overstating both the quantum nature and the commercial maturity of its technology and suggesting capabilities and customer-ready quantum offerings that did not in fact exist.

### May 14, 2023: Liscouski's "New to the Street Interview"[5]

178.    On May 14, 2023, Liscouski appeared on "New to the Street" to discuss how Quantum Computing Inc.'s photonic hardware can power multiple "ready-to-run" quantum and

---

[5]Quantum Computing interviews with Robert Liscouski, CEO, and Hunter Gaylor from, New to The Street, YouTube (May 14, 2023), https://www.youtube.com/watch?v=WEMInvmPv9M.

AI systems from a single core chip. He described QCI's "stack" as providing quantum solutions that end-users can deploy "ready-to-run," without needing specialized quantum expertise, through products like its Qatalyst software and hardware platforms exposed via standard interfaces. The message is that enterprises should be able to plug quantum acceleration into existing workflows much as they would any other service, shortening the learning curve from months to days and avoiding large in-house quantum teams. Liscouski repeatedly attributes QCI's product breadth to a single fundamental photonic quantum chip: the same core device underlies EQC optimizers, RQC AI accelerators, LiDAR sensing, medical imaging concepts, and cybersecurity tools.

179.    During the interview, Liscouski made the following statements concerning QCI's technology and its agreement with millionways:

> So millionways is an interesting little AI firm they're doing some very interesting work in the healthcare space so I think it's one of the big areas you're going to find AI having a significant impact but rather than just using the classic sort of regenerative AI they're using some very interesting algorithms to be able to identify emotional content and sort of psychological factors that can help contribute to diagnoses of various types of conditions and they're doing this currently with off a text so they can do that off of text you know or Internet you know the um uh you know chats and it's a great application for it and it's it shows a lot of good scale and they're **they've got very proven algorithms that have been been validated that this technology actually works in this space**.
>
> **But as you know taking data off of text is time consuming and trying to train AI systems to be able to do this is rather complex and expensive with our Reservoir computer our Quantum Reservoir computer we're teaming up to be able to do this off of voice so it's effectively the same characteristics can be derived from text can be derived from voice and with our systems which are optimally designed to be able to do this we're going to add a significant Dimension to their capability by using these this platform and really enhancing it now… it's a great application for our Reservoir quantum computer which is a direct app directly you know impacting the AI world.**

71

180.    The bold statements in paragraph 179 conveyed that millionways was already a proven and sophisticated AI company in healthcare, with validated emotional-analysis technology, and that QCI's existing "Quantum Reservoir computer" was a mature, optimally designed quantum system ready to be plugged into that technology. Those statements were materially false and misleading because it portrays millionways as having a "proven" healthcare AI with validated algorithms, when, millionways had no product and required a QCI loan merely to keep operating, which loan was never repaid. Those statements that QCI's "Quantum Reservoir computer" is an optimally designed quantum platform that will "add a significant dimension" by enabling voice-based emotional diagnostics and "directly impacting the AI world," were further materially false and misleading because QCI's so-called quantum offerings relied on classical or photonic-inspired techniques and lacked demonstrable quantum advantage; at bottom, QCI represented that QCI offered quantum computing or quantum computers when the QPhoton technology and hardware did not use quantum computing and could not be accurately or fairly described as using quantum computing or being a quantum computer.

181.    On May 22, 2023, issued a press release announcing that it had signed a letter of intent to acquire millionways. The press release included the following statements about QCI's technology and millionways:

> "Quantum Computing Inc. ('QCi' or the 'Company') (NASDAQ: QUBT), *the first-to-market full-stack photonic-based quantum computing and solutions company.*"

> "*The LOI follows the teaming and combining of millionways' AI sensing algorithms with QCi's quantum photonics computing power,* including substantive progress made since the Company's initial testing engagement…"

> Mr. Liscouski noted, "It is our long term stated mission to democratize quantum technologies and bring this power to AI companies, affording them the ability to compete at levels that heretofore have only been open to large and well-funded

72

companies. ***Importantly, we recognize that the field of AI is quickly evolving and has come under significant scrutiny. QCi and millionways are aligned to demonstrate that the combination of our technologies will be able to ensure the integrity of the output of AI systems and determine if text, speech or video is fake or real.***"

182.    The bold statements in paragraph 181 conveyed that QCI was a full-stack photonic-based quantum computing and solutions company. It also conveyed that QCI and millionways had successfully combined "AI sensing algorithms" with QCI's "quantum photonics computing power," had made substantive technical progress under that collaboration. Those statements were materially false and misleading because QCI's so-called quantum offerings relied on classical or photonic-inspired techniques and lacked demonstrable quantum advantage; at bottom, QCI represented that QCI offered quantum computing or quantum computers when the QPhoton technology and hardware did not use quantum computing and could not be accurately or fairly described as using quantum computing or being a quantum computer. These statements were further false and misleading because they mischaracterized the true nature of and commercial significance of the millionways agreement, which was essentially a loan to struggling counterparty rather than a meaningful quantum-AI commercial agreement.

183.    On May 23, 2023, QCI issued a press release announcing that it received a follow-on subcontract to support NASA, which stated:

> ***[QCI] a first-to-market full-stack photonic-based quantum computing and solutions company, today announces that it received a follow-on task order to its subcontract award announced on February 8, 2023, to support NASA in remote sensing and climate change monitoring. In addition to testing its proprietary quantum photonic system for remote sensing applications (QLiDAR), QCi will also be processing satellite images by utilizing its photonic-based reservoir computing technology.*** This initial testing engagement is expected to be completed during the second quarter of 2023.
>
> ***Under the expanded subcontract, QCi will run the data from the***

73

*QLiDAR system through the photonic-based reservoir computer to improve the calculation of the level of water released from snowmelt.* Upon successful completion of the task under the new subcontract, follow-on options include airborne testing and positioning these devices together with the photonic reservoir system to enhance the signal integrity of the satellite images to create a network for monitoring snow levels globally. This will promote a better understanding of climate changes and provide accurate data for industry and agriculture.

"*This expanded contract is a significant opportunity for QCi to demonstrate and validate two distinct QCi technology offerings to the recognized preeminent global leader in space research and exploration*," commented Sean Gabeler, President of Q1Solutions. "QCi's photonic LiDAR and reservoir photonic computing systems deliver new measurement and data processing capabilities with single-photon sensitivity, strong noise rejection, and high-ranging spatial resolution and image fidelity at great distances through challenging environments such as snow, ice and water, during night or day. QCi systems are built for easy, scalable, and versatile use with favorable size, weight, power, and cost combined with increased connectivity and capacity, decreased training bias, and strengthened security."

184. The bold statements in paragraph 183 convey that QCI was a full-stack photonic-based quantum computing and solutions company and that the expanded subcontract for services to be provided to NASA were an opportunity to validate this technology. Those statements were materially false and misleading because QCI's so-called quantum offerings relied on classical or photonic-inspired techniques and lacked demonstrable quantum advantage; at bottom, QCI represented that it was a full-stack quantum computing when the technology and hardware did not use quantum computing and could not be accurately or fairly described as using quantum computing or being a quantum computer. The statements concerning NASA are false and misleading because QCI took a small, non-quantum, low-dollar software/subcontracting relationship and described it as supporting NASA in testing its proprietary quantum photonic systems for remote sensing applications and processing satellite images by utilizing its photonic-based reservoir computing technology, thereby overstating both the scope and technological

74

significance of the NASA work.

185.   On July 13, 2023, QCI issued a press release announcing that its federal-contracting subsidiary, Qi Solutions, has received a subcontract from Bay Area Environmental Research Institute (BAERI), which stated:

> **"[QCI]** *a first-to-market nanophotonic-based quantum technology company, today announces a subcontract award from Bay Area Environmental Research Institute (BAERI) to build and test for NASA Ames an innovative photonic sensor instrument to provide accurate measurement of atmospheric particulates such as clouds, aerosols, smoke flume, volcanic ashes, etc., in order to identify physical properties including size, shape and chemical composition*.  This award represents the third distinct task order from NASA and is the second research center within NASA to subcontract with the Company.  Delivery of the photonic sensor is expected during the first quarter of 2024.
>
> * * *
>
> QCi, through its wholly owned federal contracting subsidiary, Qi Solutions, will perform this work under a subcontract from BAERI. BAERI is a scientist-founded non-profit research institute, headquartered within NASA facilities, and dedicated to promoting and enabling scientific research in atmospheric and space sciences*. The objective of the project is to build and test a new photonic sensor instrument that can provide a more accurate measurement of scattering when laser light travels through clouds and aerosols than is possible with existing instruments*.  Under the nine-month subcontract, QCi will deliver a compact system, programmed to process a substantial amount of data that can support standalone operations for days, and designed to be powered by a 12-volt battery that consumes no more than 30 watts of power. In addition, QCi will generate reports that will detail the operation of the system in a realistic environment, provide the range of parameters and offer predictive analyses on future enhancements with a possible long-term objective to position these instruments for field deployment to create a monitoring network.

186.   The statements in paragraph 186 are materially false and misleading because QCI took a small, non-quantum, low-dollar software/subcontracting relationship and described it as

building and testing a new photonic sensor instrument, thereby overstating both the scope and technological significance of the NASA work.

### August 14, 2023: 2Q FY 23 10-Q

187.    On August 14, 2023, QCI filed its Form 10-Q for the quarter ended June 30, 2023 (the "2Q23 10-Q"), again recasting QPhoton's classical photonic device as a commercially ready "full-stack" quantum computer and doubling down on claims that QCI already sold cloud access and hardware comparable to leading quantum-computing platforms.

188.    The 2Q23 10-Q asserted that, "[a]s a result of the merger with QPhoton in June 2022," QCI could now "offer its software capability" embedded in "photonic quantum computing systems and related services," and that the merger "adds to the Company's portfolio of quantum computing products." As former QCI engineers had already told senior management, however, QPhoton's device operated as a classical photonic machine, so relabeling it as a "photonic quantum computing system" and a "quantum computing product" overstated both the nature and maturity of the technology.

189.    Under the "Quantum Computing" heading, QCI attributed its "unique position in the marketplace" to a "core photonic computing capability" that had "transformed" the company into a "full-stack innovative quantum solutions company," purportedly allowing it to offer "quantum technologies ranging from quantum computing to quantum sensing, quantum imaging and quantum cyber security." This positioning blurred the line between speculative use cases (sensing, imaging, cybersecurity) and present-tense, commercially available quantum-computing technology, even though the core device behaved as a classical coherent Ising-type machine.

190.    Specifically, the Q2 FY23 10-Q included the following statements:

"As a result of the merger with QPhoton in June 2022, the Company is now able to offer its software capability that is embedded within its new hardware offering of photonic quantum computing systems and related services."

"Consequently, in June 2022, the Company dramatically expanded the scope of its business through its merger with QPhoton, Inc. QPhoton. *By combining QPhoton's quantum hardware intellectual property with QCi's quantum software platform and its expertise in various quantum hardware platforms, the Company has transformed into is now able to provide full-stack innovative quantum solutions company providing quantum technologies ranging from quantum computing to quantum sensing, quantum imaging and quantum cyber security.*"

"To date QCi has released 2 computers within the Dirac series: Dirac-1 is our first available EQC which delivers solutions for binary optimization problems capable of using over 11,000 qubits and Dirac-2 solves integer-based optimization problems encompassing over 1000 n64 qudits. *Both Dirac-1 and Dirac-2 are able to process the highest number of variables and problem size available in quantum computing today.*"

"*In January 2023, QCI's federal contracting subsidiary, QI Solutions, received an award from NASA, through a subcontract from Science Systems Applications, Inc., to test its QLiDAR technology for remote measurement of the physical properties of different types of snowpacks including density, particle size and depth.*"

"*Importantly, we are actively engaged in multiple testing opportunities through a subcontract with NASA*."

"*Our current contract with NASA and collaboration with AI firm millionways, both of whom are the first to use the QCi RC, speak to QCi's Reservoir Computer's ability to solve complex machine learning problems across different application areas.*"

"*On July 13, 2023, the Company received a subcontract award from Bay Area Environmental Research Institute ('BAERI') for $122,200 to build and test for NASA Ames an innovative photonic sensor instrument to provide accurate measurement of atmospheric particulates such as clouds, aerosols, smoke flume, volcanic ashes, etc., in order to identify physical properties including size, shape and chemical composition. This award*"

77

*represents the third distinct task order from NASA and is the second research center within NASA to subcontract with the Company.*"

191.    The statements in paragraph 191 conveyed that, after acquiring QPhoton, QCI had already become a full-stack quantum computing leader, seamlessly marrying genuine quantum-hardware "intellectual property" with a mature, cloud-delivered quantum-software platform to offer "quantum computers" that processed more variables and larger problems than any other system in "quantum computing today," all while deploying true quantum LiDAR, quantum sensing, and a Reservoir Computer powerful enough to solve complex machine-learning problems for demanding partners like NASA and millionways across multiple real-world use cases. Those statements were materially false and misleading because QCI's so-called quantum offerings relied on classical or photonic-inspired techniques and lacked demonstrable quantum advantage; at bottom, QCI represented that QCI offered quantum computing or quantum computers when the QPhoton technology and hardware did not use quantum computing and could not be accurately or fairly described as using quantum computing or being a quantum computer. Those statements concerning NASA were further false and misleading because QCI took a small, non-quantum, low-dollar software/subcontracting relationship and described it as demonstrating "QCi's Reservoir Computer's ability to solve complex machine learning problems across different application areas" and building and testing an innovative system, thereby overstating both the scope and technological significance of the NASA work. Those statements concerning millionways were false and misleading because they claimed the "collaboration" demonstrated "QCi's Reservoir Computer's ability to solve complex machine learning problems across different application areas," which mischaracterized the true nature of and commercial significance of the millionways agreement, which was essentially a

78

weak loan to struggling related counterparty rather than am meaningful quantum-AI commercial agreement.

192.     For Q2 2023, Woo in his analyst report again deems performance "about inline" even as he cuts his 2023 revenue estimate from $1.1 million to $0.7 million and trims his target to $9.00. His August 25, 2023 report repeats that QCI is "still very early stage," has "commenced commercialization" with "several new products," and that revenue should "grow quickly" in 2023–2024, while once more describing QPhoton's QPS as room-temperature quantum hardware and Qatalyst as ready-to-run quantum software in a "large market potential" supported by U.S. government quantum funding. This report included additional QCI investor presentations, which include slides that touted QCI's purported "[p]roven track record of innovations in quantum computing" and offers of "ready-to-use quantum technology, accessible to business teams" and that QCI's hardware made "quantum practical today."

**September 21, 2023: QCI's Press Release, "Quantum Computing Inc. Selects Tempe, Arizona as the Site for its Quantum Photonic Chip Foundry."**

193.     On September 21, 2023, QCI issued a press release announcing that it had selected a location for its quantum photonic chip foundry. The press release stated that:

> *"[QCI] an innovative, quantum optics and nanophotonics technology company, announces that it has chosen ASU Research Park in Tempe, Arizona, as the location for its new quantum photonic chips manufacturing facility, where it will produce its Thin Film Lithium Niobate (TFLN) chips. Known for its photonic-based quantum solutions, QCi is expanding production with this new facility to accelerate its advanced technology development in nanophotonics and optical chip manufacturing for use in its high-performance computing, machine learning, cyber security, sensing, and imaging products.*
>
> *\* \* \**
>
> *The location QCi chose for its new facility is on five acres within*

> *the extensive 320-acre research park hosted by ASU, a global leader in academic microelectronics research and #1 in Innovation according to U.S. News & World Report.* The research park currently provides 2.2 million sf. of Class A office and research facilities for more than 6,700 employees and 50 corporations and organizations, including Honeywell, Texas Instruments, Linear Technology, GE Healthcare, Iridium Satellite and the Institute for Supply Management. The selection of this site aims to promote cooperation, creativity and leverage the park's pre-existing infrastructure and skilled workforce.

194. The statements in paragraph 194 were false and misleading because QCI described a small, office-based R&D setup and modest test orders for thin-film lithium niobate chips as if it had built or was imminently commissioning a large-scale, five-acre, production-ready "foundry" capable of meaningful commercial output, when in reality no such industrial-grade facility existed.

### November 13, 2023: QCI's 3Q FY 23 10-Q

195. On November 13, 2023, QCI filed a quarterly report on Form 10-Q with the SEC, reporting QCI's financial and operating results for the quarter ended September 30, 2023 (the "3Q23 10-Q"). With respect to QCI's quantum computing technology, the 3Q23 10-Q emphasized that following the June 2022 merger with QPhoton, QCI transformed itself from a pure software developer into what it described as a full-stack, integrated quantum hardware-and-software company, claiming the ability to deliver room-temperature photonic quantum computing systems and related quantum information services through its proprietary Qatalyst platform.

196. QCI further stated that, while it continued to develop and improve its technology, its short-term goals and core business model centered on generating revenue by selling cloud-based and on-premise access to its "advanced quantum computing systems," supported by its Quantum Solutions team, and by developing commercial quantum imaging, sensing, and

cybersecurity products for commercial and government clients, with a near-term focus on desktop, rack-sized, and portable quantum devices designed to power hybrid systems combining conventional and quantum computing. At the same time, QCI told investors that its long-term product goal was to build laptop quantum computers at price points affordable to users at every business level and that it already offered access to its "quantum computing machines" through an in-house cloud service and had begun the process of taking orders for select hardware and device products.

197.    Specifically, the Q3 FY 23 10-Q included the following statements:

" ***As a result of the merger with QPhoton in June 2022, the Company is now able to offer its software capability that is embedded within its new hardware offering of photonic quantum computing systems and related services.***"

\*\*\*

"***By combining QPhoton's quantum hardware intellectual property with QCi's quantum software platform and its expertise in various quantum hardware platforms, the Company has transformed into a full-stack innovative solutions company providing quantum technologies in high-performance computing, remote sensing, imaging and cyber security.***"

\*\*\*

"While we are continuing to develop and improve our technology, ***our short-term goals and core business model are based on generating revenue from selling access to our advanced quantum computing systems (via the cloud) and on premise, both available with support from our Quantum Solutions team. . . We currently offer access to our quantum computing machines via our own in-house cloud service and have begun the process to be able to take orders for select hardware and device products***."

\*\*\*

"***In July 2023, the Company received a NASA Ames subcontract award from Bay Area Environmental Research Institute (BAERI) to build and test an innovative photonic sensor instrument that provides accurate measurement of atmospheric particulates such as clouds, aerosols, smoke flume, volcanic***

*ashes, etc. to identify physical properties including size, shape and chemical composition.*"

"*This award represents the third distinct task order from NASA in 2023 and is the second research center within NASA to subcontract with the Company*."

\*\*\*

"Under this nine-month subcontract, *QCI will deliver a compact system, programmed to process a substantial amount of data that can support standalone operations for days, and designed to be powered by a 12-volt battery that consumes no more than 30 watts of power.*"

\*\*\*

[QCI] "*signed contracts for its first sales of its Reservoir Computer and its Quantum Random Number Generator products to its partners Assured Cyber Protection Ltd and AI firm millionways to enhance their AI capabilities*."

[adding QCI's Reservoir Computer to millionways' assessment process is expected] "*to significantly boost machine learning efficiency, particularly in assessing audio files, dramatically reduce the power consumption and materially speed up the training of machine learning models.*"

198.   The statements in paragraph 198 conveyed that, after acquiring QPhoton, QCI had already become a full-stack quantum computing leader. Those statements were false and materially false and misleading because QCI's so-called quantum offerings relied on classical or photonic-inspired techniques and lacked demonstrable quantum advantage; at bottom, QCI represented that QCI offered quantum computing or quantum computers when the QPhoton technology and hardware did not use quantum computing and could not be accurately or fairly described as using quantum computing or being a quantum computer. Those statements concerning NASA were further false and misleading because QCI took small, non-quantum, low-dollar software/subcontracting relationship and described them as for development and testing of innovative systems, thereby overstating both the scope and technological significance of the NASA work. Those statements concerning millionways were false and misleading because

they mischaracterized the true nature of and commercial significance of the millionways agreement, which was essentially a weak loan to struggling related counterparty rather than am meaningful quantum-AI commercial agreement.

199. In his Q3 2023 note, Woo again finds results "about inline," lowers his target modestly to $8.75, and still forecasts "strong revenue growth over the next year" despite cutting full-year revenue estimates to $0.4 million. In this November 23, 2023 report, he continues to present QCI as in a "developmental and early commercialization stage" with "many proposals in development" and "first hardware sales in Q4" expected, while re-using the same QPhoton and QPS descriptions and reaffirming that QCI is "focused on quantum computing" and "well-positioned to capture and drive a meaningful market share."

### 3. False and Misleading Statements Made in 2024

**January 11, 2024: QCI Appears at the Emerging Energy Conference.[6]**

200. On January 11, 2024, Defendants Liscouski and Boehmler presented an update on QCI's technologies and commercialization efforts at the "Emerging Energy Conference." The Emerging Growth Conference serves as a live, interactive online platform for emerging public companies to engage shareholders and investors through presentations and Q&A sessions. Liscouski delivered a keynote highlighting QCI's shift to a full-stack hardware provider following its 2022 acquisition of QPhoton, Inc., which enabled production of ready-to-run quantum photonic systems operable at room temperature. The presentation emphasized 2024 priorities like revenue growth, new product launches, and a chip manufacturing facility in

---

[6] Quantum Computing Inc., (NASDAQ: QUBT) – Emerging Growth Conference, YouTube (Jan. 11, 2024), https://www.youtube.com/watch?v=sZElTy0LPGM.

Tempe, Arizona.

201.    Liscouski positioned QCI as a leader in accessible quantum solutions, stating: "qci is delivering the power of quantum Computing today." He underscored current scale, noting machines handling "10,000 Cubit problems which have been able to shown it's their efficacy in solving some really intcal problems particularly in the supply chain space." On nanophotonics' edge over gate-model systems, he declared: "nanophotonic Quantum Computing is going to be able to provide solutions that gate model cannot just do today and it's going to not just be in the near term uh it's going to be for the longer term as well." Regarding competition, Liscouski added: "we already have machines that are doing 10,000 cubits these folks are hoping to do thousand cubits several thousand cubits in the next couple of years that still have to be error corrected still can't do big problems we're already surpassing that by orders of magnitude." He claimed that QCI was providing "ready-to-run quantum systems – hardware and solutions," as reflected across company materials.False and Misleading Statements Made in 2024

202.    During the presentation, Liscouski made the following statements:

> "*We've already as you well know from previous presentations we've hit the ground really hard with our Quantum capabilities our Quantum Computing capabilities we can already do 10,000 Cubit problems which have been able to shown it's their efficacy in solving some really intcal problems particularly in the supply chain space so we are going to be launching even more capabilities this year to take on even bigger problems all with our Quantum entropy quantum computer our direct series of computers.*"
>
> ***
>
> "*Today and what I tell people is when we stop talking about the numbers of cubits we talk we stop talking about the technologies and start talking about what solutions we have like what we're doing then we know Quantum Computing is really arrived and we're pushing that edge as hard as we can so kudos to the folks that are being able to do these things but honestly it's no competition for us we are surpassing that by what is a magnitude*

84

*today.”*

***

*“What I tell you that you know folks you know Quantum Computing is here today QCi is delivering the power of quantum Computing today but what's great about this company is that it's just not computational we deliver uh Solutions in imaging cyber security and Ai and soon to be more on on and sensing for sure so the world is ready for Quantum computing Quantum QCi is ready to deliver those solutions.”*

203. The statements in paragraph 203 conveyed that QCI's quantum computing will beat gate-model approaches both now and in the long term, and that QCI is already "delivering the power of quantum computing today" through ready-for-use solutions. Those statements were materially false misleading because QCI's so-called quantum offerings relied on classical or photonic-inspired techniques and lacked demonstrable quantum advantage; at bottom, QCI represented that QCI offered quantum computing or quantum computers when the QPhoton technology and hardware did not use quantum computing and could not be accurately or fairly described as using quantum computing or being a quantum computer.

204. On February 14, 2024, QCI issues a press release announcing that it has been awarded a fourth project from NASA. The press release included the following statements:

> *“[QCI] an innovative quantum optics and nanophononics technology company, today announced that they have been awarded a fourth project from NASA. QCi, the only company worldwide that can utilize Entropy Quantum Computing (EQC) to denoise LiDAR spectral information, has been tapped by Analytical Mechanics Associates on behalf of NASA to provide a new approach to remove sunlight noise from LiDAR spectral mapping in lower earth orbit*.

> \* \* \*

> This technology improvement would be an effective and affordable method for NASA to measure the unique physical properties of clouds and aerosols to prepare for space missions at any time of day. *The adoption of EQC for denoising LiDAR spectral information provides a superior alternative to*

*traditional noise reduction methodologies that require a larger laser and restrictive bandwidth filtering, both of which require greater size, weight, power and cost to achieve as compared to the EQC.*

*QCi's engagement in this project is already underway, securing revenue immediately. QCi's Chief Executive Officer, Dr. William McGann stated, 'This opportunity showcases the generalized use of entropy quantum computing for signal-to-noise enhancement, not only for generalized LiDAR applications, but for a wide range of important spectral sensing measurements…'NASA's continued engagement with QCi fosters a partnership for leveraging QCi's innovation in photonics."*

205.     The statements in paragraph 205 conveyed that, after acquiring QPhoton, QCI had become a full-stack quantum computing leader. Those statements were materially false and misleading because QCI's so-called quantum offerings relied on classical or photonic-inspired techniques and lacked demonstrable quantum advantage; at bottom, QCI represented that QCI offered quantum computing or quantum computers when the QPhoton technology and hardware did not use quantum computing and could not be accurately or fairly described as using quantum computing or being a quantum computer. Those statements concerning NASA were further false and misleading because QCI took a small, non-quantum, low-dollar software/subcontracting relationship and repeatedly described it as "an opportunity to showcase the generalized use of entropy quantum computing" that "fosters a partnership for leveraging QCi's innovation in photonics," thereby overstating both the scope and technological significance of the NASA work.

### April 1, 2024: QCI's 2023 10-K

206.     On April 1, 2024, QCI filed an annual report on Form 10-K with the SEC, reporting QCI's financial and operating results for the quarter and year ended December 31, 2023 (the "2023 10-K"). The 2023 10-K stated that "QCi's core technology is Entropy Quantum

86

Computing ('EQC')," The 2023 10-K also stated that QCI had "leveraged [its] core technology to demonstrate powerful quantum sensing use cases in LIDAR (Light Detection and Ranging), reservoir computing (a form of neural network that can be used in machine learning applications) and quantum cyber authentication (a method for highly secure communication within a network)."

207.    The 2023 10-K included the following statements:

> **"QCi's core technology is Entropy Quantum Computing EQC.
> EQC** is a patent pending methodology that utilizes the environment to drive controlled energy loss in a photonic architecture."
>
> ***
>
> **"We anticipate that our core technologies will enable us to develop and produce multiple generations of quantum machines with increasing computational power, capacity, and speed, as well as the eventual hardware miniaturization to produce optical integrated circuits to replace the discrete components currently used."**
>
> ***
>
> **QCi's strategy is to provide a range of accessible and affordable quantum machines to commercial and government markets.** Our proprietary technology is central to our strategy because we believe that it enables us to leverage the advantages of size, weight, power and cost (over competing cryogenic products to drive market adoption and volume of sales.
>
> ***
>
> I**n addition to cloud-based access to our quantum computer**s, we offer on premises installation of our EQC product, rack-mountable and compatible with standard server room infrastructure requiring no need for special cooling, shielding, or power considerations. The Company believes the EQC's small rack-mountable size and low-energy consumption provides a substantial competitive edge as compared to superconducting, cryogenic quantum systems offered by competitors that are also designed to solve optimization problems.
>
> ***
>
> On February 29, 2024, the Company announced the release of *the first quantum photonic computing machine, Dirac-3*. At a disruptive price starting at 300,000, the Dirac-3 is an EQC that is

87

an optimization machine designed to address complex problems with larger numbers of variables that require unconventional solutions using nonlinear quantum optics.

***

"On February 14, 2024 the Company announced that it has been *awarded a fourth subcontract with NASA to study sun noise reduction in LIDAR images using the EQC*."

**This technology would be an effective and affordable method for** *NASA to measure the unique physical properties of clouds and aerosols to prepare for space missions at any time of day* and offers a superior alternative to the traditional noise reduction methodologies that require a larger laser and restrictive bandwidth filtering at greater size, weight, power and cost…

***

"Our longer-term product development plan is to migrate product designs based on discrete components to a set of **optical integrated circuits built on wafers using a crystalline material called lithium niobate Thin Film Lithium Niobate or TFLN**…The Company has begun buildout of a **state-of-the-art TFLN chip manufacturing facility in a leased space within Arizona State University's Research Park in Tempe, Arizona**."

208.    The bold statements in paragraph 207 concerning QCI's technology were materially false and misleading because QCI's so-called quantum offerings relied on classical or photonic-inspired techniques and lacked demonstrable quantum advantage; at bottom, QCI represented that QCI offered quantum computing or quantum computers when the QPhoton technology and hardware did not use quantum computing and could not be accurately or fairly described as using quantum computing or being a quantum computer. Those statements concerning NASA were further false and misleading because QCI took a small, non-quantum, low-dollar software/subcontracting relationship and described it as using quantum computing technology to study sun noise reduction in LIDAR, thereby overstating both the scope and technological significance of the NASA work. Those statements concerning TFLN manufacturing facility were misleading because they created the impression that it had built or

88

was imminently commissioning a large-scale, production-ready "state-of-art" facility capable of meaningful commercial output, when no such industrial-grade facility existed.

**August 1, 2024: "From-the-Desk-of-the-Chief-Executive-Officer" Letter to Shareholders**

209.    On August 1, 2024, QCI issued a letter to its shareholders from McGann entitled "From-the-Desk-of-the-Chief-Executive-Officer" (the "2024 CEO Letter"). In the 2024 CEO Letter, McGann told repeated the story that QCI repositioned itself to a hardware company with its acquisition of QPhoton and that it had a credible path to revenue built around its optical chip foundry and new computing platforms. He framed the past six months as a structured transition "from X to Y by Z," emphasizing disciplined execution, cost-efficient technology, and expanding commercial pipelines. He emphasized that QCI's "current position" was "a hardware company focused on delivering powerful quantum products to commercial and government markets."

210.    In his 2024 CEO Letter. McGann wrote:

> To begin, I would like to share our approach for continuously evolving our business while maintaining a singular focus. Fundamentally, it is a stepwise approach to implement our strategy without distraction. Inside the business, I refer to this as our "From X…to Y…by Z approach." In other words, since February of this year, we have taken stock in our current position, being X. We then have mapped out our desired future state, defined as Y, and plotted a strategic stepwise path in time, defined by Z, to get there.
>
> *Our current position X was set in mid-2022, with the strategic acquisition of QPhoton, where QCi transformed its business from a platform-agnostic software company to a hardware company focused on delivering powerful quantum products to commercial and government markets. Then, the first major step was to ensure that the company had a sustainable roadmap of core technology and product development to drive growth in highly volatile emerging technology markets. One critical challenge recognized early was the need to evolve our system*

*designs away from using discrete components and toward optical chip-based nanophotonic systems. We took the important first step toward addressing this challenge in early 2023 with a strategic decision to establish a semiconductor fabrication facility in Tempe, AZ to produce optical integrated circuits, which are also referred to as Photonic Integrated Circuits (PIC) or photonics chips, based on wafers using a crystalline material called Thin Film Lithium Niobate (TFLN). This critical step expanded our planned product offerings to include both quantum and non-quantum PICs.*

***

*We are proud to have received four research grants to date from the National Aeronautics and Space Administration (NASA), including one underway that is using QCi's Entropy Quantum Computing as a potentially superior and affordable alternative for filtering out the background noise ("denoising") from LiDAR imagery. If the denoising demonstration project is successful, the technology could eventually be incorporated into LIDAR satellite missions in the future. Using quantum optimization to predict and eliminate spectral noise in general can have enormous far-reaching improvements in optical spectroscopy and imaging in general and has potential for significant improvements in these fields.*

211. The 2024 CEO letter and the bold statements in paragraph 210 convey the company narrative that QCI repositioned itself to a hardware company with its acquisition of QPhoton and that it had a credible path to revenue built around its optical chip foundry, new computing platforms, and contracts with NASA. Those statements were materially false and misleading because QCI's so-called quantum offerings relied on classical or photonic-inspired techniques and lacked demonstrable quantum advantage; at bottom, QCI represented that QCI offered quantum computing or quantum computers when the QPhoton technology and hardware did not use quantum computing and could not be accurately or fairly described as using quantum computing or being a quantum computer. The statements concerning TFLN were false and misleading because they describe the development of the small, office-based R&D setup in the present tense as "a critical step expanded our planned product offerings to include both quantum

90

and non-quantum PICs," because QCI's current offerings did not use quantum computing and could not be accurately or fairly described as using quantum computing or being a quantum computer. The statements concerning NASA were false and misleading because QCI took a small, non-quantum, low-dollar software/subcontracting relationship and described it "using QCi's Entropy Quantum Computing" and "quantum optimization," thereby overstating both the scope and technological significance of the NASA work.

**October 2, 2024: QCI's Q2 FY 24 10-Q**

212. On October 2, 2024, QCI filed a Form 10-Q for the quarter ending June 30, 2024 with the SEC ("Q2 FY 24 10-Q"). The Q2 FY 24 10-Q reiterated past representations about QCI's core technology and quantum computing offerings. By Q2 FY 2024, the company's disclosures incorporate specific product evolution of EQC beyond the more generic platform description in the previous quarter, notably referencing the launch of the Dirac-3 EQC device in 1Q 2024 and plans for a series of additional EQC products based on the same analog architecture. The Q2 FY 24 10-Q ties the technology more explicitly to performance attributes and roadmap: increasing computational power and capacity, speed, scalability, performance fidelity, and eventual migration to optical integrated circuits / nanophotonic system-on-a-chip designs.

213. The Q2 FY 24 10-Q included the following representations:

> "QCi is an American company *utilizing integrated photonics and non-linear quantum optics to deliver quantum and ancillary products for high-performance computing applications based on patented and proprietary photonics technology*."

***

> "However, *following the June 2022 merger with QPhoton and its associated intellectual property and engineering team, the Company now offers integrated high-performance quantum systems, ancillary products and services*."

***

91

"**The core of our quantum offerings today is our Entropy Quantum Computing EQC technology.** We have built room-temperature photonic quantum information processing systems underpinned by a series of patented and patent pending technologies."

\*\*\*

"In addition, our engineering teams are using our leading-edge photonics technology to *continue to enhance and further develop quantum LIDAR sensing and imaging systems, quantum-secured network solutions, and photonic chips.*"

\*\*\*

"Our longer-term product development plan is to migrate product designs based on discrete components to a set of optical integrated circuits built on wafers using a crystalline material called lithium niobate Thin Film Lithium Niobate or TFLN…The Company believes that TFLN is an excellent material for design and implementation of optical integrated circuits (TFLN Chips) suitable for our quantum computing and sensing products because it is crystal based and hence can have optical waveguides directly etched into the material…*The Company has begun buildout of a state-of-the-art TFLN chip manufacturing facility in a leased space within Arizona State University's Research Park in Tempe, Arizona…"Our plan for the facility is to produce a range of custom lithium niobate chips for use in our own product lines as well as chips for sale in the commercial market.*"

214.    Those bold statements in paragraph 214 concerning QCI's technology were materially false and misleading because QCI's so-called quantum offerings relied on classical or photonic-inspired techniques and lacked demonstrable quantum advantage; at bottom, QCI represented that QCI offered quantum computing or quantum computers when the QPhoton technology and hardware did not use quantum computing and could not be accurately or fairly described as using quantum computing or being a quantum computer. Those statements concerning TFLN conveyed that QCI was already building a first-of-its-kind, state-of-the-art TFLN chip fabrication facility that would anchor a new era of custom optical integrated circuits, giving QCI a decisive lead in scalable quantum information processing, sensing, and imaging. Those statements were misleading because they created the impression that it had built

92

or was imminently commissioning a large-scale, five-acre, production-ready "foundry" capable

of meaningful commercial output, when no such industrial-grade facility existed.

215. On October 17, 2024, QCI issued a press release announcing that it had been

purportedly award a fifth project from NASA. The press release stated:

*"[QCI] an innovative, integrated photonics and quantum optics technology company, announced that the Company has been awarded a fifth project from the National Aeronautics and Space Administration (NASA) to develop quantum remote sensing technology that would significantly lower the cost of spaceborne LIDAR imaging and advance scientific understanding of the mechanisms of climate change.*

*This is a continuation of a long-standing strategic partnership between NASA and QCi aimed at creating a radically different approach to LiDAR technology for atmospheric remote sensing measurements*. The proposed approach, which is currently being developed by QCi, would significantly lower the cost of LIDAR missions, thereby allowing NASA to undertake more frequent flights to better understand the causes of climate change. The recently awarded contract is an important milestone in further assessing viability of QCi's technology.

\* \* \*

"QCi is honored to support NASA in this critical mission dedicated to advancing remote sensing and climate change monitoring. This new technology aims to reduce the cost of LiDAR missions from billions to millions and ultimately will help us in understanding the root causes of climate change and contribute to NASA's efforts to protect the earth's environment," stated Dr. William McGann, Chief Executive Officer (CEO) at QCi. *"This partnership reinforces QCi's commitment to providing innovative, cost-effective solutions for various remote sensing applications and highlights the transformative potential of QCi's quantum remote sensing technology for climate research and environmental management strategies."*

*The contract announced today builds upon QCi's work helping NASA denoise the sunlight in satellite LiDAR images by using the Company's latest entropy quantum optimization machine, the Dirac-3, to simulate the background noise and turn the denoising problem into an optimization problem.*

93

216.    The bold statements in paragraph 215 conveyed that, after acquiring QPhoton, QCI had become a full-stack quantum computing leader. Those statements were materially false and misleading because QCI's so-called quantum offerings relied on classical or photonic-inspired techniques and lacked demonstrable quantum advantage; at bottom, QCI represented that QCI offered quantum computing or quantum computers when the QPhoton technology and hardware did not use quantum computing and could not be accurately or fairly described as using quantum computing or being a quantum computer. Those statements concerning NASA were further false and misleading because QCI took a small, non-quantum, low-dollar software/subcontracting relationship and described it as using a "entropy quantum optimization machine," thereby overstating both the scope and technological significance of the NASA work.

217.    On October 22, 2023, QCI issued a press release announcing that it had reached the final stage of commissioning its quantum photonic chip foundry in Tempe, Arizona. The press release stated:

> "***[QCI] an innovative, integrated photonics and quantum optics technology company, is pleased to announce that the Company has reached the final stage of commissioning its quantum photonic chip foundry in Tempe, Arizona. Initially announced in September 2023, the QCi Foundry will focus on processing thin film lithium niobate (TFLN) to produce high-performance optical components and photonic integrated circuits (PICs).*** These photonic chips will serve as essential optical engines for photonic-based quantum computers, secure quantum communications, and 3.2Tbps data rates for datacom, driven by the increasing demands of artificial intelligence (AI) and enabling the future of integrated photonics.
>
> * * *
>
> ***The QCi Foundry has moved into its final phase of construction and capital equipment installation, with an anticipated grand opening set for Q1 2025.*** As part of its launch strategy, QCi will offer early access to customers and early adopters at favorable rate and terms. The Company's initial wafer runs will focus on custom

runs for selected clients, with plans for a multi-project wafer (MPW) run available in the second half of 2025.

218. Those statements in paragraph 218 were misleading because they created the impression that it had built or was imminently commissioning a large-scale, five-acre, production-ready "foundry" capable of meaningful commercial output, when no such industrial-grade facility existed.

**November 6, 2024: QCI's Q3 FY 24 10-Q**

219. On November 6, 2024, QCI filed a Form 10-Q for the quarter ending September 30, 2024 with the SEC ("Q3 FY 24 10-Q"). The Q3 FY 24 10-Q maintains the narrative that through the merger with QPhoton, QCI "offers integrated high-performance quantum systems, ancillary products and services." The Q3 FY 24 10-Q emphasizes how QCI's technology is actually performing in the field, highlighting benchmark studies of the Dirac-3 optimization machine with national labs and positioning EQC as demonstrably efficient at solving complex optimization problems, not just theoretically capable of doing so.

220. The Q3 FY 24 10-Q included the following representation:

> The Company initially focused on providing software tools and applications for several commercially available quantum computers. However, *following the June 2022 merger with QPhoton and its associated intellectual property and engineering team, the Company now offers integrated high-performance quantum systems, ancillary products and services*.
>
> ***
>
> "*In addition to our photonic computing platform, we have leveraged QCi's core technology to demonstrate powerful quantum sensing use cases in LIDAR (Light Detection and Ranging), reservoir computing (a form of neural network that can be used in machine learning applications) and quantum cyber authentication (a method for highly secure communication within a network).* Several of these important technologies are already in early stages of commercialization."

95

\*\*\*

*"Our longer-term product development plan is to migrate product designs based on discrete components to a set of optical integrated circuits built on wafers using a crystalline material called lithium niobate (Thin Film Lithium Niobate or 'TFLN'). The Company believes that TFLN is an excellent material for design and implementation of optical integrated circuits ('TFLN Chips') suitable for our quantum computing and sensing products because it is crystal based and hence can have optical waveguides directly etched into the material…The Company has begun buildout of a state-of-the-art TFLN chip manufacturing facility (the 'AZ Chips Facility') in a leased space within Arizona State University's Research Park in Tempe, Arizona…Our plan for the facility is to produce a range of custom lithium niobate chips for use in our own product lines as well as chips for sale in the commercial market."*

221.    Those bold statements in paragraph 221 concerning QCI's technology were materially false and misleading because QCI's so-called quantum offerings relied on classical or photonic-inspired techniques and lacked demonstrable quantum advantage; at bottom, QCI represented that QCI offered quantum computing or quantum computers when the QPhoton technology and hardware did not use quantum computing and could not be accurately or fairly described as using quantum computing or being a quantum computer. Those statements concerning TFLN conveyed that QCI was already building a first-of-its-kind, state-of-the-art TFLN chip fabrication facility that would anchor a new era of custom optical integrated circuits, giving QCI a decisive lead in scalable quantum information processing, sensing, and imaging.  Those statements were misleading because they created the impression that it had built or was imminently commissioning a large-scale, five-acre, production-ready "foundry" capable of meaningful commercial output, when no such industrial-grade facility existed.

### November 6, 2024: QCI's Quarterly Earnings Call

222.    On November 6, 2024, QCI held its first quarterly shareholder update call where McGann and Boehmler discussed the financial and operational results for the third quarter of

96

2024. McGann opened the call describing QCI as a "nanophotonics" company that "puts photons to work," using advanced optical materials to build hardware for high-performance computing, AI, machine learning, and remote sensing, with the aim of tapping multiple emerging revenue streams from a single core technology platform. McGann emphasized that growing demand for sustainable energy solutions, sector-specific innovation in areas like automotive, finance, and healthcare, and government support for quantum technologies together create a favorable backdrop for QCI's focus on energy management, automotive, and portfolio optimization use cases, which it intends to serve through high-margin quantum machines and U.S.-based foundry services built on its photonic roadmap.

223.    During the call, McGann told investors:

So additional for that, as you might imagine, there are also political drivers including governmental support for quantum technology and initiatives aimed at fostering innovation that are really creating quite a favorable environment for us right now. And our goal here is to establish what I call a best-in-class sustainable use case strategy for energy management and automotive applications and for the important portfolio – financial portfolio optimization. *These align very well with the trends of our business and allows for a focused commitment for us to deliver high margin revenue streams from our quantum machines and our U.S. based foundry services, which we're going to talk to you about today.*

\* \* \*

*So in the near-term we're going to leverage the growing demand for TFLN devices in the market to drive early significant revenues for foundry services, while we will in parallel keep on developing along the same path of our own quantum computing machine platform. So the punchline is really this, we believe it is best approach for us achieving scalable quantum machines and the immediate result this approach will be to leverage the early cash flow that we generate from the foundry services in Arizona in the large growing market that it will command to drive the high-performance machine, quantum machine adoption in the markets where the development is still emerging and a little bit*

97

*more technology maturing is needed.*

So ultimately, this approach back and forth, leveraging the technology in the markets will produce miniaturized photonic integrated circuits. They're called PICs as a term of art. ***And our TFLN chips will become the internal integral part of that scalable photonic quantum machine that will meet the extreme performance demands in these markets as you all are following***, I'm sure you know that. One really important benefit that's immediately available for our growth in market share is that our systems operate at room temperature and they are mountable in a rack in ordinary server room configuration.

\* \* \*

So now let me highlight a few of the specific operational achievements for Q3 during the third quarter. ***So first, I want to go back and discuss our specific progress with the thin film lithium niobate or TFLN foundry in Tempe, Arizona. We are in the final phase of commissioning the facility and we remain on track to begin the production early in 2025. And we've already begun finalizing offtake agreements and some pre-sales orders with new customers and strategic partners. You've probably seen that in some of our recent press releases.***

***This foundry is a really significant step in scaling our manufacturing capabilities and expanding our reach into these new markets, as I've described above***. And this is a tangible result of our efforts to improve the execution of our sales and marketing strategy. Another really key element this quarter is that we extended our Cooperative Research and Development Agreement, or CRADA, with the Los Alamos National Laboratory, LANL.

\* \* \*

***So lastly, and I'll probably stop at that point is I'd like happy to announce that the subsequent in this quarter we secured our fifth project with NASA. And this exciting new contract continues our focus on developing quantum technology for spaceborne LiDAR missions, light detection and ranging applications. And these are specifically aimed at lowering the cost associated with spaceborne LiDAR from billions of dollars per flight to millions of dollars and focused on gathering climate monitoring data and enhancing the data collection capabilities. This contract further really solidifies that partnership that we've had ongoing with NASA and it reflects our commitment to them***

98

> *and them to us on leveraging our technology for real world applications.*

224.    Those bold statements in paragraph 224 concerning TFLN conveyed that QCI was already building a first-of-its-kind, state-of-the-art TFLN chip fabrication facility that would anchor a new era of custom optical integrated circuits, giving QCI a decisive lead in scalable quantum information processing, sensing, and imaging.  Those statements were misleading because they created the impression that it had built or was imminently commissioning a large-scale, five-acre, production-ready "foundry" capable of meaningful commercial output, when no such industrial-grade facility existed. The statements concerning NASA were false and misleading because QCI took a small, non-quantum, low-dollar software/subcontracting relationship and described it as "developing quantum technology" and solidifies that partnership that we've had ongoing with NASA and it reflects our commitment to them and them to us on leveraging our technology for real world applications," thereby overstating both the scope and technological significance of the NASA work.

225.    During the November 6, 2024, earnings call, Boehmler told investors that:

> *Looking ahead, our strategy centers on driving revenue and ultimately achieving intermediate term cash flow from our Arizona TFLN foundry facility. We believe that over time the TFLN facility can serve as a source of stable non-dilutive cash flow while market demand for quantum computing catches up to our Quantum Computing manufacturing capabilities.*

226.    The bold statements in paragraph 225 concerning TFLN conveyed that QCI was already building a first-of-its-kind, state-of-the-art TFLN chip fabrication facility that would anchor a new era of custom optical integrated circuits, giving QCI a decisive lead in scalable quantum information processing, sensing, and imaging.  Those statements were misleading because they created the impression that it had built or was imminently commissioning a

large-scale, five-acre, production-ready "foundry" capable of meaningful commercial output, when no such industrial-grade facility existed.

## B.  DEFENDANTS ACTED WITH SCIENTER

227.   At all relevant times, Defendants acted with scienter. Numerous facts support that Defendants had actual knowledge of the truth that they omitted to disclose, and which contradicted their false or misleading statements. Additionally, numerous facts support that Defendants acted with deliberate recklessness as to whether their statements and omissions were false or misleading.

### 1.  Knowledge and Deliberate Recklessness

228.   Defendants Liscouski, McGann, Roberts, and Boehmler, because of their positions with QCI, possessed the power and authority to control the contents of QCI's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market. Each Individual Defendant was provided with copies of QCI's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

229.   As set forth above, Defendants Liscouski, McGann, and Roberts had actual

knowledge of the falsity of QCI's statements of its "quantum computing" technology as set forth above as FE2 personally advised each of those Defendants that the QPhoton device and technology did not use quantum computing.

230.    Alternatively, Defendants made public statements regarding the capabilities of QPhoton's technology and hardware by describing it as "quantum computing" knowing that QCI had been prevented from conducting technological due diligence and, therefore, was without knowledge or any basis for describing QPhoton's technology as "quantum computing". The Defendants thus acted with deliberate recklessness as to those statements.

231.    QCI is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

232.    The scienter of the Individual Defendants, and other employees and agents of QCI are similarly imputed to QCI under respondeat superior and agency principles.

### 2.  Core Operations and Corporate Scienter

233.    Scienter is also alleged as QCI's hardware is so important to the company and the claims are so dramatically false that there is a strong inference that at least some corporate officials knew of the false statements upon publication.

234.    As alleged above, QCI's purported quantum computer is an indisputable key part of Defendants' core business. By Defendants' own repeated admissions, QCI "evolved into [a] full-stack quantum computing company" whose "short-term core business model" centered on selling access to its "advanced quantum data processing systems via the cloud" and, over time, "desktop or rack-sized quantum devices and systems." After the QPhoton merger closed in June

2022, Defendants told investors that this transaction "enable[d] the Company to offer room temperature quantum computation systems through cloud services today, as well as affordable, turn-key products in the future," and that the "combination of quantum hardware and software" was the cornerstone of QCI's value proposition. By 2023, QCI was emphasizing that "revenue was derived from sales of hardware products and professional services" and that it would "continue to emphasize our hardware capability," thus underscoring that the shift to being a **hardware**-centric, "full-stack" quantum company was the core of its business.

235.    Additionally, QCI is liable for the acts of its corporate officials and the acts of its employees, under the doctrine of *respondeat superior* and common law principles of agency, as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

236.    As alleged above, the Individual Defendants had actual knowledge or acted with deliberate recklessness when making materially false and misleading statements to the public.

237.    Accordingly, based on the Individual Defendants' positions within the company, their knowledge and/or reckless disregard of the true nature of the technology QCI acquired from QPhoton, scienter can also be imputed to QCI.

### 3. Defendants were motivated to artificially inflate QCI's stock price to raise additional capital.

238.    As alleged above, during the Class Period, Defendants treated QCI's common stock as a primary funding vehicle, raising more than $170 million in gross proceeds through a series of equity offerings that only made economic sense if QCI's touted "quantum" story kept the share price aloft. After putting a $25 million at-the-market facility in place in December 2022 and upsizing it in August 2023, Defendants shifted to larger, highly structured capital raises in late 2024 and early 2025, including a $40 million registered direct offering in November 2024,

a $50 million combined registered/Rule 506 transaction in December 2024, and a $100 million institutional private placement accompanied by a resale registration in January 2025. Taken together, these sequential equity financings show that Defendants had every reason to maintain an artificially inflated market price for QCI securities: each new tranche of capital depended on the Company's ability to tap public investors at favorable valuations and to repeatedly monetize its Nasdaq listing by issuing ever more common stock to new buyers while diluting existing holders.

### C.  LOSS CAUSATION AND ECONOMIC LOSS

239.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated and/or maintained the price of QCI's securities, and operated as a fraud or deceit on Class Period purchasers of QCI's securities by failing to disclose and misrepresenting the facts detailed herein.

240.    The truth concerning Defendants' misrepresentations made its way into the market through a series of revelations, each partially revealing the fraud. These disclosures partially revealed truthful information correcting and/or counteracting Defendants' misrepresentations, omissions, and fraudulent course of conduct and/or constituted materializations of risk that were concealed, understated, or misrepresented by Defendants through their misrepresentations, omissions, and fraudulent course of conduct. As truthful information was revealed to the market and as the risks of QCI's business materialized, QCI's stock price declined as the artificial inflation was removed from its share price.

### 1.  The November 27, 2024 Iceberg Report

241.    On November 27, 2024, during intraday trading hours, Iceberg published a report addressing QCI (the "November 2024 Iceberg Report"). This disclosure revealed further critical truths concerning Defendants' misrepresentations regarding QCI's TFLN foundry and related

purchase orders.

242.    The November 2024 Iceberg Report exposed the falsity of Defendants' representations regarding QCI's TFLN foundry and purchase orders. It demonstrated that what Defendants had characterized as a nearly operational manufacturing facility ready for production in the first quarter of 2025 was, in reality, nothing more than office space within a multi-tenant office building—wholly unsuitable for chip manufacturing. The report further established that QCI's claimed customer orders had been misrepresented, inflated, and even announced without the knowledge or consent of the purported customer.

### 2.    The December 9, 2024 Iceberg Report

243.    On December 9, 2024, shortly after markets opened, Iceberg published a second report addressing QCI (the "December 2024 Iceberg Report"). This disclosure provided additional evidence undermining Defendants' representations regarding the TFLN foundry and QCI's quantum computing capabilities.

244.    The December 2024 Iceberg Report reinforced findings from the November 2024 report and provided additional evidence that QCI's foundry was a sham—a laboratory setup masquerading as manufacturing infrastructure. Combined with evidence of persistent revenue failures and undisclosed losses, the December report further exposed the falsity of Defendants' representations regarding QCI's commercial progress and the imminence of large-scale TFLN chip production.

245.    Following publication of the December 2024 Iceberg Report, QCI's stock price fell $0.46 per share, or 5.8%, to close at $7.47 per share on December 9, 2024. Despite this decline in QCI's stock price, QCI securities continued trading at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions concerning, *inter alia*, QCI's relationship with NASA and the purported

104

capabilities of QCI's quantum computing technologies, products, and/or services. As of December 31, 2024, QCI had written down the entirety of the outstanding $558,000 receivable from the bridge loan to millionways as uncollectible based on credit risk, further confirming the fraudulent nature of that transaction.

### 3. The January 16, 2026 Capybara Report

246. On January 16, 2025, during intraday trading hours, Capybara Research published a comprehensive report alleging systemic fraud at QCI (the "January 2025 Capybara Report"). This fourth disclosure constituted the most extensive revelation of truth regarding the scope and nature of Defendants' fraud.

247. The January 2025 Capybara Report made overarching allegations of comprehensive fraud, stating that QCI "is a rampant fraud"; that "[f]rom inception, QCI has defrauded investors by fabricating revenue, misrepresenting their products, and issuing a steady stream of false press releases"; and that "[t]o conceal their fraud, [QCI] even included a clause in employee separation agreements prohibiting them from talking to the SEC." These allegations directly contradicted Defendants' representations regarding the integrity of QCI's business operations and the honesty of their public disclosures to investors.

248. The January 2025 Capybara Report represented the most complete revelation of the truth concerning Defendants' fraud. The report documented systematic misrepresentation of product capabilities, false NASA claims, fabricated revenue deals with undisclosed related parties, fraudulent TFLN foundry representations, and deliberate use of misleading press releases to inflate QCI's stock price. Together with the earlier October 2022, November 2024, and December 2024 disclosures, the January 2025 Capybara Report apprised investors of the comprehensive nature of the fraud that Defendants had perpetrated on the market throughout the Class Period.

249. Following publication of the January 2025 Capybara Report, QCI's stock price fell $1.72 per share, or 14.89%, over the following two trading sessions, to close at $9.83 per share on January 17, 2025. This substantial decline reflected the market's recognition of the comprehensive nature of the fraud exposed by the Capybara Report.

250. When Defendants' prior misrepresentations, omissions, and fraudulent conduct were disclosed on October 5, 2022, December 9, 2024, and January 16, 2025, the price of QCI's stock declined significantly as the prior artificial inflation came out of its stock price.

251. As a result of their purchases of QCI's securities during the Class Period, Plaintiff and the other Class members suffered economic loss, i.e. damages, under the federal securities laws.

252. By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of QCI's business, financial performance, and financial results. When the truth about and risks associated with Defendants' misstatements were disclosed, the price of QCI's securities declined significantly. These declines removed the inflation from the price of QCI securities, causing real economic loss to investors who had purchased QCI securities during the Class Period.

253. The economic loss, i.e. damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate and/or maintain the price of QCI securities and the subsequent decline in the value of the securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

254. Furthermore, as alleged herein, during the Class Period, Defendants engaged in practices intended to mislead investors by artificially affecting the prices of QCI securities. Defendants employed devices, schemes, and artifices to defraud, and/or engaged in acts,

106

practices, and a course of business which operated as a fraud and deceit upon the purchasers of QCI securities during the Class Period.

255. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of QCI securities during the Class Period.

256. Because of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

### D. RELIANCE

257. At all relevant times, the markets for QCI securities were efficient for the following reasons, among others: (a) as a regulated issuer, QCI filed periodic public reports with the SEC; (b) QCI regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services; (c) QCI was followed by several securities analysts employed by major brokerage firm(s), who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and (d) QCI securities was actively traded in an efficient market, namely NASDAQ, under the ticker symbol "QUBT".

258. At all material times, Plaintiff and the Class relied on the misleading statements and omissions by Defendants.

259. Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: (a) Defendants made public misrepresentations

or failed to disclose material facts during the Class Period; (b) the omissions and misrepresentations were material; (c) QCI securities traded in an efficient market; (d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of QCI securities; and (e) Plaintiff and other members of the Class purchased QCI securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

260.    As a result of the foregoing, the market for QCI securities promptly digested current information regarding QCI from publicly available sources and reflected such information in QCI securities. Under these circumstances, all purchasers of QCI securities during the Class Period suffered similar injury through their purchase of QCI securities at artificially inflated prices and the presumption of reliance applies.

### E.  NO SAFE HARBOR

261.    The Private Securities Litigation Reform Act of 1995 ("PSLRA") restricts liability for certain forward-looking statements. *See* 15 U.S.C. § 78u–5 (the "Safe Harbor"). The Safe Harbor does not apply to any of the materially false or misleading statements and omissions alleged in this Complaint. The statements at issue are not protected by the PSLRA's Safe Harbor or the common law bespeaks caution doctrine for a variety of reasons, including the following.

262.    First, Defendants' statements and omissions alleged to be false or misleading relate to historical facts or existing conditions and, therefore, are not protected by the Safe Harbor. Second, to the extent that any of the false or misleading statements alleged may be characterized as forward-looking, they were not adequately identified as "forward-looking" at the time they were made. Third, any purported forward-looking statements were not accompanied by meaningful cautionary language because risks that Defendants warned of had already come to pass, and any cautionary language was not meaningful and/or because important

factors of similar significance to those realized. Fourth, to the extent that there were any forward-looking statements that were identified as such, Defendants are liable because at the time each of those forward-looking statements was made, the speaker knew the statement was false and/or misleading when made.

## VI.    **CLASS ACTION ALLEGATIONS**

263.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired QCI securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of QCI, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

264.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, QCI securities were actively traded on either the NASDAQ or the OTC.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by QCI or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

265.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

266.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

267.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- o    whether the federal securities laws were violated by Defendants' acts as alleged herein;

- o    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of QCI;

- o    whether the Individual Defendants caused QCI to issue false and misleading financial statements during the Class Period;

- o    whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- o    whether the prices of QCI securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- o    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

268.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress

110

the wrongs done to them. There will be no difficulty in the management of this action as a class action.

269.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

270.    Defendants made public misrepresentations or failed to disclose material facts during the Class Period; the omissions and misrepresentations were material; QCI securities are traded in an efficient market; QCI's shares were liquid and traded with moderate to heavy volume during the Class Period; QCI traded on the NASDAQ and OTC and was covered by multiple analysts; the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of QCI's securities; and Plaintiff and members of the Class purchased, acquired and/or sold QCI securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

271.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## VII.    COUNTS

### COUNT I: Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against All Defendants

272.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

273.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

274.    Throughout the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts,

111

transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of QCI securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire QCI securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

275. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for QCI securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about QCI's finances and business prospects.

276. Defendants made untrue statements of material facts and/or omitted facts necessary to make their statements not misleading. Defendants' false or misleading statements and omissions are described in Section V (A).

277. Defendants directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct

112

to conceal the adverse material information as alleged herein.

278.    Defendants had actual knowledge of the misrepresentations, omissions, and deceptive conduct alleged herein, or acted with deliberate recklessness for the truth. The facts demonstrating that Defendants acted with actual knowledge and/or deliberate recklessness are stated in Section V (B).

279.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and SEC Ruel 10b-5 promulgated thereunder.

280.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and members of the Class suffered damages in connection with their respective purchases of QCI stock during the Class Period.

### COUNT II: Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

281.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

282.    During the Class Period, the Individual Defendants participated in the operation and management of QCI, and conducted and participated, directly and indirectly, in the conduct of QCI's business affairs. Because of their senior positions, they knew the adverse non-public information about QCI's misstatement of income and expenses and false financial statements.

283.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to QCI's financial condition and results of operations, and to correct promptly any public statements issued by QCI which had become materially false or misleading.

284.    Because of their positions of control and authority as senior officers, the

113

Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which QCI disseminated in the marketplace during the Class Period concerning QCI's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause QCI to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of QCI within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of QCI securities.

285.    Each of the Individual Defendants, therefore, acted as a controlling person of QCI. By reason of their senior management positions and/or being directors of QCI, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, QCI to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of QCI and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

286.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by QCI.

## VII.    **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## VIII.    <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff hereby demands a trial by jury.

Dated: February 13, 2026

Respectfully submitted,

**LEVI & KORSINSKY, LLP**

/s/ *Adam Apton*
Adam M. Apton
Nicholas I. Porritt
Max E. Weiss
33 Whitehall St, 27th Floor
New York, NY 10004
Tel: (212) 363-7500
Fax: (212) 363-7171
nporritt@zlk.com
aapton@zlk.com
mweiss@zlk.com

*Counsel for Lead Plaintiff*
*Jaeyeol Jung*

115