Levi & Korsinsky, LLP
Adam M. Apton
33 Whitehall Street, 27th Floor
New York, NY 10004
Tel: (212) 363-7500
aapton@zlk.com

*Counsel for Lead Plaintiff Jaeyeol Jung*

-additional counsel on signature page—

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JAEYEOL JUNG, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>        v.<br><br>QUANTUM COMPUTING INC., WILLIAM J. MCGANN, ROBERT LISCOUSKI, CHRISTOPHER BOEHMLER, and CHRISTOPHER ROBERTS,<br><br>                    Defendants. | **Case No. 2:25-cv-01457-MEF-JSA**<br><br>**<u>CLASS ACTION</u>**<br><br>**ORAL ARGUMENT REQUESTED** |

**LEAD PLAINTIFF JAEYEOL JUNG'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' QUANTUM COMPUTING INC., WILLIAM J. MCGANN, ROBERT LISCOUSKI, CHRISTOPHER BOEHMLER, AND CHRISTOPHER ROBERTS MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.    Preliminary Statement..................................................................1

II.   Factual Background.....................................................................3

A.    QCI Acquires QPhoton and Markets "Quantum Computing Technology" Despite Learning That QPhoton Technology Does Not Use Quantum Computing............3

B.    Capybara and Iceberg Reports Reveal the Fraud. ........................6

III.  ARGUMENT ...............................................................................9

A.    Legal Standard.................................................................9

B.    The Second Amended Complaint Alleges Materially False and Misleading Statements......................................................9

1.    Defendants Misled Investors About QCI's Quantum Computing Capabilities...........................................10

2.    Defendants Misled Investors About QCI's Relationship with NASA..................................................21

3.    Defendants Misled Investors About QCI's Relationship with millionways. ..............................23

4.    Defendants Misled Investors About QCI's TFLN "Foundry." ........................................................24

5.    Plaintiff's Allegations Based On The Iceberg And Capybara Reports Are Credible. ...............................25

C.    Plaintiff Adequately Alleges Scienter..............................27

1.    The Individual Defendants' Positions Do Not Stand Alone—The SAC Pairs Them With Direct, Named-Defendant Knowledge of Falsity. ........................28

**Page**

2.  The Former Employee Allegations Satisfy Every *Avaya* and *Chubb* Reliability Factor. ...............................31

3.  The Motive Here Is Not Generic—It Is an Existential, CFO-Confirmed Causal Link Between the False Quantum Label and the Company's Access to Capital. ...................................................33

4.  The Core Operations Doctrine Reinforces Independently Sufficient Scienter Allegations; Corporate Scienter Provides Additional Support. ...................................35

5.  Assessed Holistically Under *Tellabs*, the Inference of Scienter Is Overwhelming. ....................................37

D.    The Second Amended Complaint Alleges Loss Causation ...........38

E.    Control Person Liability Under Section 20(a) is Adequately Pled ...............................................................40

IV.  CONCLUSION .................................................................40

**Page**

# TABLE OF AUTHORITIES

**CASES**

*Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*,
532 F. Supp. 3d 189 (E.D. Pa. 2021)..........................................................30

*Arata v. Standard Lithium Ltd.*,
2025 WL 2773004 (E.D.N.Y. Sept. 28, 2025) ...........................................14

*Bartesch v. Cook*,
941 F. Supp. 2d 501 (D. Del. 2013) ...........................................................16

*Bishins v. Marinus Pharms., Inc.*,
2026 WL 686766 (E.D. Pa. Mar. 11, 2026)................................................31

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*,
394 F.3d 126 (3d Cir. 2004)........................................................ 8, 19, 31, 32

*Carmignac Gestion, S.A. v. Perrigo Co. PLC*,
2019 WL 3451523 (D.N.J. July 31, 2019)..................................................35

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
450 F. Supp. 3d 379 (S.D.N.Y. 2020) ........................................................19

*City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*,
70 F.4th 668 (3d Cir. 2023).................................................................*passim*

*DraftKings Inc. Sec. Litig.*,
650 F. Supp. 3d 120 (S.D.N.Y. 2023) ........................................................21

*Druskin v. Answerthink,Inc.*,
299 F. Supp. 2d 1307 (S.D. Fla. 2004)......................................................40

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)....................................................................................38

*Fain v. USA Techs., Inc.*,
707 F. App'x 91 (3d Cir. 2017)..................................................................28

*Frazier v. Vitalworks, Inc.*,
341 F. Supp. 2d 142 (D. Conn. 2004)........................................................14

**Page**

*GSC Partners CDO Fund v. Washington*,
    368 F.3d 228 (3d Cir. 2004)......................................................................34

*Hall v. Johnson & Johnson*,
    2019 WL 7207491 (D.N.J. Dec. 27, 2019)............................................36, 38

*In re Advanta Corp. Sec. Litig.*,
    180 F.3d 525 (3d Cir. 1999)......................................................................28

*In re Am. Bus. Fin. Servs., Inc. Sec. Litig.*,
    2007 WL 81937 (E.D. Pa. Jan. 9, 2007)....................................................14

*In re Arqit Quantum Inc. Sec. Litig.*,
    774 F. Supp. 3d 505 (E.D.N.Y. 2025).......................................................13

*In re ATI Techs., Inc., Sec. Litig.*,
    216 F. Supp. 2d 418 (E.D. Pa. 2002).........................................................14

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997).....................................................................22

*In re Cognizant Tech. Solutions Corp. Sec. Litig.*,
    2020 WL 3026564 (D.N.J. June 5, 2020)...................................................36

*In re Dr. Reddy's Lab'ys Sec. Litig.*,
    2019 WL 1299673 (D.N.J. Mar. 19, 2019)................................................12

*In re Enzymotec Sec. Litig.*,
    2015 WL 8784065 (D.N.J. Dec. 15, 2015).....................................12, 13, 36

*In re Eros Int'l PLC Sec. Litig.*,
    2021 WL 1560728 (D.N.J. Apr. 20, 2021)..................................................25

*In re Intelligroup Sec. Litig.*,
    527 F. Supp. 2d 262 (D.N.J. 2007)............................................................18

*In re Merck & Co. Sec., Deriv., & ERISA Litig.*,
    2011 WL 3444199 (D.N.J. Aug. 8, 2011)...................................................21

*In re Merck & Co., Inc. Sec. Litig.*,
    432 F.3d 261 (3d Cir. 2005).......................................................................25

**Page**

*In re Novo Nordisk Sec. Litig.*,
    2018 WL 3913912 (D.N.J. Aug. 16, 2018) ...................................................31

*In re Party City Sec. Litig.*,
    147 F. Supp. 2d 282 (D.N.J. 2001)...................................................34

*In re Paypal Holdings Inc. Sec. Litig.*,
    2025 WL 325603 (D.N.J. Jan. 29, 2025)...................................................19

*In re PTC Therapeutics, Inc. Sec. Litig*.,
    2017 WL 3705801(D.N.J. Aug. 28, 2017) ...................................................30

*In re Ravisent Techs., Inc.*,
    2004 WL 1563024 (E.D. Pa. July 13, 2004)...................................................33

*In re Suprema Specialties, Inc. Sec. Litig.*,
    438 F.3d 256 (3d Cir. 2006)...................................................8, 28

*In re Toronto-Dominion Bank Sec. Litig.*,
    2018 WL 6381882 (D.N.J. Dec. 6, 2018)...................................................36

*In re Urban Outfitters, Inc. Sec. Litig.*,
    103 F. Supp. 3d 635 (E.D. Pa. 2015)...................................................14

*In re Viropharma Inc. Sec. Litig.*,
    21 F. Supp. 3d 458 (E.D. Pa. 2014)...................................................34

*In re Wachovia Equity Sec Litig.*,
    753 F. Supp. 2d 326 (S.D.N.Y 2011) ...................................................17

*Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*,
    620 F. Supp. 3d 167 (D.N.J. 2022)...................................................32

*Institutional Invs. Grp. V. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009)...................................................*passim*

*Leacock v. IonQ, Inc.*,
    2023 WL 6308045 (D. Md. Sep. 28, 2023) ...................................................25

*Levon v. CorMedix Inc.*,
    797 F. Supp. 3d 381 (D.N.J. 2025)...................................................15

**Page**

*Martin v. GNC Holdings, Inc.,*
    2017 WL 3974002 (W.D. Pa. Sept. 8, 2017) ...................................................18

*Matrixx Initiatives, Inc. v. Siracusano,*
    563 U.S. 27 (2011) ............................................................................................. 8

*McCullough v. Advest, Inc.,*
    754 F. App'x 109 (3d Cir. 2018) .....................................................................30

*Miao v. Fanhua, Inc.,*
    442 F. Supp. 3d 774 (S.D.N.Y. 2020) .................................................21, 25, 26

*Nat'l Junior Baseball League v. PharmaNet,*
    720 F. Supp. 2d 517 (D.N.J. 2010) ..............................................................18, 28

*Ng v. Berkeley Lights, Inc.,*
    2024 WL 695699 (N.D. Cal. Feb. 20, 2024) ...................................................25

*Novak v. Kasaks,*
    216 F.3d 300 (2d Cir. 2000) ............................................................................26

*Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.,*
    774 F.3d 598 (9th Cir. 2014) ...........................................................................15

*Ortiz v. Canopy Growth Corp.,*
    537 F. Supp. 3d 621 (D.N.J. 2021) ..................................................................15

*Police & Fire Ret. Sys. City of Detroit v. Argo Grp. Int'l Holdings, Ltd.,*
    2024 WL 5089970 (S.D.N.Y. Dec. 12, 2024) .................................................17

*Roofer's Pension Fund v. Papa,*
    2018 WL 3601229 (D.N.J. July 27, 2018) .......................................................27

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Co., Inc.,*
    75 F.3d 801 (2d Cir. 1996) ..............................................................................33

*Saskatchewan Healthcare Employee's Pension Plan v. KE Holdings Inc.,*
    718 F. Supp. 3d 344 (S.D.N.Y. 2024) ........................................................21, 26

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC,*
    351 F. Supp. 3d 874 (E.D. Pa. 2018) ...............................................................30

**Page**

*Semerenko v. Cendant Corp.*,
223 F.3d 165 (3d Cir. 2000) ..................................................... 13, 38, 39, 40

*Shulman v. Weston*,
2025 WL 3754159 (D.N.J. Dec. 29, 2025) ..................................... 12, 13, 14

*Sigman v. Nuscale Power Corp.*,
2025 WL 1455432 (D. Or. May 21, 2025) .................................................25

*Stichting Pensioenfonds ABP v. Merrill Lynch & Co.*,
2013 WL 3989066 (S.D.N.Y. July 31, 2013) .............................................26

*Strougo v. Mallinckrodt Pub. Ltd. Co.*,
2022 WL 17740482 (D.N.J. Dec. 16, 2022) ..............................................40

*T. Rowe Price Growth Stock Fund, Inc. v. Valeant Pharms. Int'l, Inc.*,
2018 WL 395730 (D.N.J. Jan. 12, 2018) ...................................................30

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) .................................................... 27, 28, 34, 37

*Werner v. Werner*,
267 F.3d 288 (3d Cir. 2001) ...................................................................23

*Wilson v. Bernstock*,
195 F. Supp. 2d 619 (D.N.J. 2002) ..........................................................34

*Winer Family Trust v. Queen*,
503 F.3d 319 (3d Cir. 2007) ...................................................................34

*Wu v. GSX Techedu Inc.*,
738 F. Supp. 3d 527 (D.N.J. 2024) (Farbiarz, J.) .......................... 15, 25, 38

## STATUTES

15 U.S.C. § 78j(b) ...................................................................................... 8

15 U.S.C. § 78u-5(c)(1)(B) ..........................................................................15

## RULES

17 C.F.R. § 240.10b-5 .................................................................................. 8

**Page**

FED. R. CIV. P. 12(b)(6) ................................................................................. 8

FED. R. CIV. P. 8(a)......................................................................................38

FED. R. CIV. P. 9(b) ......................................................................................39

## I.    Preliminary Statement

Plaintiff alleges a blatant fraud by defendants: to exploit investor demand for quantum computing stocks, Quantum Computing Inc. ("QCI") branded itself as a cutting-edge quantum computing company with "full-stack quantum systems," even though it never had a functioning quantum computer. QCI repeatedly told investors—in the present tense—that it was already delivering "quantum" systems and solutions, making concrete claims about existing products rather than projecting vague aspirational goals. None of this was true, and QCI's Chief Financial Officer, Defendant Christopher Boehmler, later admitted the technology was "not actually quantum." Nonetheless, Boehmler insisted that "quantum" remain central to QCI's messaging because investors "needed the word 'quantum'" and removing it would undermine QCI's "entire pitch to the investment community." This sums up Defendants' entire fraud during the Class Period.

Defendants' misrepresentations were not accidental. By fall 2022, internal testing had confirmed that QCI's device was not a quantum computer. Former Employee 2 ("FE2"), the engineer responsible for integrating QCI's software and hardware, conducted controlled benchmark studies showing the device behaved as an ordinary classical computing system, with no observable quantum effects or quantum advantage. FE2 presented those results and personally informed Defendants McGann and Liscouski that QCI's device (acquired as part of the

acquisition of QPhoton) was not functioning as a quantum computer. McGann and Liscouski, however, continued to describe QCI as offering a "full-stack quantum solutions" and as a "full-stack quantum software and hardware" provider with "quantum" systems available to customers. As a result of FE2's testing and report, McGann and Liscouski knew these statements were untrue.

QCI's "quantum computing" narrative also depended on overstated relationships and projects used to validate its supposed technology. Public statements and SEC filings recast a single small NASA contract and a few low-value subcontracts as a "long-standing strategic partnership," portrayed a bridge loan to "millionways" as a strategic AI collaboration and planned acquisition that QCI later wrote off, and touted a TFLN "chip foundry" that was, at most, a small lab space rather than a five-acre mass-production facility. Collectively, these misrepresentations painted a false picture of a company that had already achieved genuine quantum capability, secured marquee validation, and built scalable infrastructure—when, as the Second Amended Complaint ("SAC") shows, it had done none of those things.

Investors purchased QCI stock relying on these public statements claiming a "quantum computing" product and relationships and projects based on its purported technology. When the truth about QCI's business and its lack of a genuine "quantum computing" product was published by various investigative reports, QCI's stock

- 2 -

price materially declined: by $0.46 per share, or 5.8%, on December 9, 2024, following publication of the Iceberg Report, and by $1.72 per share, or 14.89%, on January 17, 2025, following publication of the Capybara Report. Investors who had purchased QCI stock at inflated prices lost millions of dollars.

## II.    Factual Background

### A.    QCI Acquires QPhoton and Markets "Quantum Computing Technology" Despite Learning That QPhoton Technology Does Not Use Quantum Computing.

QCI started as a software company developing software to enable users to interact with quantum computers. ¶¶38-39. By late 2021, QCI's board and management concluded that the pure software model was failing and resolved to acquire hardware capability.[1] ¶¶39, 122. On February 24, 2022—the beginning of the Class Period—QCI publicly unveiled an exclusive marketing agreement with QPhoton, Inc. branding it, "a leading innovator in the quantum photonic technology space" and the cornerstone of QCI's pivot into quantum computing hardware. ¶45. QCI told investors that QPhoton's technology represented "a condensate of ground-breaking quantum research over two decades," funded by DARPA, NSF, NASA, and the DoD, and that combining QPhoton's hardware with its software, Qatalyst,

---

[1] Paragraph citations ("¶") refer to the numbered paragraphs of Plaintiff's Second Amended Class Action Complaint ("SAC") (ECF No. 35). Unless otherwise noted, internal citations are omitted and emphasis is added.

would allow QCI to "deliver more powerful solutions to accelerate the application and value from quantum computing." ¶¶46-47.

On May 24, 2022, QCI announced a definitive agreement to acquire QPhoton outright, claiming the deal would "accelerate the accessibility of quantum computing" and advance QCI "into a full-spectrum quantum software and hardware company." ¶50. Defendant Liscouski declared that QPhoton's "powerful quantum processing technology" combined with Qatalyst would launch "ready-to-run anywhere, full-stack quantum systems that can deliver affordable, user-friendly solutions for real business problems to a much larger audience"—functionality he claimed had "seemed far off" only a year earlier. ¶51. On June 16, 2022, QCI closed the acquisition, with Liscouski announcing it was "a significant leap forward in real-world usability in the quantum computing space" and that QCI would become "a provider of full-stack quantum software and hardware solutions." ¶54. At the July 20, 2022 Nasdaq bell-ringing ceremony marking the acquisition, QCI proclaimed it had achieved "breakthroughs never before seen in the quantum computing industry" and celebrated delivering "the first commercially available ready-to-run full-stack quantum photonic solution." ¶56. Throughout the rest of 2022, QCI continuously promoted itself as a "full quantum solution" provider across Bloomberg TV, Fox Business, and YouTube. ¶57.

Two former QCI engineers, FE1 and FE2, provide detailed firsthand accounts showing that QPhoton's device never functioned as a quantum computer. ¶¶105-113. FE1, who worked on the cloud-access layer for what QCI described as "supposedly quantum computing machines," observed that the devices were unreliable, frequently offline, and shrouded in secrecy—hardware engineers refused to answer basic technical questions. ¶¶105-108.

FE2's account goes further. As an engineer responsible for integrating QCI's software and hardware architectures and a direct weekly reporter to Defendant McGann, FE2 traveled to QPhoton's lab in January 2022 for technical due diligence, only to find the device disassembled and to be denied any explanation of how it worked; QCI nonetheless acquired QPhoton without formal technical due diligence. ¶¶109-112. After the acquisition, FE2 conducted controlled benchmark tests and determined that the device did not perform genuine quantum computing but operated as a classical "coherent Ising machine," producing a smooth stream of numerically precise outputs down to coupling strengths of $10^{-15}$-$10^{-16}$—behavior that no known analog quantum hardware can achieve. ¶¶35-37, 113-115.

FE2 summarized these results in a benchmark presentation delivered at an all-hands meeting in Newark in September 2022, then presented the same findings at a Weehawken meeting later that month, where he personally informed Defendants McGann and Liscouski that QPhoton's technology did not employ quantum

computing. ¶¶114, 116. FE2's software team and multiple other engineers independently reached the same conclusion and repeatedly raised these concerns in FE2's weekly meetings with McGann and in internal presentations through 2022 and 2023. ¶¶116-118.

Despite those disclosures, QCI continued throughout the Class Period to describe itself as a full-stack quantum solutions company with quantum hardware available to customers. (¶¶153, 161, 163-167, 209-213.) QCI's public statements during this period also described a series of low-dollar subcontracts with NASA prime contractors as evidence of a "longstanding strategic partnership" with NASA (¶¶59-62, 73-75, 183-186, 204, 215), characterized bridge loans to millionways as a strategic AI collaboration and planned acquisition (¶¶63-64, 70-72), and announced a five-acre TFLN chip foundry at the ASU Research Park slated for mass production (¶¶77-82, 85, 87).

### B.    Capybara and Iceberg Reports Reveal the Fraud.

On November 27, 2024, Iceberg Research released a report accusing QCI of fabricating its claims about a proprietary thin-film lithium niobate ("TFLN") foundry and related chip orders. ¶88. The report quoted a university professor who had placed a small order for QCI's chips and was "surprised" by QCI's sweeping announcement—one that had never been reviewed or approved by anyone involved in the purchase. ¶88. Iceberg also published photographs of the address QCI had

identified as its foundry, revealing an ordinary office building rather than an operational industrial facility. ¶89. These findings directly contradicted QCI's public representation that it had secured a five-acre campus dedicated to large-scale chip manufacturing. ¶90.

On December 9, 2024, Iceberg issued a follow-up report expanding on these revelations. ¶92. The second report observed that photographs QCI had circulated of "its foundry" looked "more like a small laboratory" than a production-level plant "ready for mass production on five acres within ASU's 320-acre research park." ¶92. Iceberg also highlighted that from 2021 through the first three quarters of 2024, QCI had generated only minimal revenue—despite touting commercial success and claiming work as a NASA subcontractor. ¶92. Following publication of the December 2024 Iceberg Report, QCI's stock price fell $0.46 per share, or 5.8%, to close at $7.47 per share on December 9, 2024. ¶93.

Then, on January 16, 2025, Capybara Research published a comprehensive report amplifying these concerns. ¶97. Capybara alleged that QCI was "a rampant fraud" that had fabricated revenue, exaggerated its technology, and issued false press releases since inception. ¶97. Citing multiple former employees, the report explained that QCI repeatedly misrepresented the readiness of its products and overstated the existence of paying customers. ¶98. Specifically, Capybara quoted a former QCI employee who stated that QCI claimed its "products that were farther along than

- 7 -

they were, to lead the public to believe they had quantum capabilities that they didn't". *Id*. Capybara also quoted a former QCI executive saying that "[It] would take a small army quite some time to make what they currently have work or be a viable product. There's been no evidence from QCI. There's been no progress." ¶99. Capybara also noted QCI's "lack of real products" ¶101. Capybara debunked QCI's "longstanding" NASA partnership, noting that records showed only a single $26,000 "computer programming" contract awarded without competition. ¶100.

Finally, Capybara revealed that QCI fabricated transactions with "millionways," an affiliate tied to a QCI founder. ¶101. QCI had announced a letter of intent to acquire millionways and advanced $500,000 via an unsecured note, only to abandon the deal and quietly write down the note. ¶101. Capybara further confirmed that QCI never purchased the alleged five-acre ASU foundry site; park officials reported that QCI merely made preliminary inquiries, never followed up, and that the parcel remained unused and under its original ownership more than a year later. ¶102.

Following publication of the Capybara report, QCI's stock price fell $1.72 per share, or 14.89%, over the following two trading sessions, to close at $9.83 per share on January 17, 2025. ¶103.

## III.    ARGUMENT

### A.    Legal Standard

"'Faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true.'" *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009). [2] The motion to dismiss should be denied if a plaintiff alleges facts showing "a 'reasonable expectation that discovery will reveal evidence' of the necessary elements.'" *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 681 (3d Cir. 2023).

### B.    The Second Amended Complaint Alleges Materially False and Misleading Statements.

To plead falsity, a plaintiff must allege facts supporting a reasonable belief that a statement or omission was misleading. *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004). Plaintiff does so here through four categories of concrete, present-tense misrepresentations, each backed by

---

[2] To plead a claim under § 10(b), 15 U.S.C. § 78j(b), and SEC Rule 10b-5, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano,* 563 U.S. 27, 37-38 (2011); *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 275 (3d Cir. 2006). Defendants globally challenge the elements of falsity, scienter, and loss causation while only addressing the materiality of the NASA and TFLN statements. *See* ECF No. 39-1 ("MTD") at 15, 24.

particularized facts showing contemporaneous falsity. First, QCI repeatedly claimed to offer quantum computing hardware, even after FE2's contemporaneous tests confirmed the QPhoton device was a purely classical, not quantum, computer. This was the result of a scientific test, not simply FE2's opinion. FE2 personally reported these results to McGann and Liscouski in the fall of 2022. Second, QCI falsely touted a "long-standing strategic partnership" with NASA when it provided limited services. Third, QCI described short-term bridge loans to *millionways* as a strategic partnership and planned acquisition though the loans were soon written off. Fourth, QCI announced a "foundry" for mass production of TFLN chips, when it had a small office suite unsuited for such use. None of these statements were puffery or forward-looking, but they were specific misstatements about QCI's current operations.

### 1.  Defendants Misled Investors About QCI's Quantum Computing Capabilities.

Defendants contend that the SAC cannot show the falsity of their Quantum Computing Statements by string-citing its SEC disclosures and characterizing those statements as forward looking and corporate puffery. MTD at 17-21. That mischaracterizes both the statements and the SAC. The heart of QCI's story to investors was that, by acquiring QPhoton, it had obtained genuine quantum computing hardware and became "a full-stack quantum solutions company" with "full-stack quantum systems" available "TODAY". FE2's testing shortly after the

acquisition showed QPhoton's device was a purely classical computer rather than a quantum computer and FE2 personally communicated this to McGann and Liscouski in September 2022. Defendants, however, continually made the same false statements about QCI's hardware throughout the Class Period.

### a.    Present-Tense Claims About Current Technology Are Not Forward-Looking.

The SAC draws on numerous SEC filings, press releases, and investor communications, each containing multiple examples of the same pattern of misrepresentation: claiming that QCI presently has quantum computing capability. For example:

- February 24, 2022 press release (¶126): "By coupling quantum hardware technologies from QPhoton with Qatalyst, QCI will deliver more powerful solutions to accelerate the application and value from quantum computing.";

- May 24, 2022 press release (¶128): "The acquisition of QPhoton extends QCI's offerings to accelerate the accessibility of quantum computing . . . and advances QCI into a full-spectrum quantum software and hardware company.";

- June 16, 2022 closing press release (¶130): "[W]ith this acquisition, QCI will be a provider of full-stack quantum software and hardware solutions, delivering value and results for non-quantum experts—truly democratizing quantum computing.";

- November 14, 2022 Form 10-Q (¶153): "QCI … is a full-stack quantum solutions company"; "[QCI] is a developer of full stack quantum computing systems, including hardware platforms and ready-to-run software for complex optimization computations.";

- November 29, 2022 Liscouski "New to the Street" interview (¶¶156-57): "[W]e've become a full stack quantum computer"; "[W]e are far

- 11 -

ahead of our competitors we have the ability to do really really complex problems with thousands of qubits . . . and . . . our competitors are aspirationally hoping to be able to do the same thing in several years.";

- February 16, 2023 A.G.P. Emerging Growth Technology Conference (¶161): "Products & Services – Available in the market TODAY" (emphasis in original); QCI's "breadth of capabilities in both quantum computing and quantum solutions is unsurpassed on the market today."

- March 30, 2023 Form 10-K (¶166): "[F]ollowing the June 2022 merger with QPhoton . . . [QCI] is now able to provide full-stack quantum information services."

These are concrete, present-tense representations about existing technological reality; representations of what QCI already *is* and already *has* — an existing quantum computer and a functioning full-stack quantum platform. The Third Circuit has made clear that the safe harbor does not protect statements of present or historical fact, even when those statements appear in a forward-looking context. *Avaya*, 564 F.3d at 254-56.

Defendants' safe harbor argument rests on selectively excerpting clauses like "will deliver," "believes," or "potential" from statements that, read as a whole, assert present capability. MTD at 17-18. Even accepting that some of the challenged statements contain a forward-looking component, "a mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." *Id.*, at 255 (3d Cir. 2009); *see also Shulman v. Weston*, 2025 WL 3754159, at *8 (D.N.J. Dec. 29, 2025). "The mere fact that a statement contains some reference to a projection of future events cannot sensibly bring the statement

- 12 -

within the safe harbor." *In re Dr. Reddy's Lab'ys Sec. Litig.*, 2019 WL 1299673, at *18 (D.N.J. Mar. 19, 2019).

Indeed, many of the statements Defendants contend are forward-looking refer, in part, to the present. For example, the statements Defendants highlight that tout QCI's prospects incorporated assessments of the current conditions of its technology. *See In re Enzymotec Sec. Litig.*, 2015 WL 8784065, at *11 (D.N.J. Dec. 15, 2015) ("These statements, even if made within the context of truly forward-looking statements, are not entitled to the safe harbor.") QCI's representations that it was already "a full-stack quantum solutions company" with products and services "[a]vailable in the market today" assert present capability, not future ambition.

Even if certain statements could be deemed forward-looking, they would still require "meaningful cautionary language" to qualify for protection under the PSLRA safe harbor. The disclosures Defendants point to (Mot. at 19-20) fall short. "[C]autionary language must be extensive yet specific and touch upon the subject matter of the alleged misrepresentation in order for the safe harbor to apply." *Id.*, at *7. Defendants cite generic warnings, which are precisely the kind of "vague or blanket (boilerplate) disclaimer[s]" the Third Circuit has repeatedly held to be insufficient. *Semerenko v. Cendant Corp.*, 223 F.3d 165, 182 (3d Cir. 2000); *see also Shulman*, 2025 WL 3754159, at *8 ("generic language regarding the risk of relying on forward-looking statements are simply boilerplate warnings that Courts have held

- 13 -

are insufficient to correct a reasonable investor's risk calculations"; generic disclaimers "say nothing to correct or contradict the positive outlook implied by the statements").

QCI's "development-stage" risk disclosures fare no better. The disclosure that QCI "has not produced quantum computers at high qubit counts at volume" does not cure its repeated affirmative representations that it *already had* a functioning quantum computer delivering real solutions today. As the Third Circuit held in *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, cautionary language does not immunize affirmative misstatements about current facts. 70 F.4th 668, 688 (3d Cir. 2023); *see also In re Arqit Quantum Inc. Sec. Litig.,* 774 F. Supp. 3d 505, 536-37 (E.D.N.Y. 2025) ("[T]he disclaimers on which they rely merely state generally that some technology was still under development, and do not state that the specific capabilities described in the challenged DSs were still under development."); *Shulman*, 2025 WL 3754159, at *8 (safe harbor inapplicable where "the holistic picture plausibly indicates Defendants' actual knowledge" of falsity, "thereby removing the statements from the protection of the Safe Harbor provision"; citing 15 U.S.C. § 78u-5(c)(1)(B)).

### b.    "Quantum Computing" Is Not Opinion or Puffery and "Full-Stack Quantum Solutions" Is Not A Marketing Tagline.

Defendants further mischaracterize the SAC, suggesting it takes issue with vague phrases, and claim that a "full-stack quantum solutions" is a vague marketing tagline. MTD at 20. Not so. Defendants' statements were not puffery but provided investors with concrete information about specific products. *In re ATI Techs., Inc., Sec. Litig.*, 216 F. Supp. 2d 418, 436 (E.D. Pa. 2002); *see also In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 653-54 (E.D. Pa. 2015).[3]

The SAC explains *precisely* what "quantum computing" means technically and how QCI's hardware was tested against that definition. *See* ¶¶33-34. QCI describing itself as a "full-stack quantum software and hardware company" and QPhoton as a "ready-to-run full-stack quantum photonic solution" is neither puffery nor a "vague marketing tagline." MTD at 20. "Quantum Computing" and "full-stack" are technical classifications that are determinable and verifiable statements and therefore not puffery. *Levon v. CorMedix Inc.*, 797 F. Supp. 3d 381, 414-16 (D.N.J. 2025); *see also Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d

---

[3] Unlike Defendants' cases, these statements are not loose adjectives or rosy generalities. *Arata v. Standard Lithium Ltd.*, 2025 WL 2773004, at *9 (E.D.N.Y. Sept. 28, 2025); *Bauer v. Eagle Pharms., Inc.*, 2017 WL 2213147, at *12 (D.N.J. May 19, 2017); *In re Am. Bus. Fin. Servs., Inc. Sec. Litig.*, 2007 WL 81937, at *8 (E.D. Pa. Jan. 9, 2007).

598, 606 (9th Cir. 2014) (statements "that are capable of objective verification are not 'puffery' and can constitute material representations").

Reasonable investors in a company called "Quantum Computing Inc." understand and rely on whether its technology uses quantum computing. That is not like evaluating whether a product is "great" or "superior"—subjective judgments on which reasonable minds differ. Whether technology uses quantum computing versus classical computing is an objective, technical fact that engineers can test and determine. FE2 did exactly that and QCI's device failed the test.

### c. QCI's Former Employee Allegations Are Particularized and Reliable.

Defendants attack the SAC's former-employee allegations on several grounds (MTD at 24-29), but those challenges fail under the holistic, multi-factor approach the Third Circuit and this District apply to confidential sources. *See Avaya*, 564 F.3d at 261 (courts assess detail, basis of knowledge, corroboration, and plausibility); *Ortiz v. Canopy Growth Corp.*, 537 F. Supp. 3d 621, 658-59 (D.N.J. 2021); *Wu v. GSX Techedu Inc.*, 738 F. Supp. 3d 527, 545 (D.N.J. 2024) (Farbiarz, J.) (rejecting a rigid requirement for dates where FE allegations are "plainly detailed"). ¶¶105-121.

First, Defendants' "temporal gap" argument ignores that FE2's account is anchored to specific periods and events, including his January 2022 visit to QPhoton, his 2022 benchmark testing, and his September 2022 Newark and Weehawken

presentations to McGann and Liscouski, where he told them that QPhoton's device was not a quantum computer. ¶¶111-116, 118.

The SAC then pleads FE2's post-employment corroboration (¶118) and Boehmler's direct admission that the technology "was not actually quantum" but that "quantum" had to remain in QCI's messaging because investors "needed the word" (¶121)—independently confirming the falsity of every post-2023 statement.[4]

Defendants argue that the SAC "fails to indicate when FE2 allegedly determined that the QPhoton technology worked only with photonic elements." MTD at 27 n.5. The SAC provides specific dates. FE2 conducted controlled testing and multiple benchmark studies throughout 2022 and presented those results in September 2022. ¶¶113, 118. Unlike the allegations in *Wachovia* and *Argo Grp.*, FE2's allegations are anchored to concrete dates (January 2022 and September 2022) rather than to some open-ended, indeterminate period. MTD at 27; *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 352 (S.D.N.Y. 2011); *Police & Fire Ret. Sys. City of Detroit v. Argo Grp. Int'l Holdings, Ltd.*, 2024 WL 5089970, at *7 n. 79 (S.D.N.Y. Dec. 12, 2024).

---

[4] Unlike the former employee in *Bartesch*, who was only alleged to have a vague managerial position and obtained his information secondhand about findings of another engineer, the SAC includes detailed descriptions of FE2's position within QCI and the source of his knowledge. *Bartesch v. Cook*, 941 F. Supp. 2d 501, 507 (D. Del. 2013). The information FE2 obtained after he left QCI was communicated to FE2 directly and not relayed to him through an anonymous middleman.

- 17 -

Second, Defendants argue FE2 worked only on the hardware-software interface for the QPhoton device and had no knowledge of QCI's other products. MTD at 26-27. The SAC directly forecloses this. FE2 did not work in a silo: during much of the Class Period, FE2 *reported directly to Defendant McGann on a weekly basis*, tasked with managing the interface between QCI's software and hardware architectures—a role that afforded him comprehensive visibility into *both the technical realities and management's awareness of those realities*. ¶109. A direct report to the CEO, meeting weekly, with explicit responsibility for the hardware-software interface, is not a low-level functionary with limited knowledge. Furthermore, the SAC alleges that the claims about all of QCI's products are false and misleading because they invoke "quantum computing" when they were, in fact, only classical computing products.

Defendants invoke *Nat'l Junior Baseball League v. PharmaNet* to argue confidential witnesses must show "how this information connects to the alleged misrepresentations." *Nat'l Junior Baseball League v. PharmaNet*, 720 F. Supp. 2d 517, 547 (D.N.J. 2010). That standard is met here. FE2 explicitly told Defendants that QPhoton's technology was not quantum computing, and FE1 worked on software meant to interact with QCI's "supposedly quantum computing machines" and observed those devices to be unreliable. ¶¶106-107, 116-117. Defendants,

- 18 -

meanwhile, publicly claimed QCI was offering its own quantum computing hardware with superior capabilities. ¶¶146-160.

Defendants' reliance on *Intelligroup* is misplaced. *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262 (D.N.J. 2007). There, a former employee offered vague "personal doubts" that were undermined by factual inaccuracies. 527 F. Supp. 2d at 361, 363 & n.71. Here, FE2 did not merely harbor doubts; he conducted objective testing and directly observed classical, not quantum, computing performance. ¶113. FE1 was "pretty sure" the software layer was interacting with QCI's devices because of their distinctive unreliability, a specific experience not contradicted by other facts. ¶107. Unlike the merchandising manager in *GNC Holdings*, FE2 was not a peripheral figure with tangential knowledge; the SAC details his specific role managing the hardware-software interface and his weekly direct reporting relationship with Defendant McGann. ¶109; *Martin v. GNC Holdings, Inc.,* 2017 WL 3974002, at *13 (W.D. Pa. Sept. 8, 2017).

Third, Defendants argue the SAC asks the Court to make "multiple logical leaps" to conclude that because FE2 did not perform due diligence on one visit, no one at QCI did. MTD at 28. But this characterization misreads the SAC. FE2 *himself* was present at QPhoton in January 2022 and was prevented from examining the device because it had been disassembled. ¶112. More damning, FE2 subsequently learned from direct observation and multiple conversations that QCI's leadership—

including McGann and Liscouski—had made a "hastily arranged, 'quasi-secret' one-day trip" to QPhoton in late 2021 with "no one with meaningful technical expertise" participating. ¶119. Months after the acquisition closed, QCI's engineers were still reduced to emailing matrices and waiting for results; no one had ever been granted direct hands-on access. *Id*. FE2 concluded that such avoidance of authentic technical due diligence was inexplicable absent an awareness that a thorough examination would expose the technology's classical nature and absence of any quantum computing. *Id.* That is not a logical leap, it is a direct inference.[5]

Finally, Defendants express skepticism about why a former engineer would speak with QCI's CFO. MTD at 29 n.6. The incredulity is misplaced: the SAC alleges that Boehmler affirmatively acknowledged, in that conversation, that the technology was not quantum and that the company nevertheless *needed to keep using the word*. ¶121. Whether a fact is discovered in a surprising conversation does not diminish its probative value, it amplifies it. Boehmler's admission is corroborated by the board member's candid remark at the June 2022 Nasdaq bell-ringing dinner that

---

[5] The cases Defendants cite are inapposite for a single, dispositive reason: each one involved a witness whose position left the court guessing about whether senior management received the relevant information. *In re Paypal Holdings Inc. Sec. Litig.*, 2025 WL 325603, at *16-17 (D.N.J. Jan. 29, 2025); *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 428 (S.D.N.Y. 2020); *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 149 (3d Cir. 2004). That gap is eliminated here entirely.

the company was considering shutting down and "needed the QPhoton acquisition to succeed to avoid closure"—a remark confirming that QCI's leadership understood its survival depended entirely on maintaining a quantum computing narrative. ¶122. These allegations satisfy every standard the Third Circuit requires under *Avaya* and *City of Warren* and establish that Defendants were not merely reckless about whether their product was a quantum computer; they knew it was not, and they made a deliberate institutional choice to describe it as a quantum computer anyway.

### 2.    Defendants Misled Investors About QCI's Relationship with NASA

Defendants repeatedly portrayed QCI as having a "long-standing strategic partnership" with NASA, when in reality QCI performed a single small prime contract and a handful of low-dollar subcontracts providing basic programming and support services. ¶¶59-62, 73-75, 88, 92, 100, 183-186, 204, 215. QCI's Class Period communications—including its October 17, 2024 press release and corresponding SEC filings—framed these limited engagements as evidence that NASA had validated QCI's "quantum" technology, while relegating QCI's true status as a minor subcontractor to technical language that most investors would not appreciate. ¶¶59-62, 73-75, 183-186, 204, 215.

These are not "vague and generalized statements of optimism" or forward-looking projections; they are present-tense descriptions of QCI's actual relationship with a specific government counterparty. ¶¶59-62, 73-75, 183-186, 204,

215. As the Third Circuit has recognized, statements mislead when their context and presentation create a materially false impression. *City of Warren*, 70 F.4th at 693; *In re Merck & Co. Sec., Deriv., & ERISA Litig.*, 2011 WL 3444199, at *9 (D.N.J. Aug. 8, 2011). The SAC alleges exactly that here: QCI highlighted "strategic partnership" language and NASA branding while obscuring that it was delivering routine subcontract work unrelated to any proprietary quantum breakthroughs. ¶¶59-62, 73-75, 88, 92, 100, 183-186, 204, 214-215.

Defendants again attack the sources cited by the Capybara report (MTD at 13-14) but ignore that the SAC's allegations are corroborated by the U.S. government's official contracting and award management system records. ¶¶61-62; *Cf. Saskatchewan Healthcare Employee's Pension Plan v. KE Holdings Inc.*, 718 F. Supp. 3d 344, 381-83 (S.D.N.Y. 2024) (examining *Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 801 (S.D.N.Y. 2020) and *DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 154 (S.D.N.Y. 2023), finding that those cases do not state a rule that short seller reports are to be disregarded).

Finally, the NASA statements at issue in the SAC are material because they go to the heart of how investors assessed QCI's technological legitimacy, government validation, and growth prospects. Defendants fail to explain why they are "obviously so unimportant" to "rule them immaterial as a matter of law at the

- 22 -

pleading stage." MTD at 14; *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

### 3.   Defendants Misled Investors About QCI's Relationship with millionways.

By December 31, 2024, QCI had written off the entire $558,000 millionways receivable as uncollectible; the loan was never repaid, the acquisition never happened, and the "partnership" produced nothing. ¶95. QCI had framed this relationship as a strategic collaboration with a leading AI firm to showcase the power of combining AI with QCI's Reservoir Quantum Computing, but in reality it was a risky bridge loan to a failing company. ¶¶63, 64, 72. In April and May 2023, QCI told investors it had partnered with millionways "to demonstrate the power" of AI plus QCI's technology and that its Board had approved a letter of intent to acquire "up to 100% of the AI firm," while claiming it had "built and tested multiple hybrid AI hardware systems" that showed "substantial advantages over existing digital electronic hardware" and could "compete with large data centers on big data challenges." ¶¶63, 70-71.

Defendants again mischaracterize the allegations in the SAC, arguing that the millionways statements generally are non-actionable puffery and that QCI adequately disclosed the loan via its "Note Purchase Agreement Loan" discussion in the August 14, 2023 Form 10-Q. MTD at 21-23. But disclosure cannot be cured by burying technical loan terms in an SEC filing while press releases represent a

- 23 -

strategic acquisition of cutting-edge AI technology. *See e.g.*, *Werner v. Werner*, 267 F.3d 288, 297-98 (3d Cir. 2001).

Nor are QCI's statements too vague to be actionable. They claimed to have "built and tested multiple hybrid AI hardware systems," that those systems had "demonstrated substantial advantages over existing digital electronic hardware," and that they could "compete with large data centers on big data challenges." ¶¶63-64, 71. Such statements contain embedded statements of objective fact about present capabilities, which are actionable when false. *City of Warren*, 70 F.4th at 685-87. The escalating series of write-offs within a year of the announcement, combined with FE2's allegation that he "never saw anything delivered from millionways to QCI," supports a strong inference that these claims about built-and-tested systems and competitive performance were false when made. ¶120.

### 4. Defendants Misled Investors About QCI's TFLN "Foundry."

Defendants' TFLN arguments fail because they contradict both QCI's own disclosures and the SAC's well-pleaded allegations. QCI made concrete, present-tense assertions about having "begun buildout" of a "foundry" and a "state-of-the-art TFLN chip manufacturing facility" in a specific leased space at the ASU Research Park, claimed to have "completed initial production" of TFLN devices, and touted a purchase order for its chips. ¶¶80-82, 85, 87, 219-220. Those are statements of existing fact and current capacity, not protected forward-looking

beliefs or puffery, and generic warnings about being a "development stage" company do not cure affirmative misrepresentations about facilities and production that did not exist as described. *See* ¶¶214, 218, 224. The Iceberg Report revealed that the purported "foundry" was a small lab, "a far cry from a foundry ready for mass production" on the five-acre footprint QCI had described.

Defendants' authorities neither undermine the falsity of these statements nor their materiality. In *Merck*, the Court held that "requiring readers to perform the subtraction themselves was immaterial because the 'facts [we]re disclosed prominently and candidly.'" *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 270 (3d Cir. 2005). Here, QCI made no such prior disclosures, and the SAC alleges that Iceberg's reports revealed new information to the market, which was obtained through its investigations. *See* ¶¶88-92, 239-245. As discussed below, Defendants' overreliance on *Miao* is misplaced and Courts in this district regularly credit similar reports.

> **5.    Plaintiff's Allegations Based On The Iceberg And Capybara Reports Are Credible.**

Defendants argue that allegations drawn from the Iceberg and Capybara reports cannot establish falsity as a matter of law. MTD at 10-11 (citing *Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 802 (S.D.N.Y. 2020)); *see also, e.g.*, *Ng v. Berkeley Lights, Inc.*, 2024 WL 695699, at *10 (N.D. Cal. Feb. 20, 2024); *Leacock v. IonQ, Inc.*, 2023 WL 6308045, at *13 (D. Md. Sep. 28, 2023); *Sigman v. Nuscale*

- 25 -

*Power Corp.*, 2025 WL 1455432, at \*13 (D. Or. May 21, 2025). However, Courts in this district disagree with that conclusion. *Wu v. GSX Techedu Inc*., 738 F. Supp. 3d 527, 550 n.25 (D.N.J. 2024) (Farbiarz, J.) (collecting cases). Indeed, the court in *In re Eros* took the opposite view, accepting allegations stemming from a Hindenburg report as true because "many courts 'have held that a short-seller report ... does not implicate the same skepticism as a 'traditional' anonymous source.'" *In re Eros Int'l PLC Sec. Litig*., 2021 WL 1560728, at \*9 (D.N.J. Apr. 20, 2021).

Defendants argue the information from the reports is unreliable because they do not identify the personnel they spoke with, explain the basis for their knowledge, and because Plaintiff's counsel did not replicate Iceberg or Capybara's efforts. MTD at 11. This is incorrect as Plaintiff has independently corroborated many of the details contained in the Iceberg and Capybara reports, especially the claim that QCI misrepresented its computing technology. ¶¶105-119, 121. Defendants' caselaw is, accordingly, inapposite. *Stichting Pensioenfonds ABP v. Merrill Lynch & Co.*, 2013 WL 3989066 (S.D.N.Y. July 31, 2013) involved citing confidential witnesses from another lawsuit, which the court distinguished from statements recounted in newspaper articles and government reports. 2013 WL 3989066, at \*4.

Second, "Judge Engelmayer [in *Miao*] was not announcing a rule that the content of short seller reports must be disregarded unless it is independently corroborated by counsel, as Defendants argue here." *Saskatchewan Healthcare*

*Employee's Pension Plan v. KE Holdings Inc.*, 718 F. Supp. 3d 344, 383 (S.D.N.Y. 2024) (finding a short seller report sufficiently reliable to support lead plaintiff's claims when it relied on both confidential and non-confidential sources). "Instead, he was simply analyzing allegations based solely on statements by confidential witnesses, applying the standard described by the Second Circuit in *Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000)." *Id.*

The Third Circuit has never held that anonymous sources are *per se* unreliable for purposes of pleading falsity. Because of the detail provided, the corroborative nature of other facts alleged, and similar indicia of reliability, the Court should credit Plaintiff's allegations that emanate from the Capybara and Iceberg reports. *Avaya*, 564 F.3d at 261.

## C.    Plaintiff Adequately Alleges Scienter

A plaintiff adequately pleads scienter through "facts that constitute circumstantial evidence of either recklessness or conscious behavior." *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *15 (D.N.J. July 27, 2018). The allegations "need not be irrefutable, i.e., of the smoking-gun genre, or even the most plausible of competing inferences." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). The analysis must be "case specific" and should "ultimately rest not on the presence or absence of certain types of allegations but on a practical judgment about whether, accepting the whole factual picture painted by the SAC, it

- 27 -

is at least as likely as not that defendants acted with scienter." *Avaya*, 564 F.3d at 269.

Defendants contend that the SAC fails to plead scienter on four grounds: (1) the Individual Defendants' corporate positions cannot, standing alone, support a strong inference of scienter; (2) the FE allegations lack particularity and reliability; (3) the motive is too generic to establish scienter; and (4) neither the corporate scienter doctrine nor the core operations doctrine is available here. MTD at 30-36. Each argument fails. Taken as a whole, as *Tellabs* and *Avaya* require, the SAC presents a scienter showing of uncommon force: a senior developer's face-to-face warnings to the CEO and COO officers backed by objective scientific benchmark data; a calculated avoidance of technical due diligence designed to preserve the quantum computing fiction; a CFO's direct admission of investor deception; and over $190 million in equity raises executed against a backdrop of known falsity.

### 1. The Individual Defendants' Positions Do Not Stand Alone—The SAC Pairs Them With Direct, Named-Defendant Knowledge of Falsity.

Defendants are correct that a corporate title, standing alone, cannot establish scienter, but that principle addresses complaints that ask the Court to *infer* knowledge *solely* from organizational rank. Unlike the bare "title-and-position" allegations rejected in *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 539 (3d Cir. 1999), *Fain v. USA Techs., Inc.*, 707 F. App'x 91, 96 (3d Cir. 2017), *Nat'l Junior*

*Baseball League v. PharmaNet Dev. Grp., Inc.*, 720 F. Supp. 2d 517, 556 (D.N.J. 2010) and *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 282 (3d Cir. 2006), the SAC asks for no such naked inferences and couples the Individual Defendants' senior roles with detailed, individualized facts. *See City of Warren,* 70 F.4th at 676-77 (scienter may be sufficiently alleged as to the CFO where the complaint combined his senior role and direct responsibility for reserves with detailed confidential-witness allegations that the company was already internally modeling and contemplating a significant reserve increase at the time he publicly downplayed reserve risks).  It alleges that senior QCI officers received direct, personal, contemporaneous warnings—delivered with objective scientific data by a named witness at a named location on named dates—that QCI's flagship technology was not a quantum computer as publicly represented.

FE2 was assigned by Defendant McGann himself to manage the hardware-software interface for QCI's QPhoton device after the June 2022 acquisition—the precise role that afforded him authoritative, first-hand knowledge of whether the hardware was genuinely a quantum computer. ¶112.  Through controlled coupling-strength benchmark testing, FE2 determined that QPhoton's device produced classical-precision outputs down to coupling strengths of $10^{-15}$ to $10^{-16}$—a level of precision achievable only by a conventional digital computer, not an analog quantum system. ¶¶29, 113.

- 29 -

FE2 compiled this data and presented it at a company-wide meeting held at the Lincoln Harbor Hotel in Weehawken, New Jersey, in September 2022.  ¶114. At that meeting, FE2 personally advised both Defendants McGann and Liscouski that QPhoton's technology did not employ quantum computing. ¶115.  He then raised the same concerns at weekly one-on-one meetings with McGann throughout 2022 and into 2023.  ¶117.  Every statement QCI issued after September 2022 describing itself as a "full-stack quantum computing company" was made by officers who had been told in person, with data, that the claim was false.

The Boehmler allegation is even more direct.  In the fall of 2023, CFO Christopher Boehmler told FE2 in a post-employment conversation that QCI's technology was not actually a quantum computer—and that "quantum" nonetheless had to remain in QCI's investor messaging because investors "needed the word 'quantum.'"  ¶121.  FE2 understood from this candid admission that each time QCI went to market to sell shares on a quantum computing premise, "the offering was fundamentally a fraud."  *Id.*

Plaintiff sufficiently alleges scienter by pleading that Defendants "knew facts or had access to information suggesting that their public statements were not accurate," *McCullough v. Advest, Inc.*, 754 F. App'x 109, 113 (3d Cir. 2018); *T. Rowe Price Growth Stock Fund, Inc. v. Valeant Pharms. Int'l, Inc.*, 2018 WL 395730, at *6-7 (D.N.J. Jan. 12, 2018). Furthermore, Liscouski and McGann made

- 30 -

numerous public statements about QCI's "quantum computing" technology and hardware, supporting an inference of scienter as it indicates knowledge about the subject matter of the statements. *Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 228 (E.D. Pa. 2021); *SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 906 (E.D. Pa. 2018); *In re PTC Therapeutics, Inc. Sec. Litig.*, 2017 WL 3705801, at *16-17 (D.N.J. Aug. 28, 2017).

### 2. The Former Employee Allegations Satisfy Every *Avaya* and *Chubb* Reliability Factor.

Defendants invoke *Avaya* for the proposition that confidential witness allegations must be "steeply discounted" absent sufficient reliability indicia. *Avaya*, 564 F.3d at 262. But *Avaya* itself specifies what makes such allegations reliable: "the detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged . . . and similar indicia." *Id.*, at 261. Courts in the Third Circuit assess whether the complaint "describes the sources of [the plaintiff's] information with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Chubb*, 394 F.3d at 147. Measured against each factor, FE2's allegations are reliable and entitled to be accepted at face value. *See In re Novo Nordisk Sec. Litig.*, 2018 WL 3913912, at *7 (D.N.J. Aug. 16, 2018)("[W]itness accounts in a complaint must only include sufficient particularity to support the probability that a person in the position occupied by the source would

possess the information alleged."); *see also Bishins v. Marinus Pharms., Inc.*, 2026 WL 686766, at *18-20 (E.D. Pa. Mar. 11, 2026).

Defendants' parsing of the former-employee allegations ignores what the SAC actually pleads. MTD at 31-33. FE1 was a QCI engineer from September 2021 to November 2023, working on the cloud-access layer that interfaced with QCI's "supposedly quantum computing machines," and reported through a chain that reached Defendant McGann. ¶¶105-108. FE2 reported directly to McGann on a weekly basis, was tasked with managing the very hardware-software interface at issue, visited QPhoton's lab for due diligence in January 2022, conducted controlled coupling-strength benchmarks that objectively confirmed classical behavior, and presented those findings face-to-face to McGann and Liscouski in September 2022—satisfying detail, basis of knowledge, and objective corroboration in a single witness. ¶¶35-37, 109-117.

This is the opposite of the low-level, locally sited employee whose allegations the Third Circuit discounted in *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 149 (3d Cir. 2004). *Cf. Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, 620 F. Supp. 3d 167, 194 (D.N.J. 2022) (crediting allegations from confidential witness with "overall leadership responsibilities" who was "personally involved in reporting up and out about ... meetings and outcomes," even where a reporting buffer existed between the witness and defendants).

Defendants' cases all involved complaints where the witnesses' positions, access, timing, or linkage to the challenged statements were missing or speculative; here, by contrast, FE2's role, testing, and direct, time-anchored communications to the very defendants who made the challenged quantum statements supply the "who, what, when, where and how" that those courts found lacking.

### 3. The Motive Here Is Not Generic—It Is an Existential, CFO-Confirmed Causal Link Between the False Quantum Label and the Company's Access to Capital.

The Third Circuit has held that a generic desire to maintain a high stock price or raise capital is insufficient for scienter because virtually every issuer shares it. *Avaya*, 564 F.3d at 278. But Defendants misapply this rule by treating QCI's capital-raising as ordinary corporate financing. It was not.

The Boehmler admission eliminates any argument that the motive here is generic. Boehmler did not simply refer to raising capital while making optimistic statements—he told a witness that QCI could not remove the word "quantum" from its investor messaging because investors needed it. ¶121. That is an officer expressly describing the causal mechanism connecting the false label to the company's continued market access. Furthermore, QCI actively raised capital during the Class Period, relying on its public misrepresentations that it possessed quantum computing technology. ¶¶94-96. These efforts enriched QCI by $146 million. *Id.* This is a concrete benefit to QCI not a generic interest in maintaining its stock price.

- 33 -

All of Defendants' cited motive cases simply hold that generic, company-wide incentives do not, standing alone, create a strong inference of scienter, whereas here Plaintiff alleges a concrete scheme in the form of sequential, time-targeted capital raises that depended on maintaining a knowingly false "quantum computing" narrative and allowed the Individual Defendants to sell equity at inflated "quantum computing" valuations tied to that misrepresentation. *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Co.*, Inc., 75 F.3d 801, 814 (2d Cir. 1996); *In re Ravisent Techs., Inc.*, 2004 WL 1563024, at *10 (E.D. Pa. July 13, 2004); *In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 312 (D.N.J. 2001); *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237-38 (3d Cir. 2004). No generic-motive case addresses a CFO's own articulation of the fraud's financial purpose.  See *Wilson v. Bernstock*, 195 F. Supp. 2d 619, 634 (D.N.J. 2002) (holding only that performance-based compensation, standing alone, is insufficient—a very different proposition). With all inferences drawn in Plaintiff's favor, the allegations related to motive and opportunity "may amplify an inference of scienter." *In re Viropharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 473 (E.D. Pa. 2014).

Defendants also argue that Paragraph 228 of the SAC impermissibly relies on group-pleading under *Winer Family Trust v. Queen*, 503 F.3d 319, 335-36 (3d Cir. 2007). MTD at 34, n.8. However, Paragraph 228 pleads the Individual Defendants' *control* over QCI's reports, press releases, and investor presentations and not

- 34 -

scienter. Furthermore, Plaintiff does not rely on group pleading as the SAC ties scienter to individualized conduct (e.g. drafting and signing the challenged "quantum computing" filings, orchestrating three closely spaced equity raises immediately before and between corrective short-seller reports, and a CFO admission that the company could not "get quantum out of" its messaging without collapsing the investment thesis).

### 4. The Core Operations Doctrine Reinforces Independently Sufficient Scienter Allegations; Corporate Scienter Provides Additional Support.

Defendants argue that the Third Circuit has not adopted the corporate scienter doctrine and that the core operations doctrine requires more than centrality of the misrepresented subject to the company's business. MTD at 34-36. Neither point undermines the SAC's scienter showing because the individual-defendant allegations independently satisfy the PSLRA's strong-inference standard without reliance on either doctrine.

"Under the core operations doctrine, material misrepresentations concerning core matters of central importance to a company may support an inference of scienter when accompanied by some additional allegation of specific information conveyed to management and related to the fraud." *Carmignac Gestion, S.A. v. Perrigo Co. PLC*, 2019 WL 3451523, at *16 (D.N.J. July 31, 2019). QCI's quantum computing platform was not a peripheral division—it was the company's entire reason for

- 35 -

existence and its sole basis for attracting investment. In that context, officers responsible for investor communications had reason to attend closely to the accuracy of quantum technology claims. And the SAC then provides exactly what *Rahman* requires: FE2 conveyed specific information (benchmark test results showing classical behavior) to management (McGann and Liscouski, at the Lincoln Harbor Hotel, September 2022) related to the fraud (the classical nature of QPhoton's device). ¶¶114-115. The doctrine applies not as a substitute for individualized allegations but as a lens that makes the individualized allegations more compelling. *Rahman v. Kid Brands, Inc.,* 736 F.3d 237, 247 (3d Cir. 2013); *Cf., Hall v. Johnson & Johnson*, 2019 WL 7207491, at \*21 (D.N.J. Dec. 27, 2019) (collecting cases and finding scienter where defendant considered the product at the heart of the misstatements a "flagship product"); *Enzymotec*, 2015 WL 8784065, at \*18 (scienter inferred where "matter at issue [wa]s central to the core business of the Company,[] about which Defendants spoke regularly").

As for corporate scienter, Courts in this District have applied it when the complaint alleges a company-wide scheme directed or approved by senior leadership. *See In re Cognizant Tech. Solutions Corp. Sec. Litig.*, 2020 WL 3026564, at \*24-32 (D.N.J. June 5, 2020) (bribery scheme involving company's president sufficient); *see also In re Toronto-Dominion Bank Sec. Litig.*, 2018 WL 6381882, at \*19 (D.N.J. Dec. 6, 2018) (finding corporate scienter adequately pleaded). A

company that built its entire investor identity on a quantum computing claim, raised over $190 million in equity on that claim, and did so after its CEO, COO, and CFO all knew the claim was false presents at minimum as compelling a case for corporate scienter as a bribery scheme or a product-safety cover-up.

### 5. Assessed Holistically Under *Tellabs*, the Inference of Scienter Is Overwhelming.

*Tellabs* requires courts to weigh all the evidence together when assessing whether the inference of scienter to be drawn from a complaint is "cogent and compelling, thus strong." 551 U.S. at 324. When the SAC's scienter allegations are considered in their entirety, they present a compelling picture of fraud without a plausible innocent explanation. Defendants did not make forward-looking projections about an exciting but immature technology that failed to develop as hoped. Instead, Defendants did all of the following knowingly: repeatedly represented QCI offered a quantum computer with actual knowledge that the core product was a classical, not a quantum, device, confirmed by controlled testing by their own engineer; after direct personal warnings from that engineer to two named officers; after weekly recurring reports of the same finding to a third named officer; and after a CFO's acknowledgment that the technology was not quantum.

Defendants' competing narrative collapses on inspection. They argue that QCI, a pre-revenue, development-stage company, was merely doing what early-stage public companies do: raising capital while its officers supposedly believed in

its quantum prospects. MTD at 18-19, 33-34. But that benign story is neither cogent nor plausible considering the pleaded facts and, thus, is not stronger than Plaintiff's inference of scienter.

## D.    The Second Amended Complaint Alleges Loss Causation

"[C]ourts of this district have consistently analyzed loss causation under Rule 8(a) ..." *Hall v. Johnson & Johnson*, 2019 WL 7207491, at *27 (D.N.J. Dec. 27, 2019) (collecting cases). To satisfy Rule 8(a) , a plaintiff need only allege "some indication of the loss and the causal connection." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). This "is typically a matter of alleging (a) that the relevant company's share price 'significantly' fell, and (b) that the price fall was caused to a sufficient extent by information becoming known that revealed the truth about something the company had previously said ... often called a 'corrective disclosure.'" *Wu*, 738 F. Supp. 3d at 565.

The SAC does exactly that. It alleges that Defendants' misstatements and omissions concerning QCI's supposed quantum computing hardware, its exaggerated NASA "partnership," its purported strategic relationship with millionways, and its claimed TFLN "foundry" artificially inflated QCI's stock price, and that a series of subsequent disclosures revealed the truth about these core issues and caused that inflation to dissipate and QCI's stock price to materially decline by over 10%. ¶¶9, 12-14, 88-93, 97-103, 239-253. In particular, the Capybara Report

- 38 -

exposed that QCI did not have "real products", that QCI claimed its products "had quantum capabilities that they didn't", and there was "no evidence from QCI" that its products work. ¶¶98-101. QCI's stock price declined $1.72 per share, or 14.89%, following publication of the Capybara Report. ¶103. A material stock price decline following a corrective disclosure of a prior misrepresentation is evidence of loss causation. *Semerenko v. Cendant Corp.*, 223 F.3d 165, 187 (3d Cir. 2000).

Defendants wrongly invoke out-of-circuit authority applying the heightened Rule 9(b) gloss to loss causation. MTD at 36-37. In this Circuit, it is sufficient to allege that the price of a security was inflated by Defendants' misrepresentations and then declined when the market learned the truth. *See Id.*, at 184. Defendants also wrongly invoke out-of-circuit authority for the proposition that short seller reports are inadequate to plead loss causation. MTD at 37-38. Defendants argue the December 9, 2024 Iceberg Report does not count as corrective disclosure because it told the public what the public already knew, from the November 27, 2024 Iceberg Report. However, the December report was not merely cumulative of the November report — it addressed *different evidence* (QCI's own photos vs. the on-the-ground investigation) and different misrepresentations (the revenue and NASA subcontractor claims, not just the foundry location). ¶¶92, 243-244; *see Wu,* 738 F. Supp. 3d at 568. Accordingly, "there can be no argument, at least at this early stage, [that the December 2024 report] added too little incremental information to the

mix, [] such that by the time these reports were released, the information in them was old hat as a matter of law, and had already been impounded into the Company's stock price, absorbed and reflected from the time the First Report came out." *Id.*, at 569. Therefore, Plaintiff has adequately pled loss causation.[6]

### E.    Control Person Liability Under Section 20(a) is Adequately Pled

Defendants concede that Plaintiff's § 20(a) control person claims is predicated on their § 10(b) claim. MTD at 39. Since Plaintiff adequately alleges a § 10(b) claim, the § 20(a) claims survive as well. Defendants' assertion that Plaintiff must establish that each of the Individual Defendants was a "culpable participant" in the alleged fraud is at odds with "'the "overwhelming trend" in the Third Circuit that culpable participation need not be pled to survive a motion to dismiss.'" *Strougo v. Mallinckrodt Pub. Ltd. Co.*, 2022 WL 17740482, at *11 (D.N.J. Dec. 16, 2022).

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' motion to dismiss in its entirety.

---

[6] Unlike *Druskin v. Answerthink, Inc.*, 299 F. Supp. 2d 1307, 1339 (S.D. Fla. 2004), Defendants have neither made a statistical significance argument, nor have they put forward an alternative explanation for the stock price declines. Defendants also offer no authority for the proposition that price fluctuations negate loss causation (MTD at 39), as the Third Circuit requires that the price drop be proximately caused by the disclosure, not that it persists indefinitely. *See Semerenko*, 223 F.3d at 184-87.

Respectfully submitted,

Dated:        April 22, 2026        LEVI & KORSINSKY, LLP


 s/ Adam M. Apton
Adam M. Apton
Nicholas I. Porritt (admitted *pro hac vice)*
Max E. Weiss (admitted *pro hac vice)*
33 Whitehall Street, 27th Floor
New York, New York 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
aapton@zlk.com
nporritt@zlk.com
mweiss@zlk.com

*Counsel for Lead Plaintiff Jaeyeol Jung*